# No. 25-1529

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
*Defendants-Appellees*.

On Appeal from the United States District Court for the
Southern District of New York
Case No. 1:25-cv-02429-MKV (Hon. Mary Kay Vyskocil)

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Orion Danjuma
Rachel Goodman
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
Fax: (202) 769-3176
orion.danjuma@protectdemocracy.org
rachel.goodman@protectdemocracy.org

Eve H. Cervantez
Matthew J. Murray
Connie K. Chan
Juhyung Harold Lee
Jonathan Rosenthal
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax (415) 362-8064
ecervantez@altber.com
mmurray@altber.com
cchan@altber.com
hlee@altber.com
jrosenthal@altber.com

*Additional counsel for Plaintiffs-Appellants:*

Katie Schwartzmann
Protect Democracy Project
201 St. Charles Avenue, Ste. 114
New Orleans, LA 70170
Tel: (202) 579-4582
Fax: (202) 769-3176
katie.schwartzmann@protectdemocracy.org

Richard Primus
The University of Michigan Law School
(institutional affiliation provided for identification
purposes only; not representing the University)
625 S. State Street
Ann Arbor, MI 48109
Tel: (734) 647-5543
Fax: (734) 764-8309
PrimusLaw1859@gmail.com

## RULE 26.1 DISCLOSURE STATEMENT

There is no corporation that is a parent corporation of, or that owns 10% or more of the stock of, either of Plaintiffs-Appellants American Association of University Professors or American Federation of Teachers.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ......................................................... iii

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION .............................................................................. 1

STATEMENT OF JURISDICTION ............................................................ 3

STATEMENT OF THE ISSUE ............................................................... 3

STATEMENT OF THE CASE ................................................................ 3

    I.    Facts ........................................................................... 3

        A.    The Trump Administration's Plans to Impose its Ideology on American Universities ........................................... 3

        B.    Federal Funding for Research Performed by Columbia professors ............................................................... 4

        C.    The Government's Termination of Funding and Demands that Columbia Suppress Speech ........................... 5

                1.    Initiation of the Trump Administration's Title VI Actions at Columbia ........................................ 5

                2.    Defendants' Summary Termination of $400 Million in Grants and Contracts ................................... 7

                3.    The Government's March 13 Demand Letter ............... 9

                4.    The Government's Continued Efforts to Coerce Additional Restrictions on Speech ............................. 11

    II.    Procedural History .......................................................... 14

STANDARD OF REVIEW ................................................................. 15

SUMMARY OF ARGUMENT .............................................................. 16

ARGUMENT ............................................................................... 18

iv

I.      The District Court Erred in Dismissing Plaintiffs' Complaint
        Under the Wrong Legal Standard. .................................................18

II.     The District Court Erred in Using a Contract Framework to
        Analyze Plaintiffs' Standing. ......................................................20

III.    Dismissal Must Be Reversed Because Plaintiffs Adequately
        Pled Both Associational and Organizational Standing. ...................25

        A.      Plaintiffs adequately alleged associational standing
                to bring their First Amendment claims...................................26

                1.      Plaintiffs' members suffered First Amendment
                        injuries in fact.............................................................27

                2.      The First Amendment harms suffered by Plaintiffs'
                        members are traceable to Defendants. .........................33

                3.      Plaintiffs' members' First Amendment harms
                        are redressable.............................................................37

        B.      Plaintiffs adequately alleged associational standing to
                bring their APA/Title VI claims. ...........................................39

                1.      Plaintiffs' members have suffered cognizable
                        harms for purposes of their APA/Title VI claims. .......40

                2.      The harms suffered by Plaintiffs' members are
                        traceable to Defendants. ..............................................43

                3.      Plaintiffs' requested relief would redress their
                        members' harms. ..........................................................45

        C.      Plaintiffs adequately alleged organizational standing
                to bring their claims................................................................45

IV.     This Court Has Jurisdiction to Reverse and Remand. ......................49

        A.      The Tucker Act does not displace the district court's
                jurisdiction over Plaintiffs' constitutional and statutory
                claims.......................................................................................50

v

1.    The Tucker Act is inapplicable to Plaintiffs'
      standalone First Amendment claims. ...........................50

2.    The Tucker Act cannot "impliedly" divest this
      Court of its expressly conferred jurisdiction
      over Title VI-based claims. ...........................................52

3.    Plaintiffs' claims do not sound in contract...................53

4.    The Court should reject the district court's
      contention that no court has jurisdiction to
      hear Plaintiffs' claims. .................................................57

B.    Columbia's settlement with Defendants does not
      moot Plaintiffs' claims. ..........................................................59

CONCLUSION ...............................................................................................61

CERTIFICATE OF COMPLIANCE ...................................................................63

CERTIFICATE OF SERVICE............................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. by E.H. v. New York State Dep't of Health*,
  147 F.4th 270 (2d Cir. 2025) ............................................................ 20

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  770 F. Supp. 3d 121 (D.D.C. 2025), vacated and remanded sub
  nom. *Glob. Health Council v. Trump*, 2025 WL 2480618 (D.C.
  Cir. Aug. 28, 2025) ........................................................................... 51

*Am. Bar Ass'n v. U.S. Dep't of Just.*,
  783 F. Supp. 3d 236 (D.D.C. 2025) .................................................. 55

*Arizonans for Off. English v. Arizona*,
  520 U.S. 43 (1997) ............................................................................ 60

*Atterbury v. U.S. Marshal Serv.*,
  805 F.3d 398 (2d Cir. 2015) ........................................... 17, 54, 55, 56

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ...................................................................... 17, 22

*Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*,
  414 F.2d 1068 (5th Cir. 1969) ....................................... 17, 24, 44, 54

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ................................................................... 38, 56

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ................................................... 17, 52, 53, 6

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster
  Bay*,
  868 F.3d 104 (2d Cir. 2017) ............................................................. 46

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ......................................................... 51

*Chicago Women in Trades v. Trump*,
  778 F. Supp. 3d 959 (N.D. Ill. 2025) ............................................... 55

*Cienega Gardens v. United States*,
194 F.3d 1231 (Fed. Cir. 1998) .......................................................................58

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Heath & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025)...................................................................58, 59

*Colorado v. U.S. Dep't of Health & Human Servs.*,
2025 WL 1426226 (D.R.I. May 16, 2025).......................................................55

*Crowley Gov. Servs. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ........................................................................55

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ..........................................................................................40

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ..............................................................................................39

*Department of Education v. California*,
604 U.S. 650 (2025) ...................................................................17, 51, 52, 56

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
145 S. Ct. 2121 (2025) .............................................................................*passim*

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025) (per curiam)..............................................*passim*

*Dugan v. Rank*,
372 U.S. 609 (1963) ..........................................................................................51

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*,
2025 WL 1865971 (D. Md. July 7, 2025).......................................................55

*Fed. Deposit Ins. Corp. v. Mallen*,
486 U.S. 230 (1988) ..........................................................................................40

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
954 F.3d 118 (2d Cir. 2020)................................................................25, 38, 59

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005).......................................................................57

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................................*passim*

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ............................................................ 19

*Green & Healthy Home Initiatives v. Env't Prot. Agency*,
    2025 WL 1697463 (D. Md. June 17, 2025) ........................................ 55

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................... 45, 48

*Heim v. Daniel*,
    81 F.4th 212 (2d Cir. 2023) ................................................................ 27

*Irish Lesbian & Gay Org. v. Giuliani*,
    143 F.3d 638 (2d Cir. 1998) ..................................................... 25, 26, 45

*King v. Simpson*,
    189 F.3d 284 (2d Cir. 1999) ............................................................... 30

*Laird v. Tatum*,
    408 U.S. 1 (1972) .............................................................................. 27

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) .......................................................................... 53

*Manuel v. United States*,
    115 Fed. Cl. 105 (2014) ..................................................................... 57

*Manufacturers Hanover Tr. Co. v. Yanakas*,
    11 F.3d 381 (2d Cir. 1993) ................................................................. 60

*Martin Luther King, Jr. Cnty. v. Turner*,
    2025 WL 1582368 (W.D. Wash. June 3, 2025) ................................... 55

*Maryland Dep't of Hum. Res. v. Health & Human Servs.*,
    763 F.2d 1441 (D.C. Cir. 1985) .......................................................... 58

*Massachusetts v. Kennedy*,
    2025 WL 1747213 (D. Mass. June 23, 2025) ...................................... 52

*Massachusetts v. Kennedy*,
  783 F. Supp. 3d 487 (D. Mass. 2025) .................................................55

*Meese v. Keene*,
  481 U.S. 465 (1987) ..........................................................................40

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ...........................................54, 55, 56, 57

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................37

*Nat'l Educ. Ass'n v. Dep't of Educ.*,
  779 F. Supp. 3d 149 (D.N.H. 2025) .............................................31, 48

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ...............................................................28

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ....................................................................*passim*

*Nat'l Inst. of Health v. Am. Public Health Ass'n*,
  606 U.S. __, 2025 WL 2415669 (2025)......................................*passim*

*New Hampshire Right to Life Pol. Action Comm. v. Gardner*,
  99 F.3d 8 (1st Cir. 1996) ....................................................................28

*New York v. U.S. Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020)..................................................................47

*Nnebe v. Daus*,
  644 F.3d 147 (2d Cir. 2011)................................................................46

*Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
  554 F.3d 1290 (10th Cir. 2009)...........................................................55

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
  2025 WL 2528380 (D. Mass. Sept. 3, 2025) ..............................*passim*

*Rhode Island v. Trump*,
  2025 WL 2621593 (1st Cir. Sept. 11, 2025)........................................51

x

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) ................................................. 20

*S. Educ. Found. v. U.S. Dep't of Educ.*,
    784 F. Supp. 3d 50 (D.D.C. 2025) ...................................... 55

*San Francisco A.I.D.S. Found. v. Trump*,
    2025 WL 1621636 (N.D. Cal. June 9, 2025) ...................... 55

*San Francisco Unified Sch. Dist. v. Americorps*,
    2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ................... 55

*Schlafly v. Volpe*,
    495 F.2d 273 (7th Cir. 1974) ........................... 17, 24, 44, 52

*Shomo v. City of New York*,
    579 F.3d 176 (2d Cir. 2009) ............................................... 16

*Soule v. Connecticut Ass'n of Sch., Inc.*,
    90 F.4th 34 (2d Cir. 2023) (en banc) ................................. 38

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) .......................................... 28

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................... 27

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ........................................................... 37

*Stokes v. Vill. of Wurtsboro*,
    818 F.2d 4 (2d Cir. 1987) ................................................... 59

*Teton Historic Aviation Found. v. Dep't of Def.*,
    785 F.3d 719 (D.C. Cir. 2015) ........................................... 42

*Thakur v. Trump*,
    2025 WL 1734471 (N.D. Cal. June 23, 2025) ............. *passim*

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) ........................................... 58

xi

*United States v. Connolly,*
   716 F.2d 882 (Fed. Cir. 1983) ............................................................. 57

**Constitutional Provisions**

U.S. Const., amend. I ..................................................................... *passim*

**Statutes**

5 U.S.C.
   § 702 ................................................................................................ 52
   § 704 ................................................................................................ 52

28 U.S.C.
   § 1291 ................................................................................................ 3
   § 1331 ................................................................................................ 3

42 U.S.C.
   § 2000d ......................................................................................... 6, 23
   § 2000d-1 ................................................................................. 6, 23, 52
   § 2000d-2 .................................................................................. 24, 52

**Regulations**

28 C.F.R. §§ 42.106–111 ................................................................. 5, 7

34 C.F.R. §§ 100.6–11 ......................................................................... 6

41 C.F.R. §§ 101–6.211 to 101–6.214 ............................................ 7, 35

45 C.F.R. §§ 80.6–80.11 ............................................................. *passim*

# INTRODUCTION

This case involves an unprecedented assault by the executive branch on the freedom and independence of faculty at one of our nation's leading research universities. In March 2025, Defendant executive branch agencies and officials announced the summary termination of $400 million in federal grants and contracts to Columbia University, in defiance of Congress's carefully crafted statutory constraints on the termination of federal funding and Defendants' own regulations. One week later, Defendants announced that Columbia must immediately comply with a series of invasive demands targeting faculty and student speech as "preconditions" to *any* continued federal financial relationship—threatening to terminate more than $5 billion and refuse all future funding.

Plaintiffs are membership labor organizations comprised of faculty and other academic professionals, including at Columbia. They challenge Defendants' attacks on their members' livelihoods and speech rights, alleging that Defendants' coercive actions violate the First Amendment, the Administrative Procedure Act ("APA"), and Title VI of the Civil Rights Act of 1964.

The district court, in the course of denying a motion for a preliminary injunction and without any pending motion to dismiss, *sua sponte* dismissed the complaint on the ground that Plaintiffs American Association of University Professors ("AAUP") and American Federation of Teachers ("AFT") have no

1

standing to assert their claims on behalf of their members or themselves. The dismissal order suffers from multiple legal errors and must be reversed.

First, the district court applied the wrong legal standard for dismissal, relying upon disputed evidence rather than the allegations in the complaint. Second, the district court disregarded longstanding Supreme Court jurisprudence confirming Plaintiffs' standing to challenge the government's coercion of a third party to suppress their speech, instead characterizing the case as a contract matter between the Executive Branch and Columbia. Third, the district court's reasoning contravened the text of Title VI, which provides that "any person aggrieved" may bring suit to challenge a governmental funding termination. Fourth, the district court included erroneous dicta suggesting that the Tucker Act would additionally deprive it of jurisdiction, but Plaintiffs' claims do not sound in contract and do not belong in the Court of Federal Claims. Finally, the agreement reached by Defendants and Columbia after the district court's order does not resolve Plaintiffs' claims or foreclose relief and does not render this case moot. To the contrary, the agreement enshrines the unlawful infringement on Plaintiffs' members' academic freedom that is at the heart of Plaintiffs' complaint. The order dismissing the complaint should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. Its June 16, 2025 order dismissing the case for lack of standing is a final order appealable under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

I.     Whether the district court erred as a matter of law when it *sua sponte* dismissed Plaintiffs' claims for lack of standing.

## STATEMENT OF THE CASE

### I.     Facts

#### A. The Trump Administration's Plans to Impose its Ideology on American Universities

Even before his 2024 reelection, President Trump and his surrogates expressed their intention to control the content of speech at American universities in viewpoint-based ways. JA35-36 (Compl. ¶¶35-40). During the summer of 2023, the Trump campaign announced Trump's plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs." JA35 ¶¶35-36. Vice President JD Vance made similar comments, stating in 2021 that universities and professors "are the enemy" and praising Viktor Orban's strategy to control Hungarian universities. JA36 ¶40.

President Trump made clear he would seek to withhold federal funds from schools that he believes promote undesirable viewpoints. For example, Trump

3

boasted that he would extract "billions and billions of dollars … by taxing, fining, and suing excessively large private university endowments " to start the American Academy, at which "there will be no wokeness…." JA35-36 ¶¶37, 39. Trump further indicated that he would seek to restrict what universities (and their constituents) say about controversial issues such as the Israeli-Palestinian conflict and "diversity, equity, and inclusion…." JA35 ¶38.

## B. Federal Funding for Research Performed by Columbia Professors

Research at Columbia covers a range of topics, including health, science, and social science. JA37 ¶¶46-47; JA262-282.[1] Federal funding supports a large part of not only Columbia's research, but university research across the country, and has since the 1950s. JA38 ¶51. Although federal grants flow through the institution, making Columbia the direct recipient of the grant, the grants are assigned to one (or more) faculty principal investigator (PI), who leads the research, and involve other faculty who fill research and supervisory roles. *See e.g.* JA51-53 ¶¶101-109; JA72 ¶189; JA74 ¶205. Faculty apply for grants in intensive, competitive, peer-reviewed processes. JA882-83; JA806; JA814, 816; JA871.[2] PIs

---

[1] The documents cited here and many documents cited elsewhere in this brief were incorporated by reference in the complaint.

[2] Although only the allegations in the Complaint and incorporated documents are relevant to the district court's dismissal order, Plaintiffs' evidence cited here and elsewhere from the preliminary injunction record contained additional facts that could have been added to the complaint by amendment, if needed.

4

play a critical role in applying for the grants, executing the research, and communicating with government officials about research progress. JA806-07; JA838; JA881. Grants can also be essential to the training and career development of faculty members. JA51 ¶98; JA820; JA895.

### C. The Government's Termination of Funding and Demands that Columbia Suppress Speech

#### 1. Initiation of the Trump Administration's Title VI Actions at Columbia.

Since the October 7, 2023 attacks on Israel, the war in Gaza has sparked widespread campus protests, along with a rise in antisemitic incidents. JA39 ¶53; JA588-89. Institutions of higher education, including Columbia, have struggled to balance the need to protect free expression with the need to protect Jewish, Muslim, Israeli, and Palestinian students from harassment and discrimination. JA39 ¶53; JA594-611; JA360-63.

On February 3, 2025, DOJ announced the creation of a Joint Task Force on Antisemitism, led by Defendant Leo Terrell and including representatives from Defendants Department of Justice ("DOJ"), Department of Education ("ED"), and Department of Health and Human Services ("HHS"). JA40 ¶59; JA325-26. That same day, Defendant ED announced Title VI investigations into several universities, including Columbia. JA40 ¶60; JA329-330. Columbia immediately

5

responded by laying out steps it had taken to respond to antisemitism on campus. JA41 ¶¶62-63; JA332.

Title VI prohibits "discrimination under any program or activity receiving Federal financial assistance[,]" 42 U.S.C. § 2000d, and grants federal agencies the power to terminate funding (or refuse to grant or continue funding) to any entity that fails to comply with that prohibition, *id.* § 2000d-1. Title VI also imposes mandatory procedural safeguards carefully designed by Congress to ensure that the executive branch does not exploit Title VI as a "vindictive or punitive" measure against funding recipients. JA56 ¶¶121-22; JA491-96; JA498-503.

Before terminating funding, the agency must provide notice of findings of noncompliance; "determine[] that compliance cannot be secured by voluntary means"; provide notice and opportunity for an administrative hearing; make an "express finding on the record" of Title VI noncompliance; ensure that any termination of funding is "limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found"; and wait to act until 30 days after filing a "full written report" with Congress. 42 U.S.C. § 2000d-1. Each Defendant agency has promulgated regulations imposing even more detailed procedural requirements. 45 C.F.R. §§80.6–80.11 (HHS); 34 C.F.R. §§100.6–11 (ED); 28 C.F.R. §§42.106–111 (DOJ); 41 C.F.R. §§101–6.211 to 101–6.214 (GSA).

Rather than following any of these procedures, the Administration opted to leverage the genuine need to protect Jewish students from antisemitic harassment to illegally advance its long-laid plans targeting faculty and free speech on university campuses.

### 2. Defendants' Summary Termination of $400 Million in Grants and Contracts

On March 3, the Joint Task Force on Antisemitism announced a "comprehensive review" of Columbia's federal grants and contracts "in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act." JA41-42 ¶¶64-68; JA335-337. The following day, President Trump posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS!" JA42 ¶68; JA339.

On March 7, Defendants then jointly announced the "immediate cancellation" of approximately $400 million, noting that Columbia "had not responded" to the Task Force's notification sent just four days prior. JA42-43 ¶¶70-73; JA341-44. Defendants expressly invoked Title VI, referencing "ongoing investigations" under the statute. JA41 ¶64, n.30. They provided no reasoning for terminating $400 million rather than some other amount. JA43 ¶71. The

7

announcement stated: "President Trump has been clear that any college or university that allows illegal protests and repeatedly fails to protect students from anti-Semitic harassment on campus will be subject to the loss of federal funding." JA343. The announcement threatened to exact even harsher punishment if Columbia did not immediately take aggressive steps to suppress speech on campus, noting that the terminated funds "represent the first round of action and additional cancelations are expected to follow." JA43 ¶72; JA343. In a press interview on March 9, Defendant Terrell said, "[t]he academic system in this country has been hijacked by the left, has been hijacked by the [M]arxists. They have controlled the mindset of our young people… and we have to put an end to it." JA36 ¶41.

      As part of the terminated $400 million, Defendants ended scientific grants funding a wide range of research, like cancer, Alzheimer's, and prenatal health. JA50-53 ¶¶92-110; JA378-419. The grant terminations seemed designed to have the maximum coercive effect, as Defendants chose to end several large "center grants" providing funding for critical research services. JA74 ¶206; JA869-71; JA816; JA860-61; JA875-77.

      Defendants terminated research grants that had nothing to do with the Israel-Palestine conflict and had no complaints related to antisemitism. JA50-53¶¶95, 101-110; JA72 ¶190; JA76-77 ¶¶217-18, 223-25; JA166; JA160-61; JA174; JA840-41. Furthermore, Defendants terminated grants of Jewish professors and

students. JA52 ¶105; JA841; JA170; JA861-62. Much of the affected research focused on critical public health priorities. JA51-53 ¶¶100-110; JA870; JA859.

### 3.  The Government's March 13 Demand Letter

On March 13, less than a week after the funding terminations, Defendants sent Columbia a letter stating that the university "fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964." JA44 ¶76; JA357. The letter set forth "immediate next steps[,]" which were "a precondition for formal negotiations regarding Columbia University's continued financial relationship" with the federal government. JA44 ¶76; JA357.

Defendants demanded that within one week Columbia: (1) "complete [certain] disciplinary proceedings" related to protests, resulting in "expulsion or multi-year suspension"; (2) "[a]bolish the University Judicial Board (UJB)" and "centralize all disciplinary processes" in Columbia's President; (3) "[i]mplement permanent, comprehensive time, place, and manner [speech] rules" on campus; (4)"[b]an masks" with limited exceptions; (5) "[d]eliver [a] plan to hold all student groups accountable" for certain acts; (6) "[f]ormalize, adopt, and promulgate a definition of antisemitism" (noting the definition adopted by President Trump's executive order) and address "Anti-'Zionist' discrimination against Jews in areas unrelated to Israel or Middle East"; (7) "ensure that Columbia security has full law

9

enforcement authority, including arrest and removal of agitators"; (8) "[b]egin the process of placing the Middle East, South Asian, and African Studies [MESAAS] department under academic receivership for a minimum of five years"; and (9) "[d]eliver a plan for comprehensive admissions reform" including "reform[ing] undergraduate admissions, international recruiting, and graduate admissions practices…." JA45-46 ¶78; JA357-58.

Defendant Terrell made clear the Task Force's goal was to suppress speech and alter viewpoints expressed on campus. When asked in an interview days after the March 13 letter if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, *a new department of history*, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks," Terrell answered, "Yes, yes, and yes." JA36 ¶42; JA256 (emphasis added).

On March 21, Columbia acceded to nearly all of Defendants' demands—adopting new restrictions on protests, changing its disciplinary procedures, and subjecting certain academic programs, including the MESAAS Department, to additional scrutiny. JA47-48 ¶¶81-85; JA360-63. The additional oversight of MESAAS was a direct result of Defendants' explicit targeting of that department. *See* JA47-48 ¶¶84-85; JA938-942. Defendants issued a statement days later to "welcom[e]" Columbia's actions "*in response* to the Joint Task Force['s] … March

10

13th letter detailing 9 preconditions" and calling Columbia's "*compliance* with the Task Force preconditions" a step toward "rehabilitating its relationship with the government…." JA48-49 ¶¶86-87 (emphases added).

### 4. The Government's Continued Efforts to Coerce Additional Restrictions on Speech

Columbia's capitulation did not satisfy Defendants. Rather than restoring terminated grants, Defendants escalated their coercion. Days after Plaintiffs filed this lawsuit on March 25, 2025, Defendant HHS directed Defendant National Institutes of Health ("NIH") to freeze *all* grant funding to Columbia, meaning no new grants could be awarded to Columbia, and researchers with unterminated multi-year grants could not access any grant funds. Because these events occurred after the filing of the complaint, Plaintiffs presented them to the district court as part of the preliminary injunction proceeding. JA674-79; JA758-59; JA761; JA807-811.

Columbia reported that the government continued to impose demands that included "overly prescriptive requests about our governance … and how specifically to address viewpoint diversity issues…." JA716; JA782-84.

On May 22, 2025—over two months *after* terminating funding—Defendants HHS and ED issued a joint notice of violation under Title VI purporting to find that Columbia had been deliberately indifferent to the harassment of Jewish students in violation of Title VI—a step required *before* funds can be terminated.

11

JA832-34. Defendants did not comply with any of the other required Title VI steps, including notice and hearing, and notification of Congress. *See supra* at 6.

On July 23, 2025 (after the district court dismissed the complaint) the government and Columbia entered an agreement to resolve, inter alia, the claims alleged "in the March 7, 10, and 14, 2025 grant and contract termination letters, the May 22, 2025 Notice of Violation, [and] the facts and events under review in the Investigations arising under Title VI…." Resolution Agreement Between the United States of America and Columbia University 2 (Jul. 23, 2025) (hereinafter "Agreement").[3] Although the Agreement provided that "the United States shall restore to Columbia those Terminated Grants by HHS or NIH upon the Effective Date of this Agreement[,]" it also expressly carved out—and did *not* agree to restore—"[g]rants by Ed. and any other terminated contracts…." *Id.* ¶7. The Agreement further provides that "[n]othing … prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, *defunding* or litigation related to Columbia's actions occurring after the Effective Date of this Agreement." *Id.* ¶8.c (emphasis added). There is no evidence in the record that all funding has been restored, and indeed

---

[3] Resolution Agreement Between the United States of America and Columbia University, (July 23, 2025), https://president.columbia.edu/sites/default/files/content/July%202025%20Announcement/Columbia%20University%20Resolution%20Agreement.pdf. The Agreement is not part of the record in this case.

media reports indicate some still had not been even a full month after the Agreement.[4]

Defendants have made clear that they intend to continue the same coercive playbook at Columbia and other universities—summarily terminating funding and demanding that universities suppress student and faculty speech that is contrary to the administration's views. JA40 ¶60; JA86-89 ¶¶276-285; JA253-58, JA329-30; JA365-67; JA629-30; JA633-36; JA691-95; JA718-19; JA721; JA723-31; JA733-38; JA756; JA763-68; JA770-72. For example, Defendants demanded that Harvard retain a third party "to audit the student body, faculty, staff, and leadership for viewpoint diversity," among other sweeping demands, and cut billions of dollars when Harvard refused to obey. JA692; JA718-19; JA721; *see President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 2528380, at *4 (D. Mass. Sept. 3, 2025) ("*Harvard*").

As Defendant Terrell said explicitly: "We're going to bankrupt these universities. We're going to take away every single federal dollar …. If these universities do not play ball, lawyer up, because the federal government is coming after you." JA190; *see also* JA87 ¶278.

---

[4] Sharon Otterman, *Columbia Got Most of Its Research Funding Back. The Damage Goes Deeper.*, NY TIMES, (August 25, 2025). https://www.nytimes.com/2025/08/25/nyregion/columbia-trump-federal-money-returned.html.

## II.    Procedural History

On March 25, 2025, days after Columbia acceded to the demands in Defendants' March 13 letter, Plaintiffs AAUP and AFT filed suit, alleging that Defendants' actions violate the First Amendment, the APA and Title VI, and other constitutional provisions. *See* JA89-110 ¶¶286-385. Plaintiffs promptly sought a preliminary injunction, Dist. Ct. Dkt. 24, and moved to expedite once Defendants' ongoing coercion via the NIH freeze came to light. Dist. Ct. Dkt. 65. The district court summarily denied that request to expedite. Dist. Ct. Dkt. 66.

Plaintiffs submitted extensive evidence demonstrating the irreparable harms experienced by themselves and their members.

The district court denied Plaintiffs' motion to submit several declarations under seal, despite the declarants' fears of retaliation from the government or Columbia and harassment by third parties. Dist. Ct. Dkts. 33, 61; JA823-28. Plaintiffs filed amended versions of some of these declarations publicly, JA836-85, JA892-906, and moved for leave to file under seal an amended declaration of only one witness, Witness J, whose unique circumstances required sealing. JA937-42. The district court did not rule on Plaintiffs' motion to seal Witness J's amended declaration.

On June 16, 2025, without holding oral argument requested by Plaintiffs, the district court denied Plaintiffs' motion for lack of standing and *sua sponte*

14

dismissed the complaint. SA30 (directing Clerk of the Court "to close this case").

Rather than considering whether, under the "lower" standard "for establishing

standing at the dismissal stage," Plaintiffs "sufficiently *pled* standing to survive a

motion to dismiss," *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 114, 123 (2d Cir.

2025) (per curiam), the court relied in significant part on declarations submitted by

Defendants that contradicted allegations in the complaint, including hearsay

representations by Columbia's counsel in another case. *E.g.*, SA17-18.

The court concluded that Plaintiffs lack standing because "neither Plaintiffs

nor their members were ever the recipients of th[e] grants and contracts" that were

terminated, and thus they could not seek the "contractual remedy" of "demand[ing]

payments to a non-party." SA22. In dicta, the court also suggested that it lacked

jurisdiction because the Tucker Act grants the Court of Federal Claims exclusive

jurisdiction "over suits based on contracts with the United States." SA29 (cleaned

up). The opinion includes several gratuitous comments disparaging Plaintiffs and

their counsel. *See, e.g.*, SA2, 23 & n.9.

Plaintiffs now appeal the erroneous dismissal of the complaint.

## STANDARD OF REVIEW

This Court reviews the dismissal of claims for lack of standing *de novo*, *Do

No Harm*, 126 F.4th at 119, "'accepting all factual allegations in the complaint as

true, and drawing all reasonable inferences in the plaintiff's favor[,]'" *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009).

## SUMMARY OF ARGUMENT

The district court erred in four distinct ways. First, it applied the wrong legal standard. As this Court made clear in *Do No Harm*, 126 F.4th at 119, irrespective of whether "a plaintiff [can] establish standing to secure a preliminary injunction, the plaintiff may maintain the action if the allegations in the complaint are sufficient to support standing under the standard applicable at the pleadings stage." The district court failed to follow that controlling precedent, ignored the allegations in the complaint, which sufficiently pled standing, impermissibly relied on evidence submitted by Defendants, and drew inferences against Plaintiffs to justify its dismissal order.

Second, the court erred by suggesting that Plaintiffs and their members could never bring claims challenging the executive branch's violation of their First Amendment rights through unlawful financial coercion of Columbia because they are not formally party to the research grant agreements at issue. But the Supreme Court held unanimously just last year that "[a] government official cannot coerce a private party to punish or suppress disfavored speech on [the official's] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). The victim of such

16

coerced suppression has standing to challenge the government's actions. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).

Third, the district court employed reasoning directly contrary to Congress's directive in Title VI that "any person aggrieved" may bring suit to challenge a governmental funding termination. This "includes within the zone of interests to be protected the interests of virtually all persons satisfying [injury in fact]," not just those with a direct contractual relationship with the government. *Schlafly v. Volpe*, 495 F.2d 273, 277 (7th Cir. 1974); *see Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1075-77 (5th Cir. 1969).

Fourth, in dicta, the district court suggested that even if Plaintiffs had standing, the court would lack jurisdiction over their claims under the Tucker Act, which generally requires contract claims against the federal government to be brought in the Court of Federal Claims. That too was error. Plaintiffs' claims are constitutional and statutory, not contractual. Plaintiffs seek declaratory and injunctive relief to prevent ongoing and future rights violations, not contract damages. The district court and this Court have jurisdiction here. *See Bowen v. Massachusetts*, 487 U.S. 879, 898 & n.28, 900 (1988); *Atterbury v. U.S. Marshal Serv.*, 805 F.3d 398, 406 (2d Cir. 2015). Neither *Department of Education v. California*, 604 U.S. 650 (2025) ("*California*") nor *National Institutes of Health v. American Public Health Association*, 606 U.S. __, 2025 WL 2415669 (2025)

17

("*APHA*") addressed constitutional or Title VI claims, and nothing in those decisions implies that district courts lack jurisdiction over such claims.

Finally, Defendants may try to argue that this case is moot, because the executive branch and Columbia reached an agreement addressing some of the initial funding cuts after the district court's dismissal decision. But far from resolving this matter, that agreement perpetuates the First Amendment harms that Plaintiffs challenge here.

## ARGUMENT

### I.    The District Court Erred in Dismissing Plaintiffs' Complaint Under the Wrong Legal Standard.

Although "[t]he burden for establishing standing at the dismissal stage is lower" than "for the purposes of a motion for a preliminary injunction[,]" *Do No Harm*, 126 F.4th at 113-14, the district court dismissed Plaintiffs' complaint based solely on its erroneous conclusion that Plaintiffs had not submitted evidence establishing standing for a preliminary injunction. SA28 (Plaintiffs' evidence insufficient to establish standing). It did not evaluate standing based upon the allegations in Plaintiffs' complaint.

This reversible error is identical to the one committed by the district court in *Do No Harm*, 126 F.4th at 113-14. There, this Court held that the district court correctly assessed the plaintiff's standing to seek a preliminary injunction under an evidentiary standard "at least as rigorous as the standard that applies at the

18

summary judgment stage[,]" assessing the quantity and quality of the preliminary injunction evidence. *Id.* at 122. The district court erred, however, in concluding that "its resolution of the standing question with respect to the preliminary injunction motion was … conclusive as to [the plaintiff's] Article III standing to maintain this action." *Id.*

The Court expressly held that irrespective of whether "a plaintiff [can] establish standing to secure a preliminary injunction, the plaintiff may maintain the action if the allegations in the complaint are sufficient to support standing under the standard applicable at the pleadings stage." *Id.* at 119. Where, as here, "[Appellees] ha[ve] not yet filed an answer, and no discovery ha[s] occurred[,]" the question of "standing—for evaluating the propriety of proceeding with the case at all—should have been evaluated under the motion to dismiss standard." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *id.* ("[A]n inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case.").

Here, the district court did not even analyze Plaintiffs' complaint allegations, let alone accept them as true and draw all reasonable inferences in Plaintiffs' favor. To the contrary, the district court repeatedly and improperly drew inferences *against* Plaintiffs. *See, e.g.*, SA23 (inferring that Plaintiffs' members would disagree on Plaintiffs' "core business," directly contrary to the allegations in the

19

complaint); SA25 (inferring that Plaintiffs' members' research could be funded independently by Columbia, despite no allegations in the complaint to that effect); SA28 (drawing inferences regarding NIH's views directly contrary to allegations in the complaint). That was reversible error.

The court also erred by dismissing the case without any motion to dismiss, let alone briefing on such a motion. This Court recently stated, in reversing a grant of a motion to dismiss that had not been fully briefed, that it "ha[s] repeatedly instructed district courts not to 'dismiss an action pending before it without first providing the adversely affected party with notice and an opportunity to be heard[,]'" and that "doing so can be grounds for vacatur." *A.H. by E.H. v. New York State Dep't of Health*, 147 F.4th 270, 280 (2d Cir. 2025). Here, the district court failed to analyze whether the facts pled in Plaintiffs' complaint demonstrate standing. Plaintiffs should have had opportunity for briefing, and also should have been granted an opportunity to amend their complaint if necessary. *See, e.g.*, *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (citing Fed. R. Civ. P. 15(a)(2) ("[L]eave [to amend] shall be freely given when justice so requires.").

## II.    The District Court Erred in Using a Contract Framework to Analyze Plaintiffs' Standing.

To the extent the district court's dismissal was based on its view that "plaintiff's legal theory itself … doom[s] the plaintiff's standing[,]" *Do No Harm*, 126 F.4th at 121, the district court committed additional reversible legal error. The

20

district court asserted that Plaintiffs are improperly "inserting themselves into a quarrel between the Executive Branch and non-party Columbia," and that it had "no authority to opine on the legality of Executive Branch actions against an entity that is not a party to this case." SA21.

But this is not a breach of contract action. *See infra* at 53-56. Rather, Plaintiffs bring First Amendment and APA/Title VI claims based on concrete injuries to Plaintiffs and their members: Columbia faculty. To the extent that the district court appears to have reasoned that Plaintiffs' and their members' status as non-parties to the terminated and threatened-to-be-terminated grants and contracts precludes them as a matter of law from establishing standing to assert their constitutional and statutory claims, the district court fundamentally erred.

First, the notion that faculty do not have a stake in the terminated grants "is divorced from the reality of how federal research grants function. The professors and graduate students—who are responsible for their own research—apply for federal grants, are awarded the grants on the strength of their credentials and proposed research, and then build their professional reputations on those grants." *Harvard*, 2025 WL 2528380 at *16; *see also* JA54 ¶113 (some researchers received cancellation notices directly from Defendants rather than through Columbia). "It is hard to imagine who could have a more personal stake in this case than the researchers whose research was allegedly defunded…." *Thakur v.*

21

*Trump*, 2025 WL 1734471, at *24 (N.D. Cal. June 23, 2025), *denying stay of preliminary injunction on appeal*, 148 F.4th 1096 (9th Cir. Aug. 21, 2025).

Second, Plaintiffs assert that Defendants have violated members' First Amendment rights by unconstitutionally coercing Columbia to suppress Plaintiffs' members' speech and academic freedom on pain of losing billions of dollars in federal funding. As the Supreme Court unanimously confirmed just last year, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on [the official's] behalf." *Vullo*, 602 U.S. at 190. Those whose speech is punished or suppressed by that private party via coercion have standing to bring a First Amendment claim against the government actors engaging in the coercion. *See Bantam Books*, 372 U.S. at 64 n.6 (book publishers had standing to bring First Amendment claims against government actors for coercing book distributors to stop distributing publishers' books); *Harvard*, 2025 WL 2528380, at *27; *Thakur*, 2025 WL 1734471, at *22.

This is a paradigmatic unlawful coercion case. Defendants have demanded that Columbia stifle certain academic speech pursued by Plaintiffs' members, sanction particular academic departments and faculty, and restrict the content and manner of campus speech in which Plaintiffs' members take part—all based on Defendants' disapproval of Plaintiffs' members' (and other Columbia constituents') views. Just as Plaintiffs' members would have standing to challenge

22

Defendants' direct regulation of these activities, they also have standing to challenge Defendants' coercion of Columbia to regulate them at Defendants' behest. *See, e.g.*, *Vullo*, 602 U.S. at 190 ("[A] government official cannot do indirectly what she is barred from doing directly…."); *Harvard*, 2025 WL 2528380, at *17-18. *Vullo* and decades of jurisprudence before it confirm the federal courts' authority to address exactly this First Amendment violation.

Third, Plaintiffs assert that Defendants have violated Title VI and the APA by unlawfully terminating and refusing to grant federal funds without first complying with all of Title VI's and the APA's mandatory procedural requirements.

Title VI prohibits "discrimination under any program or activity receiving Federal financial assistance[,]" 42 U.S.C. § 2000d, and grants federal agencies the power to terminate funding to any entity that fails to comply with that prohibition, *id.* § 2000d-1. Recognizing the potential for abuse of this power, and exercising its constitutional prerogative to control federal spending, Congress wrote into the statute a host of procedural requirements with which an agency must comply *before* terminating or refusing to grant or continue funding. *Id.*; JA56-57 ¶¶121-22; *see supra* at 6-7. Plaintiffs allege that Defendants did not follow *any* of the required procedures before terminating $400 million in federal grants or before refusing to grant future federal funds to Columbia researchers.

Congress specifically provided in Title VI that "*any person aggrieved"* by the government's termination or refusal to continue funds "may obtain judicial review of such action" under the APA. 42 U.S.C. § 2000d-2 (emphasis added). Many of Plaintiffs' members are PIs or other grant beneficiaries whose grants were terminated or suspended or who were otherwise adversely impacted by Defendants' Title VI violations. JA72-83 ¶¶185-263; *see infra* at 40-43. Such beneficiaries of federal funds who are directly harmed plainly have Article III and statutory standing to seek relief under Title VI and the APA. *See Schlafly*, 495 F.2d at 277 ("any person aggrieved" under Title VI "includes within the zone of interests to be protected the interests of virtually all persons satisfying [injury in fact]"); *Finch*, 414 F.2d at 1075-77 (under Title VI, harms caused by improper funding terminations flow to individual constituents of the institutions that initially receive funding); *Harvard*, 2025 WL 2528380, at *15-17.[5]

In light of this constitutional and statutory law, the district court's holding that Columbia is the only party with "the personal stake in the litigation," SA21, is erroneous as a matter of law.

---

[5] Defendants argued in the district court that the government did not rely on Title VI in cutting funding (and therefore Title VI does not apply). Proper evaluation of the record belies that factual assertion. In any event, Plaintiffs' complaint, which must be credited at this stage, alleged that "Defendants invoked Title VI as a purported justification for" their actions. JA55 ¶115.

24

### III.    Dismissal Must Be Reversed Because Plaintiffs Adequately Pled Both Associational and Organizational Standing.

Plaintiffs "sufficiently *pled* standing to survive a motion to dismiss." *Do No Harm*, 126 F.4th at 123. The complaint alleges "(1) 'an injury in fact,' (2) 'a causal connection between the injury and the conduct complained of,' and (3) a likelihood that 'the injury will be redressed by a favorable decision.'" *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

As the Supreme Court has cautioned, courts "should not 'make standing law more complicated than it needs to be.'" *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2141 (2025). At bottom, the purpose of the standing inquiry is to ensure that the plaintiff has a "personal stake" in the dispute. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Where, as here, the district court dismisses the complaint for lack of standing, this Court "evaluate[s] 'whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*.'" *Fed. Defs. of New York*, 954 F.3d at 126 (citation omitted).

As membership organizations, Plaintiffs may "file suit on [their] own behalf" (so-called "organizational standing") and can also "assert the rights of [their] members under the doctrine of associational standing." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) ("*ILGO*"). "To establish

25

associational standing, an association must show: (1) 'its members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Do No Harm*, 126 F.4th at 118.

Here, Plaintiffs adequately alleged both associational and organizational standing to bring their First Amendment and APA/Title VI claims.

## A. Plaintiffs adequately alleged associational standing to bring their First Amendment claims.

Plaintiffs' First Amendment claims[6] rest on allegations that "Defendants have imposed financial sanctions, threats of additional financial sanctions, and conditions on future funding with the [coercive] purpose and effect of infringing on free speech… rights," JA90 ¶291, including to "obstruct, chill, deter, and retaliate against Plaintiffs' members…." JA103 ¶351. Such conduct had its desired effect: Defendants' funding cuts and related threats not only brought Plaintiffs' members' research and scholarship to a halt, but also "infringed upon their academic freedom" and otherwise "chilled the speech of Plaintiffs' members…."

---

[6] Plaintiffs pled a claim directly under the First Amendment and a claim that Defendants violated the APA by violating the First Amendment. JA89-92 ¶¶286-97; JA99 ¶¶331-32; JA103 ¶351. We refer to both as Plaintiffs' "First Amendment claims."

26

JA79 ¶239. Plaintiffs have standing to seek redress for these injuries to their members' First Amendment rights.

### 1. Plaintiffs' members suffered First Amendment injuries in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). In the First Amendment context, either a "specific present objective harm or a threat of specific future harm" gives rise to a cognizable injury. *Laird v. Tatum*, 408 U.S. 1, 14 (1972). The complaint sufficiently alleges both types of harm.

"Nowhere is it more important" than in academia to safeguard the interest that debate on public issues is "uninhibited, robust, and wide-open," for "the entire premise powering academic freedom is that the advancement of the arts and sciences is of long-term value to society…." *Heim v. Daniel*, 81 F.4th 212, 228-29 (2d Cir. 2023). This Court has noted that it would be "hard-pressed" to find that "theoretical physics, evolutionary biology, literary studies, or many other fields" are not speech protected by the First Amendment. *Id.* at 229. Plaintiffs' members suffered cognizable First Amendment harms when Defendants halted research and scholarship through the summary cancellation of hundreds of grants as a tool of coercion. *See* JA72-79 ¶¶185-237.

Plaintiffs' members' protected speech has also been profoundly chilled as a result of Defendants' targeting of specific content for retaliation. JA79-83 ¶¶238-63. A "chilling effect" exists where the government policy "would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (cleaned up). This type of injury is "peculiar to the First Amendment context. In such cases, an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. …In such situations the vice of the [challenged action] is its pull toward self-censorship." *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13-14 (1st Cir. 1996) (citing, e.g., *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)); *see also Harvard*, 2025 WL 2528380, at *17. Plaintiffs' members' fears that engaging in certain protected speech would cause harm are "real and imminent," which is enough to establish their rights are chilled. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).

The Trump Administration is "particularly focused on suppressing views that challenge (1) its preferred narrative with respect to the Israeli-Palestinian conflict, and (2) its preferred narratives with respect to race and gender[,]" JA35 ¶38, and Defendants have declared a broader intention to target "lef[tist]" and

28

woke professors on college campuses, with a goal of overhauling academic

departments to silence disfavored viewpoints. JA36-37 ¶¶41-42; JA253-58.

It is no surprise, then, that in response to Defendants' coercive cuts of

hundreds of millions of dollars and threats to cut far more, Plaintiffs' members are

"engaging [or] will engage in self-censorship on topics they perceive to be in

tension with Defendants' preferred viewpoint." JA79 ¶239. Members are "fearful

that their scholarship, if not aligned with the views or priorities of the Trump

administration, could lead to even further incursions" on their research or

departments. *Id.*

One member has been unable to speak freely in their classroom about

"issues of race, equity, or global human rights, even when such topics are directly

relevant to the curriculum…." JA81 ¶249. Another's ability to teach about "Israeli

architecture and urban planning"—and especially "how that planning has been

interpreted differently by different groups"—has been chilled. JA82 ¶257.

Defendants' actions impair one member's ability "to share challenging

interpretations of controversial artworks, objects, processes, and facts…." JA83

¶258. Another's ability to conduct research in HIV-prevention science is chilled,

JA76 ¶217, because "many words that this … member understands the government

to have deemed as related to 'DEI' are core to their HIV research." JA81 ¶250.

One member has been unable to secure student participation in reproductive justice

studies due to fear of government retaliation. JA80 ¶245-246. Another member is changing information sessions about reproductive health to avoid scrutiny. JA81-82 ¶252.

Fear of retribution for disfavored opinions is so great that self-censorship extends beyond the classroom and scholarship. JA92 ¶296. One faculty member feels they cannot "speak out" about Defendants' actions because if they do, "they will lose funding or others close to them will lose funding, and then their patients will be harmed." JA82 ¶253; *see also* JA81 ¶251. Another describes how they "mostly do[] not post on social media at all anymore," and "Defendants' actions have prevented them from expressing what should be a valid and legal viewpoint in the United States." JA79-80 ¶¶243-44. Some of Plaintiffs' members work in departments that have been placed under oversight, subject to content review and monitoring. JA47-48 ¶84; JA84 ¶265. These members have suffered and will continue to suffer ongoing harm.

There are ample allegations in Plaintiffs' complaint to establish cognizable First Amendment harms at the pleading stage. *See, e.g.*, *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999) ("generous standard" governs review of complaint). The district court wrongly dismissed these well-pleaded facts as Plaintiffs' "subjective' feelings," stating that Plaintiffs failed to identify harm or a threat of a specific future harm for protected activities. SA25. But Defendants repeatedly and openly

stated that they would punish Columbia—and, by extension, Plaintiffs' members—for noncompliance with Defendants' speech demands. JA34-37 ¶¶33-45; JA39-42 ¶¶53-69; JA44-49 ¶¶76-80, 86-91. Defendants backed up these threats by cutting $400 million in existing research funding, including Plaintiffs' members' funding. JA42-43 ¶¶70-74; JA50-54 ¶¶92-113. And Defendants threatened to withhold *all* future federal funding if Columbia did not comply with their sweeping speech-targeting demands, including targeting Plaintiffs' members' work and departments. JA44-46 ¶¶76-78; JA49 ¶87-91. Defendants made clear that their actions were part of a broader campaign against academic freedom and "woke[]" university faculty, JA35 ¶¶35-45; JA86-88 ¶¶ 274-83, and that oversight continues. JA49 ¶¶88-91.

Against this backdrop, Plaintiffs' members have alleged actual harm. As the District of Massachusetts recently concluded in a similar matter, "[t]he professors' and researchers' fears that adverse consequences may follow their decision not to abandon certain viewpoints are far from speculative. Rather, they are directly 'caused by the [Freeze Orders' and Terminations Letters'] vagueness, the steep penalties [Defendants] have announced for [the university's] noncompliance with [their] requirements, and the measures [Defendants] ha[ve] already taken' demonstrating they expect [Columbia] to comply." *Harvard*, 2025 WL 2528380, at *18 (quoting *Nat'l Educ. Ass'n v. Dep't of Educ.,* 779 F. Supp. 3d 149, 181 (D.N.H. 2025)).

31

The allegations in the complaint establish harm for standing. But beyond the allegations in the complaint, the district court was also aware of additional evidence of the impact upon Plaintiffs' members' speech and yet dismissed the suit without providing Plaintiffs the opportunity to amend.[7] Most importantly, Plaintiffs submitted a motion to file under seal an amended declaration from a member of Columbia's Middle Eastern, South Asian, and African Studies (MESAAS) Department. Dist. Ct. Dkt. 144. Plaintiffs explained that "Defendant specifically targeted the MESAAS Department by demanding it be placed in receivership as a condition of further federal funding. Columbia University largely acceded to that demand by imposing new oversight on the MESAAS Department. … Witness J's declaration provides unique evidence that Defendants are discriminating based on viewpoint and directly interfering with academic freedom." *Id.* That declaration is now the subject of a pending motion to seal before this Court.

Witness J testified to the harm Defendants have caused ██████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[7] As just some examples, Plaintiffs' members sought to "reframe or reorient their [academic] work to avoid [funding] termination, even if those changes would not be helpful for scientific advancement." JA817. Some "Departments and Institutes [at Columbia] have [even] cancelled events that might be perceived in the current climate as controversial, and faculty and outside scholars have cancelled or substantially altered … scholarly talks out of fear." JA848.

32



Plaintiffs adequately pled harm in their complaint. Dismissing the case without ruling on the motion to seal this declaration or providing an opportunity to amend to include these allegations is further evidence of error.

### 2. The First Amendment harms suffered by Plaintiffs' members are traceable to Defendants.

Where, as here, the "plaintiff is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury….'" *Diamond*, 145 S. Ct. at 2134 (quoting *Lujan*, 504 U.S. at 561-62). Multiple parties may be considered the "object" of the challenged action for purposes of causation. *See id.* at 2135-36 (noting, among several examples, that "when a State prohibited parents from sending their children to private schools, affected schools had standing to sue, even though parents were the directly regulated parties" (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 535-36

33

(1925)); *Harvard*, 2025 WL 2528380, at \*16-17. When third party behavior is predictable, commonsense inferences may be drawn. *Diamond*, 145 S. Ct. at 2136.

Plaintiffs' members have been injured both as the objects and as the predictable downstream victims of Defendants' coercive conduct. In wholesale terminating research funding to Columbia, Defendants' coercive cudgel had the predictable (and desired) downstream impact of halting Plaintiffs' members' academic inquiry and scholarship. *See infra* at 6-8. Cutting funding, issuing threats about certain viewpoints, and making demands about academic speech also made Plaintiffs' members the direct objects of Defendants' coercive threats. Defendants intentionally sent an unlawfully coercive message to the researchers whose grants were specifically earmarked for termination, the countless other researchers who depend on federal funding, and all Columbia faculty and staff. JA45-46 ¶78; JA50 ¶94; JA79-83 ¶¶239-43, 249-52, 258-262. And in demanding that Columbia place the MESAAS Department under academic receivership, Defendants directly targeted the speech of MESAAS faculty, including those who are Plaintiffs' members. JA45-48¶¶78, 84; JA84 ¶265. The harms suffered by Plaintiffs' members are traceable to Defendants. *See Harvard*, 2025 WL 2528380, at \*18.

The district court determined that Plaintiffs could not establish traceability, finding that Columbia had decided to take the actions it announced on March 21—including appointing a new provost to review the MESAAS Department, among

34

other programs— independently and not because of Defendants' coercive actions. *See* SA27. This holding is error for multiple reasons.

First, the complaint pleads otherwise. JA45-49 ¶¶78-87. Shortly after announcing their initial $400 million in funding cuts on March 7, Defendants sent their March 13 letter to Columbia expressly directing the university to adopt certain measures by March 20 as a "precondition" for any further federal funding. JA44-47 ¶¶76-80. Columbia responded to Defendants in a memorandum eight days later. JA47-48 ¶¶81-85. Defendants HHS, ED, and GSA then issued a press release "welcom[ing] the statement by Columbia University outlining actions the university is taking *in response to* the Joint Task Force['s] … March 13th letter," and welcoming "Columbia's compliance" as a first step. JA48-49 ¶¶86-87 (emphasis added). Defendants' own words show that Columbia took its steps in response to Defendants' coercion, as do "commonsense… realities." *Diamond*, 145 S. Ct. at 2136. It strains credulity to conclude that the measures Columbia announced were completely unlinked to Defendants' actions or that they were not a "predictable" response to such actions. *Hippocratic Med.*, 602 U.S. at 385.

Moreover, not only was the district court's "crucial" finding about the independence of Columbia's decision directly contrary to the allegations in the complaint, but the court based it on a representation made by Columbia's counsel in a separate action. SA27 (quoting transcript of hearing in *Khalil v. Trs. of*

*Columbia Univ. in City of New York*, 2025 WL 1019452 (S.D.N.Y. Apr. 4, 2025)).

As the district court acknowledged, "[o]n a motion to dismiss, a 'court may [*not*]

take judicial notice of a document filed in another court' … 'for the truth of the

matters asserted in the other litigation.'" SA18 n.6. What the district court *did* have

before it, instead, was the pending motion to admit a sealed declaration from

Witness J, which provided testimony that Defendants' coercion was the but-for

cause of the special new oversight imposed on the MESAAS Department. █████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ The

district court erred in dismissing the case not only because the allegations in the

complaint demonstrate a causal link between Defendants' coercive actions and

Plaintiffs' and their members' harms, but because Witness J's declaration provides

direct additional proof of that precise causation-harm link.

36

Defendants' very purpose in exerting pressure on Columbia was to force Columbia to censor speech which the Defendants could not reach directly. To treat Columbia's predictable acquiescence to Defendants' demands as interrupting the traceability of that harm would perversely reward Defendants for their unconstitutional actions and would be squarely at odds with *Vullo*.[8]

### 3. Plaintiffs' members' First Amendment harms are redressable.

Redressability is the "flip side[] of the same coin" as causation. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). "If a defendant's action causes an injury, enjoining the action … will typically redress that injury." *Hippocratic Med.*, 602 U.S. at 381. Accordingly, "the plaintiff must simply 'show a predictable chain of events' that would likely result from judicial relief and redress the plaintiff's injury." *Diamond*, 145 S. Ct. at 2139 (citing *Hippocratic Med.*, 602 U.S. at 385). However, "Article III only requires that some form of [the requested relief] 'would at least partially redress' the alleged injury."

---

[8] The district court's attempts to liken this case to *Murthy v. Missouri*, 603 U.S. 43 (2024), also miss the mark. *See* SA22, 27-28. In *Murthy*, the government defendants did not actually impose any sanctions or even expressly threaten sanctions against third party speech intermediaries. *See, e.g. Murthy*, 603 U.S. at 72 ("[I]n the months leading up to this suit, these officials issued no directives and threatened no consequences."); *id.* at 79 (Alito, J., dissenting) (acknowledging that any threats were "implicit[]"). The *Murthy* plaintiffs also lacked evidence of continued pressure from the defendants, defeating redressability. *See id.* at 73 (maj. opn.). *Murthy* only serves to highlight by contrast the coercive nature of Defendants' conduct—and the direct harms caused by that conduct—in this case.

*Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34, 48 (2d Cir. 2023) (en banc) (quoting *Meese v. Keene*, 481 U.S. 465, 476 (1987)). "[I]f the [alleged] claims satisfy Article III's redressability requirement 'as of the outset of litigation,' they will continue to do so throughout the litigation." *Fed. Defs.*, 954 F.3d at 126.

    As set forth above, Plaintiffs' members' injuries flow directly from Defendants' coercive conduct. *See infra* at 33-37. Plaintiffs allege that Defendants "continued to interfere" with their members' First Amendment rights "up through the filing of the complaint...." *Fed. Defs.*, 954 F.3d at 126; *see, e.g.*, JA49 ¶91 ("As of the time of the filing of this Complaint, Defendants have not ... withdrawn their threats to take additional coercive action and/or terminate or withhold additional funding to Columbia."). "[T]his allegation establishes that [Plaintiffs' members' First Amendment] injuries were ongoing when this suit was filed and were therefore amenable at that time to redress by their request for prospective injunctive relief. This is enough to satisfy Article III's redressability requirement." *Fed Defs.*, 954 F.3d at 126. Plaintiffs also seek compensatory relief for Defendant's past violations of their First Amendment rights, JA111 (seeking damages for deprivation of "rights secured … under the Constitution and laws of the United States"); *see, e.g.*, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971), confirming that Plaintiffs' First Amendment claims are redressable.

In light of all of the foregoing, the district court clearly erred in ruling that Plaintiffs lack standing to assert their First Amendment claims on behalf of their members.[9]

## B. Plaintiffs adequately alleged associational standing to bring their APA/Title VI claims.

Plaintiffs also challenge Defendants' actions under the APA and Title VI. As set forth in the complaint, Defendants failed to follow the mandatory procedures required by Title VI and related regulations for terminating funding pursuant to that statute, or the APA. JA55-66 ¶¶116-161; JA93-96 ¶¶304-18; JA99-101 ¶¶334-41.[10] Defendants' actions are also substantively invalid, insofar as they lack a reasoned explanation, are contrary to law, and exceed Defendants' statutory authority. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020); JA66-71 ¶¶162-84; JA96-99 ¶¶319-33; JA101-03 ¶¶ 342-51.[11]Plaintiffs' members also have standing to bring these claims.

---

[9] There is no dispute that the interests of Plaintiffs' members in protecting their academic freedom and free-speech rights are aligned with Plaintiffs' organizational purposes. Nor do any of Plaintiffs' claims or any of their requested relief require the participation of Plaintiffs' members as parties in this lawsuit. *Do No Harm*, 126 F.4th at 118.

[10] The district court seemingly accepted Defendants' assertion that they were not engaged in Title VI enforcement at Columbia. *See* SA27-28. For the reasons explained above, that conclusion is legal error because it directly conflicts with the allegations in the complaint.

[11] As noted *supra* at 26 n.6, Plaintiffs also alleged that Defendants violated the APA by violating their First Amendment rights.

39

### 1. Plaintiffs' members have suffered cognizable harms for purposes of their APA/Title VI claims.

Defendants' coercive funding cuts and refusals to grant any future funding have undeniably caused Plaintiffs' members to suffer professional, reputational, and employment-related injuries—in addition to speech injuries. JA72-79 ¶¶185-237. The district court correctly recognized these as injuries for purposes of challenging Defendants' actions. *See* SA24-25 (finding that "some of Plaintiffs['] members used federal grants to Columbia for their academic work" and recognizing that "[t]he loss of professional opportunities or income may certainly constitute an injury"); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) ("[L]os[ing] out on federal funds … is a sufficiently concrete and imminent injury to satisfy Article III…."); *Meese*, 481 U.S. at 479 n.14 ("The risk of… reputational harm ... is sufficient to establish ... standing…."); *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988) (recognizing cognizable interest in "continuing employment relationship").

Defendants' funding cuts and refusal to provide future funding have caused numerous harms beyond the loss of money. JA72-83 ¶¶185-263.

First, the abrupt termination of funding has caused significant reputational harm to Plaintiffs' members. Not only does "[t]he termination in grant funding and resulting halt of the work … break[] the relationship of trust between [Plaintiffs' members] and their [research] collaborators outside of Columbia[,]" JA73 ¶193,

40

but it also "breaks the trust of the communit[ies]" in which Plaintiffs' members conduct their research." JA75 ¶211. These reputational harms "would persist even if th[e] project[s] were to restart." JA73 ¶193; *see also* JA75 ¶212 ("As a result of th[is] loss in … trust, even if it were possible to eventually get funding again, this AAUP/AFT member and the research team could not bring this center together with the same quality…."), ¶215 ("It will be difficult for this AAUP/AFT member and the project team to establish future projects … as a result of this damaged trust and relationship.").

Second, Defendants' cuts also disrupted other core professional activities of Plaintiffs' members. For example, two AAUP/AFT members were co-leads of "a training program that has been in existence continuously since 1972…." JA73 ¶¶198-99. Defendants' funding cuts disrupted that program, affecting Plaintiffs' members' "ability to train the next generation of psychiatric epidemiologists, an important part of th[eir] career[s]." JA74 ¶¶200-01. Many of Plaintiffs' members also lost or were poised to lose pre- and post-doctoral students, as well as other critical research support because of Defendants' coercive conduct. *See* JA73-76 ¶¶195-97, 202, 209-10, 218-19; JA78-79 ¶¶ 232-37. Many members' ongoing employment relationships with Columbia are also at risk, especially for junior faculty: a prolonged loss of certain federal grants can put "career[s] in jeopardy[,]"

as "universities like Columbia generally want faculty to have one or two of these grants to obtain tenure." JA78 ¶231.

Moreover, to show standing, Plaintiffs' members do not need to show that they were *entitled* to further federal funding. Rather, all Plaintiffs must allege is that Defendants' termination of such funding caused their members concrete and particularized harm—which they have done. *See, e.g.*, *Teton Historic Aviation Found. v. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* … even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity."); JA72-79 ¶¶185-237; JA93 ¶305; JA96 ¶320.

Finally, as explained *supra* at 32-33, the district court's error in dismissing the case is compounded by the evidence that was before the court, which describes the harms suffered by Plaintiffs' members in even greater detail that could have been added to the complaint by amendment, if needed. For example, Plaintiffs' evidence described reputational harms. *See, e.g.*, JA870-71 (because subjects of halted clinical trials will not receive benefits of participating in such trials, they will be less willing to sign up in future); JA894-95 (reduced likelihood that subjects will enroll in research studies led by Columbia researchers); JA815-16 (loss of trust in Columbia would "severely jeopardize our ability as an institution to

42

conduct the community-oriented, collaborative research that is critical in the public health field"); JA882-83 (funding cuts have caused significant reputational damage and make external partner organizations less willing to work with Columbia researchers).

The evidence also showed professional and career harms. *See, e.g.,* JA882-83, 885 (harm to career options due to loss of two major grants, since most research universities will only hire faculty who are principal investigators on large federal grants, and loss of research staffing support); JA895 (significance of NIH training grants for junior researchers); JA157 (inability to hire researchers because of funding cuts); JA822 (inability to use terminated funds for professional development activities, such as academic conferences).

Thus, there is no question that Plaintiffs have alleged injury to their members for purposes of their APA/Title VI claims.

### 2. The harms suffered by Plaintiffs' members are traceable to Defendants.

As set forth above, Defendants' funding cuts, refusal to provide future funds, and related threats were directed not only to Columbia, but also to Plaintiffs' members whose grants Defendants specifically earmarked for termination. *See supra* at 26-31. Despite the direct and commonsense links between Defendants' conduct and Plaintiffs' members' harms, the district court wrongly concluded that Plaintiffs failed to establish causation.

43

First, the district court erred in treating the asserted absence of a contractual or other formal relationship between Defendants and Plaintiffs (and Plaintiffs' members) as a break in the causal chain. *See* SA22. Courts have repeatedly recognized that the government's violations of Title VI protections can cause harms that extend beyond the direct recipients of federal funds. *See Schlafly*, 495 F.2d at 277; *Finch*, 414 F.2d at 1075-77 (under Title VI, improper funding terminations harm individual constituents of the institutions that receive funding).

Second, the district court erroneously concluded that Plaintiffs' members' injuries are not traceable to Defendants because Columbia could simply reallocate existing resources to cover the monetary loss. *See* SA25. That factual assertion is nowhere in the complaint. It also "belies 'commonsense economic realities,' and the record in this case, that [Columbia] would be able to immediately cover millions or billions of dollars in funding shortfalls." *Thakur*, 2025 WL 1734471, at *23. Although Columbia filled in some funding gaps in the immediate aftermath of Defendants' termination of funding, those measures were temporary. *See* JA172. Even if Plaintiffs could ultimately obtain replacement funding from Columbia or elsewhere, that fact would not defeat traceability.

Third, the district court erred by ignoring allegations in the complaint (as well as evidence in the record) establishing that Plaintiffs' members' harms— which go beyond pure monetary harm—cannot be remedied by finding alternative

44

funding sources. *See, e.g.*, JA73 ¶¶193, 197; JA75 ¶¶212, 215-16; JA77-79 ¶¶228, 237; JA884-885.

Finally, the district court wrongly suggested that Plaintiffs' members' injuries cannot be tied to Defendants because Columbia had independently determined that some of the terminated grants may not "align[]" with certain federal administration domestic policy priorities. *See* SA27. That alleged fact is nowhere in the complaint, which alone should end the inquiry. It also is immaterial to the causation analysis: Defendants, not Columbia, cancelled Plaintiffs' members' funding expressly citing antisemitism and Title VI. Plaintiffs' members' injuries are therefore directly traceable to Defendants.

### 3.  Plaintiffs' requested relief would redress their members' harms.

Because Defendants are responsible for causing the harms to Plaintiffs' members that Plaintiffs allege in support of their APA/Title VI claims, enjoining Defendants from the challenged conduct would redress those harms. *See supra* at 37-39.

### C. Plaintiffs adequately alleged organizational standing to bring their claims.

The district court also erred in finding that Plaintiffs lacked organizational standing. "It is well established that 'organizations are entitled to sue on their own behalf for injuries they have sustained.'" *ILGO*, 143 F.3d at 649 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). The organization must

45

simply "meet[] the same standing test that applies to individuals…." *Id.* "[O]nly a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact[]'" to the organization. *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *see also Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) ( standing where organization forced "to divert money from its other current activities to advance its established organizational interests").

Plaintiffs sufficiently allege that Defendants' conduct perceptibly impaired Plaintiffs' activities. Plaintiffs are labor and membership organizations composed of higher-education professionals, including members at Columbia whose research and speech were harmed by Defendants' actions. *See* JA31-32 ¶¶13, 15. Key to their organizational missions is supporting their members' career development while protecting their academic freedom. *See* JA32 ¶¶14-15, JA84-85 ¶¶265-68. To do so, Plaintiffs provide an array of services, including counseling, advising, and representing their local chapters and members. *See* JA 84-85 ¶¶265-68.

Defendants' actions have directly harmed Plaintiffs' ability to perform these core functions. Where, as here, cuts to funding threaten the livelihoods of the university's employees, it is precisely Plaintiffs' role to provide advice, counseling, and representation to help members with the effects of those cuts. Crucially, Plaintiffs have not merely advised their members on how to oppose or advocate

46

against Defendants' actions. Rather, Plaintiffs had to counsel Columbia chapter members about how faculty can maintain their professional careers in the face of funding cuts and related efforts to restrict their research and other speech. JA85-86 ¶¶271-72.[12]

Each Plaintiff sufficiently pled injury-in-fact by alleging "that it spent money to combat activity that harms its … core activities." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61 (2d Cir. 2020) (quotation omitted). As an immediate consequence of Defendants' funding cuts and other coercive conduct, Plaintiffs have been forced to increase and alter the services they provide to members at Columbia. JA85-86 ¶¶269-72. Whereas "an issue-advocacy organization" may not "spend its way into standing" merely by "expending money to gather information and advocate against the defendant's action[,]" an organization like Plaintiffs that regularly provides services to its members has standing to challenge actions that "directly affect[] and interfere[] with [those] core business activities…." *Hippocratic Med.*, 602 U.S. at 394-95. "Such concrete and

_____

[12] Although the district court suggested otherwise, SA24, the fact that Columbia did not formally place the MESAAS Department under academic receivership does not erase Plaintiffs' organizational injuries. Columbia appointed a senior vice provost to review MESAAS's programs, leadership, and curricula and make recommendations for changes. JA47-48 ¶84. The newly announced review of MESAAS will subject Plaintiffs' members' academic speech to monitoring, evaluation, and ongoing oversight, at the behest of the Defendants. Plaintiff organizations will expend resources assisting its members through this process.

demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests…." *Havens*, 455 U.S. at 379.

Because Defendants' actions directly interfered with Plaintiffs' core functions of counseling, advising, and representing their members as to their academic freedom and careers, "there can be no question that [Plaintiffs] ha[ve] suffered injury in fact." *Id.*[13] Courts have found organizational standing for educators' organizations in analogous circumstances. *See Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 176 (educators union had organizational standing to challenge threatened funding cuts to schools with DEI programs because union's "core activities" included "providing legal representation and counseling to its members regarding employment- and education-related matters" including compliance with laws, and action impaired union's ability to offer those services); *Harvard*, 2025 WL 2528380, at *18 ("Pursuing litigation to end an alleged government intrusion on protected and well-established First Amendment rights in higher education, as well as to stop alleged arbitrary funding cuts that could end careers, furthers [AAUP's] purposes.").

---

[13] Plaintiffs also allege the additional injury that some of their members no longer feel comfortable associating with the AAUP and AFT in the wake of Defendants' actions. *See* JA86 ¶273.

Evidence in the preliminary injunction record describes in even greater detail how Defendants' coercive conduct has affected Plaintiffs' ability to perform their core functions and provide important services to their members—which detail could have been added to the complaint by amendment, if needed. *See, e.g.*, JA114-20; JA122, 124-129; JA794-95; JA798-99.

Like the injuries suffered by Plaintiffs' members, Plaintiffs' own injuries were directly caused by Defendants. *See supra* at 43-45. Plaintiffs' injuries would be redressable through their requested judicial relief: among other things, Plaintiffs would no longer have to devote so much of their counseling and advising services toward addressing their members' loss (and threatened loss) of funding, disruption of their professional activities, and effects on career development.

Plaintiffs therefore have organizational standing.

## IV.   This Court Has Jurisdiction to Reverse and Remand.

Although the district court dismissed solely for lack of standing, Plaintiffs anticipate that Defendants may urge this Court alternatively to affirm the district court's *sua sponte* dismissal order on the grounds that (1) the Tucker Act deprives the district court of jurisdiction, and (2) the action is moot in light of Columbia's agreement largely to accede to Defendants' demands. Neither argument has merit.

49

### A. The Tucker Act does not displace the district court's jurisdiction over Plaintiffs' constitutional and statutory claims.

After dismissing for lack of standing, the district court stated in dicta that, under *California*, the Tucker Act deprived it of jurisdiction by granting the Court of Federal Claims ("Claims Court") exclusive jurisdiction over Plaintiffs' claims. *See* SA28-29. This erroneous conclusion stemmed from one of the same fatal flaws that infected the district court's standing analysis: It misconstrued Plaintiffs' claims as sounding in contract and seeking only payment of contractually owed funds. But unlike the plaintiffs in *California*, neither Plaintiffs nor their members are parties to the grants and contracts at issue, and they do not seek to enforce any contractual rights. Rather, Plaintiffs' claims are rooted in the First Amendment, Title VI, and the APA, and the relief they seek is equitable in nature, including prospective relief enjoining Defendants from coercing Columbia to infringe the speech and academic freedom of Plaintiffs' members, and enjoining Defendants from terminating or refusing to award federal funds without fully complying with Title VI requirements. The Court of Federal Claims does not have jurisdiction over such equitable claims; the district court and this Court do.

### 1. The Tucker Act is inapplicable to Plaintiffs' standalone First Amendment claims.

The Tucker Act's limitation on the APA's waiver of sovereign immunity does not apply to Plaintiffs' standalone First Amendment claims in Count I of the

50

Complaint, which are not brought under the APA and do not rely on the APA's waiver of sovereign immunity. Where a plaintiff challenges a federal officer's conduct as unconstitutional, "sovereign immunity does not bar a suit," because "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).[14]

Neither *California* nor *APHA* disturbs this bedrock principle. Unlike here, plaintiffs in *California* did not assert any constitutional claims. Rather, plaintiffs in *California* had directly entered into agreements with the government and sought "to enforce a contractual obligation to pay money…." *California*, 604 U.S. at 651. *California* reaffirmed only that "the APA's limited waiver of [sovereign] immunity does not extend to orders 'to enforce a contractual obligation to pay money….'" *Id.*

Likewise, the partial judgment at issue in *NIH* adjudicated only the plaintiffs' "arbitrary and capricious" APA claim, not any direct constitutional claims. *APHA*, 2025 WL 2415669, at *1; *Massachusetts v. Kennedy*, 2025 WL 1747213, at *1 (D. Mass. June 23, 2025). *California* and *APHA* have no

---

[14] The Government has in other cases conceded that the Tucker Act "does not bear on … constitutional claims." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 135 n.6 (D.D.C. 2025), vacated and remanded sub nom. *Glob. Health Council v. Trump*, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025); *see also Rhode Island v. Trump*, 2025 WL 2621593, at *7 (1st Cir. Sept. 11, 2025) (noting government did not argue that Tucker Act had any effect on district court's jurisdiction to hear constitutional claims).

applicability to Plaintiffs' standalone First Amendment claim, over which this Court has jurisdiction.

**2. The Tucker Act cannot "impliedly" divest this Court of its expressly conferred jurisdiction over Title VI-based claims.**

This case is also unlike *California* and *APHA* because neither of those cases involved claims based on Title VI, which contains an explicit jurisdiction-granting provision. Congress expressly provided in Title VI that any aggrieved person "may obtain judicial review … in accordance with [the APA]" of any action "terminating or refusing to grant or to continue financial assistance" based on a purported Title VI violation. 42 U.S.C. § 2000d-2; *see* 5 U.S.C. §§ 702, 704 (authorizing judicial review of "[a]gency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court").

Thus, Congress expressly waived sovereign immunity and granted district courts jurisdiction over APA claims for equitable relief seeking to enjoin federal agencies from "terminating or refusing to grant or to continue financial assistance" without first complying with Title VI requirements. *See Bowen*, 487 U.S. at 898 & n.28, 900 (federal grant-in-aid programs "expressly included" among "proceedings in which [Congress] wanted to be sure the sovereign-immunity defense was waived" under § 702); *Schlafly*, 495 F.2d at 282 ("The clear intent of section 2000d-2 is to provide a forum for judicial review for persons aggrieved by the severe action authorized by § 2000d-1.").

52

In the face of Title VI's express jurisdictional grant, the Tucker Act cannot be construed as "impliedly" divesting this Court of jurisdiction simply because federal grants and contracts are at issue. After all, federal funding agreements are at issue in every Title VI claim involving unlawful termination. The district court's conclusion effectively strikes the judicial review language from Title VI, rendering it surplusage, in violation of bedrock statutory construction principles and in contravention of the Supreme Court's instruction to employ "a narrow interpretation of the Tucker Act." *Bowen*, 487 U.S. at 908 n.46; *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020) ("Tucker Act yields to APA).

*California* and *APHA* have no bearing on the district court's jurisdiction here, as neither addressed jurisdiction over APA claims based on violations of Title VI nor any other statute with an analogous jurisdiction-granting provision.

### 3. Plaintiffs' claims do not sound in contract.

Entirely ignoring these independent bases for jurisdiction, Defendants argued below that the Tucker Act "impliedly" divests the district court of jurisdiction because Plaintiffs' claims depend on the existence of government grants and contracts. For the reasons explained, the Tucker Act does not apply to constitutional claims and cannot "impliedly" divest the district courts of jurisdiction expressly granted to them by Congress in Title VI. But even without

53

those dispositive points, Defendants' argument would still be meritless under controlling authority.

An action is not founded upon a contract simply because it "require[s] some reference to or incorporation of a contract…." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982); *APHA*, 2025 WL 2415669, at *2 (Barrett, J., concurring) ("That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded ... upon' contract…." (quoting 28 U.S.C. § 1491(a)(1))). Rather, to determine "[w]hether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction" or instead a non-contractual claim belonging in the district court, the Second Circuit considers (1) "the source of the rights upon which the plaintiff bases [its] claims" and (2) "the type of relief sought." *Atterbury*, 805 F.3d at 406. Here, both prongs establish that Plaintiffs' constitutional and statutory claims are not "in essence" contract claims.

*Source of Rights.* The "source of the rights" for Plaintiffs' claims is the Constitution and Title VI, not contract. Plaintiffs seek to enforce rights under the First Amendment, *see, e.g.*, *Vullo*, 602 U.S. at 191-92, and rights under Title VI designed "for the protection of the innocent beneficiaries of programs," *Finch*, 414 F.2d at 1075-76. These rights exist independently of contractual terms, and the Court "could decide this case without ever reading the grant agreement[s]." *San*

54

*Francisco Unified Sch. Dist. v. Americorps*, 2025 WL 1180729, at *9 (N.D. Cal. Apr. 23, 2025). Numerous courts have held *California* (and more recently, *APHA*) distinguishable where the claims, as here, are grounded in constitutional or statutory rights, not contractual ones. *See Harvard*, 2025 WL 2528380, at *12-14.[15] Defendants' argument that Plaintiffs' claims sound in contract because they would have no cause of action but for the existence of the grants and contracts has repeatedly been rejected. *See Atterbury*, 805 F.3d at 406-08 (Due Process Clause source of plaintiff's rights, notwithstanding that plaintiff would have no constitutionally protected interest absent contract); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299-1300 (10th Cir. 2009) (source of plaintiff's rights was federal regulations governing HUD's termination of contracts, not contracts themselves); *Megapulse*, 672 F.2d at 969; *Crowley Gov. Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1110 (D.C. Cir. 2022).

---

[15] *See also, e.g.*, *Thakur*, 148 F.4th at 1103-04; *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971, at *10-14 (D. Md. July 7, 2025); *Thakur*, 2025 WL 1734471, at *18-21; *Green & Healthy Home Initiatives v. Env't Prot. Agency*, 2025 WL 1697463, at *14 (D. Md. June 17, 2025); *San Francisco A.I.D.S. Found. v. Trump*, 2025 WL 1621636, at *11-12 (N.D. Cal. June 9, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 1582368, at *7-12 (W.D. Wash. June 3, 2025); *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 6-66 (D.D.C. 2025); *Colorado v. U.S. Dep't of Health & Human Servs.*, 2025 WL 1426226, at *6, 9 (D.R.I. May 16, 2025); *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 244-45 (D.D.C. 2025); *Massachusetts v. Kennedy*, 783 F. Supp. 3d 487, 499-500 (D. Mass. 2025); *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 980-81 (N.D. Ill. 2025).

*Relief Sought.* Nor is the relief Plaintiffs seek "fundamentally contractual in nature…." *Atterbury*, 805 F.3d at 408. Because the source of Plaintiffs' rights is statutory and constitutional, the first prong of the *Megapulse* test is "determinative." *Id.* Moreover, Plaintiffs do not seek damages as compensation for loss of federal funding, nor are the claims "properly characterized as … for specific performance."[16] *Megapulse*, 672 F.2d at 969. Rather, the principal relief Plaintiffs seek is "prospective relief that, among other things, mandates that Defendants comply with the First Amendment and Title VI's procedural requirements." *Harvard*, 2025 WL 2528380, at *13; *see* JA110-111 (Prayer for Relief). Such relief is equitable. *Bowen*, 487 U.S. at 893; *California*, 604 U.S. at 651 ("district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds").

At minimum, there is no question that this Court has jurisdiction over Plaintiffs' claims challenging Defendants' coercive March 13 letter and seeking declaratory and prospective injunctive relief enjoining Defendants from violating Title VI's procedural requirements by terminating additional grants or contracts, refusing to grant or continue federal financial assistance, or threatening to do so,

---

[16] Plaintiffs' Complaint prays for damages for violations of their *constitutional* rights, not any *contract*. JA111 (seeking damages for deprivation of "rights secured … under the Constitution and laws of the United States"); *see, e.g.*, *Bivens*, 403 U.S. at 397.

56

as granting such relief would not require restoration of any previously terminated funds. *See APHA*, 2025 WL 2415669, at *1-2 (Barrett, J., concurring). "Given the nature of the First Amendment claims (purely constitutional) and the Title VI claims (statutory), these claims do not belong in the Court of Federal Claims, which, in any event, cannot fully adjudicate either set of claims. Under these circumstances, the *Megapulse* factors tip to Plaintiffs." *Harvard*, 2025 WL 2528380, at *14.

### 4. The Court should reject the district court's contention that no court has jurisdiction to hear Plaintiffs' claims.

A decision that the Tucker Act divests the district court of jurisdiction would lead to the extraordinary result that no court has jurisdiction over Plaintiffs' claims. Not only is it firmly established that district courts have jurisdiction over constitutional and Title VI-based APA claims, but it is well-settled that the Claims Court does not. *See Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (Claims Court has jurisdiction only over claims for money damages premised on contract, or under a money-mandating provision like the Takings Clause); *United States v. Connolly*, 716 F.2d 882, 886-87 (Fed. Cir. 1983) (no jurisdiction over First Amendment claims); *Manuel v. United States*, 115 Fed. Cl. 105, 114 (2014) (no jurisdiction over Title VI claims).

Moreover, because Plaintiffs and their members are not parties to the grants and contracts at issue, they have no cause of action under the Tucker Act that could

57

be heard in Claims Court. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (quoting *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990)) ("[T]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government…."); *cf. Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Heath & Hum. Servs.*, 137 F.4th 932, 939  (9th Cir. 2025) (subcontractors could not sue under Tucker Act); *Thakur*, 2025 WL 1734471, at *19 (university researchers could not sue under Tucker Act because they were not parties to government contracts).

"The result requested by the Government would mean that no court has jurisdiction to hear [P]laintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the 'strong presumption favoring judicial review of administrative action' that is embodied in the APA." *CLSEPA*, 137 F.4th at 939 (quoting *Mach. Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)); *Thakur*, 2025 WL 1734471, at *19. This Court should "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006); *see Maryland Dep't of Hum. Res. v. Health & Human Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985); *CLSEPA*, 137 F.4th at 939.

**B. Columbia's settlement with Defendants does not moot Plaintiffs'
claims.**

After the district court's dismissal order, Columbia entered into an

agreement with the federal government to resolve certain "pending Investigations

or compliance reviews regarding Columbia's compliance with Title VI," among

other statutes. Agreement; *supra* at 12-13. That agreement does not moot this case,

and Defendants cannot carry the "'formidable burden' of demonstrating that

intervening events mooted [Plaintiffs'] claims." *Fed. Defs.*, 954 F.3d at 127.

As an initial matter, by its own terms, the Agreement does not restore all

terminated funding. *See* Agreement ¶7 ("The Terminated Grants by Ed. and any

other terminated contracts are excluded from this provision."). Even if Plaintiffs'

members' grants are reinstated, the Agreement does not address or undo the

significant nonmonetary harms that Plaintiffs and their members have suffered,

which warrant judicial review and redress. The complaint also expressly seeks

"compensatory and viable damages" for Defendants' violations of their

constitutional rights, which "automatically avoid[s] mootness." *Stokes v. Vill. of

Wurtsboro*, 818 F.2d 4, 6 (2d Cir. 1987).

Moreover, the Agreement *enshrines* the unlawful infringements of Plaintiffs'

members' free speech and academic freedom at the heart of Plaintiffs' complaint.

*See* Agreement ¶¶12-13 (terms reflecting government demand requiring Columbia

to exert control over faculty members' academic speech); *id.* ¶27 (requiring

59

Columbia to continue to suppress lawful protest speech). Far from precluding Defendants from again restricting funding or speech in precisely the same unlawful manner, the Agreement expressly provides that "[n]othing … prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, *defunding* or litigation related to Columbia's actions occurring after the Effective Date of this Agreement." *Id.* ¶8.c (emphasis added). In a context in which Defendants have expressly targeted "leftist," "woke" viewpoints, the Agreement amplifies the chilling effect of Defendants' coercive actions on Plaintiffs' members. Plaintiffs have had no opportunity to plead or brief these facts because the complaint was summarily dismissed.

Finally, if this Court were to nonetheless conclude that Plaintiffs' claims have become moot, "the established practice in the federal system is to reverse or vacate the judgment below and remand with a direction to dismiss." *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 71 (1997) (cleaned up) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)). Especially where "the right of a party to appellate review is curtailed for reasons of mootness not attributable to that party[,]" this Court "should … vacate the district court's decision…." *Manufacturers Hanover Tr. Co. v. Yanakas*, 11 F.3d 381, 383 (2d Cir. 1993). Accordingly, if this Court were to conclude this case is moot, the district court's order must be vacated.

60

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal of Plaintiffs' complaint and remand.

Respectfully submitted,

Dated:  September 22, 2025          By:  /s/ Rachel Goodman

Rachel Goodman
Orion Danjuma
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
Fax: (202) 769-3176
rachel.goodman@protectdemocracy.org
orion.danjuma@protectdemocracy.org

Katie Schwartzmann
Protect Democracy Project
201 St. Charles Avenue, Ste. 114
New Orleans, LA 70170
Tel: (202) 579-4582
Fax: (202) 769-3176
katie.schwartzmann@protectdemocracy.org

Eve H. Cervantez
Matthew J. Murray
Connie K. Chan
Juhyung Harold Lee
Jonathan Rosenthal
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax (415) 362-8064
ecervantez@altber.com
mmurray@altber.com

61

cchan@altber.com
hlee@altber.com
jrosenthal@altber.com

Richard Primus
The University of Michigan Law School
(institutional affiliation provided for
identification purposes only; not
representing the University)
625 S. State Street
Ann Arbor, MI 48109
Tel: (734) 647-5543
Fax: (734) 764-8309
PrimusLaw1859@gmail.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1 because it contains 13,693 words, as determined by the Word Count function of Microsoft Word. It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared with Microsoft Word and uses 14-point proportionately spaced Times New Roman font.

Dated: September 22, 2025          By: s/ Rachel Goodman
                                       Rachel Goodman
                                       Protect Democracy Project
                                       82 Nassau Street, #601
                                       New York, NY 10038
                                       Tel: (202) 579-4582
                                       Fax: (202) 769-3176
                                       rachel.goodman@protectdemocracy.org

                                       *Counsel for Plaintiffs-Appellants*

63

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2025, I electronically filed the foregoing Opening Brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the ACMS system, which will send notice of such filing to all counsel of record in compliance with Local Rule 25.1(h)(2). The unredacted version of the brief has been served on Defendants' counsel through electronic mail. Defendants' counsel have consented to electronic service.

Dated: September 22, 2025          By: s/ Rachel Goodman
                                   Rachel Goodman
                                   Protect Democracy Project
                                   82 Nassau Street, #601
                                   New York, NY 10038
                                   Tel: (202) 579-4582
                                   Fax: (202) 769-3176
                                   rachel.goodman@protectdemocracy.org

                                   *Counsel for Plaintiffs-Appellants*