# No. 25-1529

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.
*Defendants-Appellees*.

On Appeal from the United States District Court for the
Southern District of New York
Case No. 1:25-cv-02429-MKV (Hon. Mary Kay Vyskocil)

**JOINT APPENDIX (JA477 – JA586)**
**VOLUME 4 OF 8**

Orion Danjuma
Rachel Goodman
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
Fax: (202) 769-3176
orion.danjuma@protectdemocracy.org
rachel.goodman@protectdemocracy.org

Eve H. Cervantez
Matthew J. Murray
Connie K. Chan
Juhyung Harold Lee
Jonathan Rosenthal
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
ecervantez@altber.com
mmurray@altber.com
cchan@altber.com
hlee@altber.com
jrosenthal@altber.com

*Additional counsel for Plaintiffs-Appellants:*

Katie Schwartzmann
Protect Democracy Project
201 St. Charles Avenue, Ste. 114
New Orleans, LA 70170
Tel: (202) 579-4582
Fax: (202) 769-3176
katie.schwartzmann@protectdemocracy.org

Richard Primus
The University of Michigan Law School
(institutional affiliation provided for identification
purposes only; not representing the University)
625 S. State Street
Ann Arbor, MI 48109
Tel: (734) 647-5543
Fax: (734) 764-8309
PrimusLaw1859@gmail.com

# JOINT APPENDIX
## TABLE OF CONTENTS

| Tab. No. | Docket No. | Date Filed | Description | Page No. |
|---|---|---|---|---|
| Volume 1 | | | | |
| 1 | | | District Court Docket Sheet | JA1 |
| Volume 2 | | | | |
| 2 | 1 | 03/25/25 | Complaint | JA26 |
| 3 | 27 | 04/03/25 | Declaration of Todd Wolfson | JA113 |
| 4 | 28 | 04/03/25 | Declaration of Julie Schmid & Exhibit A (*Condemning Hate and Affirming Freedom of Speech on Campus*, American Federation of Teachers (Nov. 9, 2023)) | JA121 |
| 5 | 29 | 04/03/25 | Declaration of Reinhold Martin | JA135 |
| 6 | 29-1 | 04/03/25 | Exhibit A to the Declaration of Reinhold Martin (March 7, 2025 Email from Katrina Armstrong) | JA152 |
| 7 | 30 | 04/03/25 | Declaration of Susan Witte | JA155 |
| 8 | 31 | 04/03/25 | Declaration of Victoria Frye | JA164 |
| 9 | 32 | 04/03/25 | Declaration of Jennifer S. Hirsch | JA169 |
| 10 | 45 | 04/03/25 | Declaration of Veena Dubal | JA178 |
| 11 | 45-1 | 04/03/25 | Exhibit A to the Declaration of Veena Dubal (March 24, 2025 Email from Danna Drori) | JA182 |
| 12 | 47 | 04/04/25 | Declaration of Jonathan Rosenthal in Support of Plaintiffs' Motion for Preliminary Injunction | JA187 |
| 13 | 47-1 | 04/04/25 | Exhibit 1 to the Declaration of Jonathan Rosenthal (Lydia Gall, *Hungary Continues Attacks on Academic Freedom*, Human Rights Watch (Sept. 3, 2020)) | JA202 |

| 14 | 47-2 | 04/04/25 | Exhibit 2 to the Declaration of Jonathan Rosenthal (Muzaffer Kaya, *Turkey's Purge of Critical Academia*, Middle East Report 288 (Fall 2018)) | JA205 |
|----|------|----------|---------------------------------------------------------------------------------------------------------------------------------------------|-------|
| 15 | 47-3 | 04/04/25 | Exhibit 3 to the Declaration of Jonathan Rosenthal (Pedro Salgado, *The Crisis of Brazilian Universities: Higher Education Under Bolsonaro*, International Research Group on Authoritarianism and Counter-Strategies (July 22, 2021)) | JA217 |
| 16 | 47-4 | 04/04/25 | Exhibit 4 to the Declaration of Jonathan Rosenthal (*Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DJTFP 2024 (July 17, 2024)) | JA225 |
| 17 | 47-5 | 04/04/25 | Exhibit 5 to the Declaration of Jonathan Rosenthal (*Agenda47: The American Academy*, DJTFP 2024 (Nov. 1, 2023)) | JA229 |
| 18 | 47-6 | 04/04/25 | Exhibit 6 to the Declaration of Jonathan Rosenthal (Henry Reichman*, 'The Professors Are the Enemy' Right-wing attacks on academic freedom have real repercussions.*, The Chronicle of Higher Education (Dec. 14, 2021)) | JA233 |
| 19 | 47-7 | 04/04/25 | Exhibit 7 to the Declaration of Jonathan Rosenthal (Rod Dreher, *"I would like to see European elites actually listen to their people for a change": An Interview with J.D. Vance*, The European Conservative (Feb. 22, 2024)) | JA240 |
| 20 | 47-8 | 04/04/25 | Exhibit 8 to the Declaration of Jonathan Rosenthal (*Leo Terrell, Senior Counsel to the Attorney General for Civil Rights, On Crushing Anti-Semitism On Campus*, HughHewitt & Duane Patterson (March 19, 2025)) | JA252 |
| 21 | 47-9 | 04/04/25 | Exhibit 9 to the Declaration of Jonathan Rosenthal (Feb. 17, 2025 Letter to Georgetown Law School from Edward R. Martin, Jr.) | JA259 |

| 22 | 47-10 | 04/04/25 | Exhibit 10 to the Declaration of Jonathan Rosenthal (Jan Claassen, MD, et al., *Sleep Patterns May Reveal Comatose Patients with Hidden Consciousness*, Columbia University Irving Medical Center (March 3, 2025)) | JA262 |
|---|---|---|---|---|
| 23 | 48-1 | 04/04/25 | Exhibit 11 to the Declaration of Jonathan Rosenthal (Timothy Wang, MD, et al., *Nerves Electrify Stomach Cancer, Sparking Growth and Spread*, Columbia University Irving Medical Center (Feb. 19, 2025)) | JA269 |
| 24 | 48-2 | 04/04/25 | Exhibit 12 to the Declaration of Jonathan Rosenthal (Julia Wattacheril, MD, MPH, *Training Your Electronic Health Record to Think Like a Liver Doctor*, Columbia University Irving Medical Center (Feb. 20, 2025)) | JA277 |
| 25 | 48-3 | 04/04/25 | Exhibit 13 to the Declaration of Jonathan Rosenthal (Financial Overview of Columbia University) | JA283 |
| Volume 3 | | | | |
| 26 | 48-4 | 04/04/25 | Exhibit 14 to the Declaration of Jonathan Rosenthal (Economic Impact of Columbia University) | JA290 |
| 27 | 48-5 | 04/04/25 | Exhibit 15 to the Declaration of Jonathan Rosenthal (Ian Bogost, *A New Kind of Crisis for American Universities*, The Atlantic (Feb. 10, 2025)) | JA299 |
| 28 | 48-6 | 04/04/25 | Exhibit 16 to the Declaration of Jonathan Rosenthal (Willem Marx, *Campus protests over the war in Gaza have gone international*, NPR (May 3, 2024)) | JA312 |
| 29 | 48-7 | 04/04/25 | Exhibit 17 to the Declaration of Jonathan Rosenthal (Executive Order 14188 Additional Measures To Combat Anti-Semitism (January 29, 2025)) | JA321 |
| 30 | 48-8 | 04/04/25 | Exhibit 18 to the Declaration of Jonathan Rosenthal (Office of Public Affairs, *Justice Department Announces Formation of Task Force to Combat* | JA324 |

| | | | | |
|---|---|---|---|---|
| | | | *Anti-Semitism*, U.S. Department of Justice (Feb. 3, 2025)) | |
| 31 | 48-9 | 04/04/25 | Exhibit 19 to the Declaration of Jonathan Rosenthal (Office of Communications and Outreach, *Justice Department Announces Formation of Task Force to Combat Anti-Semitism*, U.S. Department of Education (Feb. 3, 2025)) | JA328 |
| 32 | 48-10 | 04/04/25 | Exhibit 20 to the Declaration of Jonathan Rosenthal (*Statement on Notice From U.S. Department of Education Office of Civil Rights*, Columbia University Office of Public Affairs (Feb. 3, 2025)) | JA331 |
| 33 | 49-1 | 04/04/25 | Exhibit 21 to the Declaration of Jonathan Rosenthal (*HHS, ED, and GSA announce additional measures to end anti-Semitic harassment on college campuses*, U.S. General Services Administration (March 3, 2025)) | JA334 |
| 34 | 49-2 | 04/04/25 | Exhibit 22 to the Declaration of Jonathan Rosenthal (Truth Social Post from Donald J. Trump (March 4, 2025)) | JA338 |
| 35 | 49-3 | 04/04/25 | Exhibit 23 to the Declaration of Jonathan Rosenthal (*DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Services Administration (March 7, 2025)) | JA340 |
| 36 | 49-4 | 04/04/25 | Exhibit 24 to the Declaration of Jonathan Rosenthal (Matthew Haag et al., *Decades Ago, Columbia Refused to Pay Trump $400 Million*, The New York Times (March 21, 2025)) | JA345 |
| 37 | 49-5 | 04/04/25 | Exhibit 25 to the Declaration of Jonathan Rosenthal (*Responding to Federal Action*, Columbia Office of the President (March 7, 2025)) | JA352 |
| 38 | 49-6 | 04/04/25 | Exhibit 26 to the Declaration of Jonathan Rosenthal (March 13, 2025 Letter to Columbia University | JA356 |

| 39 | 49-7 | 04/04/25 | Exhibit 27 to the Declaration of Jonathan Rosenthal (*Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia*, Columbia University) | JA359 |
| 40 | 49-8 | 04/04/25 | Exhibit 28 to the Declaration of Jonathan Rosenthal (*HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions*, U.S. Department of Health and Human Services (March 24, 2025)) | JA364 |
| 41 | 49-9 | 04/04/25 | Exhibit 29 to the Declaration of Jonathan Rosenthal (X Post from NIH (March 10, 2025)) | JA369 |
| 42 | 49-10 | 04/04/25 | Exhibit 30 to the Declaration of Jonathan Rosenthal (Caroline Lewis, *Hundred of research grants at Columbia canceled following Trump edict, administrator says*, Gothamist (March 11, 2025)) | JA372 |
| 43 | 50-1 | 04/04/25 | Exhibit 31 to the Declaration of Jonathan Rosenthal (Spreadsheet of Awards) | JA377 |
| 44 | 50-2 | 04/04/25 | Exhibit 32 to the Declaration of Jonathan Rosenthal (Ryan Quinn, *Trump's Columbia Cuts Start Hitting Postdocs, Professors*, Inside Higher Ed (March 13, 2025)) | JA420 |
| 45 | 50-3 | 04/04/25 | Exhibit 33 to the Declaration of Jonathan Rosenthal (Humberto Basilio, *'My career is over': Columbia University scientists hit hard by Trump team's cuts*, Nature ((March 14, 2025)) | JA428 |
| 46 | 50-4 | 04/04/25 | Exhibit 34 to the Declaration of Jonathan Rosenthal (Joseph Goldstein, *Medical Research at Columbia Is Imperiled After Trump Terminates Funding*, The New York Times (March 18, 2025)) | JA435 |
| 47 | 50-5 | 04/04/25 | Exhibit 35 to the Declaration of Jonathan Rosenthal (Jason Mast, *Columbia scientists reel as Trump administration cancels grants, hitting broad suite of research*, Stat News (March 11, 2025)) | JA442 |

| 48 | 50-6 | 04/04/25 | Exhibit 36 to the Declaration of Jonathan Rosenthal (Isabella Cueto, *ME/CFS research program shuts down at Columbia after Trump cuts*, Stat News (March 19, 2025)) | JA448 |
|---|---|---|---|---|
| 49 | 50-7 | 04/04/25 | Exhibit 37 to the Declaration of Jonathan Rosenthal (March 30, 2025 Open letter in response to federal funding cuts at Columbia) | JA453 |
| Volume 4 | | | | |
| 50 | 50-8 | 04/04/25 | Exhibit 38 to the Declaration of Jonathan Rosenthal (Mark Alfred, *The Trump Administration Cut Cancer and Alzheimer's Research Funding at Columbia University*, Notus (March 18, 2025)) | JA477 |
| 51 | 50-9 | 04/04/25 | Exhibit 39 to the Declaration of Jonathan Rosenthal (Thomas Bailey, *Update in Light of March 7 Federal Announcement*, Teachers College of Columbia University (March 7, 2025)) | JA483 |
| 52 | 50-10 | 04/04/25 | Exhibit 40 to the Declaration of Jonathan Rosenthal (Jocelyn Kaiser, *After Columbia's 'nightmare,' dozens more universities brace for Trump NIH cuts*, Science (March 18, 2025)) | JA486 |
| 53 | 51-1 | 04/04/25 | Exhibit 41 to the Declaration of Jonathan Rosenthal (Congressional Record, Senate (April 7, 1964)) | JA490 |
| 54 | 51-2 | 04/04/25 | Exhibit 42 to the Declaration of Jonathan Rosenthal (Congressional Record, House of Representatives (Feb. 7, 1964)) | JA497 |
| 55 | 51-3 | 04/04/25 | Exhibit 43 to the Declaration of Jonathan Rosenthal (Abigail A. Graber, *Religious Discrimination at School: Application of Title VI of the Civil Rights Act of 1964*, Congressional Research Service (Sept. 17, 2024)) | JA504 |
| 56 | 51-4 | 04/04/25 | Exhibit 44 to the Declaration of Jonathan Rosenthal (Jared P. Cole, *Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of* | JA511 |

| | | | | |
|---|---|---|---|---|
| | | | *1964*, Congressional Research Service (April 4, 2019)) | |
| 57 | 51-5 | 04/04/25 | Exhibit 45 to the Declaration of Jonathan Rosenthal (*Case Processing Manual*, U.S. Department of Education Office for Civil Rights (Feb. 19, 2025)) | JA539 |
| 58 | 51-6 | 04/04/25 | Exhibit 46 to the Declaration of Jonathan Rosenthal (*Upholding Our Values*, Columbia Office of the President (Oct. 18, 2023)) | JA572 |
| 59 | 51-7 | 04/04/25 | Exhibit 47 to the Declaration of Jonathan Rosenthal *(Standing in Solidarity*, Columbia Office of the President (Oct. 27, 2023)) | JA575 |
| 60 | 51-8 | 04/04/25 | Exhibit 48 to the Declaration of Jonathan Rosenthal (*Task Force on Antisemitism*, Columbia University | JA578 |
| Volume 5 | | | | |
| 61 | 51-9 | 04/04/25 | Exhibit 49 to the Declaration of Jonathan Rosenthal (*Announcing Task Force on Antisemitism*, Columbia Office of the President (Nov. 1, 2023)) | JA587 |
| 62 | 51-10 | 04/04/25 | Exhibit 50 to the Declaration of Jonathan Rosenthal (*About the Task Force on Antisemitism*, Columbia University) | JA590 |
| 63 | 52-1 | 04/04/25 | Exhibit 51 to the Declaration of Jonathan Rosenthal (*Report #1: Task Force on Antisemitism Columbia University's Rules on Demonstrations*, Columbia University (March 2024)) | JA593 |
| 64 | 52-2 | 04/04/25 | Exhibit 52 to the Declaration of Jonathan Rosenthal (*President Shafik Welcomes the First Set of Recommendations From the Task Force on Antisemitism*, Columbia Office of the President (March 4, 2024)) | JA612 |
| 65 | 52-3 | 04/04/25 | Exhibit 53 to the Declaration of Jonathan Rosenthal (*Report #2: Task Force on Antisemitism*, Columbia University (Aug. 2024)) | JA615 |

| 66 | 52-4 | 04/04/25 | Exhibit 54 to the Declaration of Jonathan Rosenthal (*Combatting Antisemitism*, Columbia Office of the President) | JA620 |
|---|---|---|---|---|
| 67 | 52-5 | 04/04/25 | Exhibit 55 to the Declaration of Jonathan Rosenthal (*University Statement Regarding UJB Determinations*, Columbia University Office of Public Affairs (March 13, 2025)) | JA625 |
| 68 | 52-6 | 04/04/25 | Exhibit 56 to the Declaration of Jonathan Rosenthal (Office of Public Affairs, *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism*, U.S. Department of Justice (Feb. 28, 2025)) | JA628 |
| 69 | 52-7 | 04/04/25 | Exhibit 57 to the Declaration of Jonathan Rosenthal (Office of Communications and Outreach, *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, U.S. Department of Education (March 10, 2025)) | JA632 |
| 70 | 52-8 | 04/04/25 | Exhibit 58 to the Declaration of Jonathan Rosenthal (Maya Sulkin, *Columbia University Says One Thing to Trump Admin—and Another in Private*, The Free Press (March 25, 2025)) | JA637 |
| 71 | 52-9 | 04/04/25 | Exhibit 59 to the Declaration of Jonathan Rosenthal (*A Message from Dr. Katrina A. Armstrong*, Columbia University Office of Public Affairs (March 28, 2025)) | JA642 |
| 72 | 52-10 | 04/04/25 | Exhibit 60 to the Declaration of Jonathan Rosenthal (*Joint Task Force statement regarding Columbia University's steps to advance negotiations*, U.S. General Services Administration (March 28, 2025)) | JA645 |
| 73 | 52-11 | 04/04/25 | Exhibit 61 to the Declaration of Jonathan Rosenthal (Eugene Volokh et al., *A Statement from* | JA648 |

| | | | | |
|---|---|---|---|---|
| | | | *Constitutional Law Scholars on Columbia*, The New York Review (March 20, 2025)) | |
| 74 | 93 | 05/01/25 | Declaration of Josh Gruenbaum in Opposition to Plaintiffs' Motion for a Preliminary Injunction | JA653 |
| 75 | 93-1 | 05/01/25 | Exhibit A to the Declaration of Josh Gruenbaum (March 3, 2025 Memorandum to Columbia University from Josh Gruenbaum) | JA657 |
| 76 | 94 | 05/01/25 | Declaration of Allison M. Rovner in Opposition to Plaintiffs' Motion for a Preliminary Injunction | JA661 |
| 77 | 94-1 | 05/01/25 | Exhibit A to the Declaration of Allison Rovner (March 7, 2025 Letter to the Trustees of Columbia University from Mark Washington) | JA663 |
| 78 | 94-2 | 05/01/25 | Exhibit B to the Declaration of Allison Rovner (March 7, 2025 Letter to the Teachers College Columbia University from Mark Washington) | JA666 |
| 79 | 94-3 | 05/01/25 | Exhibit C to the Declaration of Allison Rovner (Oral Argument Transcript of Mahmoud Kahil et al., v. The Trustees of Columbia University in the City of New York, et al. (March 25, 2025)) | JA669 |
| 80 | 99 | 05/08/25 | Reply Declaration of Jonathan Rosenthal in Support of Plaintiffs' Motion for Preliminary Injunction | JA674 |
| 81 | 99-1 | 05/08/25 | Exhibit 62 to the Reply Declaration of Jonathan Rosenthal (Sara Reardon, *Exclusive: NIH freezes all research grants to Columbia University,* Science (April 9, 2025)) | JA680 |
| 82 | 99-2 | 05/08/25 | Exhibit 63 to the Reply Declaration of Jonathan Rosenthal (Maddie Khaw, *All of Columbia's NIH Funding Is Apparently Frozen. Here's What That Looks Like for One Researcher*, Chronicle (April 11, 2025)) | JA683 |

| 83 | 99-3 | 05/08/25 | Exhibit 64 to the Reply Declaration of Jonathan Rosenthal (April 11, 2025 Letter to Harvard University) | JA690 |
|----|------|----------|----|----|
| 84 | 99-4 | 05/08/25 | Exhibit 65 to the Reply Declaration of Jonathan Rosenthal (Michael C. Bender et al., *Inside Trump's Pressure Campaign on Universities*, The New York Times (April 14, 2025)) | JA696 |
| 85 | 99-5 | 05/08/25 | Exhibit 66 to the Reply Declaration of Jonathan Rosenthal (*Sustaining Columbia's Vital Mission*, Columbia Office of the President (April 14, 2025)) | JA714 |
| 86 | 99-6 | 05/08/25 | Exhibit 67 to the Reply Declaration of Jonathan Rosenthal (April 14, 2025 Letter from Harvard University) | JA717 |
| 87 | 99-7 | 05/08/25 | Exhibit 68 to the Reply Declaration of Jonathan Rosenthal (*Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University*, U.S. Department of Education (April 14, 2025)) | JA720 |
| 88 | 99-8 | 05/08/25 | Exhibit 69 to the Reply Declaration of Jonathan Rosenthal (Liz Essley Whyte et al., *The Little-Known Bureaucrats Tearing Through American Universities*, The Wall Street Journal (April 14, 2025)) | JA722 |
| 89 | 99-9 | 05/08/25 | Exhibit 70 to the Reply Declaration of Jonathan Rosenthal (Alan Blinder, *Trump Has Targeted These Universities. Why?*, The New York Times (April 15, 2025)) | JA732 |
| 90 | 99-10 | 05/08/25 | Exhibit 71 to the Reply Declaration of Jonathan Rosenthal (*Miguel S. Urquiola*, Columbia Office of the Provost) | JA739 |
| 91 | 99-11 | 05/08/25 | Exhibit 72 to the Reply Declaration of Jonathan Rosenthal (Meghnad Bose et al., *Inside Columbia's Betrayal of its Middle Eastern Studies Department*, The Intercept (April 16, 2025)) | JA742 |

| 92 | 99-12 | 05/08/25 | Exhibit 73 to the Reply Declaration of Jonathan Rosenthal (Truth Social Post from Donald J. Trump (April 16, 2025)) | JA755 |
|---|---|---|---|---|
| 93 | 99-13 | 05/08/25 | Exhibit 74 to the Reply Declaration of Jonathan Rosenthal (Anil Oza et al., *NIH said to have halted awarding of new grants to more top universities*, Stat News (April 18, 2025)) | JA757 |
| 94 | 99-14 | 05/08/25 | Exhibit 75 to the Reply Declaration of Jonathan Rosenthal (X Post from Max Kozlov (April 18, 2025)) | JA760 |
| 95 | 99-15 | 05/08/25 | Exhibit 76 to the Reply Declaration of Jonathan Rosenthal (Nandika Chatterjee, *Trump Takes Personal Revenge on Harvard's Lawyer for Standing Up to Him*, Daily Beast (April 24, 2025)) | JA762 |
| Volume 6 | | | | |
| 96 | 99-16 | 05/08/25 | Exhibit 77 to the Reply Declaration of Jonathan Rosenthal (May 5, 2025 Letter to Hard University from Linda E. McMahon) | JA769 |
| 97 | 99-17 | 05/08/25 | Exhibit 78 to the Reply Declaration of Jonathan Rosenthal (*Preserving Columbia's Critical Research Capabilities*, Columbia Office of the President (May 6, 2025)) | JA773 |
| 98 | 99-18 | 05/08/25 | Exhibit 79 to the Reply Declaration of Jonathan Rosenthal (Diabetes Prevention Program et al., *An open letter to the Columbia administration*, Columbia Spectator (May 4, 2025)) | JA777 |
| 99 | 99-19 | 05/08/25 | Exhibit 80 to the Reply Declaration of Jonathan Rosenthal (Liz Essley Whyte et al., *Trump Administration Proposes Terms for Federal Oversight of Columbia University*, The Wall Street Journal (May 5, 2025)) | JA781 |
| 100 | 100 | 05/08/25 | Supplemental Declaration of Todd Wolfson | JA785 |

| 101 | 101 | 05/08/25 | Supplemental Declaration of Julie Schmid | JA796 |
|---|---|---|---|---|
| 102 | 102 | 05/08/25 | Supplemental Declaration of Reinhold Martin | JA800 |
| 103 | 103 | 05/08/25 | Declaration of Joshua Jacobs | JA804 |
| 104 | 104 | 05/08/25 | Declaration of Jamie Daw | JA812 |
| 105 | 105 | 05/08/25 | Declaration of Abigail Greenleaf | JA818 |
| 106 | 121 | 05/20/25 | Order Denying Requests to Seal | JA823 |
| 107 | 124 | 05/23/25 | Declaration of Matthew Murray in Support of Plaintiffs' Motion for Preliminary Injunction | JA829 |
| 108 | 124-1 | 05/23/25 | Exhibit A to the Declaration of Matthew Murray (*HHS' Civil Rights Office Finds Columbia University in Violation of Federal Civil Rights Law*, U.S. Department of Health and Human Services (May 22, 2025)) | JA831 |
| 109 | 128 | 05/23/25 | Declaration of Ezra Susser (Witness B) | JA836 |
| 110 | 129 | 05/23/25 | Declaration of Joseph Slaughter (Witness C) | JA844 |
| 111 | 130 | 05/23/25 | Declaration of Joel Swanson (Witness D) | JA849 |
| 112 | 131 | 05/23/25 | Declaration of Andrew Geneslaw (Witness K) | JA857 |
| 113 | 132 | 05/23/25 | Declaration of Alex de Sherbinin (Witness L) | JA863 |
| 114 | 133 | 05/23/25 | Declaration of Mary Beth Terry (Witness M) | JA868 |
| 115 | 134 | 05/23/25 | Declaration of Steven Chillrud (Witness N) | JA873 |
| Volume 7 | | | | |
| 116 | 136 | 05/23/25 | Declaration of Teresa Javenic (Witness O) | JA879 |
| 117 | 137 | 05/23/25 | Supplemental Declaration of Joseph Slaughter (Witness C) | JA886 |

| 118 | 138 | 05/23/25 | Supplemental Declaration of Andrew Geneslaw (Witness K) | JA889 |
|---|---|---|---|---|
| 119 | 139 | 05/23/25 | Amended Declaration of Melanie Wall (Witness A) | JA892 |
| 120 | 140 | 05/23/25 | Amended Declaration of Safia Southey (Witness E) | JA899 |
| 121 | 141 | 05/23/25 | Amended Declaration of Anne Li (Witness I) | JA903 |
| 122 | 142-1 | 05/23/25 | Amended Declaration of Jon Lorsch, Ph.D | JA907 |
| 123 | 142-2 | 05/23/25 | Exhibit A to the Amended Declaration of Jon Lorsch (*NIH Grants Policy Statement,* National Institutes of Health (April 2024)) | JA914 |
| 124 | 142-3 | 05/23/25 | Exhibit B to the Amended Declaration of Jon Lorsch (Dorothy A. Fink, *Secretarial Directive on DEI-Related Funding*, Department of Health & Human Services (Feb. 10, 2025)) | JA921 |
| 125 | 142-4 | 05/23/25 | Exhibit C to the Amended Declaration of Jon Lorsch (Matthew J. Memoli, M.D., *Directive on NIH Priorities*, National Institutes of Health (Feb. 21, 2025)) | JA924 |
| 126 | 142-5 | 05/23/25 | Exhibit D to the Amended Declaration of Jon Lorsch (March 10, 2025 Letter to Angela V. Olinto, Ph.D., from Michelle G. Bulls) | JA927 |
| 127 | 142-6 | 05/23/25 | Exhibit E to the Amended Declaration of Jon Lorsch (March 14, 2025 Letter to Angela V. Olinto, Ph.D., from Michelle G. Bulls) | JA930 |
| 128 | 142-7 | 05/23/25 | Exhibit F to the Amended Declaration of Jon Lorsch (March 7, 2025 Notification of Termination of Multiple Task Orders to the Trustees of Columbia University from Alice Pagán Pereira) | JA933 |
| 129 | 149 | 06/16/25 | Notice of Appeal | JA935 |
| Volume 8 | | | | |

| 130 | 145 | 05/29/25 | Amended Declaration of Witness J (To be filed UNDER SEAL and included in Joint Appendix contingent upon this Court's grant of Plaintiffs' Unopposed Motion to File Under Seal) | JA937 |
|---|---|---|---|---|

# EXHIBIT 38

JA477

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 18 of 127
Case: 1:25-cv-02429-MK DocumentNo-1 Filed: 04/25 Page: 2 of 6

**HEALTH & SCIENCE**

# The Trump Administration Cut Cancer and Alzheimer's Research Funding at Columbia University

His administration terminated a $5 million grant to the Herbert Irving Comprehensive Cancer Center — and listed the exact dollar amount among DOGE's "savings."



John McDonnell/AP

**By Mark Alfred**

**March 18, 2025 05:03 AM**

JA478

3/21/25, 12:13 PM
Trump Gov Terminated (MH) Cancer and DOGEbag Research Funding at Columbia University - N' (Gall, (Allbritton Journalism Institute)

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 19 of 127

Case 1:25-cv-02321 (MH) DOGE Research Filed 04/25 Page 3 of 6



President Donald Trump's administration terminated a $5 million grant to the Herbert Irving Comprehensive Cancer Center amid the White House's sweeping efforts to punish Columbia University for its approach to protests against the war in Gaza.

The terminated grant, which has not been previously reported, appears to be one of the more than 400 National Institutes of Health grants pulled at Columbia University over its handling of alleged antisemitism on campus.

Neither the White House nor Columbia University has said which grants were terminated, but NOTUS identified that grant and hundreds of others not previously reported by analyzing data published by the Department of Government Efficiency and the NIH.

Several of the grants that were cut supported research, including the Alzheimer's Disease Research Center's work toward "early detection, prevention and intervention." Others supported research on HIV, maternal health, cardiovascular disease and drug abuse prevention, along with other programs spread across research centers tied to Columbia University.

The grants affected not only specific research programs but also funding for students' education. Multiple terminated grants, totaling over a million dollars collectively, supported the training of students in the fields of neuroscience research and autoimmune rheumatic diseases.

The exact dollar figure for each of those grants is listed on the DOGE website's "savings" page without a name attached.

The cuts are part of the White House's wider effort to go after Columbia University. Earlier this month, HHS, the Department of Education and other agencies said they would cancel a collective $400 million worth of federal grants at the campus "due to the school's continued

inaction in the face of persistent harassment of Jewish students." The agencies are members of the administration's Joint Task Force to Combat Anti-Semitism.

A few days later, the NIH, the largest sponsor of biomedical research globally, said it canceled upward of 400 grants worth over a quarter-billion dollars at Columbia University. The same day, DOGE updated its savings page to include nearly 400 new grants listed as "terminated" by the Department of Health and Human Services, the NIH's parent agency.

Although the page does not list what each award is for, NOTUS matched the dollar amounts of nearly every HHS grant added that day to corresponding grants previously doled out by the NIH to Columbia University. (Some grants had a listed value of $0, making them impossible to identify.)

The Herbert Irving Comprehensive Cancer Center, which is part of the Columbia University Irving Medical Center, was granted $5,302,111 in August 2024. The budget end date was listed as June 30, but it was updated in recent days to be March 12. It was around that time that DOGE listed a $5,302,111 federal grant issued and terminated by HHS on its savings page.

Columbia's Irving Medical Center said the campus was still in the process of "reviewing notices and cannot confirm how many grant cancellations have been received from federal agencies since March 7."

The campus remains "dedicated to our mission to advance lifesaving research and pledge to work with the federal government to restore Columbia's federal funding," a spokesperson told NOTUS in a statement.

"From pioneering cancer treatments to innovative heart disease interventions and cutting-edge gene and cell therapies, research conducted by Columbia faculty has helped countless people live healthier, longer, and more productive lives," the spokesperson said.

JA480

The White House did not respond to a request for comment. Neither the NIH nor the National Cancer Institute responded to requests for comment.

"Anti-Semitism – like racism – is a spiritual and moral malady that sickens societies and kills people with lethalities comparable to history's most deadly plagues," Secretary Robert F. Kennedy, Jr. said in a statement announcing HHS's review of grants at Columbia University.

The Trump administration demanded that Columbia University implement a series of changes to its policies by the end of the day Wednesday. Without those changes, the administration said it would not begin "formal negotiations" with Columbia University to receive continued federal funding.

The demands, outlined in a March 13 letter from the General Services Administration, HHS and Education Department officials, included the "expulsion or multi-year suspension" of those who participated in encampments on campus, the reforming of "undergraduate admissions, international recruiting, and graduate admissions practices" and a ban on face mask use with exceptions for "religious and health reasons."

While the White House looks to make an example out of Columbia, dozens of other universities could soon see federal funding pulled.

The same day NIH canceled hundreds of grants to Columbia University, the Department of Education's Office for Civil Rights put 59 other universities on notice. Those included Harvard, Stanford, Northwestern, four University of California campuses and others being investigated for potential Title VI violations "relating to antisemitic harassment and discrimination."

"U.S. colleges and universities benefit from enormous public investments funded by U.S. taxpayers," Secretary of Education Linda McMahon wrote. "That support is a privilege and it is contingent on scrupulous adherence to federal antidiscrimination laws."

JA481

—

*Mark Alfred is a NOTUS reporter and an Allbritton Journalism Institute fellow. He can be reached on Signal at MarkAlfred.14 or at MarkAlfred@NOTUS.org.*

---

NEW ON NOTUS

- **Courts:** A New Court Filing Shows How Serious the White House Is About Invoking 'State Secrets' Over Its Deportations

- **Arizona:** The Arizona Race to Replace Raúl Grijalva Could Show What's Next For the Democratic Party

- **Congress:** Some Republicans Doubt Congress Will Vote to End the Department of Education

- **Newsletter:** The Ed Dept. Gets DOGE'd

- **Policy:** Consumer Protection Groups Plead With Congress to Block Trump's FTC Pick Over Firings

---

DON'T MISS

- **Health & Science:** Trump Administration Backtracks on Closing the Field Office That Oversees a Nuclear Waste Site

- **The Influencers:** If Trump Succeeds, This Man May Be Why

- **Donald Trump:** When DOGE Hits Red States: Republican Lawmakers Push Back on Trump's NIH Cuts

- **Democrats:** Democrats Name Their Battlegrounds for the Next Two Years of State-Level Races

- **Defense:** Hegseth's First Days in the Pentagon Are Marked by Tragedy — And Chaos

---

## Allbritton Journalism Institute

# EXHIBIT 39

JA483

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 24 of 127

*A Graduate School of Education, Health & Psychology*

Announcements

# Update in Light of March 7 Federal Announcement

## Friday, March 7, 2025

Dear Members of the TC Community,

Earlier today (March 7), the Federal Government announced (https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million) the immediate cancellation of $400 million in federal grants and contracts to Columbia University because of what it described as the school's failure to address antisemitism and protect Jewish students from harassment.

Even though Teachers College is an independent institution, guided by a separate Board of Trustees and President, one that enforces its own set of anti-harassment and anti-discrimination policies, we have received notice that a number of our faculty grants are also being cut as part of this effort. We are investigating the scope and legality of these cuts and the impact they will have on our faculty, students, staff, and the communities they serve.

These wholesale cuts to vital research endeavors will have lasting and devastating impacts on the public good, to which our university system is devoted: from public health, to K-12 teachers and students, mental health and counseling, community colleges, and much more. We will fight to restore these critical funds, and will appeal the decision.

Our mission and priority focus remain on the well-being of our students, faculty, staff, and on our contributions to building a smarter, healthier, more just and equitable world.

I am grateful that the TC community is united in this focus and will keep you informed as we move forward.

Sincerely,

**Thomas Bailey**
President
Teachers College, Columbia University

**Tags:** Announcements (/newsroom/stories/?news-10749105=1%3A1088%3A%25%3A%25%3A25)

President (/newsroom/stories/?news-10749105=1%3A%25%3A1502%3A%25%3A%25)

JA484

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 25 of 127
Case 1:25-cv-04292-MKV Document 50 March 1 Filed 04/30/25 Page 3 of 3

*Published Friday, Mar 7, 2025*

## Contact Us

Teachers College Newsroom

*Address:* Institutional Advancement 193-197 Grace Dodge Hall

*Box:* 306 * *Phone:* (212) 678-3231 * *Email:* views@tc.columbia.edu

© 2025, Teachers College, Columbia University, New York, NY 10027.

JA485

# EXHIBIT 40

JA486

ADVERTISEMENT

HOME › NEWS › SCIENCEINSIDER › AFTER COLUMBIA'S 'NIGHTMARE,' DOZENS MORE UNIVERSITIES BRACE FOR TRUMP NIH CUTS

SCIENCEINSIDER    SCIENTIFIC COMMUNITY

# After Columbia's 'nightmare,' dozens more universities brace for Trump NIH cuts

Threats to end funding over alleged antisemitism are rocking medical researchers—and stoking calls for legal action

18 MAR 2025 • 3:40 PM ET • BY JOCELYN KAISER



President Donald Trump's administration alleges Columbia University mishandled campus protests over the war in Gaza.  ANDREA RENAULT/STAR MAX/IPX VIA AP

SHARE:        

 A version of this story appeared in Science, Vol 387, Issue 6740. 

A "nightmare," "in shock," "devastating." Those are some reactions Columbia University researchers had last week after learning that their funding is included in the $250 million in National Institutes of Health (NIH) grants that President Donald Trump's administration is terminating because of the university's alleged "antisemitic harassment." The cancellation, which covers about one-third of the university's NIH grants, mostly to Columbia's Irving Medical Center, has put research projects on hold while the university scrambles to negotiate with Trump officials and find ways to at least temporarily support students, postdocs, and other staff.

Columbia's situation has rocked major research universities nationwide as the Trump administration has warned it is investigating 59 additional schools for antisemitism. As *Science* went to press, many were waiting to see whether Columbia sues to block the funding elimination, as legal experts say it could do successfully. "They would have a very, very strong likelihood" of winning a court order to "unpause" funding," says Samuel Bagenstos, a law professor at the University of Michigan and former general counsel of the Department of Health and Human Services (HHS), NIH's parent agency.

The nightmare began on 3 March, when HHS, the Department of Education, and the General Services Administration notified Columbia that officials were reviewing the school's federal funding as part of "ongoing investigations" into potential civil rights violations involving antisemitism. White House officials have suggested university officials did not do enough to protect Jewish students at Columbia who felt threatened last year when other students held major demonstrations opposing Israel's bombing of Gaza in response to the 7 October 2023 attack by Hamas.

**SIGN UP FOR THE AWARD-WINNING** *SCIENCE* **ADVISER NEWSLETTER**

The latest news, commentary, and research, free to your inbox daily

SIGN UP ›

On 7 March, the administration announced it was terminating $400 million in grants and contracts to Columbia. That total included 400 NIH grants totaling $250 million, the agency later claimed on X, the social media company owned by billionaire Elon Musk, who now leads the Department of Government Efficiency (DOGE).

As of 18 March, the university could not confirm how many grants had been killed, a spokesperson said. Among the awards NIH grantees say administrators have told them are terminated are training and research project grants, as well as larger awards to Columbia's Alzheimer's disease, autism, and cancer centers. Grantees have been told to cease work. One researcher who received a formal cancellation notice this week from NIH was told their funding was terminated "due to unsafe antisemitic actions that suggest the institution lacks concern for the safety and wellbeing of Jewish students." Columbia can request funds only "to support patient safety and orderly closeout," it added.

Immunologist Megan Sykes, in contrast, only learned from Columbia that her $3.2 million grant to study xenotransplantation—transplanting animal organs into humans—in mice, monkeys, and pigs was killed. "I've been working with the NIH for 35 years and it's beyond anything I ever imagined. … I feel absolutely shattered," Sykes says. Like many others given the bad news by Columbia, she wonders whether a "diversity" component of her grant—to hire a graduate student from a group underrepresented in science—caught the administration's attention.

ADVERTISEMENT

The school's partners are also potential collateral damage. Columbia physician and aging researcher José Luchsinger is a principal investigator for an $18 million grant that Columbia manages for about two dozen institutions and a couple hundred staff for a study that has been following 1700 people with diabetes for nearly 30 years. The latest phase is exploring mechanisms by which diabetes might cause Alzheimer's—an alternative to the popular amyloid hypothesis. HHS Secretary Robert F. Kennedy Jr. has expressed support for such Alzheimer's research, Luchsinger notes. Luchsinger has not yet been formally notified by NIH, but "there's great concern about job cuts" and participants have been told by Columbia the funding has been eliminated and the study could be ending, he says. "It's a pity because Columbia is just a fraction of the study."

Several affected researchers told *Science* the university has said it will provide funding to keep trainees paid and help maintain experiments. But that will be "like trying to stick your finger in the dike," says physician-scientist Anthony Ferrante, who expects to lose two grants, one a $1.2 million award that helps support a 44-year-old obesity research center with about 100 researchers at Columbia and a partner school. "To be targeted in this way is demoralizing," Ferrante says.

Columbia so far has told staff to "stand together" and "we will never stray from open dialogue and free debate of ideas." But after the NIH announcement, the university said it has expelled or suspended some students involved in last year's protests. On 13 March, Trump officials sent a list of demands to Columbia that includes banning most mask wearing, adopting a formal definition of antisemitism, and placing one department in "receivership."

NIH has recently terminated grants on specific topics, such as transgender health and vaccine hesitancy, disfavored by the Trump administration, but the Columbia episode represents an escalation in which a political fight takes out unrelated science funding. There's worry the damage could spread. Another school on the administration's investigations list, Johns Hopkins University, has already announced it is laying off about 2200 people, most of them abroad, because it lost $800 million in multiyear public health funding from the U.S. Agency for International Development. The agency has largely been dismantled by DOGE.

Bagenstos notes the civil rights statute covering discrimination, Title VI, lays out a specific process—including a hearing—for withdrawing funds, which the Trump administration did not follow. "The cutoff of funds is totally illegal," he says. "If Columbia does not stand up [in court]," he says, "that makes it harder for the next university."

doi: 10.1126/science.z87okti

**RELEVANT TAGS:**

SCIENTIFIC COMMUNITY    TRUMP ADMINISTRATION

---

## ABOUT THE AUTHOR



### Jocelyn Kaiser ✉

Author

Jocelyn Kaiser writes about biomedical research news and edits *Science*'s online policy news. She can be found on Signal at jocelynkaiser.51.

---

## MORE FROM NEWS



20 MAR 2025
**This fuzzy hummingbird chick may be in disguise—as a caterpillar**
BY ERIK STOKSTAD



20 MAR 2025
**'Pioneering' study scans babies' brains as they form memories**
BY SARA REARDON



20 MAR 2025
**In Mauritius, research monkeys are big business—and big controversy**
BY REFAEL KUBERSKY

VIEW MORE  ›

---

## TRUMP TRACKER ⓘ



20 MAR 2025    BY SCIENCE NEWS STAFF
**NIH council meetings back on, questioning scientists, slow payments at USAID: Trump Tracker**

VIEW MORE  ›

# EXHIBIT 41



# Congressional Record

**United States of America**

## PROCEEDINGS AND DEBATES OF THE 88th CONGRESS, SECOND SESSION

---

## SENATE

### TUESDAY, APRIL 7, 1964

*(Legislative day of Monday, March 30, 1964)*

The Senate met at 10 o'clock a.m., on the expiration of the recess, and was called to order by Hon. CLAIBORNE PELL, a Senator from the State of Rhode Island.

Cardinal Franz Koenig, of the Roman Catholic Church, Vienna, Austria, offered the following prayer:

In the words of President George Washington:

"Almighty God:

"We make our earnest prayer that Thou wilt keep the United States in Thy holy protection; that Thou wilt incline the hearts of the citizens to cultivate a spirit of subordination and obedience to government; and entertain a brotherly love and affection for one another and for their fellow citizens of the United States at large. And, finally, that Thou wilt most graciously be pleased to dispose us all to do justice, to love mercy, and to demean ourselves with that charity, humility, and pacific temper of mind which were the characteristics of the Divine Author of our blessed religion, and without a humble imitation of whose example in these things we can never hope to be a happy nation.

"Grant our supplication, we beseech Thee, through Jesus Christ our Lord. Amen."

---

### THE JOURNAL

On request by Mr. HUMPHREY, and by unanimous consent, the reading of the Journal of the proceedings of Monday, April 6, 1964, was dispensed with.

---

### ORDER OF BUSINESS

Mr. HUMPHREY. Mr. President, I ask unanimous consent that there may be a morning hour, with statements therein limited to 3 minutes.

Mr. MORSE. Mr. President, I object.

The PRESIDING OFFICER. Objection is heard.

---

### CALL OF THE ROLL

Mr. HUMPHREY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

[No. 118 Leg.]

| | | |
|---|---|---|
| Aiken | Hickenlooper | Mundt |
| Allott | Holland | Muskie |
| Anderson | Hruska | Nelson |
| Bartlett | Humphrey | Neuberger |
| Bayh | Inouye | Pastore |
| Bible | Jackson | Pell |
| Boggs | Johnson | Proxmire |
| Brewster | Jordan, N.C. | Ribicoff |
| Burdick | Jordan, Idaho | Robertson |
| Cannon | Keating | Saltonstall |
| Carlson | Kennedy | Scott |
| Case | Kuchel | Smith |
| Church | Lausche | Sparkman |
| Clark | Long, Mo. | Stennis |
| Cotton | Magnuson | Symington |
| Curtis | Mansfield | Talmadge |
| Dirksen | McGovern | Thurmond |
| Dominick | McIntyre | Walters |
| Douglas | McNamara | Williams, N.J. |
| Ellender | Metcalf | Williams, Del. |
| Gore | Miller | Yarborough |
| Gruening | Monroney | Young, Ohio |
| Hart | Morse | |
| Hayden | Morton | |

Mr. HUMPHREY. I announce that the Senator from Connecticut [Mr. DODD], the Senator from Arkansas [Mr. FULBRIGHT], the Senator from Louisiana [Mr. LONG], the Senator from Minnesota [Mr. McCARTHY], the Senator from Arkansas [Mr. McCLELLAN], the Senator from Wyoming [Mr. McGEE], the Senator from Utah [Mr. MOSS], the Senator from Georgia [Mr. RUSSELL], and the Senator from North Carolina [Mr. ERVIN] are absent on official business.

I also announce that the Senator from Virginia [Mr. BYRD], the Senator from West Virginia [Mr. BYRD], the Senator from Mississippi [Mr. EASTLAND], the Senator from Oklahoma [Mr. EDMONDSON], the Senator from California [Mr. ENGLE], the Senator from Indiana [Mr. HARTKE], the Senator from Alabama [Mr. HILL], and the Senator from Florida [Mr. SMATHERS] are necessarily absent.

I further announce that the Senator from West Virginia [Mr. RANDOLPH] is absent because of illness.

Mr. KUCHEL. I announce that the Senator from Utah [Mr. BENNETT], the Senator from Arizona [Mr. GOLDWATER], and the Senator from North Dakota [Mr. YOUNG] are necessarily absent.

The Senator from Maryland [Mr. BEALL] and the Senator from Vermont [Mr. PROUTY] are detained on official business.

I also announce that the Senator from Kentucky [Mr. COOPER], the Senator from Hawaii [Mr. FONG], the Senator from New York [Mr. JAVITS], the Senator from New Mexico [Mr. MECHEM], the Senator from Kansas [Mr. PEARSON], the Senator from Wyoming [Mr. SIMPSON],

and the Senator from Texas [Mr. TOWER] are detained on official business.

The PRESIDING OFFICER (Mr. KENNEDY in the chair). A quorum is present.

---

### CIVIL RIGHTS ACT OF 1963

The PRESIDING OFFICER. The Chair lays before the Senate the unfinished business.

The Senate resumed the consideration of the bill (H.R. 7152) to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States to provide injunctive relief against discrimination in public accommodations, to authorize the Attorney General to institute suits to protect constitutional rights in public facilities and public education, to extend the Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes.

Mr. PASTORE obtained the floor.

Mr. HUMPHREY. Mr. President, will the Senator from Rhode Island yield to me without in any way jeopardizing his rights to the floor?

Mr. PASTORE. And with the understanding that it will not be counted as a second speech; I yield.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

### RECESS OF THE SENATE FROM 2 P.M. TO 4 P.M. TOMORROW

Mr. HUMPHREY. Mr. President, I should like to make an announcement.

I ask unanimous consent that tomorrow the Senate stand in recess from 2 o'clock to 4 o'clock, in order that the Senate may pay its respects to the late General MacArthur, and also in order that the members of the Armed Services Committee and the Senate leadership may participate in the ceremonies.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

---

### ORDER FOR RECESS TO 10 A.M. TOMORROW

Mr. HUMPHREY. I also ask unanimous consent that when the Senate completes its business today, it stand in recess until 10 a.m. tomorrow.

The PRESIDING OFFICER. Without objection, it is so ordered.

7045

CX——443


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

7058                     CONGRESSIONAL RECORD — SENATE                  *April 7*

white institutions in the four States maintaining complete segregation at the higher education level increases the disparity between the public financial support of colleges for white students and colleges for Negroes. In fiscal year 1958, for instance, the amount of Federal funds expended in support of public white institutions, per student enrolled, exceeded the amount expended for public Negro institutions by $130.88 in Alabama, $171.33 in Georgia, $179.50 in Mississippi, and $141.59 in South Carolina. The effect of this discrepancy is to contribute to the continuation of inferior segregated institutions and to magnify the disparity between the quality of the public higher education offered to white students and that offered to Negro students in such States. The same situation exists in other States, but, owing to desegregation in some degree of one or more public colleges or universities, the effect on a statewide basis is not so great.

Mr. PASTORE. Let me tell Senators how far matters have gone. A short while ago in Alabama an all-Negro program was instituted. Perhaps consciences are justified by saying it is "all-Negro." But what is the program? The program is in embalming and mortuary science. Yet in the same place they do not have any programs to allow Negro doctors to go into hospitals to treat Negro patients. There is a special program to teach Negroes how to embalm people when they die, but there is no program to enable Negro doctors to go into hospitals to treat Negro patients who want their own doctors when they are ill. I cannot, for the life of me, see how anyone can justify that as being morally right.

Another very important area of discrimination in federally financed programs is employment. Here discrimination is omnipresent, though the form it takes varies with the particular Federal program. Thus, for instance, in the State vocational training programs financed in part by Federal grants, markedly different courses are available to Negroes and whites.

The Commission on Civil Rights reports that vocational training programs in segregated public schools typically train Negroes only for the most menial jobs, requiring the lowest level of skills. But these are precisely the jobs for which the economy has less and less need. White schools, on the other hand, offer training in many of the newer skills in increasing demand today.

Thus, disparity in opportunity is perpetuated; but the Federal Government pays the bill.

The apprenticeship programs which are operated in many unions manifest similar discrimination. Typically, Negroes are excluded from these programs altogether or permitted entry only in the most menial trades. Negro apprentices in trades such as ironworkers, plumbers, steamfitters, electricians, sheet metal workers, cabinetmakers, and so forth, are virtually nonexistent.

While the Bureau of Apprenticeship of the Department of Labor provides no direct financial assistance to these programs, many of them reap the benefits of other Federal financial assistance, such as that for related classrooms and instructors' salaries.

There has also been a past record of discrimination and segregation by the country's largest employment agency, the U.S. Employment Service. The State employment security offices, while financed by the U.S. Government, are administered by the States. In the past, different offices, or different entrances and waiting rooms for a single office have been maintained. According to the 1961 report of the Civil Rights Commission:

In 1958, there were 15 cities in 4 States with physically segregated employment offices, 25 cities had offices with separate entrances and separate personnel to process white and Negro applicants, and in over 70 other cities the offices had either separate waiting rooms or separate service points for the different races. In some areas of the South, where the office is too small to support more than one employee, Negro and white applicants sit on different sides of the interviewer's desk.

In addition to offices segregated by law, there are many offices segregated in fact by being located in all-Negro or white neighborhoods, or because the office specialized in processing jobs customarily barred to Negroes. (1961 Report, U.S. Commission on Civil Rights, Employment, pp. 131–132.)

I ask unanimous consent that a portion of the U.S. Commission on Civil Rights 1961 Report on Employment be printed at this point in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

U.S. COMMISSION ON CIVIL RIGHTS 1961
REPORT ON EMPLOYMENT

The availability of training in Atlanta presents a different picture. The public schools are still segregated. Moreover, Atlanta has six other public training facilities which accept only whites, and only one that accepts both white and Negro clients for training. Of the 55 private training facilities, 37 accept only whites and 15 only Negroes. As a result of public and private discrimination in admission to training facilities, there is no local training available to Negroes in Atlanta in colleges of business administration, colleges or institutes of technology, art centers, law schools, schools of competency, or schools of pharmacy. Nor can Negroes in Atlanta obtain training as X-ray or medical technicians, medical records librarians, or in specialized airport occupations. The only local training available to Negroes but not to whites in a specializing facility is in embalming and mortuary science.

Mr. PASTORE. Many State employment offices have declined to hire Negroes altogether or have hired them only as janitors and yardmen. The Negro office generally handles only requests for unskilled labor, while the white office handles requests for all types of jobs. Not only are Negroes sent primarily for unskilled jobs but they are also sent out primarily for 1-day jobs, for short-term jobs, which results in their being unemployed again rapidly.

Discriminatory practices of that type are now prohibited by regulations, but affirmative congressional action is needed to insure that discrimination is ended in employment and in other activities which are federally financed.

This then concludes a sketch—and it is nothing more than a sketch—of the most blatant aspects of discrimination in federally financed programs.

From birth to death, in sickness and in want, in school, in job training, in distribution of surplus food, in program staffing, in job referral, in school lunch programs, and in higher education, the Negro has consistently been subjected to gross and extensive deprivation. And the Federal Government has paid the bill.

Now let us see what title VI provides. The first section, section 601, states a broad nondiscrimination principle which is both constitutionally and morally sound. That section provides that no person shall, on account of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. It is difficult to understand how anyone could dispute the basic fairness of this policy.

The next section in title VI, section 602, is an authorization and a direction to the Federal agencies administering a financial assistance program to take action to effectuate the basic principles of nondiscrimination stated in section 601.

I note parenthetically that agencies administering programs which consist of contracts of insurance or guarantee are excluded from the scope of section 602.

However, some of those agencies already have statutory authority to impose nondiscrimination provisions in connection with contracts of insurance or guarantee, and pursuant to Executive order, are now exercising that authority. The Veterans' Administration and the Federal Housing Administration are well-known examples. Title VI is not intended to and does not deprive such agencies of authority they have which may derive from any other source. Consequently, the exclusion of contracts of insurance or guarantee from the direction contained in section 602 will in no way affect the program of nondiscrimination in housing built with federally insured or guaranteed mortgages.

In accordance with the provisions of section 602, each agency affected is required by the term "shall" to take action to eliminate discrimination within the programs under its jurisdiction. By the term "may" each agency is given a certain degree of latitude in the procedure by which it accomplishes the mandate to eliminate discrimination. The agency may take action by or pursuant to rule, regulation, or order of general application.

They are the three categories stated in the act.

Action is mandatory, but the procedure by which that action is accomplished is discretionary, subject, however, to the approval of the President.

Some agencies have already taken action which meets the requirements of section 602. These agencies will be required only to review their past actions to make sure that they effectuate the policy set forth in title VI. Nothing more will be required of them. However, any additional or new action will have to be pursuant to a rule, regulation, or order of general applicability. In this context the word "may" imports a choice only among these three methods. It does not

confer freedom to effectuate section 602 in any other way.

The reason I emphasize it is that this was the question raised by the Senator from Tennessee [Mr. GORE].

Failure of a recipient to comply with a rule, regulation, or order issued by an agency may ultimately lead to a termination or refusal of Federal assistance. Cutoff of assistance is not the object of title VI, however.

I wish to repeat: Cutoff of assistance is not the objective of title VI.

Fund cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds.

The rule or regulation issued by the particular Federal agency would vary, depending on the nature and method of administration of the particular assistance program. There might be rules, for example, governing the conduct of recipients of assistance, or orders specifying a standard form of written assurance or understanding to be given by each applicant for assistance, or perhaps a standard provision-of-assistance contract.

One important thing must be kept in mind. Title VI is not a device to terminate all Federal aid to a State or community because there has been discrimination in one specific program. Therefore, the nondiscrimination requirements must relate directly to the particular program or activity against which they are imposed. Participation in one program would not justify the exaction of a non-discrimination assurance concerning some other program. Similarly, any fund cutoff, or similar action, can be taken only concerning a program or activity in which discrimination has been practiced. Only the program in which discrimination has been practiced would be affected by title VI.

Mr. RIBICOFF. Mr. President, will the Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. RIBICOFF. I believe the Senator makes an important point. One could cut off any other program, and the cutoff would be confined to the jurisdiction where discrimination was found. In other words, if there were 100 school districts and discrimination was found in 1 school district, the funds would be cut off for only that one school district, but not for the funds for the other 99.

Mr. PASTORE. The Senator is absolutely correct. It is not the intention of the framers, the sponsors, or the supporters of title VI of H.R. 7152 to enact punitive statutes. We do not wish to be vindictive. We do not wish to be punitive. We do not wish to be unreasonable. So the section provides that when Federal funds are used, they must be used in the American way—in a constitutional manner. That is its purpose.

With reference to the particular cutoff of Federal funds, as the Senator from Connecticut has brought out, it must be confined to the particular program that is involved. Let us assume that we are considering aid to dependent children. We could not cut off funds for the building of a road because that is another program, although it is a Federal grant. The action must be confined to the specific program in which discrimination exists, and then only within the particular jurisdiction where the discrimination takes place. There is no intent, no motive, no idea of spreading the tentacles of the Federal Government to choke off all State activity. Not at all.

Mr. RIBICOFF. What we are seeking to accomplish, as the Senator from Rhode Island has so ably pointed out, is to obtain compliance and eliminate discrimination. We do not wish to use punitive measures against any individual, any State, or any part of any State.

Mr. PASTORE. The Senator is absolutely correct. I shall discuss the procedures that must be followed to effectuate that end.

Mr. RIBICOFF. In other words, great safeguards have been built up even to protect an individual or a jurisdiction?

Mr. PASTORE. Frankly, I do not see how we could have gone any further, to be fair. Without title VI—accepting the fact that the President himself, under Presidential powers, has the right to issue directives, which he already has—such directives are much more stringent than the proposed title VI. Section 602 of title VI not only requires the agency to promulgate rules and regulations but all procedure must be in accord with these rules and regulations. They must have broad scope. They must be national. They must apply to all 50 States. We could not draw one rule to apply to the State of Mississippi, another rule to apply to the State of Alabama, and another rule to apply to the State of Rhode Island. There must be only one rule, to apply to every State.

Further, the President must approve the rule. Then, before there can be a cutoff of Federal funds, there must be a hearing. After the hearing, there may be a judicial review. In the meantime, before the agency can stop the money, it must submit a written report giving all the reasons why it wishes to cut off the money. This report must go to the appropriate committees of the Congress. Thereafter, the cutoff would not take effect for 30 days. If any unfairness existed, one can imagine what the repercussions would be on the floor of the Senate within those 30 days. Talk about a filibuster—it would be a Roman holiday.

Mr. RIBICOFF. More safeguards are provided in title VI than many executive agencies now have or have acted upon in the past; in other words, the rights and privileges of those affected would be fully safeguarded.

Mr. PASTORE. The Senator is absolutely correct.

Mr. STENNIS. Mr. President, before the Senator from Rhode Island returns to his text, will he yield to me for a few questions?

Mr. PASTORE. I am glad to yield to the Senator from Mississippi.

Mr. STENNIS. The Senator addressed himself to the powers in title VI. He was clear in his explanation of the extent of those powers, as he sees it. Will the Senator inform me just what words in title VI confer the power to cut off funds?

Mr. PASTORE. To cut them off?

Mr. STENNIS. Where is the power to cut off funds covered in title VI?

Mr. PASTORE. We start with section 601, which reads:

Notwithstanding any inconsistent provision of any other law, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance

Section 602 provides:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, shall take action to effectuate the provisions of section 601 with respect to such program or activity. Such action may be taken by or pursuant to rule, regulation, or order of general applicability and shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation or order shall become effective unless and until approved by the President. After a hearing, compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding of a failure to comply with such requirement.

It is right there.

Mr. STENNIS. Does the power to cut off the Federal assistance relate only to the agency which is administering the program? How far does it extend? I know the Senator wishes to be helpful.

Mr. PASTORE. This is its extent. Many community schools are controlled by county school districts. Let us assume that in one particular State only one school district has been guilty of discrimination. Aid would be cut off as to that one school district only. In other words, funds could not be used in that particular school district. However, the funds of the other school districts would not be cut off.

Mr. STENNIS. That is a good illustration, but suppose a statewide agency was found to be guilty of discrimination.

Mr. PASTORE. Then all assistance would be cut off.

Mr. STENNIS. In the entire State?

Mr. PASTORE. Yes, if discrimination reached that point, the Senator is correct.

Mr. STENNIS. That would, of course, work an injustice on many people.

Mr. PASTORE. If a statewide agency, as the Senator suggests, is guilty of discrimination, it might well be said that there would be an injury to many people if cutoff is applied. That is the cost of State-sponsored discrimination.

Mr. STENNIS. I ask the Senator if he has any suggestions as to how the situation could be handled so as to apply only to a limited area, where they were not all transgressors?

Mr. PASTORE. That would be quite impossible, if it were a program administered statewide, because, after all, I

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 34 of 127
Case 1:25-cv-02429-MKV    Document 51-1    Filed 04/04/25    Page 5 of 7

7062    CONGRESSIONAL RECORD — SENATE    *April 7*

cannot be expected to continue to pay out tax dollars contributed by all the people to just some of them and to exclude others because of the color of their skin. As I shall develop, there are some statutes now on the books which contemplate Federal assistance to racially segregated institutions.

For example, the Hill-Burton Act which provides for grants for hospital construction, the second Morrill Act which provides for grants to land-grant colleges, and Public Law 815 which authorizes grants for school construction in federally "impacted areas," all contain clauses authorizing—directly or by implication—that Federal aid be furnished under the obsolete separate-but-equal formula. But the Court has already declared that to be unconstitutional.

I ask unanimous consent that excerpts from these two acts be printed at this point in the RECORD.

There being no objection, the excerpts were ordered to be printed in the RECORD, as follows:

PROVISIONS OF EXISTING FEDERAL ASSISTANCE STATUTES RELATING TO RACIAL DISCRIMINATION

The Hill-Burton Act of August 13, 1946 (60 Stat. 1041, 42 U.S.C. 291 et seq.), authorizes construction grants for public and non-profit hospitals. Section 622(f), 42 United States Code 291e(f), provides that the Surgeon General shall by regulation prescribe, inter alia,

"That the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color. * * * Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group"[1]

The Second Morrill Act of August 30, 1890 (26 Stat. 416, 7 U.S.C. 321 et seq.), provides for annual grants to land-grant colleges. Section 1, 7 United States Code 323, provides in part:

"No money shall be paid out under sections 321-326 and 328 of this title to any State or Territory for the support or maintenance of a college where a distinction of race or color is made in the admission of students, but the establishment and maintenance of such colleges separately for white and colored students shall be held to be a compliance with the provisions of said sections if the funds received in such State or Territory be equitably divided as hereinafter set forth."

Public Law 815 of September 23, 1950 (64 Stat. 972 (reenacted as permanent legislation by the Act of August 12, 1958, 72 Stat 551) 20 U.S.C. 631 et seq.), provides for grants for school construction in federally impacted areas. Section 205(b)(1)(f) of the 1950 act (Sec. 6(b)(1)(f) of the 1958 act), 20 U.S.C. 636(b)(1)(f), provides that each application for grant shall include—

[1] The provision beginning "but an exception" was held invalid and severable in *Simkins v. Moses H. Cone Hospital* (C.A. 4, No. 8908) decided November 1, 1963.

"Assurance that the school facilities of such agency will be available to the children for whose education contributions are provided in this chapter on the same terms, in accordance with the laws of the State in which the school district of such agency is situated, as they are available to other children in such school district.".

Mr. PASTORE. Mr. President, as I have already noted, the separate-but-equal provision of the Hill-Burton Act was involved in litigation before the Court of Appeals for the Fourth Circuit and that court held that the provision was unconstitutional. The court enjoined hospitals involved upon excluding Negro patients and doctors. There has also been litigation involving Public Law 815. There, the Court of Appeals for the Fifth Circuit dismissed suits by the United States to enjoin pupil segregation at schools which received Public Law 815 funds, *United States v. Madison County Board of Education*, 326 F. 2d 237.

Enactment of title VI would eliminate that kind of confusion and override all such separate-but-equal provisions for the future regardless of the ultimate outcome of the pending litigation.

It is, of course, by no means true that in all instances payments to segregated institutions are required by positive command of present law.

Actually—and I want this to be well understood—in many respects title VI would merely clarify and support authority which now exists. For example, President Kennedy issued Executive Order No 11063—November 20, 1962, F.R. 11527—which requires the appropriate agencies to "take all action necessary and appropriate to prevent discrimination because of race, color, creed, or national origin" in the sale, lease, rental disposition, use or occupancy of housing which is provided in whole or in part with the aid of Federal grants, loans, contributions, guarantees, or insurance

Similarly racial discrimination in employment on construction in the programs supported by Federal financial assistance is prohibited by Executive Order No. 11114—June 25, 1963, 28 F.R. 6485

Individual agencies have also taken action to preclude racial discrimination in connection with assistance programs administered by them. For example, the regulations of the Department of Agriculture prohibit schools or other institutions receiving donated agricultural commodities from discriminating against any person receiving food because of his race, creed, or color—6 CFR, section 503.6 (a) and (b).

Mr. President, title VI would serve to provide express statutory approval for this kind of action taken by the executive branch. The executive officers, from the President on down, are sworn to uphold the Constitution They must see to it that the laws are faithfully executed. Certainly such officers must not engage in any conduct which they believe to be unconstitutional

In many instances, existing Federal programs have been interpreted by the agencies administering those programs to preclude discrimination. While the executive branch is believed in most cases to have adequate authority to preclude discrimination or segregation by

recipients of Federal assistance, enactment of title VI would clarify and confirm that authority. It would require agencies to act to eliminate racial discrimination, rather than to leave the matter, as now, to individual agency discretion. It would give the nondiscrimination policy express statutory sanction, and thus would tend to insure that the policy would be continued in future years as a permanent part of our national policy.

Another advantage of enactment of title VI would be to remove from the area of legislative debate the question of nondiscrimination every time a Federal assistance program is under consideration by Congress. Repeatedly, in recent years, nondiscrimination amendments have been proposed in Congress to bills providing for, or extending, Federal assistance to education, housing, and other matters. Such amendments have often been opposed by some Members of Congress who favored the principle of nondiscrimination, but feared that to raise the issue of discrimination in the particular legislative context might well result in the defeat of the particular bill.

Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of desirability of any particular Federal assistance program. The enactment of this title would avoid for the future the occasion for legislative dilemmas of the type described above. It would also avoid any basis for argument that the failure of Congress to adopt such nondiscrimination amendments in connection with the particular program implied congressional approval of racial discrimination in that program.

Speaking of congressional debate, I should now like to consider a number of objections which have been offered to title VI.

In the House, a concerted attack was made on title VI as "punitive" or "vindictive." These charges are undeserved. These characterizations appear to result from the belief that title VI is intended to deny the South the benefit of social-welfare programs—that it would punish entire States for any act of discrimination committed within them This argument merely betrays the issues. It ignores both the purpose of title VI and all of the limitations that have been carefully been written into its language.

As is clear, the purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination. In many instances, the practices of segregation and discrimination, which title VI seeks to end, are unconstitutional.

This is clearly so wherever Federal funds go to a State agency which engages in racial discrimination. It may also be so where Federal funds go to support private, segregated institutions, as the decision in the Simkins case teaches In all cases, racial discrimination is contrary to the national policy and to the moral sensibilities of the people of this Nation. Thus, title VI is simply designed to insure that Federal funds are spent in accordance with the Constitution and our public policy.

Speaking of private institutions, the original draft of title VI referred to religious discrimination. Since there is no history of discrimination on the basis of religion in the administration of Federal aid programs, the reference was eliminated—and wisely so, I believe.

Moreover, as cannot be too often emphasized, the purpose of title VI is not to cut off funds, but to end racial discrimination. This requirement is reflected in section 602, which provides that any action taken by the Federal department or agency must be "consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." As a general rule, cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available.

Section 602, by authorizing the agency to achieve compliance "by any other means authorized by law," encourages agencies to find ways to end discrimination without refusing or terminating assistance These careful safeguards certainly demonstrate that the proposed statute is not intended to be vindictive or punitive.

Nor does title VI vest any broad authority to cut off all Federal aid to a State just because there are instances of discrimination within that State Any nondiscrimination requirement an agency adopts must be supportable as tending to end racial discrimination with respect to the particular program or activity to which it applies Funds can be cut off only on an express finding that the particular recipient has failed to comply with that requirement Thus, title VI does not authorize any cutoff or limitation of highway funds, for example, by reasons of school segregation.

Nor does it authorize the cutoff or other compliance action on a statewide basis merely because there is discrimination in a particular program For example, in the case of grants to impacted area schools, separate compliance action would have to be taken with respect to each school district receiving a grant.

There is, finally, one additional feature of title VI which demonstrates beyond doubt that it is not intended to be vindictive or punitive. I am referring to the fact that the authority contained in the title to cut off funds is hedged about with a number of procedural restrictions and requirements. These would hardly be necessary or appropriate if the bill were designed as a punitive or vindictive measure. These restrictions have already been briefly described but let me here again summarize what must be done before funds can be cut off. The following would have to occur:

First. The agency must first adopt a general nondiscrimination rule, regulation, or order.

Second. The President must give his approval.

Third. The agency must seek to secure compliance by voluntary means.

Fourth. A hearing must be held before any formal compliance action is taken.

Fifth. The agency may, and in many cases will, seek to secure compliance by means not involving a cutoff of funds.

Sixth. If the agency determines that a refusal or termination of funds is appropriate, it must make an express finding that the particular person from whom funds are to be cut off is still discriminating

Seventh. The agency must file a written report with the appropriate congressional committee and 30 days must elapse before further action can be taken.

Eighth. The aid recipient can obtain judicial review and may apply for a stay pending such review,

Let me recount those eight safeguards to show that action under title VI is neither precipitous nor punitive.

Certainly, a piece of legislation that contains this multitude of protections cannot be said to be arbitrary, vindictive, or punitive.

Another objection that has been lodged against title VI is that it would give to the executive branch broad and sweeping powers that it has not heretofore known This is totally inaccurate. Most Federal agencies extending assistance now have authority to refuse or terminate assistance for failure to comply with a variety of requirements imposed by statute or by administrative action. The difference is that this existing statutory authority is not surrounded by the procedural safeguards provided for in title VI.

For example, the Hill-Burton Act provides that an application for a grant for hospital construction must meet a number of requirements, and if the application fails to meet any of them, the Surgeon General may simply disapprove.

In case of disapproval, the State agency involved in hospital control is entitled to a hearing prior to final disapproval, the hospital applying for a grant is not (42 U.S.C. 291(h)). Likewise, the State agency can obtain judicial review (42 U.S.C. 291(j)).

After a grant-in-aid under the Hill-Burton Act has been approved, the Surgeon General may terminate payments if he makes any one of a number of findings Again, the State has a right to judicial review (42 U.S.C. 291(j)),

How would title VI affect this procedure? It would, of course, have the effect of a repeal of the substantive provision which authorizes payments for separate-but-equal facilities—a provision which the court of appeals has already held unconstitutional. Thus, there would be no new authority to refuse a grant or terminate payments thereunder. But title VI would first afford the hospital, in addition to the State, a hearing in connection with a refusal or termination of a grant and judicial review under the Hill-Burton Act would, of course, continue to be available; second, require a report of any such refusal or termination to be made to Congress; third, require efforts to achieve voluntary compliance; and fourth, require Presidential approval of the Surgeon General's regulations relating to nondiscrimination.

There are numerous other Federal statutes that are similar in these respects to the Hill-Burton Act. This is true, for example, of the School Construction Act—Public Law 815—and the Library Services Act of 1956 (20 U.S.C. 351).

In most statutes of this type, considerable discretion is lodged in the administrator. When title VI is compared with these enactments, it is evident that the kind and degree of discretion granted here is far narrower and more carefully limited by procedural safeguards than that which Congress has frequently provided in other Federal assistance statutes.

There is another objection to title VI which has been advanced which is designed to foster public fear. It is alleged that title VI will interfere with private business. But title VI is not intended to regulate business. It is merely an exercise of an unquestioned power of the Federal Government. Under Federal assistance programs, the Federal Government is giving something away. Clearly, it should be able to fix the conditions under which money and goods are distributed. In fact, the Supreme Court has confirmed this power in the case of *Oklahoma* v. *Civil Service Commission*, 330 US 127, 143 (1947), where the Court said that the Federal Government may "fix the terms on which—Federal funds—shall be disbursed."

No one is required to accept Federal assistance or Federal funds If anyone does so voluntarily he must take it on the conditions on which it is offered Certainly no one can claim that it is arbitrary for the Federal Government to insist that its funds not be put to a use which is unconstitutional or contrary to public policy.

A California court put it graphically but accurately when it said:

When one dips one's hands into the Federal Treasury a little democracy clings to whatever is withdrawn, *Ming* v. *Horgan,* 3 R.R.L.R. 693, Superior Court, Sacramento 1958.

The basic fairness of title VI is so clear that I find it difficult to understand why it should create any opposition. When new Federal programs are devised or when Congress is concerned with the appropriation of Federal funds, there is always a clamor to insure that no funds be expended unless adequate safeguards are adopted to prevent their improper use. Certainly, if—to use again the Hill-Burton Act as an example—the Surgeon General can say that he will not authorize money for a particular hospital unless that hospital has a particular type of lavatory facility or a particular type of kitchen, it is hard to believe that private rights are being infringed if the hospital is also that it must serve all of the people in the community without regard to the color of the skin. It seems to me that Congress should be at least as concerned with the latter as with the former.

The principles of our Government are an example for the entire world. This country knows no castes and no classes. The tenet of the Declaration of Independence that all men are created equal has its counterpart in the constitutional

directive that all are entitled to the equal protection of the laws.

With each passing year, our practices approach more clearly our ideals.

Private prejudices, to be sure, cannot be eliminated overnight. However, there is one area where no room at all exists for private prejudices. That is the area of governmental conduct. As the first Mr. Justice Harlan said in his prophetic dissenting opinion in *Plessy* v. *Ferguson*, 163 U.S. 537, 559.

Our Constitution is colorblind

So—I say to Senators—must be our Government.

The enactment of title VI will insure for all time that the financial resources of this Government will play no part in subsidizing racial discrimination. That part of the bill is right legally; it is right constitutionally, and it is right morally.

Title VI is right—yet it is restrained—almost reluctant to use its powers—not vindictive but seeking voluntary compliance for the common good of all our people.

Title VI closes the gap between our purposes as a democracy and our prejudices as individuals. The cuts of prejudice need healing. The costs of prejudice need understanding. We cannot have hostility between two great parts of our people without tragic loss in our human values—without deep damage to our national decency and dignity—without threat to our manifest destiny in a world we have to accept for what it is—a world which has to accept us for what we are or aim to be.

Title VI offers a place for the meeting of our minds as to Federal money It can recognize no prejudice. It affords a place for the meeting of our hearts, as prejudice must yield to our common purposes, our common progress, and the common perfection of these United States.

Our conscience as a nation—our consciousness that the world is looking at our deeds as well as listening to our words—our commonsense as neighbors in a democracy that deserves to survive—all these commend title VI and command us to enact it as a vital part of a real civil rights bill.

Mr. HART. Mr. President, will the Senator yield?

Mr PASTORE. I yield.

Mr. HART. I would hope that every American concerned about the charges that are made with respect to the reach and scope of the pending bill would carefully read the brilliant remarks of the Senator from Rhode Island. I would go out on a limb which is not very long and which is pretty solid There are few Americans who in broad daylight would argue that the Federal Government should subsidize discrimination. That is what title VI is all about. No Senator could have put the case more eloquently and persuasively than has the Senator from Rhode Island. That is my reaction to a wonderful speech

Mr. PASTORE. I thank the Senator.

Mr. BOGGS. Mr. President, will the Senator yield?

Mr. PASTORE. I yield to the Senator from Delaware.

Mr. BOGGS. I wish to make only a brief comment. I always enjoy listening to the distinguished senior Senator from Rhode Island, but I have especially appreciated the opportunity to listen to his address on title VI of the pending legislation. It is an outstandingly able and valuable contribution to the legislative history of this title and the proposed legislation, and I thank him for it

Mr PASTORE. I thank the Senator from Delaware.

Mr. PELL Mr. President, will the Senator yield?

Mr. PASTORE I yield to my colleague from Rhode Island

Mr PELL. I rise to congratulate my senior colleague on his eloquent and excellent speech, and also to ask him one question in connection with it.

Is it not true that the philosophy of title VI is already in the law? The authority is permissive. Title VI would merely extend it, but would not bring in a new concept. Is that correct?

Mr. PASTORE. The Senator is correct.

Mr. RIBICOFF. Mr President, will the Senator yield?

Mr PASTORE I yield to the Senator from Connecticut.

Mr. RIBICOFF I commend the Senator from Rhode Island for a brilliant presentation of title VI. I believe the distinguished Senator from Rhode Island has done a great public service to the Senate and the country.

I deem it a decided privilege to be able to follow the Senator from Rhode Island in further explanation of title VI.

Mr. PASTORE. I thank the Senator

Mr President, I yield the floor

Mr. RIBICOFF, Mr. HART, and Mr. STENNIS addressed the Chair.

The PRESIDING OFFICER (Mr. INOUYE in the chair). The Chair recognizes the Senator from Connecticut.

Does the Senator from Connecticut yield?

Mr. HART Mr. President, my intention was to ask that the Senator from Connecticut yield to me for the purpose of suggesting the absence of a quorum, on condition that he would be recognized at the conclusion thereof.

Mr. RIBICOFF Mr. President, I yield, provided I do not lose the right to the floor.

The PRESIDING OFFICER. Is there objection to the request? Without objection, it is so ordered.

Mr HART Mr. President, I suggest the absence of a quorum

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk called the roll, and the following Senators answered to their names:

[No. 118 Leg.]

| | | |
|---|---|---|
| Aiken | Cotton | Johnston |
| Allott | Curtis | Jordan, Idaho |
| Anderson | Dirksen | Keating |
| Bartlett | Dominick | Kennedy |
| Bayh | Douglas | Kuchel |
| Beall | Fong | Lausche |
| Bible | Gore | Long, Mo |
| Boggs | Hart | Magnuson |
| Brewster | Hickenlooper | Mansfield |
| Burdick | Holland | McGovern |
| Cannon | Hruska | McIntyre |
| Carlson | Humphrey | McNamara |
| Case | Inouye | Mechem |
| Church | Jackson | Metcalf |
| Clark | Javits | Miller |

| | | |
|---|---|---|
| Monroney | Pell | Symington |
| Morton | Proxmire | Talmadge |
| Mundt | Ribicoff | Tower |
| Muskie | Robertson | Walters |
| Nelson | Saltonstall | Williams, Del |
| Neuberger | Scott | Yarborough |
| Pastore | Smith | Young, Ohio |
| Pearson | Stennis | |

The PRESIDING OFFICER. A quorum is present

Mr. RIBICOFF. Mr. President, of all the provisions of this civil rights bill, none rests on so simple and so sound a principle as does title VI. That principle is taxpayers' money, which is collected without discrimination, shall be spent without discrimination

This principle requires no argument. It is based on simple justice. It is based on ordinary decency It is consistent with, if not required by the U.S. Constitution.

In fact, the principle of nondiscrimination in the use of Federal funds is so undeniably sound that to my knowledge there has not been one word said in opposition to this principle during the debate on this bill. Some opponents of this bill have frankly expressed their view, in discussing other titles of the bill, that there is a question in their minds as to whether Negroes should have the right to go to public schools on the same basis as whites, or whether Negroes should have the right to enter places of public accommodation on the same basis as whites, or even whether Negroes should have the right to vote on the same basis as whites. But however ill-founded those views may be—and I deeply believe they are wrong as a matter of law and of morality—I have heard no opponent express the slightest doubt as to whether Negroes should participate in the benefits of federally aided programs on the same basis as whites. If such a point of view exists, I would like to hear it expressed I would be glad to yield at this point to any opponent of this bill who cares to contend that discrimination in federally aided programs is justified. I have heard no such argument nor do I expect to, for this is a principle on which 100 Senators and indeed every American can and do readily agree.

So unlike other titles in this bill, title VI seeks to protect a right that is universally recognized as being entitled to protection. The only issue is whether there is a need to protect the right and whether the remedies of title VI are reasonable and appropriate.

The need can be demonstrated conclusively. The fact is that discrimination does exist in federally aided programs. This result has been permitted, and until recently required, by Federal statutes such as the Hill-Burton Act for hospital construction, the Morrill Act for land-grant colleges, and Public Law 874 for construction of schools in federally impacted areas. In fiscal year 1962 more than $13 million of Federal funds was spent to build and operate impacted area schools in 3 States that have 100-percent school segregation. Millions more have gone to school districts in other States that are completely segregated. Since 1946, $32 million of Federal funds was used to build 76 medical facilities that admit no Negroes. Racial discrimination has occurred in programs

# EXHIBIT 42

JA497

**2460**   CONGRESSIONAL RECORD — HOUSE   *February 7*

small bells are hung above the highest platform. In order to achieve a musical balance, the tones of the large bells are slightly subdued by louvres, and a sounding board placed above the other bells amplifies their sound to a certain extent.

Listen once on a quiet summer afternoon in the wooded surroundings to the skillfully played carillon, and you will agree that the music arouses in you remarkable feelings, varying from subtle emotion while the small bells are being played to an almost overpowering feeling during the majestic sounds of the complete carillon when the largest bells are being played.

It is not surprising that a carillon can create such a deep emotion when we realize that of old even the sound of a single bell inspired poets and composers.

The carillon of real bells played by an inspired carillonneur brings us into a mood of heavenly peace and wonderful rest. As these bells ring out, putting music from the Netherlands into our American air, one more voice from beyond the sea will speak to us, and with us. It will have a noble message, for it will remind us of the great unity of the free peoples of this earth.

May the clear tones of the bells of Holland speak to us of the friendship that is possible between separate peoples. May they help us to understand that the forces which tie people together in freedom and harmony will always be greater than the forces which tend to drive them apart. May we come to see that a broader unity awaits the nations of this earth; and may this music, bespeaking the deep and lasting friendship between two great countries, take its place in our lives as a symbol of the peace and freedom which will someday prevail all across the world.

The Netherlands carillon and the surrounding grounds are administered by the National Capital region, National Park Service.

Mr. HUMPHREY. Mr. President, I have a feeling that with a little more prodding on the part of Congress, the banks of the Potomac may become melodious and that the beautiful music that can inspire the Nation's Capital will be forthcoming.

### ADJOURNMENT UNTIL NOON ON MONDAY, FEBRUARY 10, 1964

Mr. HUMPHREY. Mr. President, if there is no further business to be transacted, I move that the Senate adjourn until 12 o'clock noon on Monday next.

The motion was agreed to; and (at 6 o'clock and 55 minutes p.m.) the Senate adjourned until Monday, February 10, 1964, at 12 o'clock meridian.

### NOMINATION

Executive nomination received by the Senate February 7, 1964:

G. McMurtrie Godley, of the District of Columbia, a Foreign Service officer of class 1, to be Ambassador Extraordinary and Plenipotentiary of the United States of America to the Republic of the Congo.

## HOUSE OF REPRESENTATIVES

FRIDAY, FEBRUARY 7, 1964

The House met at 12 o'clock noon.

The Chaplain, Rev. Bernard Braskamp, D.D., offered the following prayer:

Romans 10: 12: *The same Lord, who is over all is rich unto all who call upon Him.*

Our Heavenly Father, inspire us to enter upon the tasks and responsibilities of this new day with noble desires and lofty purpose surging though our minds and hearts.

May we make the most of every opportunity and invest the best we have of wisdom and understanding, of intelligence and experience, of effort and enthusiasm in solving life's many problems.

Help us to appreciate more fully that the greatness and glory of life consists in doing what we can to make life less difficult for the members of the human family who are finding its struggle so difficult and burdensome.

Grant that we may go forth bravely following in the footsteps of all who have spanned the ages with the glory of service and sacrifice.

Hear us in Christ's name. Amen.

### THE JOURNAL

The Journal of the proceedings of yesterday was read and approved.

### LOUISIANA STATE SOCIETY OF WASHINGTON

Mr. LONG of Louisiana. Mr. Speaker, I ask unanimous consent to address the House for 1 minute, to revise and extend my remarks, and to include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Louisiana?

There was no objection.

Mr. LONG of Louisiana. Mr. Speaker, this year, as in 16 other years since 1942, the Louisiana State Society of Washington is proud to salute the Nation's Capital on the occasion of Mardi Gras.

This year, I am honored to serve as chairman of the 1964 Mardi Gras ball, which will be held at the Sheraton-Park Hotel tomorrow night, Saturday, February 8.

Louisiana pays tribute to a new chapter in its illustrious history with this year's Mardi Gras ball. To the traditional trappings of Mardi Gras, with its color and pageantry, we have added the marvels of the space age.

The soil where Jean Lafitte once trod is now the home of a vital link in the space crescent, stretching from Cape Kennedy to Houston, Tex.

Our great industries are now joined by new industrial partners, all adding vital components to our Nation's space program.

Only recently, a Saturn rocket lifted the largest payload ever sent into space from our Atlantic testing ground; vital parts of its booster were made in Louisiana.

Mardi Gras also honors a part of Louisana which has no equal anywhere: beauty. We are proud of our feminine beauty and in the royal court of this year's Mardi Gras ball is a good sampling of our State's feminine blessings.

The royal assemblage of 28 queens, representing our major fairs and festivals, and 13 maids from all sections of the State, is reigned over by Miss Elizabeth M. Bolton, a 21-year-old Alexan-

dria, La., girl who is queen of the Mardi Gras ball.

Her royal consort is a distinguished citizen of our State, Mr. Harvey Peltier, Sr., of Thibodaux, La. Mr. Peltier, as king of the Mardi Gras, joins an honor roll of some of Louisiana's finest men who have served with distinction in the past.

At another part of the RECORD, I will list the visiting queens and maids.

### MISSISSIPPI VALLEY ASSOCIATION CALLS FOR WORK ACCELERATION

Mr. EDMONDSON. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD and include extraneous matter.

The SPEAKER. Is there objection to the request of the gentleman from Oklahoma?

There was was no objection.

Mr. EDMONDSON. Mr. Speaker, the Mississippi Valley Association has just completed its annual meeting at New Orleans, with thousands in attendance from across the Nation.

This great association, which has led in the drive to develop America's water resources and inland waterways, has adopted a resolution which will command the attention of all Members of the House.

I am informed that this resolution was adopted unanimously, as an expression of the views of the association.

I am confident that it will not only win the attention of all Members of the Congress, but the President as well.

The text of the resolution follows:

ACCELERATED PUBLIC WORKS PROGRAM

We urge that a significant portion of any Federal funds appropriated for the acceleration of public works in the administration's war on poverty program be expended on authorized, economically justified, permanent, capital investment programs in water resources and river development in the United States of America.

### ARMENIAN REVOLUTIONARY FEDERATION CREDO

Mr. O'HARA of Illinois. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

Mr. O'HARA of Illinois. Mr. Speaker, on many occasions in this Chamber and elsewhere my voice has been raised in the righteous cause of the captive nations. Too long have we been dragging our feet in the matter of the creation of a joint congressional committee to give direction and drive to the efforts of the world of freedom to rescue the captive nations from their unhappy plight.

Armenia is numbered among the captive nations. I am indebted to Arthur Kaprelian, a constituent of Armenian blood residing at 11915 South Wallace Street, Chicago, for a copy of the credo recently adopted by the Armenian Revolutionary Federation. It is an inspiring document worthy of place in the world's literature of freedom. That it may be read by my colleagues, I am extending


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

The Committee again divided, and the tellers reported that there were—ayes 82, noes 179.

So the amendment was rejected.

AMENDMENT OFFERED BY MR WILLIS

Mr. WILLIS Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr WILLIS On page 63, line 2, insert the following two new sentences at the end of section 602

"In the case of any action terminating, or refusing to grant or continue assistance because of failure to comply with a requirement imposed pursuant to this section the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action No such action shall be effective until 30 days have elapsed after the filing of such report."

Mr WILLIS Mr. Chairman, section 602 says that each Federal department and agency which is empowered to extend Federal assistance to any program or activity shall take action to effectuate the provisions of the title

You will see that it is mandatory that each Federal department and agency shall take steps to effectuate the objectives of this particular title Someone—a man, a human being, a fallible person—is ordered to do what, and what means shall he take or must he employ to enforce his decision? He does it by determination or refusal to grant or continue assistance under such program.

Suppose he does cut off a program A single man is doing that. What happens in actuality? I merely repeat my colleague from Louisiana [Mr. BOGGS], in that respect as it would affect my own State Suppose the agency head would cut out the school lunch program, who actually would be primarily hitting? He would be hitting all the people, the young people Then suppose the distribution of surplus food is cut off, who would he be hitting? He would be hitting primarily the persons who are to be protected. Certainly in my State the colored people are the greatest beneficiaries under this program Suppose he would cut off the welfare program, who would he be hitting? He would be primarily hitting the colored people because they are the primary and greatest beneficiaries.

Suppose he would cut off funds in connection with the highway program, what would happen? In my State we had a recent experience on that Something like 85 percent of the manpower employed on highways are colored people So if they cut them off their jobs and if perchance they cut off welfare and the distribution of food, what would happen then, not only aid to colored people but to aid everybody?

My amendment would bring into play other minds in connection with this question of decision to cut off a Federal assistance program. It would bring into play committees of Congress having jurisdiction over the programs under consideration. The head of the agency would have to give a report to the committees of Congress having jurisdiction over the subject matter, so that at least

there would be some responsible minds over and beyond the agency head

Then the last sentence would be that no such action shall become effective until 30 days had elapsed after the filing of such report.

This is a very carefully thought out amendment, it is sensible, and I would hope it might be accepted

Mr CELLER Mr. Chairman, will the gentleman yield?

Mr. WILLIS. I yield to the gentleman from New York

Mr CELLER The amendment is acceptable to myself and most members on the Committee on the Judiciary

Mr McCULLOCH Mr Chairman, will the gentleman yield?

Mr. WILLIS I yield to the gentleman from Ohio

Mr. McCULLOCH I am pleased to say that the amendment is an improving amendment to this title, and I hope it will be agreed to

Mr SELDEN Mr Chairman, will the gentleman yield?

Mr WILLIS I yield to the gentleman from Alabama.

Mr. SELDEN Mr Chairman, title VI of the civil rights bill gives Federal departments and agencies extending Federal financial assistance practically unlimited powers to dictate the implementation of any and all Federal programs within the States According to my interpretation of title VI, this could include control over many facets of our daily lives including our transportation and communications systems, hospitals, schools, construction companies, and even our farmers who participate in the various federally-sponsored farm programs Under the guise of antidiscrimination, this section of the bill is little more than a legislative weapon with which Federal bureaucrats can threaten and bludgeon State authorities into surrender of constitutional powers If enacted into law the provisions of title VI can mean either the hampering and breakdown of Federal-State cooperation in joint programs or the wholesale usurpation of State rights by Federal authorities

The proponents of H.R. 7152 who believe, however mistakenly, that this section will serve the purposes of American Negroes might well consider what other purposes, in the hands of this or any other President, such broad discretionary powers might serve The amendment offered by the gentleman from Louisiana [Mr. WILLIS] makes a small improvement in another extremely dangerous and ill-advised section of this bill, and I urge its adoption.

Mr RODINO. Mr. Chairman, will the gentleman yield?

Mr WILLIS I yield to the gentleman from New Jersey

Mr. RODINO. In other words, the gentleman's amendment would merely state that there is an additional 30 days which the person allegedly discriminated against would have within which to comply without any cutoff of funds? Is that it?

Mr. WILLIS The amendment speaks for itself. It is two sentences, that the recommendations would have to be sub-

mitted to the parallel House-Senate committees having jurisdiction over the subject matter, and that the cutoff could not come until 30 days after the submission of those recommendations.

Mr. EDMONDSON Mr. Chairman, will the gentleman yield?

Mr WILLIS I yield to the gentleman from Oklahoma

Mr. EDMONDSON. In other words, this serves to provide a continuing oversight over the provisions of this title? I think it is a good amendment, and support it.

Mr. LONG of Louisiana Mr Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD

The CHAIRMAN Is there objection to the request of the gentleman from Louisiana?

There was no objection

Mr LONG of Louisiana. Mr. Chairman, I wish to raise strenuous objections to title VI of this bill, a section which would place in the hands of a Government agency virtual control over the economic life or death of any given region of our Nation.

In section 602, any Federal department and agency which has the power to extend Federal financial assistance to any program or activity would have the right to withdraw those funds to force compliance with section 601, that part of the title which calls for an end to discrimination in any program involving Federal participation.

I am not going to spend a great deal of time of the basic flaw of this title, which should be obvious to anyone. But for those whose judgment may have been swayed by the force of this emotional issue of civil rights, I think I should again point it out. This is, to put it simply, bureaucratic blackmail. This title does not simply give these agencies the right to seek court action because of some alleged violation of the contract under which the funds were granted—it gives the agency the right to withdraw those funds, with what amounts to a "cease and desist" warning before the withdrawal takes effect. Not only does the title allow these unknown bureaucrats to wield this power, unchecked by the Congress; it sets no standards by which proof of noncompliance can be judged

In the case of our welfare programs, for instance, which receive large amounts of Federal funds under this proposal, the agency—presumably the Department of Health, Education, and Welfare—could make a determination that some form of discrimination exists in a portion of the State system. According to this title, some unknown person in that Department could issue a warning to the State officials, wait a couple of days, then cut off all funds

There is certainly nothing in the wording of the act to say who shall make this decision; and no standard to establish how this faceless and nameless person shall decide that compliance cannot be secured by voluntary means.

This complete lack of standards violates every precedent, and it certainly should offend any Member of Congress that reads it

This title, in effect, puts a price tag on every Federal program and says, if you do not dance the proper tune, you will have to pay the piper. If that is not blackmail, I do not know what it is.

This is an alarming precedent, and an insult to the people of the United States. We have laws, gentlemen, which have been formed over nearly 200 years of compromise and debate. To each one of those laws you are being asked to add a clause which says:

*If, in the opinion of unknown persons in the Government, you have used Federal funds in a program which in any way discriminates against any group said unknown person can warn you to desist and after an undesignated period of time take away those funds.*

The fact that an ex post facto right for judicial review is held out as a mild protection does not alter the dangers and the insolence of this measure.

Mr KASTENMEIER Mr Chairman. I move to strike out the last word.

Mr. Chairman I rise reluctantly on this occasion. As a member of the subcommittee that considered this legislation, I have sat here silent for the last 7 long legislative days on this matter. I am only sorry I did not speak sooner last night with relation to what was done on title V

I rise in opposition to this, and think that perhaps some members of the committee conceded too much at least in this amendment, because this is obviously an open invitation certainly, to every committee chairman from the South to call on the carpet every agency head or department head who has the temerity to file a report with him cutting out funds for any area in his State or any adjacent State We know this would result. I think what this amendment does is render this full title ineffective For this reason, I would urge the Committee to reject this amendment.

I am sorry that the Committee last night saw fit, also, to make the permanent section of the Civil Rights Commission now impermanent and temporary again for a period of 4 years. This I think is unfortunate I think we should resist some of these amendments. These are not clarifying or technical amendments.

In fact, this amendment is not truly a safeguard but really again will be a question of congressional dominance over the timorous executive branch in connection with an area of legislation which is very important in terms of administration

Actually, in the Committee on the Judiciary there was a proposal to make the program mandatory and not discretionary as it now is For the very reason that administrative and department heads would scarcely have the courage to implement this title unless it were required of them

This is a further invitation not to implement the program, and I think, Mr Chairman, this amendment ought to be defeated.

The CHAIRMAN The question is on the amendment offered by the gentleman from Louisiana [Mr. WILLIS]

The question was taken, and on a division (demanded by Mr KASTENMEIER) there were—ayes 129, noes 21

So the amendment was agreed to.

AMENDMENT OFFERED BY MR LINDSAY

Mr LINDSAY Mr Chairman, I offer an amendment

The Clerk read as follows

*Amendment offered by Mr LINDSAY: On page 62 line 17, after the words "is taken" insert no such rule, regulation or order shall become effective unless and until approved by the President"*

The CHAIRMAN The gentleman from New York [Mr LINDSAY] is recognized

Mr. LINDSAY Mr Chairman, this amendment is designed to require that the President shall approve rules and regulations that are promulgated pursuant to section 602 of title VI.

I believe this amendment will be accepted by the chairman of the Committee on the Judiciary and the ranking minority member. The members of your committee feel that the rulemaking power is so important in this area and can be so significant because of the latitude that this title by definition has to give to the executive in drafting rules and regulations that the Chief Executive should be required to put his stamp of approval on such rules and regulations—after, of course, the normal procedures have been followed in promulgating such rules and regulations

Mr. CELLER. Mr Chairman, will the gentleman yield?

Mr LINDSAY I yield to the chairman of the committee

Mr CELLER. As chairman of the Judiciary Committee, I approve the amendment of the gentleman from New York

Mr LINDSAY I thank the chairman.

Mr. McCULLOCH. Mr. Chairman, will the gentleman yield?

Mr. LINDSAY I yield to the gentleman from Ohio

Mr. McCULLOCH. The amendment is an acceptable amendment to us

Mr SMITH of Virginia Mr Chairman, I should like to have a brief explanation of what the amendment would do

Mr. LINDSAY. I yield to the gentleman from Virginia.

Mr SMITH of Virginia I thought the gentleman had yielded the floor

Mr LINDSAY I had not yet yielded the floor If the gentleman would like the floor on his own time, I shall be glad to yield the floor.

Mr SMITH of Virginia No I should merely like to have a more clear idea as to what the amendment would do

Is it the gentleman's thought or intent that the President shall personally approve every regulation that is made under this regulatory power?

Mr. LINDSAY. No, it is not.

Mr SMITH of Virginia What would it do, then?

Mr LINDSAY Pursuant to title VI, rules and regulations will have to be promulgated, as the gentleman will note on lines 14 and 15 on page 62 of the bill The rules, regulations and orders there required, which will have to be promulgated according to standard procedures, with hearing and the rest, would have to

be approved by the President of the United States

Mr. SMITH of Virginia. Then he would have to approve every one of these regulations personally

Mr LINDSAY. No, I did not say that.

Mr SMITH of Virginia. I thought the gentleman did.

Mr. LINDSAY The rules and regulations will be promulgated, and will have to be promulgated as indicated on the lines 14 and 15 as I have mentioned, and are to be approved by the President of the United States if they are to be effective

Mr SMITH of Virginia Did the gentleman not just say they had to be approved by the President?

Mr LINDSAY. That is correct.

Mr. SMITH of Virginia Then what does that mean? Would he have to approve them or would he not have to approve them?

Mr LINDSAY I refer the gentleman again to the language to which I referred, on lines 13 through 17 of page 62

*Such action may be taken by or pursuant to rule regulation, or order of general applicability and shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.*

It is those rules regulations, or orders of general applicability the President would be required to approve Very plainly stated

Mr SMITH of Virginia Perhaps so. I still do not understand what the President would have to do, but I am happy to see any amendment agreed to by the gentleman from New York [Mr. CELLER] and the gentleman from Ohio [Mr McCULLOCH], so I am disposed to go along with it. I only wish I could get them to agree on my amendment to prohibit slavery

Mr. POFF. Mr. Chairman, will the gentleman yield?

Mr. LINDSAY. I yield to the gentleman from Virginia.

Mr. POFF. Mr Chairman, I am inclined to feel that the amendment is constructive in nature. I inquire, for the sake of the public How will the President document his approval of the orders and regulations? Will his approval appear as an Executive order? Will it be published in the Federal Register?

Mr LINDSAY It will be published in the Federal Register.

Mr. POFF I thank the gentleman.

Mr. JONES of Missouri. Mr Chairman, I move to strike out the last word, for the purpose of clarifying the statement of the gentleman from New York

I should like to have the attention of the gentleman from New York [Mr. LINDSAY].

It seems, after you offered your amendment, you started wiggling around I will read what the amendment says. I got a copy from the Clerk's desk. It says.

*No such rule, regulation or order shall become effective unless and until approved by the President.*

Does it mean that the President has to approve every rule before it will become effective?

**2500**  CONGRESSIONAL RECORD — HOUSE  *February 7*

Mr. LINDSAY That is correct, if it is applicable to this title and is of general applicability

Mr. JONES of Missouri. The amendment says

No such rule * * * shall become effective unless and until approved by the President

Mr. LINDSAY That is correct.

Mr. JONES of Missouri. Is that not what the amendment says?

Mr. LINDSAY. That is correct.

Mr. JONES of Missouri. You ought to be able to answer the question "Yes" or "No".

Mr. LINDSAY. It must be a rule, regulation, or order of general applicability. If it is not a rule, regulation, or order of general applicability, I would assume that the President would not have to put his approval on it.

Mr. JONES of Missouri The "such" refers back to that, but you were trying to wiggle out of it in the discussion of the amendment.

Mr. LINDSAY. Then, vote against the amendment if you do not like it.

Mr. JONES of Missouri No. I am like Judge Smith. I want to do anything I can to improve this thing. Of course, I will vote against the bill.

Mr. LINDSAY. If the gentleman will yield further, I am sure he is trying to improve it, and we appreciate it.

Mr. JONES of Missouri I am trying to make it "less worse."

I yield back the balance of my time.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York [Mr. LINDSAY].

The amendment was agreed to.

AMENDMENT OFFERED BY MR CELLER

Mr. CELLER. Mr. Chairman, I offer an amendment.

The Clerk read as follows.

Amendment offered by Mr CELLER On page 69 line 11 strike the words "contract, or loan" and insert in lieu thereof the following "loan or contract other than a contract of insurance or guaranty"

Mr. CELLER. The purport of the amendment is to eliminate all guarantees programs of the Federal Government, all insurance programs of the Federal Government. In other words, title VI would have no effect, if you accept this amendment, on guarantees or insurance Fears have been expressed by a number of the Members as to the meaning of the word "contract" in the bill before you The word "contract," it was feared might be stretched to cover insurance or guarantee. To prevent such construction we offer this amendment I say "we" because I cleared this amendment with the gentleman from Ohio [Mr. McCULLOCH], before offering it. In other words, we nail down the prohibition We allay all fears that, for example, actions under the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, and the Federal Housing Administration insurance programs, or any other Federal insurance and guarantee programs are included in the bill They are excluded because they involve guarantees and insurance. In order to make crystal clear that guarantees and insurance are not in title VI we are offering this amend-

ment, and only contracts not connected with insurance, not connected with guarantees are included

Mr. McCULLOCH Mr Chairman, will the gentleman yield?

Mr CELLER I yield to the gentleman from Ohio

Mr McCULLOCH Mr Chairman, I am glad to join with the chairman of the committee in his explanation of this amendment to make certain the meaning of the bill. It is a needed restrictive amendment and ought to be agreed to

Mr POFF Mr. Chairman will the gentleman yield to me?

Mr CELLER I yield to the gentleman from Virginia.

Mr POFF For the purpose of legislative history, will the gentleman say the amendment is intended as drafted to cure the problem which I addressed on page 379 of the hearings before the Committee on Rules?

Mr CELLER. I do not remember it precisely, but I will take the gentleman's word for it, because I have always found the gentleman to be thoroughly careful in his remarks and I am sure what he says is accurate.

Mr O'HARA of Michigan Mr. Chairman will the gentleman yield to me?

Mr. CELLER I yield to the gentleman from Michigan

Mr O'HARA of Michigan. Would the gentleman please make it clear as to whether or not the amendment he offers, if adopted, will in any way affect the authority now being undertaken under President Kennedy's housing order affecting the operations of the FHA?

Mr. CELLER. No, sir It has nothing to do with it

Mr. O'HARA of Michigan. I thank the gentleman.

Mr SMITH of Virginia Mr Chairman will the gentleman yield to me?

Mr. CELLER Yes I yield to the gentleman from Virginia.

Mr SMITH of Virginia I am a little bit unclear as to what language you are putting in

Mr CELLER. The amendment reads as follows:

On line 11 page 82 strike out the words "contract, or loan" and insert in lieu thereof the following "loan or contract other than a contract of insurance or guarantee"

Mr SMITH of Virginia That clarifies it very much, insurance is a contract.

Mr CELLER Yes

Mr RYAN of Michigan. Mr. Chairman, will the gentleman yield?

Mr CELLER I yield to the gentleman.

Mr RYAN of Michigan. Mr. Chairman, I want to make it doubly crystal clear to the extent that private homes that are covered by FHA and VA loans will not be covered by the terms of this act.

Mr. CELLER. They will not be.

Mr RYAN of Michigan Mr Chairman, I wish to make it very explicit and without there being any doubt whatsoever, that any person or persons owning real estate, whether it be a private home, an income, or flat or apartment, or a farm, that may now be encumbered by a mortgage insured under the Federal

Housing Act, the Veterans' Administration, or other Federal agency, or which may in the future by encumbered by an FHA mortgage or VA mortgage, are not included and do not come within the provisions of title VI, that title VI simply just does not apply to private property with a mortgage insured under the Federal Housing Act, the Veterans' Administration, or other Federal agency.

Mr. WELTNER. Mr Chairman, will the gentleman yield?

Mr CELLER. I yield to the gentleman.

Mr WELTNER Mr. Chairman, I had prepared an amendment of similar import to this. I am happy to see that the committee has proposed a diminution of the scope of this act to this degree.

Mr JONES of Missouri. Mr Chairman, I move to strike out the last word.

Mr Chairman, I should like to ask the chairman of the committee a question. He did not mention Veterans' Administration loans or contracts. Were they included?

Mr CELLER Any direct aid is not involved in this. A veteran would get direct aid from the Government and is not covered by title VI.

Mr. JONES of Missouri I had a VA housing case and I have been trying to get to the floor, to call attention to a situation that has arisen with a constituent of mine who is a GI, who owned a home in Las Vegas Nev. He had been transferred to Florida and had made arrangements to sell his home to another GI The Veterans' Administration had entered into an agreement that they would loan the money for this home. After he had gotten his appraisal, and everything seemed to be in order, someone discovered that there was a racial restriction clause on the property The Veterans' Administration in answer to my inquiry wrote me a four-page letter telling me that the racial restriction laws under the decision of the Supreme Court were of no effect and nonenforceible and they should not affect this case They were willing to guarantee the loan except that if it was foreclosed they would not pay any money That is under the present law. Those are some of the things that I was fearful of under this bill. What I am trying to find out is whether under the amendment the gentleman has offered the exclusion he has indicated, this kind of loan would not be affected by any race or color restriction or anything of that kind.

Mr. CELLER. I would say this. If it involves Veterans' Administration insurance or Veterans' Administration guarantee it is not covered by title VI in any sense or form

Mr JONES of Missouri. Would the gentleman be so kind as to tell me if he thinks that it is covered under the present law.

Mr CELLER Mr Chairman, I did not understand all of the nuances or details of the case the gentleman referred to I just could not hear them all

Mr JONES of Missouri I am not going to take the time of the Committee nor the gentleman's time to repeat them, but I am going to send the gentleman a copy of the letter that I received.

Case: 25-1529   09/22/2025   DktEntry: 36.1   Page 42 of 127
Case 1:25-cv-02429-MKV   Document 51-2   Filed 04/04/25   Page 6 of 7

could go either way, and it is a question of protecting both sides.

Mr EDMONDSON I will agree thoroughly with the gentleman that it would be desirable to have a record of what takes place It would be my hope that the record would be available for judicial review whichever way the decision went.

Mr TAFT. Unfortunately I think some of us have had such experiences with the agencies and that we do not share the viewpoint of the gentleman that there would be a record of the decision.

Mr WHITTEN. Mr Chairman, will the gentleman yield?

Mr. TAFT. I yield to the gentleman.

Mr. WHITTEN I think most of the Members here would agree with me there have been many times and there have been many times in my experience here where we were hard put under severe examination, to determine who made the decision not to act. There have been many cases in the years that I have been here where we have had department heads before us and they have had a terrific job in trying to find out who made the decision That is one point.

The second point is, I have been here also when for years under the milk marketing orders of the Department of Agriculture, is called for the proponents of the order to give notice to those opposed to it. Of course, you know they did not do it If you are relying on an agency to take care of these things, I would remind you there have been plenty of experiences in my own service here, and I am sure it is true of the other Members where they just simply do not do it unless you spell it out and require that they go through some procedure to keep a record in writing so that it will be available for those who have to pass judgment on the matter.

Mr. DINGELL   Mr Chairman, I move to strike out the last word

Mr Chairman, the gentleman from Florida has drafted a very neat amendment. I think we can look at this amendment in the light of our good friend, the attitude of the gentleman from Florida toward this bill. He is a bitter and announced opponent of the bill Every amendment that has been offered by our good friend, the gentleman from Florida, has had for its sole and exclusive purpose the hamstringing and destruction of this legislation in any way possible

So once we have established this framework, we can look at this issue now before the House in the light of the established pattern of law.

The fact of the matter is the Administrative Procedure Act is not a new provision in the law It is simply enunciative of those things which have always been the requirements of due process within the Constitution And it has been held on many occasions that the due process clause of the Constitution, of which the Administrative Procedure Act is simply enunciative, with regard to the question of hearings and with regard to ░░ ░░░ ░░ ░░░░░░ ░ ░ ░░░░ ░░░ ░░░░ by Federal action. requires that a hearing be held. requires that notice be given to the affected parties; and requires that all procedural fairness and due process

be afforded to persons affected by a ruling or a proposed ruling about a matter before a Federal agency which might later become the subject matter of a hearing

Implicit in this is the requirement that a hearing be held Implicit in this is the requirement that a record be kept Since without an adequate record there can be no review by the courts. The failure by the Agency concerned with regard to section 601, section 602, or section 603 to keep an adequate and full and complete record would certainly be abundant ground for reversal by the courts of any finding by the Agency either with regard to the promulgation of general rules or with regard to the finding or ruling in a specific instance

So with or without reference to the Administrative Procedure Act in section 601, the rights of parties are fully and completely protected But because of the requirements of section 603 that review be done by the courts in accordance with section 10 of the Administrative Procedure Act which is the section dealing with judicial review, it becomes very plain that a record must be kept; that notice must be afforded to the parties; that service must be made upon interested parties; and that procedural due process, hearings, and general requirements of fair play which are inherent in our Constitution, and which the Administrative Procedure Act has been held by the courts in many instances simply to be enunciative must be made

So I say there is no need for the amendment offered by our good friend from Florida It would serve no purpose other than to becloud the issues

In view of the fact that the gentleman has repeatedly announced his opposition to this proposed legislation and in view of the fact that he has sought on a number of occasions to hamstring and cripple the legislation, I say that the House of Representatives should not accept the amendment offered by the gentleman from Florida

Mr McCULLOCH  Mr Chairman, I move to strike the requisite number of words

It is apparent that we are in a difficult technical situation, from which we wish to get legislation which will meet the approval of the majority of the House  The staff and the Chairman of the Committee are working on a substitute amendment which should clarify our uncertain position.

For many weeks we who serve on the subcommittee tried to find a way agreeable to all, to the end that the action of an administrator could be adequately reviewed  I feel sure some of us have come to the conclusion that the time has been reached, after some 18 years, for the Administrative Procedure Act to be reviewed in its entire breadth and depth. If for the time being we can solve this immediate problem, I have a commitment that the Judiciary Committee will go into a complete review of the Admin-░ ░░░░ ░░░░░ ░░░░░

I hope, in view of those facts, that the House will accept the substitute now being drafted at the table.

I yield back the remainder of my time.

Mr WHITTEN  Mr. Chairman, I wonder if it would be in order to move that the House do now adjourn, while the coalition works out the substitute amendment?  Would it be in order to move that the House do now adjourn?

The CHAIRMAN.  A motion to adjourn, of course, does not lie while the House is in the Committee of the Whole House

Mr WHITTEN.  I merely wished to know if it were possible under the circumstances.

Mr Chairman, I move that the Committee do now rise, while the coalition works out a settlement of the differences

The CHAIRMAN.  The question is on the motion of the gentleman from Mississippi [Mr. WHITTEN].

The motion was rejected

SUBSTITUTE AMENDMENT OFFERED BY MR. LINDSAY

Mr LINDSAY  Mr. Chairman, I offer a substitute amendment for the amendment of the gentleman from Florida.

The Clerk read as follows.

Amendment offered by Mr LINDSAY as a substitute for the amendment offered by Mr. CRAMER: On page 62 line 17 insert before the word "Compliance" "After a hearing."

Mr. LINDSAY  Mr Chairman, I hope the Committee members will listen carefully.

The proposed substitute would make express what we thought was at least implied, that there is a hearing in connection with the statutory requirement that there be an express finding

Now, the chairman of the committee [Mr CELLER] said there would be a hearing, and that is the way the title is contemplated.  A hearing is on the record and, in fact, no adjudication could be made, as provided in section 603 of title VI. in the absence of such a record  In fact the court would have full plenary powers to turn the matter over to the agency in order to provide such a record I do think a hearing, which would be a hearing on the record, is entirely proper, and that is the way the drafters of the language have contemplated it.  An express finding could not be made in the absence of such a hearing in any event

Mr. CELLER  Mr. Chairman, will the gentleman yield?

Mr. LINDSAY  I yield to the gentleman from New York.

Mr CELLER.  I accept the substitute offered by the gentleman from New York [Mr LINDSAY].

Mr CRAMER  Mr Chairman, will the gentleman yield?

Mr LINDSAY.  I yield to the gentleman from Florida

Mr CRAMER.  I think it would be well to take a minute to clarify exactly what you are doing.  Now, if you are going to gut my amendment, then I am a little concerned about it, but I sure heard that argument offered often enough against any amendment I have ever offered  Is it the intention and the purpose, in good faith, by the proponents of ░░░ ░░░░░░░░░ ░ ░░░░░░ ░░░  ░ ░░ ░░ vided in the Administrative Procedure Act, a hearing consistent with the Administrative Procedure Act, section 5, "in every case of adjudication required by

statute to be determined on the record after opportunity for an agency hearing"? Therefore, all the protections are provided which I have tried to enumerate in my discussion of the constitutional rights of those who are being charged with discrimination. If the gentleman will give me the assurance that that is the purpose and the objective of his substitute amendment I will be delighted to accept it.

Mr. LINDSAY. I will give the gentleman every assurance that it is our intention that all constitutional rights be meticulously taken care of. I can recall arguing some cases in the Supreme Court for the Government, having been given quite a punching around because the word "hearing" was contained in the statute, and the Supreme Court, as do all Federal courts, surrounded that word with all of the requirements of due process, notice, and everything else. I am sure that the gentleman can be assured that the requirement of the hearing will protect every constitutional right.

Mr. GRIFFIN. Mr. Chairman, will the gentleman yield to me?

Mr. LINDSAY. I yield to the gentleman from Michigan.

Mr. GRIFFIN. Section 603 refers to a judicial review in accordance with section 10 of the Administrative Procedure Act. Section 10 of the Administrative Procedure Act deals with judicial review and provides that a court may set aside a finding of an agency "if the finding is unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute."

The gentleman from New York, the chairman of the committee, referred to the substantial evidence rule.

Do I understand that this is the kind of a hearing to which they refer?

Mr. LINDSAY. I think the gentleman from Michigan for his constructive and helpful comment, because it reinforces the statement which I made earlier to the effect that review provided for in section 605, and in that part where the Administrative Procedure Act is referred to, means that substantial evidence is required to support the decision made by the agency below. And, if substantial evidence is not apparent, then there is a reversible error.

Mr. GRIFFIN. May I say to the gentleman the thing about which I am concerned is not to pin down just the application of the substantial evidence rule. I am aware of that. I am concerned about the hearing. I wonder whether it is the kind of requested hearing which would be expedited in accordance with this provision.

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. LINDSAY. Mr. Chairman, I ask unanimous consent to proceed for 2 additional minutes.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. LINDSAY. In answer to the gentleman from Michigan the hearing has to be on the record and the record which is made at the hearing has to be sufficient so that the reviewing court can be satisfied that all provisions of the act have been met and that the "substantial evidence" rule has been followed.

Mr. HALEY. Mr. Chairman, will the gentleman yield?

Mr. LINDSAY. I yield to the gentleman from Florida.

Mr. HALEY. May I say to my colleague the gentleman from Florida [Mr. Cramer] and the gentleman from Michigan [Mr. Griffin] that perhaps the hearing will come after execution. I would suggest to the gentleman that it would be well to find out when you are going to get this hearing.

The CHAIRMAN. The question is on the substitute amendment offered by the gentleman from New York [Mr. Lindsay] to the amendment offered by the gentleman from Florida [Mr. Cramer].

The question was taken; and on a division (demanded by Mr. Cramer) there were—ayes 182, noes none.

So the substitute amendment was agreed to.

The CHAIRMAN. The question now recurs on the amendment offered by the gentleman from Florida [Mr. Cramer], as amended.

The amendment was agreed to.

AMENDMENT OFFERED BY MR. CRAMER

Mr. CRAMER. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. Cramer. On page 63 line 13 after "Act" insert "except that such action shall be sustained only as supported by a preponderance of the evidence."

Mr. CRAMER. Mr. Chairman, I am going to take as little time as possible. This also involves the basic question of whether or not after an order has been issued a full review of the facts should be had. This is another question which we discussed in the subcommittee.

The Committee on the Judiciary of the House had a 'tough problem to wrestle with, and I admit it is tough, and I tried to be constructive in this aspect of it, as I was in connection with one of the amendments adopted in the committee I am trying to do it on the floor of the House in the same spirit.

In the FEPC the issue was raised, and I am the one who raised it—the gentleman from Michigan and a number of others raised it—as to what kind of a review do you get when the effect of the administrative order is as broad as this is. Do you get a right of trial by jury de novo, or do you not? Are you hampered and hamstrung by the administrative procedure rule that there must be an abusive discretion on the part of the agency in order to get any relief in the review section? That is the crucial stage. The final decision is made in the review section. All my amendment does is to say that the party is accused of discrimination on this record which we have now created through hearing. When this hearing and the record comes up for review, that we put all parties on the same basis, the party that has discriminated and the Government agency is on exactly the same ground if you accept my amendment. That is, for the party discriminated against as represented by the Government. And if the Government can prove by more than 50 percent of the evidence it is right, the decision goes to the Government. If the party who is accused of discriminating can carry the weight of the evidence, the preponderance of the evidence, which means more than 50 percent, then the decision goes to him. What could be fairer than that? But, oh, no. Contrary to what they did in the FEPC, which has the rule of preponderance of evidence that I am trying to write into this section, they said that is all right for this section, but it is not all right for the other section. I want to put both parties on an equal basis when it comes to review. That is what the amendment does. I know the Members are familiar with that fact under the Administrative Procedure Act, otherwise the heavyweight is the Government. This puts everybody on the same even, equitable, fair, square basis.

Mr. POFF. Mr. Chairman, will the gentleman yield?

Mr. CRAMER. I yield to the gentleman from Virginia.

Mr. POFF. I think it would help matters if it were understood why a different quantum of evidence was required for the Administrative Procedure Act as compared with the Federal Government. Ordinarily the rule is preponderance of evidence. In the Administrative Procedure Act as written it was felt substantial evidence would be sufficient because it was felt that the administrative agency which rendered the decision had special expertise in the field. But in this case the gentleman will agree outside the Department of Justice no Federal agency has any special expertise in the field.

Mr. CRAMER. The gentleman has made a very crucial point. There had to be a reason for giving the Government agency the advantage of this rule of evidence against the party charged. The reason was that the agency is assumed to know more about the subject matter than a large number of other people, therefore they were entitled to this rule because they were experts and that if a substantial portion of the evidence supported what they did, the Government agency should not be upset.

Who are the experts on the question of discrimination other than the Attorney General's office? This is not involving the Attorney General's office. This is every agency of the Government across the board that has the right to make these factual determinations on discrimination. Every single agency makes the determination. They are not experts on the question, and everybody ought to have a fair chance.

Mr. RODINO. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, the gentleman's amendment would completely upset the design of the Administrative Procedures Act, which has been in operation for so many years. I recognize what the gentleman is intending to do, and I have some sympathy with his attempt to try to establish some other rules of evidence and procedure. But I think this is not

# EXHIBIT 43

JA504





# Religious Discrimination at School: Application of Title VI of the Civil Rights Act of 1964

## Updated September 17, 2024

Since the beginning of armed hostilities between Israel and Hamas on October 7, 2023, Congress has focused significant attention on the reaction of students and schools, colleges, and universities to events unfolding in the region. Congressional hearings have been held and legislative proposals have been introduced addressing religion-based animus, and in particular antisemitism, at institutions of higher education. A number of media reports, complaints filed with the Department of Education (ED), and lawsuits allege that Jewish or Muslim students have faced harassment or other discrimination on campus because of their religious beliefs or identities.

These events have prompted questions about whether and how federal antidiscrimination statutes protect students from discrimination on the basis of religion. A trio of statutes enacted pursuant to Congress's authority under the Spending Clause serve as the primary (though not exclusive) vehicles for students seeking redress for certain kinds of discrimination by their schools: Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), and Section 504 of the Rehabilitation Act of 1973 (Section 504). These laws prohibit discrimination on the basis of race, color, and national origin (Title VI); sex (Title IX); and disability (Section 504) by all or certain recipients of federal financial assistance. None of these laws directly prohibit religious discrimination.

Students facing religious discrimination at public schools may be able to bring claims under the First or Fourteenth Amendments, but the Constitution does not provide for the same enforcement mechanisms that Title VI, Title IX, and Section 504 do. The Constitution does not offer any direct recourse to students at private institutions. In addition, federal agencies lack the authority they possess under these other antidiscrimination laws to enforce any prohibition on religious discrimination, including, for example, the authority to issue regulations, undertake compliance reviews, and investigate and resolve complaints.

For several decades, however, ED has interpreted Title VI to reach religious discrimination when it overlaps with race or national origin discrimination. As ED, Congress, and the courts respond to allegations of religious discrimination at schools, they are considering whether and how Title VI applies to such claims. This Sidebar reviews the state of the law on that question.

**Congressional Research Service**

https://crsreports.congress.gov

LSB11129

# Background on Title VI

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in federally funded programs. All public schools, colleges, and universities in the country and many private ones accept federal funding and are therefore subject to Title VI. Each federal agency enforces Title VI with respect to its own funding recipients. ED, through its Office for Civil Rights (OCR), is the primary federal agency that enforces Title VI against schools, colleges, and universities.

OCR has broad authority to prevent racial and national origin discrimination by its funding recipients. It issues formal regulations and sub-regulatory guidance interpreting and implementing Title VI. OCR regulations impose obligations beyond the basic nondiscrimination mandate, including, for example, recordkeeping and reporting requirements. OCR may secure Title VI compliance via "any . . . means authorized by law." It can conduct compliance reviews and investigate complaints. If it finds a violation, it determines the remedy to seek, although it must first attempt a cooperative resolution. Remedies can include agreements or orders to an institution to, for example, change its policies, compensate injured students, and cooperate with OCR monitoring going forward. As a last resort, ED may seek to terminate federal funding, which it can do only after making a finding of noncompliance on the record of a formal administrative hearing and giving Congress a chance to weigh in. OCR can also refer cases to the Civil Rights Division at the Department of Justice for enforcement in court.

Educational institutions may be liable under Title VI when they treat students differently because of their race or national origin (known as a disparate treatment claim) and when they fail to respond appropriately to racial or national origin harassment that is so severe, pervasive, and objectively offensive that it deprives students of access to educational benefits or opportunities (known as a hostile educational environment claim). Not all racially or ethnically offensive conduct rises to the level of actionable harassment. Furthermore, to be liable for harassment, a school must have exhibited deliberate indifference—that is, its response must be clearly unreasonable in light of the known circumstances. (For more information on Title VI harassment claims, see CRS Legal Sidebar LSB11087, *Title VI and Peer-to-Peer Racial Harassment at School: Federal Appellate Decisions*, by Jared P. Cole (2023)). Additionally, ED's Title VI regulations prohibit disparate impact discrimination, that is, neutral policies that adversely affect a particular racial or national origin group. The Supreme Court has held that the disparate impact regulation is not enforceable by private litigants, but it has never directly ruled on the validity of the regulation and whether ED can enforce it.

Students who believe their schools have violated Title VI can file complaints with OCR. They may also bring suit directly in federal court. Victorious plaintiffs can receive injunctive relief, that is, a court order directing the institution to change its policies or practices; certain compensatory damages (although likely not damages for emotional distress); and attorneys' fees.

An original draft of Title VI included a prohibition on religious discrimination. Congress omitted that language in the final version. One commentator reads the legislative history to suggest that Congress was concerned that including religion would cut off sectarian colleges and universities from federal funding. Members also expressed the view that religious discrimination in education was not widespread.

For more information about Title VI in general, see CRS Report R46534, *The Civil Rights Act of 1964: An Overview*, by Christine J. Back.

# Title VI and Religious Discrimination

## Department of Education's Approach

On its face, Title VI does not prohibit discrimination on the basis of religion. However, in 2004, OCR released guidance explaining that, in OCR's opinion, religious discrimination could, in some circumstances, overlap with racial or national origin discrimination, bringing it within Title VI and ED's purview. OCR has since released additional guidance documents explaining how it interprets Title VI to apply to claims alleging religious discrimination, including claims by Jewish, Muslim, and Sikh students. As OCR interprets the law, religious discrimination is illegal under Title VI if it is based on a group's "actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity," rather than the group's religious practices. Discrimination may include "ethnic or ancestral slurs"; harassment based on how students "look, dress, or speak in ways linked to ethnicity or ancestry (e.g., skin color, religious attire, language spoken)"; and actions grounded in "stereotype[s] based on perceived shared ancestral or ethnic characteristics." OCR's examples of religious discrimination overlapping with racial or national origin discrimination include "Muslim students targeted for wearing a hijab," "Sikh students taunted and called terrorists," and Jewish students targeted with swastikas, Nazi salutes, and Holocaust jokes.

OCR's interpretation of Title VI to prohibit some forms of religious discrimination is not new, and OCR had investigated institutions of higher education and K–12 school districts for discrimination against religious groups on the basis of "shared ancestry" before October 7, 2023. In 2021, for example, OCR investigated the University of Vermont and State Agricultural College in response to complaints of antisemitic harassment including, among other things, that a teaching assistant had published tweets threatening to retaliate academically against "zionist" students. In 2022, OCR resolved an investigation against an Arizona school district for its failure to respond to student-on-student antisemitic harassment, including pro-Nazi conduct and Holocaust jokes. OCR has opened more than 100 investigations involving national origin discrimination and religion since October 7, 2023.

## Judicial Approaches

Case law is sparse on when discrimination ostensibly on the basis of religion may also constitute racial or national origin discrimination under Title VI. Courts regularly dismiss Title VI claims based on alleged antagonism toward or failure to accommodate religious beliefs. Few courts, however, have addressed the kinds of harassment highlighted by OCR's guidance, making it difficult to know whether courts would agree with OCR's interpretation of Title VI. One district court rejected a Title VI claim based on anti-Muslim discrimination that included allegations that school officials equated Muslims with terrorists. Three other district courts have allowed Jewish K–12 students to proceed under Title VI on claims that their schools failed to address antisemitic harassment by fellow students, who, among other things, allegedly displayed swastikas, performed Nazi salutes, used antisemitic epithets, and made offensive statements about the Holocaust. One court explained that such harassment, drawing on "hackneyed stereotypes, bigoted 'jokes,' and painful references to the Holocaust and Nazism," is "rooted in" antagonism to the victims' "actual or perceived national origin or race" and not only their "faith or religious practices." This analysis appears to align with OCR's view of religious harassment that may violate Title VI.

Beyond Title VI, courts recognize that other laws prohibiting racial and national origin discrimination can reach discrimination against certain groups, including religious groups, when, at the time those laws were enacted, members of those groups were considered to share a racial or ethnic background. Thus, the Supreme Court has allowed claims by Arab and Jewish plaintiffs to proceed under two 19th-century laws

prohibiting certain racial discrimination because, by 19th-century standards, "Jews and Arabs were among the peoples then considered to be distinct races and hence within the protection of the statute." Courts have not analyzed popular ideas of race and ethnicity as applied to religious groups at the time Congress enacted Title VI in the 1960s. Nor has any court weighed in on whether Title VI would protect only those religious groups considered racially distinct in the 1960s, or whether, as OCR would have it, harassment based on the modern perpetrator's apparent view of a group's shared ethnic characteristics could suffice.

# Executive Order 13,899, the Antisemitism Awareness Act, and Title VI in the Midst of the Israel-Hamas Conflict

Recent congressional attention to Title VI and discrimination at schools has focused particularly on antisemitism. Beyond whether and how Title VI covers religious discrimination at all, another question concerns what kind of conduct constitutes antisemitism. Agencies, courts, and Congress have considered whether and what forms of opposition to Israel can be antisemitic and might be prohibited by Title VI. In 2019, President Trump adopted Executive Order 13,899, which remains in effect, stating the administration's policy to enforce Title VI against antisemitism. The executive order directed federal agencies to "consider" the "non-legally binding working definition of anti-Semitism adopted . . . by the International Holocaust Remembrance Alliance (IHRA)," as well as the "contemporary examples" cited therein. The IHRA defines antisemitism as "a certain perception of Jews, which may be expressed as hatred toward Jews." Examples include, among other things, "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor"; "[a]pplying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation"; and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis." A bill introduced in the 118th Congress in both houses, the Antisemitism Awareness Act, would similarly instruct ED to "take into consideration" the IHRA definition of antisemitism and contemporary examples when enforcing Title VI. The Antisemitism Awareness Act passed the House on May 1, 2024.

Few courts have considered whether Title VI, or other federal antidiscrimination laws, prohibit particular forms of conduct tied to sentiments about Israel or a Palestinian state. CRS has not located any judicial opinion holding that opposition to Israel, or to Jewish claims in Israel, can be antisemitic for purposes of federal antidiscrimination law. Nor has it located any case holding that pro-Israel conduct, or hostility to pro-Palestinian advocacy, constitutes discrimination on the basis of Palestinian, Arab, or Muslim identity. In the few cases that have addressed claims in the former category, courts have avoided ruling that certain anti-Israel conduct or speech is inherently antisemitic, observing that the issue is "hotly disputed" and emphasizing First Amendment protections for political speech. Courts have also held that discrimination against people for pro-Palestinian expression is not the same as discrimination on the basis of Palestinian identity. This latter category of case suggests another approach courts may take to the question of whether or when anti-Israel activity discriminates on the basis of Jewish identity.

This issue is presently before several courts. Since October 7, 2023, lawsuits have raised the question of whether opposition to Israel can violate Title VI. For example, groups representing Jewish students sued Berkeley Law School for, among other things, allowing student groups to refuse membership and speaker invitations to people who "hold views . . . in support of Zionism." The plaintiffs argue that "'Zionism' is a proxy term for Jews." Even if the term is not being used as a "proxy," the plaintiffs argue, discriminating on the basis of "Zionism" violates Title VI both because Zionism is integral to many Jews' identity and because it denies the Jewish "ancestral" and "historical" connection to Israel. In urging the court to dismiss the suit, Berkeley contends that disciplining student groups who adopt an "anti-Zionism" policy would violate students' First Amendment rights. Other lawsuits also claim Title VI violations based on campus "anti-Zionism," and other universities have raised the First Amendment in response.

Were a court to determine that certain anti-Israel activity discriminated against Jews, that would not fully resolve the question of whether Title VI prohibited such activity—because, as explained above, Title VI does not cover religious discrimination. To find that Title VI applied, a court would also have to find that such actions constituted a form of racial or national origin discrimination, rather than religious discrimination or some other form of discrimination that Title VI does not address.

In the present litigation, many of the defendant schools have not contested that Title VI prohibits antisemitism or that the conduct alleged by plaintiffs is, at least in part, antisemitic. This approach limits the likelihood that the courts in those cases will issue guidance on Title VI's application to religious discrimination. Indeed, while one court ruled that the plaintiffs in one post-October 7 case pled a Title VI claim, it did not opine on whether and when antisemitism is a form of racial or national origin discrimination.

For its part, ED differentiates between harassing speech critical of a country's policies versus that which is critical of its people. In ED's view, Title VI does not reach the expression of purely political opinions about a country. On the other hand, Title VI may be implicated, ED says, if such expression is harassing and "targeted at or infused with discriminatory comments" about a national origin group.

# Considerations for Congress

As OCR and a few courts currently interpret the law, the viability of Title VI claims based on animus toward members of a religious group may turn on whether the plaintiffs can show, based on the specific nature of the harassment, that the perpetrators perceived them to share ethnic, racial, or national characteristics. Alternatively, or perhaps additionally, plaintiffs may need to show that they are members of a group considered to share a common race or ethnicity at the time Title VI was enacted.

Congress can amend Title VI to clarify if and when it prohibits religious discrimination. It could, for example, add religion as a protected category or elaborate on when religious discrimination overlaps with racial or national origin discrimination. Congress may consider how other antidiscrimination laws approach prohibitions on religious discrimination, particularly given that a large number of sectarian schools accept federal funding. Other antidiscrimination laws contain exceptions for certain conduct by at least some religious institutions, including sectarian schools. Title VI does not.

Since 2016, lawmakers have introduced a version of the Antisemitism Awareness Act at least eight times, as well as other bills that could cause schools, colleges, and universities to lose federal funding if they respond inadequately to antisemitism as defined by the IHRA. Congress may consider how these and similar bills interact with Title VI. The versions of the Antisemitism Awareness Act in the 118th Congress, for example, instruct ED to "take into consideration" the IHRA definition of antisemitism when enforcing Title VI, but they do not amend Title VI itself to explain if and when Title VI covers religious discrimination at all. The Antisemitism Awareness Act also does not specify whether the IHRA definition of antisemitism is to be considered in private lawsuits in addition to OCR enforcement actions.

Various approaches to combating religious discrimination at schools, colleges, and universities may also raise complex constitutional questions. In imposing obligations on sectarian schools, Congress may need to take into account First Amendment limits on applying antidiscrimination laws to religious institutions. Furthermore, lower courts have struck down some school policies prohibiting harassment or limiting access to certain speakers as vague, overbroad, or viewpoint discrimination in violation of the First Amendment. The IHRA defines antisemitism broadly—"a certain perception of Jews"—and includes some forms of criticism of Israel that courts and commentators, including an author of the IHRA definition, have suggested enjoy First Amendment protection. There may be other constitutional considerations as well. For example, laws that extend greater protection to people of one faith than to people of other faiths may face scrutiny under the Equal Protection or Establishment Clauses.

# Author Information

Abigail A. Graber
Legislative Attorney

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

JA510

# EXHIBIT 44

JA511



# Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964

April 4, 2019

**Congressional Research Service**

https://crsreports.congress.gov

R45665

**CRS REPORT**
Prepared for Members and
Committees of Congress


## Congressional Research Service
Informing the legislative debate since 1914

R45665

# Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964

April 4, 2019

**Jared P. Cole, Coordinator**
Legislative Attorney

Title VI of the Civil Rights Act of 1964 prohibits federally funded programs, activities, and institutions from discriminating based on race, color, or national origin. In its current form, largely unchanged since its adoption, Title VI incorporates a number of unique features. Besides barring federally funded programs from discriminating based on race, Title VI also authorizes and directs all federal funding agencies to promulgate rules effectuating that nondiscrimination mandate. Those rules were also made subject to presidential approval, an authority since delegated to the Attorney General by executive order. To enforce Title VI, agencies also have at their disposal a uniquely powerful tool: the termination or refusal to provide federal financial support to an institution or program seeking it. Although this power to withdraw federal funds was envisioned as the primary mechanism for enforcing Title VI, that authority was also hedged with a range of procedural requirements designed to spur agencies to resolve complaints against recipients through voluntary agreements.

In the 50 years since Title VI became law much of the debate over the statute has centered on how the courts have read its two central provisions—Sections 601 and 602—and how federal agencies have gone about enforcing them. In the courts those debates have especially focused on what counts as unlawful "discrimination" under Section 601. The courts have long agreed that Title VI bars federally funded programs from intentionally singling out individuals by race for adverse treatment. In its first case involving Title VI the Supreme Court suggested that Section 601 might also reach beyond intentional discrimination to bar the use of policies with a disparate impact—policies that, irrespective of the intent, impose a discriminatory effect on different racial groups. With its 2001 ruling in *Alexander v Sandoval*, the Court appeared to put that interpretive question to rest: Title VI directly prohibits only intentional discrimination.

For the agencies charged with enforcing Title VI, the primary concerns have tended to be more operational and programmatic—how to go about the business of reviewing and assessing particular practices under Section 602 of the statute. Section 602 authorizes and directs agencies to issue regulations "effectuat[ing]" Section 601. The breadth of that authority has produced a further point of uncertainty about the statute: what limits are there to funding agencies' rulemaking authority under Title VI? So far, two divergent views have emerged from the Court's decisions: (1) a largely deferential view that would give agencies leeway to issue prophylactic rules reaching conduct beyond intentional discrimination, and (2) a more exacting view under which agencies may redress only provable cases of intentional discrimination.

Although Title VI's nondiscrimination prohibition accompanies nearly all awards of federal financial support, much of the statute's doctrine has been shaped by its use in the public schools. That doctrinal history has centered on one agency in particular: the Office for Civil Rights (OCR) in the U.S. Department of Education (ED). Title VI continues to play a central part in OCR's mission of protecting civil rights on campuses at all educational levels, and in institutions both public and private. OCR handles a large volume and variety of claims alleging race and national origin discrimination, which it administratively resolves through a series of investigative procedures laid out in its Case Processing Manual. Although the types of allegations OCR investigates vary, three major categories of complaint occupy much of its docket: disparate treatment, retaliation, and racial harassment.

Congress has the ultimate say over how Title VI works—rooted not only in its legislative power but in its authority to oversee the statute's enforcement. In recent years two questions surrounding Title VI have drawn particular congressional interest: the viability of disparate impact regulations under Section 602 and the possible inclusion of new protected classes in Section 601. No matter how Congress may choose to address those subjects, however, they are likely only to raise further questions about the future of this landmark civil rights law.

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 54 of 127
Case 1:25-cv-02429-MRV   Document 51-4   Filed 04/04/25   Page 4 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

# Contents

Introduction ................................................................................................................................. 1

Title VI of the 1964 Civil Rights Act: Origins and Overview .......................................................... 2
  Leveraging the Spending Power: The Origins of Title VI ......................................................... 2
  Title VI: An Overview ............................................................................................................. 4

Defining "Discrimination" Under Title VI ..................................................................................... 5
  Banning Intentional Discrimination (Disparate Treatment) ...................................................... 6
    Disparate Treatment: Direct Evidence ................................................................................ 6
    Disparate Treatment: Circumstantial Evidence ................................................................... 6
  Banning Discriminatory Effects (Disparate Impact) ................................................................ 7
    The Origin of Disparate Impact Under Title VI: *Lau v. Nichols* ........................................... 7
    Limiting *Lau* ................................................................................................................... 8

Regulating "Discrimination" Under Title VI .................................................................................. 10
  Rulemaking Under Title VI: Section 602 ............................................................................... 10
  The Limits to Section 602: Two Views .................................................................................. 12
    1. The Reasonable-Relation View ...................................................................................... 12
    2. The View from *Sandoval* ............................................................................................. 14
  Unresolved Questions About Disparate Impact Under Section 602 ........................................ 15

Enforcing Title VI at School: The U.S. Department of Education's Office for Civil Rights ........ 16
  OCR's Enforcement of Title VI ............................................................................................. 17
  Major Areas of Administrative Enforcement .......................................................................... 19
    Different Treatment: Two Illustrations ............................................................................... 20

Considerations for Congress ...................................................................................................... 22

Conclusion ............................................................................................................................... 23

## Contacts

Author Information ..................................................................................................................... 24

# Introduction

With its adoption as part of the Civil Rights Act of 1964, Title VI invested the federal government with a uniquely powerful role in addressing race and national origin discrimination.[1] Like other statutory provisions in the Civil Rights Act,[2] Title VI seeks to end race discrimination among institutions and programs whose doors were otherwise open to the public—especially public schools.[3] But unlike the Civil Rights Act's better known and more heavily litigated provisions,[4] Title VI is concerned specifically with the use of "public funds," designed to ensure that federal dollars not be "spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination."[5] And to fulfill that broad mandate, Title VI takes a distinctive approach to policing discrimination by making the promise of nondiscrimination a condition of the federal government's financial support.

Title VI consequently prohibits all federally funded programs, activities, and institutions from discriminating based on race, color, or national origin.[6] Although that prohibition accompanies nearly all grants and contracts awarded by the federal government,[7] much of Title VI's doctrine has been shaped by its use in the public schools.[8] That doctrinal story has accordingly centered on one agency in particular: the Office for Civil Rights (OCR) in the U.S. Department of Education (ED). As this report explains, Title VI continues to play a central part in OCR's mission of protecting civil rights on campuses at all educational levels, and in institutions both public and private.[9]

---

[1] 42 U.S.C. § 2000d et seq.; *see also* Olatunde C.A. Johnson, *Lawyering That Has No Name: Title VI and the Meaning of Private Enforcement*, 66 STAN. L. REV. 1293, 1294 (2014) (noting that Title VI has long been regarded as the "sleeping giant" of federal civil rights law, a "powerful but largely unused" antidiscrimination statute). Title VI, by its terms, applies to discrimination based on three distinct categories: race, color, and national origin. To ease exposition, this report generally refers more simply to Title VI's prohibition on "race discrimination," which, unless otherwise indicated, is intended to mean discrimination outlawed by Title VI.

[2] *See, e.g.*, 42 U.S.C. § 2000c-6(a)(1) (empowering the Attorney General to receive and file suit over complaints that a "school board" has deprived students of the "equal protection of the laws").

[3] By the time the Civil Rights Act became law in 1964, fully a decade after the Supreme Court had declared an end to the *de jure* segregation of public schools in *Brown v. Board of Education*, 347 U.S. 483 (1954), "only 1.2 percent of black schoolchildren in the South attended school with whites." GERALD N. ROSENBERG, THE HOLLOW HOPE: CAN COURTS BRING ABOUT SOCIAL CHANGE? 52 (2d ed. 2008). Discounting Tennessee and Texas, that "percentage drops to less than one-half of one percent (0.48 percent)." *Id.*

[4] *See id.* at 1294-95 (describing Title VI as "largely unknown" to "the general public and even to most lawyers," likely because "the number of Title VI cases litigated each year has always paled in comparison to most other civil rights statutes, particularly in comparison to the fair employment provisions of the Civil Rights Act of 1964").

[5] 110 Cong. Rec. 6543 (1964) (statement of Sen. Humphrey quoting President Kennedy).

[6] 42 U.S.C. § 2000d.

[7] The only exceptions are funds disbursed pursuant to "a contract of insurance or guaranty." *See* 42 U.S.C. §§ 2000d-1, 2000d-4. Thus, for example, to the extent that a bank "receives federal financial assistance in the form of deposit insurance from the" Federal Deposit Insurance Corporation, it would likely not be bound by Title VI's nondiscrimination mandate. Marshall v. Webster Bank, N.A., 2011 U.S. Dist. LEXIS 5665, at *20-21 (D.Conn. Jan. 20, 2011) (dismissing a race discrimination complaint on this basis because the alleged "federal assistance [was] in the form of a guaranty or contract for insurance").

[8] *See generally* STEPHEN C. HALPERN, ON THE LIMITS OF THE LAW: THE IRONIC LEGACY OF TITLE VI OF THE 1964 CIVIL RIGHTS ACT (1995). *See also* 110 Cong. Rec. 7068 (1964) (statement of Sen. Ribicoff) (observing that "[u]nquestionably, more programs under HEW would be affected than all other programs put together" by Title VI).

[9] Given the breadth of institutions that receive federal education money, all public elementary and secondary schools are subject to Title VI, as well as nearly all colleges and universities, public and private. *See* U.S. Dep't of Educ., Office for Civil Rights, *Race and National Origin Discrimination: Frequently Asked Questions,*

This report begins by briefly tracing Title VI to its historical and conceptual roots in the federal spending power, and explains how the early understanding of that power shaped the various legislative proposals that ultimately became Title VI. The report then examines the central doctrinal question behind the statute: what exactly Title VI outlawed by prohibiting "discrimination" among federally funded programs, and what agencies are therefore allowed to do in order to enforce that prohibition. The report then turns to ED's OCR, briefly reviewing how that agency goes about the day-to-day work of enforcing Title VI in schools, and concludes by surveying two recent developments related to Title VI, along with some considerations should Congress wish to revisit this landmark civil rights law. Because this report focuses specifically on how OCR has come to understand and enforce Title VI, it does not directly discuss litigation under the statute, whether filed by a private party or by the U.S. Department of Justice following a referral from OCR,[10] though many of the substantive legal standards overlap.

# Title VI of the 1964 Civil Rights Act: Origins and Overview

## Leveraging the Spending Power: The Origins of Title VI

By the time Title VI was being seriously debated in 1964, its basic premise—that federal dollars should not go to support programs or institutions that discriminate based on race—was already familiar. In 1947, nearly a decade before the Supreme Court declared an end to the *de jure* segregation of the public schools in *Brown v. Board of Education*,[11] President Truman's Committee on Civil Rights had already sketched out the basic pattern for Title VI, calling for "establishment by act of Congress or executive order" of a federal office to review "the expenditures of all government funds," so that none would go to subsidize discrimination based on race, color, creed, or national origin.[12] Several years later, in 1953, President Eisenhower was also expressing dismay at the "discrimination in expenditure of [federal] funds as among our citizens."[13] And *Brown*, decided the next year, put even more pressure on the federal government to begin leveraging its funds to combat discrimination[14]—first in the public schools, but possibly also on a wider scale.

The early years of the Kennedy Administration saw some of the first steps in that direction. Early on in his tenure, for example, Abraham Ribicoff, then the Secretary of Health, Education, and

---

https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/race-origin.html ("All public school districts are covered by Title VI because they receive some federal financial assistance. All public colleges and universities and virtually all private colleges and universities are covered because they receive such assistance by participating in federal student aid programs.").

[10] *See* Alexander v. Sandoval, 532 U.S. 275, 279-80 (explaining that private parties may sue to enforce Title VI); *see also infra* note 34 and accompanying text.

[11] 347 U.S. 483 (1954).

[12] PRESIDENT'S COMM. ON CIVIL RIGHTS, TO SECURE THESE RIGHTS 170 (1947); *see also* Charles F. Abernathy, *Title VI and the Constitution: A Regulatory Model for Defining "Discrimination,"* 70 GEO. L.J. 4-7 (1981) (recounting this history in greater detail).

[13] HALPERN, *supra* note 8, at 23.

[14] *Id.* (noting that "the *Brown* decision in 1954 focused even greater attention than ever on the use of federal funds," leading to several proposals for the government to begin doing so in "housing, education, and other matters"); *cf.* 110 Cong. Rec. 7068 (1964) (statement of Sen. Ribicoff) (explaining that, since *Brown*, "the executive branch ha[d] been moving, cautiously at first but with firmness in recent years, to carry out the mandate of the Constitution").

Welfare (HEW), refused to locate the department's summer teacher-training institutes at "any college or university that declined to operate such institutes without discrimination."[15] In a related decision, HEW later moved to withdraw support from segregated schooling on military bases as well.[16] Those steps led others in the Administration, like then-Attorney General Robert Kennedy, to publicly suggest that the federal funds might be used on a wider scale, "to persuade southern states to alter their racial practices" more generally.[17]

These early uses of the federal spending power to redress race discrimination had their limits, however. After leaving HEW for the U.S. Senate, Ribicoff explained during the floor debate over Title VI that, while at HEW, he had frequently "found [his] authority to act was questionable, and in some instances ... limited by the explicit wording of congressional enactments."[18] A number of Kennedy Administration officials evidently shared that view, with some publicly questioning whether the executive branch had authority to withhold money appropriated by Congress or condition disbursement on terms not found in underlying funding authorities.[19] This view "did not go unchallenged," as civil rights leaders made clear during the House hearings on the bill;[20] nor has it received a definitive judicial ruling since.[21] But with the risk of a bruising, possibly fatal, legal challenge looming over unilateral executive action,[22] it "became clear" to Administration officials "that administrative action alone could not solve the entire problem."[23]

Congressional action, by contrast, seemed to face far fewer legal constraints. In several earlier decisions the Supreme Court had established that Congress unambiguously had the right under the Spending Clause[24] to condition the receipt of appropriated funds on the terms of its choosing, even in areas traditionally left to the regulation of the states.[25] Congress was therefore free to do by legislation what the executive branch could only questionably have done on its own: make nondiscrimination a condition for receiving federal financial support.[26]

---

[15] 110 Cong. Rec. 7065 (1964) (statement of Sen. Ribicoff).

[16] HALPERN, *supra* note 8, at 24.

[17] *Id.*; 110 Cong. Rec. 7068 (1964) (statement of Sen. Ribicoff) (explaining that, since *Brown*, "the executive branch ha[d] been moving, cautiously at first but with firmness in recent years, to carry out the mandate of the Constitution").

[18] *Id.* at 7065 (statement of Sen. Ribicoff).

[19] HALPERN, *supra* note 8, at 26-27.

[20] *Id.* at 27 (discussing the NAACP and ACLU's view that "the president did not need congressional authorization but had the unilateral authority via executive order to withhold funds from programs that discriminated").

[21] *Id.* The Supreme Court has yet to rule on the scope of the President's authority to "impose reasonable contractual requirements in the exercise of its procurement" or grant-making authority. Chrysler Corp. v. Brown, 441 U.S. 281, 305-06 (1979) (raising but declining to address that question). The question has been raised and analyzed, however, in some federal courts of appeals. *See* Contractors Ass'n of Eastern Pa. v. Sec'y of Labor, 442 F.2d 159 (3d Cir. 1971), *cert. denied*, 404 U.S. 854 (1971) (considering the President's authority to make certain nondiscrimination provisions a condition for federal contracts).

[22] *Cf. Contractors Ass'n of Eastern Pa.*, 442 F.2d 159 (discussing this issue in connection with Executive Order 11246, mandating nondiscrimination by federal contractors).

[23] 110 Cong. Rec. 7065 (1964) (statement of Sen. Ribicoff).

[24] *See* U.S. CONST., Art. 1, § 8, cl. 1.

[25] *See* Oklahoma v. U.S. Civil Service Comm'n, 330 U.S. 127, 143-44 (1947) (concluding that "[t]he offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual"). The Supreme Court has since repeatedly reaffirmed Congress's power to condition the expenditure of federal funds, subject to certain limitations. *See* South Dakota v. Dole, 483 U.S. 203, 206-07 (1987) (affirming that under the Spending Clause, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives").

[26] HALPERN, *supra* note 8, at 27 (explaining that President Kennedy was "[u]nwilling to accept the political risk and

# Title VI: An Overview

The final legislative resolution, reached after a period of protracted debate, was Title VI.[27] The legislation went through a number of significant alterations from the measure originally proposed by the Kennedy Administration, many of which sought to address fears of potential administrative abuse by layering agencies' enforcement power with procedural protections for funding recipients.[28] But the basic pattern suggested by the Committee on Civil Rights some 20 years earlier—making nondiscrimination a condition for federal financial support—remained the same. In its final form, largely unchanged since its adoption, Title VI incorporates five basic features relevant to this report:

1. **Nondiscrimination Mandate.** Title VI bars any federally funded "program or activity" from discriminating against a "person in the United States" based on his or her "race, color, or national origin."[29]

2. **Implementing Rules, Regulations, and Orders.** All federal funding agencies are "authorized and directed" to promulgate rules, regulations, or orders of general applicability "effectuat[ing]" that nondiscrimination mandate.[30]

3. **Approval of Implementing Rules, Regulations, and Orders.** Any rule, regulation, or order issued under Title VI was made subject to presidential approval,[31] an authority since delegated to the Attorney General by executive order.[32]

4. **Agency Enforcement.** To enforce Title VI an agency could resort to either of two measures:[33] (1) the termination or refusal to provide federal financial assistance to an institution or program seeking it; or (2) "any other means authorized by law," now understood to be a lawsuit brought by the Attorney General seeking a recipient's compliance with Title VI.[34]

---

confront the controversy that would ensue if he issued an executive order" mandating nondiscrimination as a condition for receiving federal financial assistance).

[27] 42 U.S.C. § 2000d et seq. For a comprehensive account of the legislative debate over Title VI, see generally Abernathy, *supra* note 12.

[28] HALPERN, *supra* note 8, at 27-41 (concluding that "[i]t would be hard to overestimate the significance of the procedural protections Congress placed in the statute," which "encumbered those who would have to wield th[e] power" Title VI granted).

[29] 42 U.S.C. § 2000d.

[30] *Id.* § 2000d-1 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 601 [42 USCS § 2000d] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.").

[31] *Id.* ("No such rule, regulation, or order shall become effective unless and until approved by the President.").

[32] Exec. Order No. 12250, 45 Fed. Reg. 72995 (Nov. 2, 1980) (delegating to the Attorney General the authority vested in the President under Section 602 of Title VI, "relating to the approval of rules, regulations, and orders of general applicability").

[33] 42 U.S.C. § 2000d-1 ("Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . or (2) by any other means authorized by law.").

[34] *See, e.g.*, Nat'l Black Police Ass'n, Inc. v. Velde, 712 F.2d 569, 575 (D.C. Cir. 1983) (noting that "although fund termination was envisioned as the primary means of enforcement under Title VI,[] ... Title VI clearly tolerates other enforcement schemes," including the "referral of cases to the Attorney General, who may bring an action against the

5. **Procedural Requirements Related to Agency Enforcement.** Though an agency's withdrawal of federal funds was envisioned as the primary mechanism for enforcing Title VI, that authority was hedged with a range of procedural requirements designed to spur agencies into seeking consensual resolutions with recipients.[35]

Each of these statutory features is explained below, including how they have come to be understood since Title VI's passage and the role they play in addressing racial discrimination at school.[36]

# Defining "Discrimination" Under Title VI

Title VI revolves around a single sentence-long prohibition, found in Section 601 of the law, providing that "[n]o person in the United States" may be "subjected to discrimination" by a "program or activity" that receives federal financial assistance based on his or her "race, color, or national origin."[37] Plainly that prohibition outlaws racial "discrimination" in all federally funded programs. It does not define, however, the sorts of practices Title VI thereby excludes.[38] And with the legislative history on this point inconclusive at best,[39] the task of providing a workable definition has been left to the agencies charged with enforcing Title VI and, ultimately, to the courts.[40] As explained below, however, with its 2001 decision in *Alexander v. Sandoval*,[41] the Supreme Court appears to have put the basic interpretive question to rest: Section 601 directly prohibits only *intentional discrimination*.

---

recipient").

[35] Originally those requirements provided that (1) the agency could terminate funds only if it had advised the recipient of its noncompliance and attempted voluntary resolution; (2) the agency had to limit the effect of fund termination to the "program or activity" found to be out of compliance with Title VI; (3) before withdrawing funds the head of the agency had to file "written report of the circumstances and the grounds for such action" with the relevant congressional committees; and (4) the agency had to wait at least 30 days after filing that report before cutting off funds. *See* 42 U.S.C. § 2000d-1. Of those requirements only the first has been amended since Title VI became law. With the adoption of the Civil Rights Restoration Act of 1987 (CRRA), Pub. L. No. 100–259, 102 Stat. 31 (1988), Congress broadened the definition of "program or activity" to include, in the educational context, "all of the operations" of an elementary or secondary school or institution of higher education when "any part of" those institutions or entities receives federal funding. 42 U.S.C. § 2000d-4a(2). The CRRA thereby extended Title VI's coverage "so that it [now] encompasses programs or activities of a recipient of Federal financial assistance on an institution-wide" and system-wide basis. Cureton v. Nat'l Collegiate Athletic Ass'n, 198 F.3d 107, 115 (3d Cir. 1999).

[36] *See supra* note 9 (explaining the scope of public and private institutions of education that receive federal funding and are subject to Title VI).

[37] 42 U.S.C. § 2000d.

[38] Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 592 (1983) (White, J., announcing judgment of the Court) ("The language of Title VI on its face is ambiguous; the word 'discrimination' is inherently so."); *see also* Charles F. Abernathy, *supra* note 12, at 25 (noting that while debating the provision of the House bill that eventually became Section 601 of Title VI, "two members . . . perceptively remarked that the word 'discrimination' had no fixed meaning, and was nowhere defined in title VI").

[39] *See* Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 286 (1978) (Powell, J., announcing the judgment of the Court) (noting the "repeated refusals of [Title VI's congressional] supporters precisely to define the term "discrimination"); *see also* Abernathy, *supra* note 12; HALPERN, *supra* note 8, at 295 (concluding that Title VI's "legislative history" did not "provide a workable definition" of "discrimination").

[40] *See* HALPERN, *supra* note 8, at 6 ("It was left to the federal courts and to executive branch officials enforcing Title VI to identify the parameters of the legal right blacks had to equal, nondiscriminatory treatment in public schools.")

[41] 532 U.S. 275 (2001).

JA519

# Banning Intentional Discrimination (Disparate Treatment)

Despite Title VI's basic ambiguity, the courts have long agreed that, at a minimum, Section 601 bars federally funded programs from *intentionally* singling out individuals for adverse treatment because of their race.[42] This sort of intentional discrimination is commonly known as *disparate* or *different treatment*. And it can be proved in either of two ways: (1) directly, by pointing to a policy or decision that expressly singles out individuals by race, or (2) indirectly, by providing circumstantial evidence that a discriminatory motive was likelier than not responsible for the alleged mistreatment.[43]

## Disparate Treatment: Direct Evidence

Perhaps the clearest way a program may discriminate along racial lines is by *expressly* singling out individuals by race for adverse treatment. Thus, for example, a school that explicitly excludes students from an assembly by race will clearly have discriminated in this intentional sense.[44] And because the "discrimination" involved appears on the face of the policy or decision itself, proving a violation of Title VI becomes that much more straightforward: to prevail, the aggrieved party generally need only establish that the discriminatory policy existed and was used against him.[45]

## Disparate Treatment: Circumstantial Evidence

Although still litigated, over the years such facially discriminatory policies and decisions have grown less common—a shift widely attributed to laws like the 1964 Civil Rights Act.[46] As a

---

[42] *Cf.* Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 589 (1983) (White, J., announcing judgment of the Court) ("The Court squarely held in *Lau v. Nichols* . . . that Title VI forbids the use of federal funds . . . in programs that intentionally discriminate on racial grounds."); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 284 (1978) (Powell, J.) (announcing the judgment of the Court) ("Examination of the voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to the" intentional discrimination barred by the Constitution.); *id.* at 334 (Brennan, J.) (concurring in the judgment in part and dissenting in part) ("Again and again supporters of Title VI emphasized that the purpose of the statute was to end segregation in federally funded activities and to end other discriminatory uses of race disadvantaging Negroes.").

[43] *See, e.g.*, De La Cruz v. Tormey, 582 F.2d 45, 50 (9th Cir. 1978) (distinguishing "government action" which is "'facially' discriminatory," in violation of the Equal Protection Clause, from a "more subtle variety of discrimination focuse[d], not on the form of the governmental action, . . . but rather upon its effects").

[44] *See* U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Oak Park and River Forest High School District 200, at 3-4 (Sept. 29, 2015) (concluding that a "racially exclusive assembly" constituted intentional discrimination); *see also infra* notes 176-183 and accompanying text.

[45] *Cf.* Cmtys. for Equity v. Mich. High Sch. Ath. Ass'n, 459 F.3d 676, 694 (6th Cir. 2006) (noting that a complainant need not prove discriminatory animus where the allegation involves a facially discriminatory policy); *accord* Parker v. Franklin County Cmty. Sch. Corp., 667 F.3d 910, 920 (7th Cir. 2012) (citing *Cmtys. for Equity* for the same). Because Title VI has been read to incorporate constitutional principles, as explained below, even where a recipient has been found to have intentionally discriminated based on race it may still not be liable under Title VI if its discriminatory conduct was narrowly tailored to serve a compelling interest. Generally, however, that is a difficult showing to make. See CRS Report R45481, *"Affirmative Action" and Equal Protection in Higher Education*, by Christine J. Back and JD S. Hsin, at 21-24 (Jan. 31, 2019).

[46] *See* Tristin K. Green, *The Future of Systemic Disparate Treatment Law*, 32 BERKELEY J. EMP. & LABOR L. 395, 401, 418 (2011) (observing that "after the passage of Title VII of the Civil Rights Act in 1964, most formal, facially discriminatory employment policies ended, even as less formalized discrimination continued," and that "[o]ver time . . . individuals made fewer blatantly and overtly racist or sexist decisions" as well); GERALD N. ROSENBERG, THE HOLLOW HOPE: CAN COURTS BRING ABOUT SOCIAL CHANGE? 52 (2d ed. 2008) (documenting the "extraordinary" impact that the enforcement of Title VI had in unraveling the *de jure* segregation of schools in the South); HALPERN, *supra* note 8, at 80 ("The enforcement of title VI between 1965 and 1968 is widely and rightfully recognized as having produced historic breakthroughs in dismantling the system of [*de jure*] racial segregation in southern schools.").

result, the more usual case today instead involves allegations of racially motivated mistreatment under a policy or decision that, at least on its face, is race-neutral.[47]

Thus, for example, an African American student might still plausibly allege that a school official discriminated against him based on his race by disciplining him more severely than his white classmates for substantially the same misconduct, even though neither the discipline policy nor the disciplining official made any mention of his race.[48] In such cases, the "*form of the governmental action*"—the literal wording of the policy used or the decisionmaker's explanation—is not at issue.[49] What matters is *why* the individuals alleging mistreatment received the treatment they did; whether, that is, a discriminatory *intent* shaped the allegedly discriminatory decision. Where the surrounding circumstances suggest that some such racial animus was likelier than not what motivated the adverse treatment, that treatment will amount to intentional discrimination, presumptively violating Title VI.[50]

## Banning Discriminatory Effects (Disparate Impact)

Title VI has long been understood to bar federally funded programs from intentionally discriminating based on race. At least for the first few decades following its adoption, however, there was considerably more debate about whether Section 601 might also forbid policies that, while not purposefully discriminatory, nonetheless had a disparate effect on persons of different races. And in its first case involving Title VI—*Lau v. Nichols*[51]—the Supreme Court seemed to say exactly that.[52] In its most recent encounter with disparate impact under Title VI, however, in *Alexander v Sandoval*,[53] the Court squarely rejected *Lau*'s ruling on that point.[54] Today, as a result, the *only* discrimination Title VI directly prohibits is *intentional*.[55]

### The Origin of Disparate Impact Under Title VI: *Lau v. Nichols*

*Lau* was the Court's first encounter with Title VI, and it set the stage for much of the uncertainty about the statute that has followed. In *Lau,* non-English-speaking Chinese students had sued San Francisco's school system alleging that its policy of refusing bilingual or remedial English

---

[47] *See* Rashdan v. Geissberger, 764 F. 3d 1179, 1182 (9th Cir. 2014) (analyzing circumstantial evidence of discrimination under Title VI according to the same standards as Title VII); *see also* Green, *supra* note 46, at 401 (noting that even as "most formal, facially discriminatory employment policies ended, . . . less formalized discrimination continued").

[48] *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Platteville Public Schools, at 11-12 (Nov. 20, 2013) (analyzing a similar claim under Title VI).

[49] *Tormey*, 582 F.2d at 50.

[50] As a formal matter, the federal courts of appeals have generally applied the same "basic allocation of burdens and order of presentation of proof"—widely known as the *McDonnell Douglas* burden-shifting framework—that the Supreme Court has used in reviewing claims of employment discrimination under Title VII of the 1964 Civil Rights Act. Rashdan, 764 F. 3d at 1182 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) and collecting cases). *See also supra* note 45 (noting the constitutional defense).

[51] 414 U.S. 563 (1974).

[52] *See, e.g.*, *Guardians*, 463 U.S. at 589 (White, J., announcing the judgment of the Court) ("The Court squarely held in *Lau v. Nichols* . . . that Title VI forbids the use of federal funds not only in programs that intentionally discriminate on racial grounds but also in those endeavors that have a disparate impact on racial minorities.").

[53] 532 U.S. 275 (2001).

[54] *Id.* at 285 ("[W]e have since rejected *Lau's* interpretation of [Section] 601 as reaching beyond intentional discrimination.").

[55] *Id.* at 280.

Case: 25-1529  09/22/2025  DktEntry: 36.1  Page 62 of 127
Case 1:25-cv-02429-MKV  Document 51-4  Filed 04/04/25  Page 12 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

instruction effectively denied them the educational opportunities provided non-Chinese students, in violation of Title VI as well as the Equal Protection Clause of the Fourteenth Amendment.[56] And in an unexpectedly unanimous ruling,[57] the Court agreed—albeit along two different lines of reasoning.

Relying "solely" on Section 601, five of the Justices, led by Justice Douglas, concluded that Section 601 barred discrimination "which has [a discriminatory] *effect* even though no purposeful design is present."[58] In that case the effect was clear: "the Chinese-speaking minority receive[d] fewer benefits than the English-speaking majority" from the city's schools.[59] As recipients of federal educational dollars subject to Title VI, the school system had "contractually" obligated itself to reform its instructional policies to ensure the Chinese-speaking minority the same educational benefits as the English-speaking majority.[60]

*Lau* therefore seemed to imply that Section 601 directly outlawed policies with discriminatory effects, *irrespective of their motivating intent*—a form of discrimination now commonly known as *disparate impact*. But the Court also mixed some uncertainty into that message. Immediately after saying that they were "rely[ing] solely on [Section] 601" in siding with the student plaintiffs, the majority in *Lau* turned to recite a regulation issued by HEW, specifically addressing what recipient school districts had to do under Title VI to ensure students with "linguistic deficiencies" had the same "opportunity to obtain the education generally obtained by other students in the system."[61] That discussion drew a contrasting concurrence from three other Justices, all of whom agreed that the student should prevail under a disparate impact theory, but believed that the proper basis for that theory—and the result in favor of the students—was HEW's regulation implementing Title VI, not Section 601 itself.[62] In all, though, eight Justices in *Lau* put down a marker in favor of disparate impact under Title VI, five seemingly under Section 601. And so, whatever the vagaries in its rationale, *Lau*'s basic message seemed clear: Title VI barred not just intentional discrimination, but policies with a disparate impact as well.

## Limiting *Lau*

Only a few years after handing down *Lau*, in its landmark ruling in *Regents of the University of California v. Bakke*,[63] the Court appeared to reverse course. *Bakke* involved a white applicant's challenge to the affirmative action admissions policy then in use at the University of California at Davis's medical school.[64] And like the Chinese students in *Lau*, Bakke objected to that policy on

---

[56] *Lau*, 414 U.S. at 564-65. The case also involved a claim under the Equal Protection Clause of the Fourteenth Amendment, which the Court declined to address. *See id.*

[57] *See* Rachel F. Moran, *The Story of* Lau v. Nichols: *Breaking the Silence in Chinatown, in* EDUCATION LAW STORIES 111, 134 (Michael A. Olivas & Ronna Greff Schneider eds. 2008) (observing that, though "some attorneys and scholars had expected the decision in *Lau* to be a close and difficult one, the Court handed down a unanimous opinion in just six weeks after oral argument").

[58] *Lau*, 414 U.S. at 566.

[59] *Id.* at 568.

[60] *Id.* at 568-69.

[61] *Id.* at 566-67.

[62] *Id.* at 569-71 (Stewart, J., concurring in the result, and joined by Blackmun, J., and Burger, C.J.). Justice White concurred in the judgment but declined to write or join an opinion. *Id.* at 569.

[63] 438 U.S. 265 (1978).

[64] For a more detailed analysis of Bakke and affirmative action more generally in higher education, see CRS Report R45481, "Affirmative Action" and Equal Protection in Higher Education, by Christine J. Back and JD S. Hsin (Jan. 31, 2019).

JA522

both constitutional and statutory grounds.[65] To dispose of his challenge the Justices therefore had to confront the question they effectively avoided in *Lau*: how does Section 601's nondiscrimination mandate relate to the Fourteenth Amendment's Equal Protection Clause? None of the opinions in *Bakke* commanded a clear majority, but in separate opinions, five of the Justices, separately sifting through the legislative record, arrived at the same answer: Title VI's drafters intended Section 601 to "enact[] constitutional principles," and nothing more.[66] Title VI, in their view, therefore "proscribe[d] only those racial classifications that would violate the Equal Protection Clause"[67]—policies that the Court had already said must involve more than just a racially disparate impact, but a provable discriminatory intent as well.[68]

In the decades since *Bakke*, the Court continued to divide over the basic ambiguity in Title VI—over exactly what sort of "discrimination" Section 601 outlawed.[69] By the time Title VI returned to the Court in 2001, however, with *Alexander v. Sandoval*,[70] a unified five-Justice majority appeared to settle on a more definite view.

As Justice Scalia explained for the *Sandoval* majority, despite the lingering "uncertainty regarding [Title VI's] commands," it seemed "beyond dispute" at that point that a policy with only a disparate impact did not violate Section 601.[71] Tallying the votes in *Bakke* seemed to make that clear enough: on that statutory point, five Justices in *Bakke* explicitly agreed that Title VI should be read coextensively with the Equal Protection Clause.[72] And as claims under that constitutional provision had already been limited to cases of provable discriminatory intent,[73] the *Sandoval* majority thought it stood to reason that claims under Title VI had to be so limited as well.[74]

The difficulty, however, was *Lau*. There, after all, the Court seemed to say that Section 601 *did* prohibit policies with a racially disparate impact, irrespective of whether those effects were intentional.[75] But as the *Sandoval* majority saw it, *Bakke* had effectively resolved that difficulty as

---

[65] *Bakke*, 438 U.S. at 278 (Powell, J., announcing the judgment of the Court).

[66] *Id.* at 286; *id.* at 328 (Brennan, J., concurring in the judgment in part and dissenting in part) ("In our view, Title VI prohibits only those uses of racial criteria that would violate the Fourteenth Amendment if employed by a State or its agencies; it does not bar the preferential treatment of racial minorities as a means of remedying past societal discrimination to the extent that such action is consistent with the Fourteenth Amendment.").

[67] *Id.* at 287 (Powell, J., announcing the judgment of the Court).

[68] Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")

[69] The only other case to squarely present the question was Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983). That case involved a claim brought by black and Hispanic police officers under Title VI, challenging the New York City police department's use of a written examination as a component of its entry-level hiring. *Id.* at 585 (White, J., announcing the judgment of the Court). The officers argued that the exams had an unjustifiably "discriminatory impact on the scores and pass-rates of blacks and Hispanics," violating Title VI—a claim which the Court rejected, albeit in a badly fractured judgment, splintered into six different opinions. *See id.* at 584; *see also* Alexander v. Choate, 469 U.S. 287, 293 (1985) (explaining that "[n]o opinion commanded a majority in *Guardians*, and Members of the Court offered widely varying interpretations of Title VI").

[70] 532 U.S. 275 (2001).

[71] *Id.* at 279.

[72] *Id.* at 280-81.

[73] *Arlington Heights*, 429 U.S. at 265 (discussing Washington v. Davis, 426 U.S. 229, 242 (1976), among other cases).

[74] *Sandoval*, 532 US. at 280-81.

[75] *Cf. Guardians*, 463 U.S. at 589 (White, J., announcing the judgment of the Court) ("The Court squarely held in *Lau v. Nichols* . . . that Title VI forbids the use of federal funds not only in programs that intentionally discriminate on racial grounds but also in those endeavors that have a disparate impact on racial minorities."); *cf. Lau*, 414 U.S. at 566

---

Case: 25-1529  09/22/2025  DktEntry: 36.1  Page 64 of 127
Case 1:25-cv-02429-MKV   Document 51-4   Filed 04/04/25   Page 14 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

well: to the extent *Lau* rested on Section 601 directly—rather than HEW's regulations[76]—the majority in *Lau* had simply misread Title VI.[77] The only discrimination Title VI directly outlawed, according to the votes in *Bakke*, was intentional. As far as the *Sandoval* Court was concerned, to the extent *Lau* disagreed with *Bakke*, *Lau* had already been "rejected."[78]

# Regulating "Discrimination" Under Title VI

In *Sandoval* the Court appeared to resolve the basic ambiguity in Title VI: the statute's central nondiscrimination mandate—Section 601—outlaws only intentional discrimination. But saying that much, the *Sandoval* majority also acknowledged, did not speak to whether policies with a disparate impact might still be barred under the rulemaking grant found in Section 602 of Title VI. Section 602, as noted, directs agencies to promulgate regulations "to effectuate" the antidiscrimination prohibition of Section 601 "consistent with achievement of the objectives of the statute."[79] And pursuant to that directive, all Cabinet-level federal funding agencies, along with many smaller agencies, have since issued rules and guidance under Title VI outlawing disparate impact discrimination.[80] As this section explains, however, *Sandoval* seems to have placed narrower limits on what funding agencies may redress through regulations under Section 602, arguably constraining them to redress in their rulemakings the same forms of intentional discrimination outlawed by Section 601.

## Rulemaking Under Title VI: Section 602

In the courts, and especially the Supreme Court, much of the fight over Title VI has focused on definitions—what in general terms will count as unlawful "discrimination" under Section 601.[81]

---

(relying "solely" on Section 601 to rule for the plaintiffs).

[76] *See Lau*, 414 U.S. at 567-68 (discussing HEW's disparate impact regulation).

[77] *Sandoval*, 532 U.S. at 285 ("[W]e have since rejected *Lau*'s interpretation of [Section] 601 as reaching beyond intentional discrimination."); *cf. Lau*, 414 U.S. at 569-71 (Stewart, J., concurring in the result).

[78] *Sandoval*, 532 U.S. at 285.

[79] 42 U.S.C. § 2000d-1.

[80] 7 C.F.R. Part 15 (Agriculture); 15 C.F.R. Part 8 (Commerce); 32 C.F.R. Part 195 (Defense); 34 C.F.R. Part 100 (Education); 10 C.F.R. Part 1040 (Energy); 40 C.F.R. Part 7 (Environmental Protection Agency); 45 C.F.R. Part 80 (Health and Human Services); 6 C.F.R. Part 21 (Homeland Security); 24 C.F.R. Part 1 (Housing and Urban Development); 43 C.F.R. Part 17, Subpart A (Interior); 28 C.F.R. Part 42, Subpart C (Justice); 29 C.F.R. Part 31 (Labor); 22 C.F.R. Part 141 (1982) (State); 49 C.F.R. Part 21 (Transportation); 31 C.F.R. Part 22 (Treasury); 38 C.F.R. Part 18, Subpart A (Veterans Affairs). In addition to these Cabinet-level departments, a number of other agencies have also promulgated rules or, in some cases, guidance pursuant to Section 602 of Title VI. *See, e.g.*, 45 C.F.R. Part 1203 (Corporation for National and Community Service); 44 C.F.R. Part 7, Subpart A (FEMA); 41 C.F.R. Subpart 101-6.2 (General Services Administration); 14 C.F.R. Part 1250 (NASA); 13 C.F.R. Part 112 (Small Business Administration); 18 C.F.R. Part 1302 (Tennessee Valley Authority).

[81] Though definitional disputes have loomed large over the federal docket, questions about Title VI's enforcement have also figured prominently over the years, especially in the federal courts of appeals. Three issues have proved particularly salient: (1) whether private parties may sue to enforce Section 601, *see Sandoval*, 532 U.S. at 279-80 (concluding that they may, based on Cannon v. Univ. of Chicago, 441 U.S. 677 (1979)); (2) whether and to what extent the federal courts may oversee funding agencies' enforcement of Title VI, *see* Women's Equity Action League v. Cavazos, 906 F.2d 742, 749 (D.C. Cir. 1990) (Ginsburg, J.) (holding that private parties may not "demand across-the-board judicial supervision of continuing federal agency enforcement" of Title VI and are instead limited to "situation-specific suits against [a] federal agency based on federal funding of a particular project or district"); and (3) whether private parties may sue to enforce regulations issued under Section 602, *see Sandoval*, 532 U.S. at 288-91 (finding "no evidence anywhere in the text [of Title VI] to suggest that Congress intended to create a private right to enforce regulations promulgated under [Section] 602").

But for the agencies charged with actually enforcing that mandate the primary concerns have tended to be more operational and programmatic: how to go about the business of reviewing and assessing particular practices under Title VI.[82] To address those concerns, funding agencies have therefore had to look beyond the bare substantive standard in Section 601 to their rulemaking authority under Section 602.

Section 602 is at once a source of authority and a command, "authoriz[ing] and direct[ing]" every federal funding agency to "effectuate" Section 601's nondiscrimination mandate "by issuing rules, regulations, or orders of general applicability consistent with" the "objectives" of its underlying funding authority.[83] Every Cabinet-level department, among many other smaller agencies, has since done so.[84] And given DOJ's unique coordinating authority over Title VI,[85] those funding agencies have generally followed the rules DOJ developed for HEW in 1964,[86] including its regulation outlawing disparate impact discrimination.[87]

Like the nondiscrimination provision in Section 601, the rulemaking authority provided by Section 602 was made deliberately broad.[88] That breadth has produced a further point of uncertainty about the statute: what limits are there to agencies' rulemaking authority under Section 602? The Supreme Court, for its part, has never squarely addressed that question, nor the validity of the disparate-impact regulations in particular.[89] And as explained below, the resulting ambiguity has yielded two contrasting views of what Section 602 will allow an agency to outlaw as unlawful "discrimination" under Title VI: (1) a largely deferential view that would give agencies broad leeway to issue "broad prophylactic rules"[90] reaching conduct beyond intentional

---

[82] The first major steps taken under Title VI—perhaps unsurprisingly given its roots in *Brown v. Board of Education*—emerged with HEW's efforts to end the *de jure* segregation of public schools, especially in the South. Empowered by the infusion of new grant money appropriated by the Elementary and Secondary Education Act of 1965 (ESEA), HEW issued its first set of Title VI guidelines in April 1965, which made measurable progress toward desegregation a condition for receiving funds under ESEA. *See* Singleton v. Jackson Mun. Separate Sch. Dist., 348 F.2d 729, 730 (5th Cir. 1965) (describing the "close connection . . . between the judiciary's standards in enforcing the national policy requiring desegregation of public schools and the executive department's standards in administering this policy"); *see also* HALPERN, *supra* note 8, at 45-52 (discussing the background to HEW's 1965 Guidelines and their reception in the federal courts). Assistance conditioned under ESEA remains a major source of ED's enforcement authority today.

[83] 42 U.S.C. § 2000d-1.

[84] *See supra* note 80 (citing regulations of various agencies and departments).

[85] *See* Exec. Order No. 12250, *Leadership and Coordination of Nondiscrimination Laws*, reprinted at 45 Fed. Reg. 72, 995 (Nov. 4, 1980) (delegating presidential approval authority under Section 602 of Title VI to the Attorney General).

[86] Section 602 directs every funding agency to issue its own rules "effectuat[ing]" Section 601's nondiscrimination mandate. *See* 42 U.S.C. § 2000d-1. Once President Lyndon Johnson delegated his approval authority under Title VI to the Attorney General, however, DOJ took the lead in "work[ing] out a consistent, enforceable policy" under the statute, beginning with the regulations it crafted for HEW shortly after the law's passage. *Comment: Title VI of the Civil Rights Act of 1964—Implementation and Impact*, 36 GEO. WASH. L. REV. 824, 844-45 (1968). Those regulations later served as the "standard" by which DOJ reviewed and approved other agencies' regulations, a fact which explains their general uniformity to this day. *Id.*

[87] *See Guardians*, 463 U.S. at 619 (Marshall, J., dissenting) ("Following the initial promulgation of regulations adopting an impact standard, every Cabinet Department and about 40 federal agencies adopted standards interpreting Title VI to bar programs with a discriminatory impact.").

[88] *See* Abernathy, *supra* note 12, at 276 (observing that the congressional drafters of Title VI "consciously adopted a compromise that delegated to agency regulators, subject to extraordinary Presidential oversight, the decision" of how to enforce its bar on "discrimination" in federally funded programs).

[89] *Cf. Sandoval*, 532 U.S. at 308 (Stevens, J., dissenting) (noting that "the question whether [Section] 601 applies to disparate-impact claims has never been analyzed by this Court on the merits").

[90] *Sandoval*, 532 U.S. at 305 (Stevens, J., dissenting).

discrimination; and (2) a more exacting view under which agencies would be limited to redressing provable cases of intentional discrimination.

## The Limits to Section 602: Two Views

### 1. The Reasonable-Relation View

The earliest view of Title VI's rulemaking authority was also the most expansive. In his concurring opinion in *Lau*, Justice Stewart set out the basic theory: because Section 602 allows agencies to promulgate rules "effectuat[ing]" Section 601, HEW had the authority to enact any rule that broadly furthered the purpose of deterring "discrimination" in federally funded programs.[91] All the courts would require, as a formal matter, is that any rules issued under Section 602 be "reasonably related" to the antidiscriminatory ambitions of the statute.[92] Only two other Justices signed on to Justice Stewart's view in *Lau*, and it has never been adopted by a majority of the Court.[93] But it also has never been squarely rejected by the Court either.[94]

This more expansive view of Section 602 appears nevertheless to rest on two arguable bases. The first comes down to basic principles of administrative law. As Justice Stewart noted in *Lau*, the Court has generally accorded considerable latitude to agencies authoring rules pursuant to generic rulemaking provisions, on the assumption that Congress intended to defer more particular legislative decisions to their expert judgment.[95] And thus, when presented with such broad delegations—permitting an agency, for example, to make "such rules and regulations as may be necessary to carry out" another statutory mandate[96]—the courts have traditionally been inclined to defer "to the informed experience and judgment of the agency to whom Congress delegated appropriate authority."[97]

Given its similarly expansive wording, Section 602 could be seen to embody much the same sort of broad rulemaking authority.[98] In such cases, as Justice Stewart argued, and as some Justices later agreed,[99] the test should be correspondingly lenient, asking only whether the agency's rule

---

[91] Lau v. Nichols, 414 U.S. 563, 571 (Stewart, J., concurring).

[92] *Id.*

[93] *Cf. Sandoval*, 532 U.S. at 280-81 (noting that "five Justices in *Guardians* voiced the view" that "regulations promulgated under [Section] 602 of Title VI may proscribe activities that have a disparate impact on racial groups"); *see also* Alexander v. Choate, 469 U.S. 287, 294 (1985) (noting that "the Court held [in *Lau*] that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI this case").

[94] As explained below, a majority in *Sandoval* seemed to question whether Section 602 could reach discrimination not outlawed by Section 601, but they expressly declined to decide that issue there. *Sandoval*, 532 U.S. at 286 n.6.

[95] *Lau*, 414 U.S. at 571 (Stewart, J., concurring) (citing Mourning v. Family Publ'ns Serv., 411 U.S. 356 (1973)).

[96] *Mourning*, 411 U.S. at 369.

[97] *Id.* at 371-72. As Justice Stevens later pointed out, this reasoning has some resonance with the rule later developed under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), generally calling for the courts' to defer to agencies' rules when confronted with an ambiguity in their organic statutes. *See Sandoval*, 532 U.S. at 309 (Stevens, J., dissenting) ("[W]hen the agencies charged with administering a broadly-worded statute offer regulations interpreting that statute or giving concrete guidance as to its implementation, we treat their interpretation of the statute's breadth as controlling unless it presents an unreasonable construction of the statutory text"). For an overview of *Chevron* deference, *see* CRS Report R44954, *Chevron Deference: A Primer*, by Valerie C. Brannon and Jared P. Cole (Sept. 19, 2017).

[98] 42 U.S.C. § 2000d-1.

[99] *See* Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 643 (1983) (Stevens, J., dissenting) ("It is well settled that when Congress explicitly authorizes an administrative agency to promulgate regulations implementing a federal

JA526

bears some reasonable relationship "to the purposes of the enabling legislation."[100] That leniency would arguably authorize an agency to issue "broad prophylactic rules" so long as they "realiz[e] the vision laid out in" Section 601—as arguably would a rule outlawing policies with racially disparate impacts.[101]

Apart from principles of administrative law, this more expansive view of Section 602 might also find support in a constitutional analogy, based on two of the Reconstruction Amendments. As Justice Stevens pointed out in his dissent in *Guardians Association v. Civil Service Commission*, the Court had at one time indicated—in a decision dating to "the dawn of [the last] century"—that "an administrative regulation's conformity to statutory authority was to be measured by the same standard as a statute's conformity to constitutional authority."[102] And as it happened, only a few years before *Guardians*, the Court had read the Fifteenth Amendment, despite "only prohibit[ing] purposeful racial discrimination in voting," to allow "Congress [to] implement that prohibition by banning voting practices that are discriminatory in effect."[103] Congress could do that, according to Justice Stevens, because the Fifteenth Amendment—much like Title VI—supplements its prohibition against racially discriminatory voting policies[104] with a provision empowering Congress "to enforce" that prohibition "by appropriate legislation."[105] Given the structural similarity between the amendment and Title VI, Justice Stevens saw no reason why Section 602 should give federal agencies any less authority than the Fifteenth Amendment offers Congress— including authority to outlaw policies with discriminatory effects.[106]

Justice Steven's view in *Guardians*, like Justice Stewart's in *Lau*, has never commanded a majority from the Court. That analogy may also have lost some force more recently, following the Court's arguably more restrictive decisions under the Fifteenth Amendment.[107] But the Court has also never expressly ruled out the analogy, and it appears to be at least consistent with the way the federal courts have read another of the Reconstruction Amendments—the Thirteenth, outlawing

---

statute that governs completely private conduct, those regulations have the force of law so long as they are 'reasonably related to the purposes of the enabling legislation.'"); *id.* at 592-93 (White, J., announcing judgment of the Court) (apparently agreeing with Justice Stewart in *Lau*).

[100] *Lau*, 414 U.S. at 571 (Stewart, J., concurring) (quoting Thorpe v. Hous. Auth. of the City of Durham, 393 U.S. 268, 280-281 (1969)).

[101] *Sandoval*, 532 U.S. at 305 (Stevens, J., dissenting).

[102] *Guardians*, 463 U.S. at 644 (Stevens, J., dissenting) (discussing Boske v. Comingore, 177 U.S. 459, 470 (1900)).

[103] *Id.*

[104] U.S. CONST. amend. XV, § 1.

[105] *Id.* at § 2.

[106] *Cf. Sandoval*, 532 U.S. at 309-10 (Stevens, J., dissenting) (suggesting that under the "well-established principle of administrative law" in *Chevron* that the Court should "read [Section] 602 as granting the federal agencies responsible for distributing federal funds the authority to issue regulations interpreting [Section] 601 on the assumption that their construction will—if reasonable—be incorporated into our understanding of [Section] 601's meaning"). This analogy presumes, moreover, that the standard under the Thirteenth Amendment will remain what the Court said it was in *Jones v. Alfred H. Mayer Co*. In recent years, however, a number of parties have contested the vitality of *Jones* on that point, arguing that the deferential standard in that case has been eroded by the Court's more recent decisions under the Fourteenth and Fifteenth Amendments. *See, e.g.*, United States v. Metcalf, 881 F.3d 641 (8th Cir. 2018) (rejecting a challenge to the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009 on this basis); United States v. Cannon, 750 F.3d 492 (5th Cir. 2014) (same); United States v. Hatch, 722 F.3d 1193 (10th Cir. 2013), *cert. denied*, 134 S.Ct. 1538 (2014) (same).

[107] *See* United States v. Cannon, 750 F.3d 492, 509 (5th Cir. 2014) (Elrod, J., specially concurring) (noting that in *Shelby County v. Holder*, 570 U.S. 529 (2013), the Court appears to have restricted Congress's power to enact remedial legislation under the Fifteenth Amendment, by requiring it to justify any such legislation with evidence of "current needs" "in our current society").

Case: 25-1529    09/22/2025    DktEntry: 36.1    Page 68 of 127
Case 1:25-cv-02429-MKV    Document 51-4    Filed 04/04/25    Page 18 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

slavery and involuntary servitude.[108] Whether that analogy would find favor among the Justices today seems at best uncertain, however, partly for the reasons discussed below.

## 2. The View from *Sandoval*

In opposition to the early expansive reading of Section 602, a number of other Justices—and arguably a majority in *Sandoval*—have suggested that regulations under Section 602 must instead fit more closely with the particular purpose of Section 601: ridding federally funded programs of intentional discrimination. *Sandoval*, given its posture, did not squarely address disparate impact rules under Title VI; that case concerned the right of private parties to sue under a Title VI disparate impact regulation, not the validity of the underlying regulation itself.[109] But in a suggestive footnote in his opinion for the majority, Justice Scalia expressed some doubt that those regulations could be squared with the majority's view that Section 601 bars only intentional discrimination.[110]

The majority's concern fastened less on the breadth of Section 602 than on the narrowness of Section 601. It seemed "strange," Justice Scalia explained, that a rule prohibiting disparate impact could "effectuate" the purpose of Section 601 when that provision "permits the very behavior that the regulations forbid."[111] Or as Justice O'Connor had put the same point in her concurrence in *Guardians*, also involving a disparate impact claim under Title VI, it was "difficult to fathom how the Court could uphold" regulations outlawing discriminatory *effects* when, to do so, they would have to "go well *beyond*" Title VI's purpose of proscribing *intentional* discrimination.[112]

The majority in *Sandoval*, like Justice O'Connor in *Guardians*, seemed to signal their dissatisfaction with the "reasonably related" test endorsed by Justice Stewart's concurrence in *Lau*. Neither, however, proposed a test to replace it. To do so, however, they may well have turned to a constitutional analogy of their own—based not on the Fifteenth Amendment but the Fourteenth.

---

[108] Like Title VI, the Thirteenth Amendment also consists of two basic provisions: a general prohibition—found in Section 1 of the amendment—outlawing "slavery" and "involuntary servitude" "within the United States," and a separate provision—Section 2—granting Congress "power to enforce" Section 1 "by appropriate legislation." U.S. CONST. amend. XIII. As the Court has read those provisions, they not only "clothe[] Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States," but also with the power to "rationally determine" what those forbidden "badges" or "incidents" of slavery are. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439 (1968) (quoting Civil Rights Cases, 109 U.S. 3, 20 (1883)). It is worth noting, however, that a number of parties have contested the vitality of *Jones* on this point, and pressed for a more constrained view of Congress's remedial power under the Thirteenth Amendment, arguably in line with the Court's more recent decisions under the Fourteenth and Fifteenth Amendments. *See, e.g.*, United States v. Metcalf, 881 F.3d 641 (8th Cir. 2018) (rejecting a challenge to the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009 on this basis); United States v. Cannon, 750 F.3d 492 (5th Cir. 2014) (same); United States v. Hatch, 722 F.3d 1193 (10th Cir. 2013), *cert. denied*, 134 S.Ct. 1538 (2014) (same).

[109] *See Sandoval*, 532 U.S. at 278, 281 ("We must assume for purposes of deciding this case that regulations promulgated under [Section] 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under [Section] 601.").

[110] *Id.* at 280-81.

[111] *Id.* at 286 n.6.

[112] *See* Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 613 (1983) (O'Connor, J., concurring in the judgment) (emphasis in original). Nor did Justice O'Connor think those regulations could be sustained even under the more lenient "reasonably related" test. As she explained, "'Reasonably related to' simply cannot mean inconsistent with." *Id.* at 614. And yet that, she believed, "would be the effect of upholding the administrative regulations" outlawing disparate impact, when "the expressed will of Congress is that federal funds recipients are prohibited only from purposefully discriminating on the grounds of" race and national origin. *Id.*

JA528

Under the Fourteenth Amendment, the Court has held that Congress may legislatively *enforce* that amendment's guarantees of equal protection and due process of law but in doing so may not *redefine* what would count as violating either.[113] By that analogy, an agency could then clearly seek to enforce Section 601's bar against intentional discrimination by enacting prophylactic regulation "congruent and proportional" to redressing instances of *different treatment*.[114] But the agency could not substantively *amplify* that prohibition by adding to the types of discrimination outlawed by Section 601—as a disparate impact rule arguably would, given the Court's view in *Sandoval* that Section 601 does not bar a policy simply for having discriminatory effects.[115]

## Unresolved Questions About Disparate Impact Under Section 602

The Court has yet to squarely resolve which of these views of agencies' rulemaking authority under Section 602 is the right one.  Regardless of which they choose, however, an agency arguably may still be able to defend its Title VI disparate impact regulations, depending on how it styles its enforcement under that regulation.

Even if Section 602 is construed narrowly to permit only regulations that address intentional discrimination, it might still be argued that Title VI allows agencies to promulgate regulations addressing disparate impact in at least some circumstances. As Justice Stevens pointed out dissenting in *Sandoval*, one way of looking at Title VI's disparate impact regulations is as an *indirect* rule against intentional discrimination—only intentional discrimination in a "more subtle form[]," masked by an "ostensibly race-neutral" policy but with "the predictable and perhaps intended consequence of materially benefitting some races at the expense of others."[116] Styled that way, an agency might be able to defend its disparate impact rules as a means of "counteract[ing] unconscious prejudices and disguised animus that escape easy classification as disparate treatment."[117] In that sense, those rules would still be *directed* at "uncovering discriminatory intent," even if only in subtler forms, such as "covert and illicit stereotyping."[118] And, for that reason, those rules would arguably also comply with *Sandoval*'s more exacting standard for Section 602 regulations, despite their formal focus on racial disparities.

Even if styled in this way, however, a disparate impact rule under Title VI would likely face further constraints. As the Court recently explained in the context of the Fair Housing Act, an agency relying on a disparate impact theory will still need to "point to a defendant's policy or policies causing" the "statistical disparity" at issue—that the policy actually had racially discriminatory *effects*.[119] And to make that showing, the agency may also need to satisfy a "robust causality requirement," to "ensure[] that [r]acial imbalance [] does not, without more, establish a prima facie case of disparate impact," protecting "defendants from being held liable for racial disparities they did not create."[120] What such a causality requirement might entail as a practical

---

[113] City of Boerne v. Flores, 521 U.S. 507, 519-20 (1997); *cf.* Gail Heriot and Alison Somin, *The Department of Education's Obama-Era Initiative on Racial Disparities in School Discipline: Wrong for Students and Teachers, Wrong on the Law*, 22 TEX. REV. L. & POL. 472, 533-44 (2018) (sketching an argument along these lines).

[114] *Cf. id.* at 520 (noting that, under the Fourteenth Amendment, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end").

[115] *See supra* note 78 and accompanying text.

[116] *Sandoval*, 532 U.S. at 306 (Stevens, J., dissenting).

[117] Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2522 (2015).

[118] *Id.*

[119] *Id.* at 2523. (explaining this requirement for disparate impact liability under the Fair Housing Act).

[120] *Id.* (internal quotation marks omitted).

matter seems unclear at this point.[121] Nevertheless, recasting the argument over Section 602 in these terms might help sharpen some of the debate around Title VI, by redirecting the discussion away from the abstract concerns about rulemaking authority to the more basic and concrete issue of what disparate impact liability may—or may not—involve.

# Enforcing Title VI at School: The U.S. Department of Education's Office for Civil Rights

Although Title VI applies to funds distributed by every federal agency,[122] much of the doctrine under the statute has been shaped by its use in the public schools.[123] That doctrinal story has accordingly centered on one agency in particular: the Office for Civil Rights (OCR), originally housed in HEW but today located in the U.S. Department of Education (ED).[124] As the agency primarily responsible for enforcing Title VI in the public schools, as well as nearly all colleges and universities,[125] OCR handles every year a large volume and variety of claims alleging race and national origin discrimination.[126] Some of the most common types of those claims are

---

[121] The U.S. Department of Housing and Urban Development has issued an advance notice of proposed rulemaking to address this very question under the Fair Housing Act. *See* U.S. Dep't of Hous. and Urban Dev., *Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard*, 83 Fed. Reg. 28560, 28561 (June 20, 2018) (seeking public comment as to whether "the Disparate Impact Rule [should] be amended to clarify the causality standard for stating a prima facie case under *Inclusive Communities* and other Supreme Court rulings").

[122] The only exceptions are funds disbursed pursuant to "a contract of insurance or guaranty." *See* 42 U.S.C. §§ 2000d-1, 2000d-4. Thus, for example, to the extent that a bank "receives federal financial assistance in the form of deposit insurance from the" Federal Deposit Insurance Corporation, it would likely not be bound by Title VI's nondiscrimination mandate. Marshall v. Webster Bank, N.A., 2011 U.S. Dist. LEXIS 5665, at *20-21 (D.Conn. Jan. 20, 2011) (dismissing a race discrimination complaint on this basis because the alleged "federal assistance [was] in the form of a guaranty or contract for insurance").

[123] *See generally* HALPERN, *supra* note 8; *see also* 110 Cong. Rec. 7068 (1964) (statement of Sen. Ribicoff) (observing that "[u]nquestionably, more programs under HEW would be affected than all other programs put together" by Title VI).

[124] *See* HALPERN, *supra* note 8, at 106, 186-87 (describing the organization of OCR under HEW and its later relocation as a part of the newly created Department of Education). ED has played such a pivotal role in Title VI's history that at least one federal court of appeals has suggested that the department's interpretation of the statute merits *Chevron* deference. *See* Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1033 (9th Cir. 1998) ("The Department of Education is the agency charged by Congress with enforcing Title VI. As such, its interpretation is entitled to a high degree of deference by the courts so long as it does not conflict with a clearly expressed congressional intent and it is reasonable.") Whether *Chevron* deference really applies to Title VI, however, is less clear. *Cf.* Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n, 194 F.3d 72, 79 n.7 (D.C. Cir. 1999) (explaining that for "statutes administered by several different agencies—statutes, that is, like the APA and unlike the standing provision of the Atomic Energy Act—courts do not defer to any one agency's particular interpretation'); *see also* FLRA v. Dep't of the Treasury, Fin. Management Serv., 884 F.2d 1446, 1451 (D.C. Cir. 1989) (declining to defer to an agency's reading of the Privacy Act and the Freedom of Information Act, because it was "not charged with a special duty to interpret" them).

[125] *See* U.S. Dep't of Educ., Office for Civil Rights, *Race and National Origin Discrimination: Frequently Asked Questions*, https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/race-origin.html ("All public school districts are covered by Title VI because they receive some federal financial assistance. All public colleges and universities and virtually all private colleges and universities are covered because they receive such assistance by participating in federal student aid programs.").

[126] As of March 1, 2019, OCR listed more than 1,500 pending Title VI cases currently under investigation, some dating as far back as 2005. *See* U.S. Dep't of Educ., Office for Civil Rights, *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/tvi.html.

JA530

Case: 25-1529   09/22/2025   DktEntry: 36.1   Page 71 of 127
Case 1:25-cv-02429-MKV   Document 51-4   Filed 04/04/25   Page 21 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

discussed below, beginning first with a brief overview of how ED, as a matter of policy, processes the complaints it receives under Title VI.[127]

## OCR's Enforcement of Title VI

OCR primarily enforces Title VI through its investigation and resolution of complaints.[128] To guide its review of those complaints, OCR has published a detailed manual of procedures—known as the Case Processing Manual (CPM)—by which it receives, analyzes, and disposes of allegations under Title VI, among other statutes within its jurisdiction.[129] That guidance document, described below, divides OCR's enforcement into five distinct phases:

**Jurisdictional Evaluation.** At the first phase of its review, OCR evaluates an allegation for its basic sufficiency—conducting an essentially jurisdictional analysis. As a part of that evaluation, OCR first examines whether an allegation has enough information in it, of the right kind.[130] If so, OCR has to establish jurisdiction over both the subject matter of the complaint as well as the entity complained of. Thus, the allegation must state enough facts from which to infer race or national origin discrimination (subject matter jurisdiction),[131] and the complainant must allege discrimination by a program or activity that receives ED's financial assistance (personal jurisdiction).[132] And the allegation must also be timely: a complaint under Title VI generally must be filed with OCR within 180 calendar days of the date when the discrimination allegedly occurred.[133] Insufficiency on any of these points may result in an allegation's dismissal without OCR's further investigation or review.[134]

After determining that it has jurisdiction over an allegation and finds it otherwise suitable for review, OCR will formally open its investigation, beginning with the issuance of informational

---

[127] As noted earlier, this report does not discuss the two other mechanisms available for enforcing Title VI in the schools: (1) a lawsuit filed by a private party under Title VI's implied right of action or (2) a suit brought in federal court by DOJ, following a referral from OCR. For OCR's referral procedures, *see* U.S. Dep't of Educ., Office for Civil Rights, *Case Processing Manual* [hereafter CPM], at 23-24 (Nov. 19, 2018).

[128] In addition to its investigations of complaints, OCR is also required by regulation to conduct "compliance reviews" "from time to time" to assess whether "the practices of recipients . . . are complying" with Title VI. 34 CFR § 100.7(a). OCR may also conduct so-called "directed investigations" whenever "information indicates a possible failure to comply with the laws and regulations enforced by OCR, the matter warrants attention and the compliance concern is not otherwise being addressed through OCR's complaint, compliance review or technical assistance activities." CPM, *supra* note 127, at 22 (citing 34 CFR § 100.7(c)). Information about how frequently these types of review have resulted in investigations, resolutions, and enforcement actions does not appear to be publicly available.

[129] OCR relies on the CPM when handling complaints raised under all of the statutes it enforces, including Title IX of the Education Amendments of 1972, dealing with sex discrimination, and Section 504 of the Rehabilitation Act, addressing disability discrimination.

[130] Thus, for example, an allegation communicated only orally, or provided anonymously in correspondence, may be dismissed without further processing. CPM, *supra* note 127, at 4.

[131] *Id.* at 5.

[132] *Id.* at 6. Under several delegations arrangements ED also has some authority to investigate complaints involving programs or institutions that receive federal funds awarded by other federal agencies. *Id.* OCR has acknowledged, moreover, that statistical evidence will not make a complaint actionable on its own, but that evidence may support an investigation when presented with other facts suggesting disparate treatment. CPM at 6; *accord* Everett v. Pitt Cty. Bd. of Educ., 788 F.3d 132, 149 n.11 (4th Cir. 2015) (finding no abuse of discretion where a district court "refused to consider disparity in student discipline," "because there was not sufficient evidence in the record demonstrating that the school district target[ed] black students for discipline or otherwise treat[ed] them differently in disciplinary matters").

[133] CPM, *supra* note 127, at 8.

[134] OCR does, however, allow appeals from some dismissals. *See id.* at 21.

JA531

Case: 25-1529   09/22/2025   DktEntry: 36.1   Page 72 of 127
Case 1:25-cv-02429-MKV   Document 51-4   Filed 04/04/25   Page 22 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

letters to both the complainant and recipient.[135] Those letters primarily serve to notify the parties of the allegations OCR intends to investigate and the basis for its jurisdiction, including appropriate statutory and regulatory authority.[136] The letters also apprise the parties of OCR's role in the investigation—as a "neutral fact-finder"—as well as the complainant's right to bring suit in federal court regardless of how OCR administratively resolves the complaint.[137]

**Facilitated Resolution.** As a part of its opening letter, OCR will also inform the parties of its voluntary resolution process, called a "Facilitated Resolution Between the Parties."[138] Under that process, OCR may offer to serve as "an impartial, confidential facilitator between the parties," to assist them in informally resolving the allegations before OCR formally makes any findings of its own.[139] During those discussions OCR may accordingly suspend its investigation for up to 30 calendar days to allow negotiations to proceed in good faith; it will reinstate its investigation, however, should the parties fail to reach an agreement within that time.[140] In no case, though, will OCR approve or otherwise endorse an agreement reached under this process, nor monitor a recipient's compliance with it.[141]

**Investigation.** If the parties cannot voluntarily resolve the complaint through facilitated negotiation, OCR will proceed to investigate.[142] At any time during that investigation—which may involve OCR's review of school data, interviews with students and staff, or other measures—the recipient may still choose to negotiate a voluntary resolution with OCR, and recent resolutions suggest that this is relatively common.[143] In such cases, OCR will issue a resolution letter memorializing the allegations and its investigation, along with the agreement resolving them.[144] In these cases, however, OCR will generally not make any findings on the underlying allegations.

In the event the recipient declines to negotiate a voluntary resolution, at the completion of its investigation OCR will issue findings on each allegation, resolving them by a preponderance of the evidence. In each case OCR will therefore explain why the evidence likelier than not supports the finding of a violation ("non-compliance determination") or else explain why it does not ("insufficient evidence").[145] In cases of non-compliance OCR will also propose a resolution agreement, outlining the steps for the recipient to take to resolve the allegations in question and ensure its future compliance with Title VI.[146] A recipient generally has 90 days in which to consider and negotiate the terms of a final agreement with OCR.[147] If the recipient and OCR fail to reach an agreement within that period, OCR will advise the recipient, by "Letter of Impending

---

[135] *Id.* at 12.

[136] *Id.* at 13.

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.* at 15.

[143] *Id.* at 15-16.

[144] *Id.* at 19-20.

[145] *Id.* at 17-18, 19-20. OCR also allows for appeals based on a finding of insufficient evidence. *See id.* at 21.

[146] *Id.* at 19-20.

[147] *Id.* at 18.

JA532

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 73 of 127
Case 1:25-cv-02429-MKV    Document 51-4    Filed 04/04/25    Page 23 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

Enforcement Action," that it intends to proceed to enforcement should the parties fail to reach an agreement in short order.[148]

**Monitoring.** Once the sides have reached an acceptable resolution agreement, OCR will monitor, on an ongoing basis, the recipient's compliance with its terms. To do so, recipients generally must agree to certain reporting requirements, ensuring OCR access to "data and other information in a timely manner" by which it can assure the recipient's compliance.[149] OCR also reserves the right to "visit the recipient, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the recipient has fulfilled the terms and obligations of the resolution agreement."[150] In some instances OCR may also choose to amend or altogether end a resolution agreement "when it learns that circumstances have arisen that substantially change, fully resolve, or render moot, some or all of the compliance concerns that were addressed by the resolution agreement."[151]

**Enforcement Action.** Where OCR cannot negotiate or secure compliance with an acceptable resolution agreement, it may resort to either of the two enforcement mechanisms allowed by Title VI: (1) an administrative proceeding resulting in the termination or refusal of federal funds; or (2) the referral of a complaint to DOJ for litigation.[152] Fund termination, as noted, was envisioned as the primary mechanism for enforcing Title VI, and was once aggressively used by OCR to enforce the desegregation of southern schools.[153] Over the past several Administrations its use appears to have waned significantly,[154] perhaps owing to an increased reliance on resolution agreements, voluntary or otherwise, to achieve compliance.

## Major Areas of Administrative Enforcement

OCR's administrative docket for Title VI is considerable, covering a wide variety of allegations involving race and national origin discrimination. Among the issues raised in those complaints, three appear especially common: different treatment, retaliation, and racial harassment. In 2016, for instance, OCR reported receiving some 2,400 total complaints raising issues under 17 general categories of Title VI violations.[155] Of those, 976 alleged some form of different treatment,[156]

---

[148] Depending on the state of their negotiations the window for reaching an agreement may be as short as 10 calendar days, or as long as 30. *Id.* at 20.

[149] *Id.*

[150] *Id.*

[151] *Id.* at 23.

[152] *Id.* at 23-24; *see also* 42 U.S.C. § 2000d-1.

[153] *See* HALPERN, *supra* note 8, at 294 (noting that "during the Johnson era . . . fund termination [was] used with regularity to combat racial discrimination in schools").

[154] OCR does not appear to publish any data on its use of fund termination proceedings. A CRS search of Westlaw and Lexis databases of OCR administrative proceedings failed to uncover any termination orders issued under Title VI in the last 25 years. *Cf.* HALPERN, *supra* note 8, at 294 (noting that "[t]he termination of federal funds is a most difficult and awkward sanction to invoke," and that, as of 1995, that sanction had "been used in no more than a handful of cases in the [preceding] two decades").

[155] U.S. Dep't of Educ., Office for Civil Rights, *Securing Equal Educational Opportunity: Report to the President and Secretary of Education* [2016 Report], at 17 (2016). As of this writing the 2016 Report remains the most recent that OCR has made publicly available on its website.

[156] As OCR styles this category, it includes allegations that a recipient has excluded individuals, or denied them some benefit, based on their race. *See* 2016 Report at 17; *see also* 34 C.F.R. § 100.3(a) (ED's regulation under Title VI disallowing any person to be "excluded from participation in, or denied the benefits of ... any program" "on the ground of race, color, or national origin").

Case: 25-1529   09/22/2025   DktEntry: 36.1   Page 74 of 127
Case 1:25-cv-02429-MKV   Document 51-4   Filed 04/04/25   Page 24 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

while another 569 complaints alleged race-based retaliation[157] and a further 548 made claims of racial harassment.[158] In 2015, OCR reported largely similar figures as well.[159] The next section examines two recent examples of how OCR reviews complaints under Title VI, one involving a more typical allegation of indirect "disparate treatment," and another posing a less typical allegation of direct discrimination.

## Different Treatment: Two Illustrations

The single largest category of complaints OCR receives involves allegations of "disparate treatment."[160] That category covers a wide variety of conduct, covering any complaint that a recipient has singled out an individual or individuals by race for adverse treatment. Of those complaints two types are especially common: "intentionally disciplining students differently based on race"[161] or else excluding them in some way.[162] As noted, OCR will seek to confirm those allegations in either of two ways: either directly, by looking to evidence of overt discriminatory intent, or else indirectly, by establishing that any "apparent differences in the treatment of similarly-situated students of different races" have no legitimate, nondiscriminatory basis.[163] And because Title VI has been read to overlap with the Equal Protection Clause,[164] even where OCR believes a recipient has treated individuals differently by race, it still has to assess whether that treatment was a "narrowly tailored" means of "meet[ing] a compelling governmental interest."[165]

---

[157] According to OCR, retaliation occurs wherever a recipient "intimidate[s], threaten[s], coerce[s], or discriminate[s] against any individual for the purpose of interfering with any right or privilege secured by [S]ection 601" or ED's implementing regulations, or because an individual "has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under" the same regulations. 34 C.F.R. 100.7(e).

[158] 2016 Report, *supra* note 155, at 17. Racial harassment involves allegations of "intimidation or abusive behavior toward a student based on race," whether by a peer or teacher, "that creates a hostile environment by interfering with or denying a student's participation in or receipt of benefits, services, or opportunities in the institution's program." *See* U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Platteville Public Schools, at 2 (Nov. 20, 2013). Under that theory, OCR holds recipient schools "responsible for taking prompt and effective action to stop racial harassment and prevent its recurrence." *Id.* at 3. In so doing OCR appears not to follow the prevailing rule in private actions under Title VI, holding a school liable only for teacher- or peer-on-student racial harassment only where the school has acted with "deliberate indifference" to it. *See* Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 273 (3d Cir. 2014) (collecting cases to this effect under Title VI). Meanwhile, though the same "deliberate indifference" standard applies to private suits under Title IX for sexual harassment, ED has signaled that it intends to enforce the "deliberate indifference" standard for sexual harassment claims as a part of its new package of regulations under Title IX.

[159] *See* U.S. Dep't of Educ., Office for Civil Rights, *Delivering Justice: Report to the President and Secretary of Education*, at 18 (2015) (reporting 849 complaints of different treatment, 561 of retaliation, and 452 of racial harassment).

[160] *See supra* note 154 and accompanying text.

[161] U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Minneapolis Public Schools, at 2 (Nov. 20, 2014).

[162] *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Oak Park and River Forest High School District 200 (Sept. 29, 2015) (addressing complaint of racially exclusive assembly).

[163] U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Platteville Public Schools [Platteville Letter], at 2 (Nov. 20, 2013).

[164] Alexander v. Sandoval, 532 U.S. 280-81 (2001).

[165] U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Oak Park and River Forest High School District 200, at 2 (Sept. 29, 2015).

JA534

Case: 25-1529  09/22/2025  DktEntry: 36.1  Page 75 of 127
Case 1:25-cv-02425-MKV  Document 51-4  Filed 04/04/25  Page 25 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

### *Disparate Treatment: Circumstantial Evidence*

In one recent example, OCR received a complaint from an African American student, identified only as "Student A," alleging that he had been disciplined more severely than his white classmates, in violation of Title VI.[166] As in many disciplinary cases, the student did not produce direct evidence of discrimination.  And so OCR instead looked to whether there were any "apparent differences" in the way the school treated Student A from the way it handled "similarly-situated students of different races," and if so, whether those differences had a legitimate, nondiscriminatory basis.[167]

In the course of its investigation, OCR uncovered what it believed were four apparent differences in the way the school treated Student A. First, the school had repeatedly recorded disciplinary warnings it gave Student A, but "did not consistently record warnings given to similarly situated white students."[168] Second, even though "the Principal employed an informal progressive discipline policy" that was applied to Student A, "increasing the severity of the disciplinary consequence after each incident," a "similarly situated white student who had a more extensive disciplinary history, did not face increasingly severe disciplinary consequences."[169] Third, the evidence suggested that the school's principal "responded more favorably" to allegations made by a white student's mother than Student A's mother "that other students were teasing him to entice him to engage in misconduct."[170] And, finally, Student A had pointed to a specific case where a white male student had been treated more leniently for assaulting another student.[171]

The school, for its part, sought to defend some of those decisions by pointing to differences in the students' misconduct.[172] OCR, however, disagreed: according to its investigators, the students' files bore out no meaningful differences besides the students' race.[173] Nor did OCR accept the school's admission that in the other cases it had simply made a mistake: the quantity, frequency, and variety of those mistakes, OCR found, "established a pattern of unjustified, discriminatory treatment on the basis of race in the discipline administered to Student A."[174] That was enough, OCR concluded, to violate Title VI and its implementing regulations.[175]

### *Disparate Treatment: Direct Evidence*

Another recent case, also involving an allegation of disparate treatment, illustrates how OCR reads Title VI against the backdrop of the Equal Protection Clause. That case arose in the wake of events in Ferguson, MO, in 2014, following the fatal police shooting of an 18-year-old African American that provoked widespread protests in Ferguson and elsewhere.[176] In response to the events there, an Illinois public school had decided to convene a special "Black Lives Matter"

---

[166] Platteville Letter, *supra* note 163, at 11.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.* at 12.

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.* (citing 34 C.F.R. § 100.3(a) and 34 C.F.R. §100.3(b)(1)(i)–(iv)).

[176] U.S. Dep't of Educ., Office for Civil Rights to Superintendent, Oak Park and River Forest High School District 200 [Oak Park Letter], at 3 (Sept. 29, 2015).

JA535

Case: 25-1529  09/22/2025  DktEntry: 36.1  Page 76 of 127
Case 1:25-cv-02429-MKV    Document 51-4    Filed 04/04/25    Page 26 of 28

*Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*

assembly, so that "black students [could] express their frustrations" in "a comfortable forum."[177] To do that, however, the school chose to "limit the assembly to participation by students who self-identified as black."[178] That decision, as the school district later admitted, clearly amounted to different treatment—excluding some students while admitting others solely based on whether they identified as African American.[179] That finding alone, though, did not decide the school's liability under Title VI. Instead, OCR had to go on to examine whether the school's decision would satisfy *constitutional* requirements—whether the school had an "interest in holding a racially exclusive assembly [that] was compelling and that the means [it] used [would] survive strict scrutiny."[180] Looking to relevant constitutional precedent,[181] OCR ultimately sided with the complainant: even though the school did have a compelling interest in holding a racially exclusive assembly, it had nevertheless failed "to assess fully whether there were workable race-neutral alternatives" or to "conduct a flexible and individualized review of potential participants."[182] The school had therefore violated Title VI, according to OCR. And to resume compliance, the school district agreed not to allow similarly exclusive assemblies again.[183]

# Considerations for Congress

Title VI has gone largely unchanged in the 50 years since it became law. As this report has explained, the debates over the statute have therefore centered on how the courts have read its two central provisions—Sections 601 and 602—and how federal agencies have gone about enforcing them. But Congress has the ultimate say over how Title VI works—rooted not only in its legislative power but in its authority to oversee the statute's use by federal agencies. As this section explains, recently two issues over the statute have drawn particular congressional interest: the viability of disparate impact regulations under Section 602, and the inclusion of new protected classes in Section 601.

As explained earlier, with its 2001 decision in *Alexander v. Sandoval*, the Court seemed to cast doubt on the future of *all* disparate impact liability under Title VI as currently written, even when liability was premised on regulations issued under Section 602. In the last several months, following the release of a widely remarked report on school safety, the Trump Administration signaled that it may be rethinking altogether Title VI regulations that reach beyond intentional discrimination to address policies with a racially disparate impact.[184] Given the continuing debate about the relation of Title VI's central provisions, Congress could opt to put down its own marker, by definitively clarifying Title VI's scope in either of two ways. On the one hand, Congress could make clear that Section 601 indeed prohibits only intentional discrimination, and that any rules under Section 602 may not find a recipient liable for discrimination absent proof of

---

[177] *Id.*

[178] *Id.*

[179] *Id.* ("[T]he District acknowledged holding a racially exclusive program—an assembly entitled "*Black Lives Matter*"—at which District officials turned away students of other races.").

[180] *Id.* at 3-4.

[181] *Id.* (applying Grutter v. Bollinger, 539 U.S. 306 (2003)). For a more extensive discussion of the Court's precedent under the Equal Protection Clause in this area, see CRS Report R45481, *"Affirmative Action" and Equal Protection in Higher Education*, by Christine J. Back and JD S. Hsin, at 21-38 (Jan. 31, 2019).

[182] Oak Park Letter, *supra* note 176, at 3.

[183] *Id.* at 4.

[184] For a more extensive discussion of that report and its implications for Title VI, *see* CRS Legal Sidebar LSB10254, *Is the Trump Administration Rethinking Title VI?*, by JD S. Hsin (Feb. 4, 2019).

JA536

discriminatory intent. Congress, on the other hand, could expressly endorse disparate impact under Title VI by, for example, grafting that standard onto Section 601, as it has done in Title VII of the 1964 Civil Rights Act.[185] That addition would unambiguously allow funding agencies to investigate policies and practices under Title VI based on their discriminatory effects, regardless of the underlying intent.

In addition to clarifying the types of discrimination Title VI outlaws, Congress could also choose to revise the classes of individuals who come within its protection. One recent proposal, for example, would amend Section 601 to include "sex (including sexual orientation and gender identity)" along with race, color, and national origin among its protected classes.[186] Although that or a similar amendment would clearly expand Title VI's coverage, its effects will likely hinge on how the courts choose to interpret Section 601 in light of such additions. Though a complete analysis lies beyond the scope of this report, at least two readings seem arguable.

On the one hand, the courts could continue to read Section 601 to "enact[] constitutional principles,"[187] in which case they would presumably review claims based on sex discrimination under a heightened standard of review,[188] while in the case of gender identity, possibly only for basic rationality.[189] On the other hand, to the extent that an amendment introduces a statutory protection for a class of individuals not currently recognized by the Court as a constitutionally "suspect classification," that addition, especially if buttressed by supporting legislative history, could suggest that Congress had decided to amend the reach of Title VI altogether, to "independently proscribe conduct that the Constitution does not."[190]

# Conclusion

In the 50 years since becoming law Title VI has played a central role in addressing racial discrimination in the nation's schools. Title VI provides that protection in a unique way: by making the promise of nondiscrimination a condition for any program or institution that receives federal financial support. For much of its history, the debates over Title VI have fastened on two basic ambiguities in the statute: the kind of "discrimination" Title VI was meant to outlaw and the types of rules a funding agency could issue to effectuate that prohibition. The Supreme Court

---

[185] 42 U.S.C. § 2000e-2(k)(1)(A).

[186] Equality Act, H.R. 5, 116th Congress, § 6.

[187] Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 285 (1978) (Powell, J., announcing judgment of the Court).

[188] Arguably, as a sex-based classification, a court would apply an intermediate level of review. *See* United States v. Virginia, 518 U.S. 515, 524 (1996) ("[A] party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification," by showing "at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives"). At least one federal court of appeals, however, has suggested that where two nondiscrimination provisions "use the same language, they should, as a matter of statutory interpretation, be read to require the same levels of protection and equality." Jeldness v. Pearce, 30 F.3d 1220, 1227-28 (9th Cir. 1994). There the court consequently reviewed a gender discrimination claim under Title IX of the Education Amendments of 1972 just as it would have analyzed a claim of race discrimination under Title VI—that is, under strict scrutiny. *See id.*

[189] *See* Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ., 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) (concluding that "neither the United States Supreme Court nor the Third Circuit Court of Appeals has recognized transgender as a suspect classification under the Equal Protection Clause" and accordingly reviewing a claim of discrimination based on gender identity under rational basis); *but see* Carcano v. Cooper, 350 F. Supp. 3d 388, 421 (M.D.N.C. 2018) ("There has been considerable debate at the district and circuit court levels about the applicable standard of scrutiny for classifications based on transgender status, with the majority of courts to have considered the question in recent years finding that 'heightened' or 'intermediate' scrutiny applies.").

[190] Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 417 (1978) (Stevens, J., concurring in the judgment in part and dissenting in part).

appears to have definitively resolved the first of those ambiguities: because Title VI simply "enacts constitutional principles," as currently written, it prohibits *only* intentional discrimination. And on that basis the Court has suggested, but not definitively ruled on, how it might resolve the second ambiguity as well: to effectuate Title VI's purpose, an agency may outlaw only policies resulting from a provable discriminatory intent, not simply having a racially discriminatory effect.

Whether the Court will turn that suggestion into a holding remains to be seen. Until then, however, federal agencies like OCR will likely continue to enforce Title VI consistent with constitutional standards that the Court has since read into the statute. In OCR's case, that enforcement work is already considerable, involving thousands of complaints every year culminating in significant resolutions across a wide range of schools and institutions of higher education. And in the background remains ED's ultimate authority under Title VI—to withdraw its financial support from any program or institution that refuses to comply with the statute's command that all individuals be treated equally, regardless of their race.

## Author Information

Jared P. Cole, Coordinator
Legislative Attorney

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

JA538

# EXHIBIT 45

JA539

# U.S. DEPARTMENT OF EDUCATION

# OFFICE FOR CIVIL RIGHTS



# CASE PROCESSING MANUAL (CPM)

## EFFECTIVE DATE: FEBRUARY 19, 2025

JA540

# INTRODUCTION

The mission of the Office for Civil Rights (OCR) is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights. The <u>Case Processing Manual</u> (CPM) provides OCR with the procedures to promptly and effectively investigate and resolve complaints, compliance reviews and directed investigations to ensure compliance with the civil rights laws and regulations enforced by OCR.

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 82 of 127
Case 1:25-cv-02429-MKV   Document 51-5   Filed 04/04/25   Page 4 of 33
C a s e   P r o c e s s i n g   M a n u a l                                                       |Page 3

## Table of Contents

**ARTICLE I: EVALUATION** ................................................................................................ **4**
Section 101    Privacy act and freedom of information act ....................................................................... 4
Section 102    Determine Whether the information provided is subject to further processing .................... 4
Section 103    Assign a Case Number and Establish a File ....................................................................... 6
Section 104    Acknowledge the Complaint .............................................................................................. 7
Section 105    Obtain a Consent form ....................................................................................................... 7
Section 106    Determine Whether the Allegations Are Timely ................................................................ 8
Section 107    Determine Whether a Waiver Should Be Granted .............................................................. 8
Section 108    Dismissal of allegations ..................................................................................................... 9
SECTION 109    First Amendment Principles ............................................................................................ 12
SECTION 110    Rapid resolution process ................................................................................................. 12
SECTION 111    Opening the complaint allegations for investigation ....................................................... 12
**ARTICLE II: MEDIATION** ............................................................................................... **13**
Section 201    Mediation ......................................................................................................................... 13
Section 202    Roles ................................................................................................................................ 13
Section 203    Initiation and Termination of mediation ........................................................................... 14
Section 204    Confidentiality of mediation ............................................................................................ 14
Section 205    Successful Conclusion of the mediation ........................................................................... 14
Section 206    Breach of mediation Agreements ..................................................................................... 14
Section 207    Investigative Determination When mediation is unsuccessful .......................................... 15
**ARTICLE III: CASE PLANNING, INVESTIGATION AND RESOLUTION** ................... **14**
Section 301    C a s e   p l a n n i n g .................................................................................................... 15
Section 302    Resolution Agreement Reached During an Investigation .................................................. 16
Section 303    Investigative Determinations ........................................................................................... 17
Section 304    Guidelines for Resolution Agreements ............................................................................. 19
Section 305    Letter of Impending Enforcement Action ......................................................................... 20
Section 306    Referrals from the Department of Justice (DOJ) and the          Equal Employment Opportunity Commission (EEOC).................... 21
Section 401    Compliance Reviews ........................................................................................................ 21
Section 402    Directed Investigations .................................................................................................... 21
**ARTICLE V: MONITORING RESOLUTION AGREEMENTS**  .................................... **22**
Section 501    Respond to Monitoring Reports and verify Recipient's Implementation ............................ 22
Section 502    implementation problems ................................................................................................. 22
Section 503    Modifications of Agreements ............................................................................................ 22
Section 504    Conclusion of Monitoring ................................................................................................ 22
**ARTICLE VI: INITIATION OF ENFORCEMENT ACTION** .......................................... **23**
Section 601    Initiate administrative proceedings where appropriate ...................................................... 23
Section 602    Refer to DOJ Where Appropriate ..................................................................................... 23
Section 603    Enforcement for Denial of Access .................................................................................... 23
Section 604    Enforcement for failure to comply with the resolution agreement ..................................... 23
**ARTICLE VII: APPENDICES** ......................................................................................... **24**
  Section 701    Special intake procedures ............................................................................................. 24
    (a)          Age Discrimination Complaints ................................................................................... 24
    (b)          Title VI Complaints against Proprietary Schools .......................................................... 25
    (c)          Title VI and Title IX Employment Complaints (see 29 C.F.R. §§ 1691.1 – 1691.13 and 28 C.F.R. §§ 42.601 – 42.613)............ 25
    (d)          Title II ADA Complaints (Other than Employment) (see 28 C.F.R. § 35.171(a)(2)(i)) ....................................... 26
    (e)          Section 504 and Title II Disability Employment Complaints (see 28 C.F.R. Part 37 and 29 C.F.R.  Part 1640) ...................... 26
  Section 702    Data Collection and Information Gathering .................................................................... 27
    (a)          Generally    27
    (b)          OCR's Authority to Obtain Information ........................................................................ 27
    (c)          Requests for Records ................................................................................................... 28
    (d)          Interviews  29
    1.           Introduction ................................................................................................................ 29
    2.           Notice       29
    3.           Privacy      29
    4.           Interviews with Minors (Persons under 18) or Legally Incompetent Individuals ............ 29
    5.           Records of Interviews ................................................................................................. 30
  Section 703    Freedom of Information Act and Privacy Act ................................................................. 30
  Section 704    Recipients Operating Under Federal Court Order ........................................................... 31
    (a)          United States a Party ................................................................................................... 31
    (b)          United States Not a Party ............................................................................................ 32

# ARTICLE I: EVALUATION

Upon receipt, OCR will determine whether the written information provided to the U. S. Department of Education (Department) is subject to further processing pursuant to applicable statutes and regulations and the OCR's *Case Processing Manual.* As appropriate, OCR will provide complainants[1] with assistance regarding the nature of their rights and of the OCR investigation process. Also as appropriate, OCR will provide reasonable assistance to complainants who are persons with disabilities, individuals of limited English proficiency, and persons whose communication skills are otherwise limited. All written information provided to OCR should include the sender's contact information.[2] Written information may be filed online as well as by mail, electronic mail, or fax.

## SECTION 101    PRIVACY ACT AND FREEDOM OF INFORMATION ACT

To investigate a complaint, OCR may collect and analyze personal information. The Privacy Act of 1974, 5 U.S.C. § 552a, Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552, govern the use of personal information collected by OCR. Disclosure will only be made as consistent with the Privacy Act, FERPA, and FOIA.

Subject to the restrictions imposed by FOIA and the Privacy Act, OCR may release certain information about a complaint to the press or general public, including the name of the school or institution; the date a complaint was filed; the type of discrimination included in a complaint; the date a complaint was resolved, dismissed or closed; the basic reasons for OCR's decision; or other related information. Under these circumstances, any information OCR releases to the press or general public will not include the complainant's name or the name of the person on whose behalf the complaint was filed except as noted in the paragraph above. All information within case files is subject to FOIA and the Privacy Act. See CPM Section 703.

## SECTION 102    DETERMINE WHETHER THE INFORMATION PROVIDED IS SUBJECT TO FURTHER PROCESSING

Upon receipt, OCR will determine whether the information provided to the Department is subject to further processing, as follows:

(a)  Not all information that OCR receives is sufficient to constitute a complaint subject to further processing. The following are generally not subject to further processing, but this determination will be made on an individualized basis, as appropriate:

   (i)      anonymous correspondence;
   (ii)     courtesy copies of correspondence or documentation filed with or otherwise submitted to another person or entity;
   (iii)    inquiries that solely seek advice or information from OCR;
   (iv)    allegations that are communicated to OCR only orally and not in writing.

---

[1] This manual uses the term "complainant" throughout. Note: The term "complainant" may also refer to the person or group injured by the alleged discriminations on whose behalf a complainant files a complaint.
[2] Contact information should include, for example, mailing address, phone number, or an electronic mail address.

Case: 25-1529  09/22/2025  DktEntry: 36.1  Page 84 of 127
Case 1:25-cv-02429-MRV  Document 51-5  Filed 04/04/25  Page 6 of 33
C a s e   P r o c e s s i n g   M a n u a l                                                                    |Page 5

(b) OCR must have jurisdiction over the subject matter of the allegation(s). An allegation(s) over which OCR lacks subject matter jurisdiction will not be processed further but will be dismissed pursuant to Section 108.

For OCR to establish subject matter jurisdiction, the written information must allege, or OCR must be able to infer from the facts given, an allegation of: (1) discrimination based on race, color, national origin, sex, disability or age, (2) discrimination in violation of the Boy Scouts of America Equal Access Act of 2001, or (3) retaliation for the purpose of interfering with any right or privilege secured by the civil rights laws and regulations enforced by OCR, or as a result of making a complaint, testifying, or participating in any manner in an OCR proceeding.  See 34 C.F.R. §§ 100.7(e), 104.61, 106.71, 108.9, 110.34; and 28 C.F.R. § 35.134.

OCR has jurisdiction pursuant to the following statutory and regulatory authorities:

- **Title VI of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000d et seq., 34 C.F.R. Part 100.

  Under Title VI, OCR has jurisdiction to investigate complaints involving individuals covered by the law (e.g., applicants, students, parents) and certain employment complaints based on race, color, or national origin. With respect to employment, OCR has jurisdiction if:  (1) the alleged discrimination could adversely affect program beneficiaries on the basis of race, color, or national origin, or (2) a primary objective of the federal financial assistance is to provide employment. See CPM subsection 701(b) for processing Title VI complaints with respect to proprietary vocational schools. For employment complaints, OCR follows procedures consistent with the employment coordinating regulations at 28 C.F.R. Part 42 and 29 C.F.R. Part 1691, see CPM subsection 701(c).

- **Title IX of the Education Amendments of 1972**, as amended, 20 U.S.C. §§ 1681 et seq., 34 C.F.R. Part 106.

  Under Title IX, OCR has jurisdiction to investigate complaints involving individuals covered by the law (e.g., applicants, students, parents) and employment complaints based on sex that involve educational programs and activities. For employment complaints, OCR follows procedures consistent with the employment coordinating regulations at 28 C.F.R. Part 42 and 29 C.F.R. Part 1691.  See CPM subsection 701(c).

- **Section 504 of the Rehabilitation Act of 1973**, as amended, 29 U.S.C. § 794, 34 C.F.R. Part 104.

  Under Section 504, OCR has jurisdiction to investigate complaints involving individuals covered by the law (e.g., applicants, students, parents) and employment complaints based on disability. For employment complaints, OCR follows procedures consistent with the employment coordination regulations at 28 C.F.R. Part 37 and 29 C.F.R. Part 1640. See CPM subsection 701(e).

- **Age Discrimination Act of 1975**, 42 U.S.C. §§ 6101 et seq., 34 C.F.R. Part 110.

  Under the Age Discrimination Act, OCR has jurisdiction to investigate complaints involving individuals covered by the law (e.g., applicants, students, parents). For instructions regarding referral of complaints to the Federal Mediation and Conciliation Service (FMCS) before investigation, see CPM subsection 701(a). OCR does not have jurisdiction over employment under the Age Discrimination Act.  See CPM subsection 701(a).

- **Title II of the Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12131 et seq., 28 C.F.R.

Part 35.

Under Title II, OCR has jurisdiction to investigate complaints involving individuals covered by the law (e.g., applicants, students, parents) and employment complaints based on disability. For employment complaints, OCR follows procedures consistent with the employment coordination regulations at 28 C.F.R. Part 37 and 29 C.F.R. Part 1640, which address coordinating disability employment complaints with DOJ and EEOC. See CPM subsection 701(e).

- **Boy Scouts of America Equal Access Act of 2001**, 20 U.S.C. § 7905, 34 C.F.R. Part 108.

  Under the Boy Scouts Act, OCR has jurisdiction to investigate complaints involving the denial of equal access or a fair opportunity to meet to, or discrimination against, any group officially affiliated with the Boy Scouts of America or officially affiliated with any other youth group listed in Title 36 of the United States Code.

(c) OCR must have personal jurisdiction over the entity alleged to have discriminated. An allegation(s) about an entity over which OCR lacks personal jurisdiction will not be processed further but will be dismissed pursuant to Section 108.

Under Title VI, Title IX, Section 504, and the Age Discrimination Act, OCR has jurisdiction over institutions that receive federal financial assistance from the Department and institutions for which OCR has been delegated authority from other federal agencies. Under Title II, OCR has jurisdiction over public elementary and secondary education systems and institutions, public institutions of higher education and vocational education (other than schools of medicine, dentistry, nursing, and other health-related schools), and public libraries – regardless of whether these institutions receive federal financial assistance. Under the Boy Scouts Act, OCR has jurisdiction over public elementary schools, public secondary schools, local educational agencies, and State educational agencies that receive funds made available through the Department.

Where appropriate, OCR will refer the written information to the appropriate agency.  See CPM Section 701.

When OCR determines that the written information provided to the Department pursuant to CPM Section 102 (a), (b), or (c) is not subject to further processing, it will notify the sender in writing of its determination.

(d) Generally, statistical data alone are not sufficient to warrant opening an investigation, but can serve to support the opening of an investigation when presented in conjunction with other facts and circumstances.

## SECTION 103    ASSIGN A CASE NUMBER AND ESTABLISH A FILE

Once OCR determines that written information it has received is appropriate for further processing pursuant to Section 102 (hereinafter referred to as a "complaint"), OCR will assign a case number and establish a file.
The following guidelines will be applied in determining how many case numbers should be assigned:

- When OCR receives written information at or around the same time by the same complainant that raises identical allegations against the same recipient, OCR will assign one case number to the complaints.

- When OCR receives written information alleging discrimination against multiple recipients and OCR has determined that the written information is appropriate for further processing pursuant to CPM Section 102, OCR will assign a separate case number to each recipient[3] named. If, during the course of the investigation, OCR determines that other recipients are involved in the alleged acts of discrimination, OCR will assign a separate case number for each such recipient; the case opening date is the date on which OCR determines that other recipients are involved.

- Written information from more than one person against the same recipient that contains different or distinct allegations are assigned separate case numbers.

- Written information from one or more than one person that raises the same or a similar allegation based on the same operative facts against the same recipient may be assigned one case number when OCR makes this determination prior to the docketing. When OCR is currently investigating a case against the same recipient, written information that is filed subsequently and that raises substantially identical allegations will be assigned a separate case number(s) and reviewed to determine whether to consolidate with the existing investigation and dismiss the subsequent case under CPM Section 108.

- New allegations filed by the same person against the same recipient after OCR has begun to investigate the original complaint are reviewed on a case-by-case basis to determine whether the allegations should be added to the open complaint or assigned a separate case number and, if assigned a separate case number, whether to consolidate the investigation of the subsequent complaint with the investigation of the allegation(s) in the original case.

## SECTION 104    ACKNOWLEDGE THE COMPLAINT

OCR will promptly acknowledge in writing receipt of the complaint and provide a Consent Form to the complainant.  OCR will also inform the complainant that the complaint will be evaluated to determine whether OCR will proceed to investigate the allegations and that further communications about complaint processing will be forthcoming.  A Consent Form, a Complaint Form, and *OCR Complaint Processing Procedures* are available online at: (https://www2.ed.gov/about/offices/list/ocr/docs/howto.html?src=rt).

## SECTION 105    OBTAIN A CONSENT FORM

When disclosure of the identity of the complainant is necessary in order to resolve the complaint, OCR will require written consent before proceeding. The complainant will be informed that the complaint will be dismissed if written consent is necessary in order to resolve the complaint and is not received within 20 calendar days of the date that the Consent Form was provided with the acknowledgement letter or the date OCR requests the Consent Form from the complainant, whichever is earlier. The signed Consent Form may be submitted to OCR by mail, fax, electronic mail, or in person. If OCR does not receive a signed

---

[3] This manual uses the term "recipient" throughout. With respect to Title VI, Title IX, Section 504 and the Age Discrimination Act, a recipient is an entity that receives federal financial assistance. With respect to the Boy Scouts of America Equal Access Act, a recipient is a public elementary or secondary school or local or State educational agency that receives funds made available through the Department and with respect to Title II, the term is intended to include public entities whether or not they receive federal financial assistance. Specifically, the Department of Justice has identified the Department of Education as the designated agency to carry out Title II compliance activities regarding public elementary and secondary education systems and institutions, public institutions of higher education and vocational education (other than schools of medicine, dentistry, nursing, and other health-related schools) and public libraries.

written Consent Form, and it is necessary in order to resolve the complaint, the complaint will be dismissed and the complainant so informed in writing.

A complainant filing on behalf of or pertaining to another person(s) is responsible for securing any necessary written consent from that individual, including when a parent files for a student over the age of 18 or one who becomes 18 while the complaint is under investigation or in monitoring. Where the person is a minor (under the age of 18) or a legally incompetent adult, the Consent Form must be signed by that person's parent or legal guardian. Parental or legal guardian consent may not be required for persons under the age of 18 if they are emancipated under state law and are therefore considered to have obtained majority. Proof of emancipation, incompetence, and/or legal guardianship must be provided if requested by OCR.

## SECTION 106    DETERMINE WHETHER THE ALLEGATIONS ARE TIMELY

OCR will take action only with respect to those allegations (except allegations of age discrimination and, in special circumstances, allegations relating to breach of Facilitated Resolution Between the Parties agreements) that have been filed within 180 calendar days of the date of the alleged discrimination, unless the complainant is granted a waiver under CPM Section 107. With respect to allegations of age discrimination, OCR will take action with respect to those complaint allegations that have been filed within 180 days of the date the complainant first had knowledge of the alleged discrimination. OCR may extend this time limit for age discrimination complaints for good cause shown. See CPM subsection 701(a).  With respect to the timeliness requirements for allegations relating to the breach of Facilitated Resolution Between the Parties agreements, see CPM Section 205.

The filing date of a complaint for the purpose of determining timeliness is the following:

- The filing date of complaints submitted online or by electronic mail or fax is the date the complaint was sent to OCR.
- The filing date of complaints submitted by mail is the date the complaint is postmarked.
- For Title II complaints referred from DOJ, the filing date is the date the complaint was received by DOJ.

Timely allegations may include those where the complainant alleges a continuing violation and/or a pattern or practice of discrimination.

## SECTION 107    DETERMINE WHETHER A WAIVER SHOULD BE GRANTED

If a complaint allegation[4] is not filed in a timely manner (see CPM Section 106), where appropriate, OCR will notify the complainant of the opportunity to request a waiver.[5] OCR may grant a waiver of the 180-day filing requirement for reasons such as:

(a) The complainant could not reasonably be expected to know the act was discriminatory within the 180-day period, and the complaint allegation was filed within 60 days after the complainant could

---

[4] Although the manual refers to "complaints" and "complaint allegations," OCR makes a determination as to each allegation in a complaint.  For example, in a single complaint, OCR may decide that it is appropriate to proceed to complaint investigation on one or more allegations while dismissing another allegation or other allegations. The complainant will be informed of OCR's decision with respect to each allegation.
[5] OCR's complaint form notifies the complainant of the opportunity to request a waiver of OCR's timeliness requirement.

reasonably have become aware of the alleged discrimination (note that lack of previous awareness of OCR or the civil rights laws and regulations enforced by OCR is not a basis for a waiver).

(b) The complainant was unable to file a complaint because of incapacitating illness or other incapacitating circumstances during the 180-day period, and the complaint allegation was filed within 60 days after the period of incapacitation ended.

(c) The complainant filed a complaint alleging the same or similar allegation based on the same operative facts within the 180-day period with another federal, state, or local civil rights enforcement agency, or federal or state court, and filed a complaint with OCR within 60 days after the other agency had completed its investigation or, in the case of a court, there had been no decision on the merits or settlement of the complaint allegations. Dismissal with prejudice is considered a decision on the merits.

(d) The complainant filed, within the 180-day period, an internal grievance with the recipient of federal financial assistance, or a due process hearing, alleging the same discriminatory conduct that is the subject of the OCR complaint, and the complaint is filed no later than 60 days after the internal grievance is concluded.

(e) Unique circumstances generated by OCR's action have adversely affected the complainant.

## SECTION 108     DISMISSAL OF ALLEGATIONS

Allegations can be dismissed during the evaluation stage of case processing or after the allegations have been opened for investigation.

As appropriate, in the evaluation stage, OCR will assist the complainant in understanding the information that OCR requires in order to proceed to the investigation of the complainant's allegation(s). This will include explaining OCR's investigation process and the rights of the complainant under the statutes and regulations enforced by OCR. OCR may also specifically identify the information necessary for OCR to proceed to investigation. OCR staff will provide reasonable assistance to complainants who are persons with disabilities, individuals of limited English proficiency, or persons whose communication skills are otherwise limited.

When an allegation(s) is dismissed during the evaluation stage, OCR will issue a letter to the complainant explaining the reason for the decision.[6] When a complaint allegation is dismissed after the complaint allegation has been opened for investigation, OCR will issue a letter to the complainant and the recipient explaining the reason for the decision. Complainants may elect to refile complaints that were dismissed pursuant to Sections 108(a), (b), (c), (e), (p), and (q) if they have addressed the deficiencies stated by OCR in the dismissal.

Where the Regional Office has approved issuance of a final determination under CPM Section 303 with regard to any allegation(s), OCR will not dismiss the allegation(s), but will proceed in accordance with CPM Section 303.

---

[6] In circumstances where the complaint has been referred to the Federal Mediation and Conciliation Service, OCR will also notify the recipient of the dismissal.

OCR **will** dismiss an allegation, or, if appropriate, the complaint[7] in its entirety, when:

(a)  The allegation, on its face or as clarified, fails to state a violation of one of the laws and regulations OCR enforces.

(b)  The allegation, on its face or as clarified, lacks sufficient factual detail (e.g., who, what, where, when, how), or is so speculative, conclusory[8] or incoherent that OCR cannot infer that discrimination or retaliation may have occurred or may be occurring.

Before dismissing an allegation(s) under CPM subsection 108 (b), OCR will contact the complainant either by telephone or in writing (by letter or electronic mail) to (i) explain the information necessary for OCR to open an investigation of the allegation(s), (ii) request that the information be received within 14 calendar days of the date of the telephone contact, letter, or electronic mail, and (iii) advise the complainant that the allegation(s) will be dismissed if the information is not received by that date. OCR will dismiss the allegation(s) if the requested information is not received within 14 calendar days of the date of the telephonic or written request, unless the complainant has requested additional time to provide the information.

(c)  Based on all of the facts/information provided by the complainant, OCR cannot reasonably conclude that the recipient has violated a law(s) OCR enforces.

(d)  The allegation is not timely filed with OCR pursuant to CPM Section 106 and a waiver was not requested or was requested but not granted pursuant to CPM Section 107.

(e)  OCR determines that a signed Consent Form is required to proceed with an investigation, and the Consent Form has not been provided.

(f)  OCR determines that it lacks jurisdiction over the entity alleged to have discriminated.  When appropriate, OCR will refer the complaint to the appropriate agency.  See CPM Section 701.

(g)  OCR transfers or refers the complaint to another agency for investigation.  See CPM Section 701.

OCR **may** dismiss an allegation, or, if appropriate, the complaint[7] in its entirety, pursuant to subsections 108(h) through (r) below. However, where OCR determines that the complaint or OCR's investigation indicates that the alleged violative conduct may recur, OCR will not dismiss the complaint and will continue the investigation.

(h)  The same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with another federal, state, or local civil rights enforcement agency[9] or through a recipient's internal grievance procedures, including due process proceedings, and

i.  ***The same or similar allegation(s) filed with OCR involve the same operative facts currently pending before another federal, state, or local civil rights enforcement agency or through a recipient's internal grievance procedures, including due process proceedings,*** and OCR

---

[7] The provisions of section 108 do not apply to compliance reviews and directed investigations initiated by OCR pursuant to Article IV.
[8] This provision applies where the complaint allegation (including any additional information provided by the complainant) does not provide sufficient information to raise the allegation above the level of speculation. The complaint must provide more than bare conclusions of alleged violations of the laws and regulations enforced by OCR.
[9] Also includes agencies (such as, for example, state educational agencies) that have jurisdiction to investigate such complaints.

anticipates that all allegations will be investigated and that there will be a comparable resolution process pursuant to legal standards that are acceptable to OCR. OCR will advise the complainant that she or he may re-file within 60 days of the completion of the other entity's action. Generally, OCR will not conduct its own investigation; instead, OCR reviews the results of the other entity's determination and decides whether the other entity provided a comparable resolution process pursuant to legal standards that are acceptable to OCR.

ii.   ***The same or similar allegation(s) filed with OCR involve the same operative facts that has been resolved by another federal, state, or local civil rights enforcement agency or through a recipient's internal grievance procedures, including due process proceedings,*** and all allegations were investigated and there was a comparable resolution process pursuant to legal standards that are acceptable to OCR.

(i)   The same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with state or federal court. An OCR complaint may be re-filed within 60 days following termination of the court proceeding if there has been no decision on the merits or settlement of the complaint allegations. Dismissal with prejudice is considered a decision on the merits.

(j)   OCR obtains credible information indicating that the allegations raised by the complainant are currently resolved and are therefore no longer appropriate for investigation.

(k)   A class action with the same or a similar allegation(s) with the same operative facts has been filed against the same recipient with state or federal court. An OCR complaint may be re-filed within 60 days following termination of the court proceeding if there has been no decision on the merits or settlement of the state or federal complaint.

(l)   The complaint filed by the complainant or someone other than the complainant against the same recipient raises the same or similar allegation(s) based on the same operative facts that was previously dismissed or closed by OCR.

(m)   OCR has recently investigated or is currently investigating the same or similar allegation(s) based on the same operative facts involving the same recipient in a compliance review, directed investigation, or an OCR complaint.

(n)   The complainant withdraws the complaint.

(o)   The death of the complainant makes it impossible to investigate the allegations fully, or forecloses the possibility of individual relief.

(p)   OCR determines that its ability to complete an investigation is substantially impaired by the complainant's refusal to provide information that is reasonably accessible to the complainant and is necessary for investigation of the complaint. OCR will include documentation in the case file of its efforts to contact the complainant by phone, in writing, or via electronic mail to request the necessary information and of the complainant's refusal to provide information.

(q)   OCR determines that its ability to complete an investigation is substantially impaired by its inability to contact the complainant in order to obtain information that is necessary for investigation of the complaint. OCR will include documentation in the case file of its unsuccessful efforts to contact the complainant by phone, in writing, or via electronic mail to request the necessary information.

(r)  OCR determines that the complaint is moot or unripe.

## SECTION 109    FIRST AMENDMENT PRINCIPLES

Although OCR does not have jurisdiction to enforce the First Amendment to the U.S. Constitution, as a threshold issue and throughout the processing of the complaint, OCR interprets its statutes and regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles. OCR will not interpret any statute or regulation to impinge upon rights protected under the First Amendment or to require recipients to encroach upon the exercise of such rights.

## SECTION 110    RAPID RESOLUTION PROCESS

The Rapid Resolution Process (RRP) is an expedited case processing approach that can be used to resolve cases in any of OCR's statutory areas either during the evaluation stage or after issuance of the letter of notification. The outcomes in all RRP cases must meet OCR's standards for legal sufficiency and be consistent with applicable statutory and regulatory authority. Any resolution agreement reached through RRP must be aligned with the allegations in the complaint deemed appropriate for resolution pursuant to RRP. See CPM Article III.

Once OCR has received any necessary signed Consent Form from the complainant (see CPM Section 105) and has determined that the complaint is appropriate for RRP, OCR will promptly attempt to resolve the complaint and obtain information necessary to make a compliance determination. OCR will contact the recipient to determine if the recipient is interested in immediately resolving or has taken action to resolve the complaint allegation(s). Where such interest is expressed, RRP may be used to resolve complaints under the following circumstances:

(a)  Where a recipient has already taken action that will resolve the complaint, the complaint may be resolved without an agreement where compliance is verified and does not require monitoring by OCR. Under this circumstance, OCR will issue a dismissal letter pursuant to CPM Section 108(j).

(b)  Where a recipient has indicated that it is willing to take action in the future to resolve the complaint, or the recipient has already taken action that requires monitoring, the complaint may be resolved by obtaining a resolution agreement, the implementation of which OCR will monitor. See CPM Section 304. Under this circumstance, OCR will issue a resolution letter pursuant to CPM Section 302(c).

(c)  Where OCR obtains sufficient information from the recipient to make a compliance determination pursuant to CPM Section 303, OCR will issue a letter of finding pursuant to CPM subsection 303(a) or OCR will issue a letter of finding and obtain a resolution agreement pursuant to CPM subsection 303(b), the implementation of which OCR will monitor.

For cases in RRP, the Regional Office must ensure expeditious completion in accordance with statute, regulations, and case processing procedures.

## SECTION 111    OPENING THE COMPLAINT ALLEGATION(S) FOR INVESTIGATION

When OCR opens a complaint for investigation, it will issue letters of notification to the complainant and the recipient that contain the following information:

- OCR's jurisdiction with applicable statutory and regulatory citations.
- The allegations to be investigated.
- A statement that OCR is a neutral fact-finder and citing the CPM.
- Information about OCR's mediation process.
- A statement that the complainant may have a right to file a private suit in federal court whether or not OCR finds a violation.
- Contact information for the OCR staff person who will serve as the complainant's and the recipient's primary contact during the investigation and resolution of the complaint.

A copy of *OCR Case Processing Procedures* will be included with the letter to the recipient. A copy of the complaint will be provided to the recipient.

## ARTICLE II: MEDIATION

### SECTION 201    MEDIATION

OCR offers two mediation options that provide an opportunity for the parties involved to voluntarily resolve the allegation(s).  OCR will determine, on an individualized basis, whether the allegation(s) are appropriate for resolution pursuant to the mediation options:

(a) Complainants may request mediation at the time of filing of the complaint.  If the allegation(s) is within OCR's jurisdiction, is filed timely (or OCR granted a waiver), provides sufficient detail, states a violation of one of the laws or regulations OCR enforces, and the complainant has provided a signed Consent Form, OCR will contact the recipient and offer this resolution option.  If the recipient is interested in mediation, OCR will provide the recipient with a statement of the allegation(s) to be mediated. If the recipient is not interested in mediation, OCR will determine whether to open the complaint for investigation.  If the mediation is not successful, OCR will close the original complaint pursuant to this subsection, assign a new docket number to the complaint, and determine whether to open the complaint for investigation.

(b) If a complainant has not requested mediation but OCR determines during the course of the investigation that a complaint could be appropriate for mediation, OCR will contact the parties and offer this resolution option.

### SECTION 202    ROLES

(a) **OCR's Role**

- To serve as an impartial, confidential facilitator between the parties.
- To inform the parties of mediation procedures, establish a constructive tone, and encourage the parties to work expeditiously and in good faith toward a mutually acceptable resolution.
- To review the allegations with the parties and assist both parties in understanding the pertinent legal standards and possible remedies.
- To facilitate a discussion between the parties regarding possible actions that the parties may consider in working toward a resolution.
- To offer assistance, as appropriate, with regard to reducing any resolution to writing. When an agreement is reached, the parties are informed that OCR will issue a closure letter reflecting the resolution of the complaint by agreement of the parties.

(b) **Role of the Participants**

- To participate in the discussions in good faith.

- To consider offers or suggestions with an open mind and to work constructively toward a mutually acceptable resolution.
- To implement any agreement in good faith.

OCR does not sign, approve, endorse, or monitor any agreement reached between the parties.

## SECTION 203    INITIATION AND TERMINATION OF THE MEDIATION PROCESS

If OCR determines that mediation is appropriate and the complainant and the recipient are willing to proceed with this resolution option, OCR will designate staff to facilitate an agreement between the recipient and

complainant. Staff assigned to conduct mediation of a complaint shall not be staff assigned to the investigation of that complaint.

An Agreement to Participate in mediation must be reviewed and signed, verbally agreed to, or agreed to by electronic mail by the complainant and recipient. In circumstances where verbal agreement is obtained, the mediator shall send a letter or electronic mail to the parties confirming the Agreement.

If a case has been opened for investigation, OCR has the discretion to suspend its investigation for up to 30 calendar days to facilitate an agreement between the parties. If an agreement has not been reached, OCR will resume its investigation if it had been suspended.

## SECTION 204    CONFIDENTIALITY OF THE MEDIATION PROCESS

A Confidentiality Agreement must be reviewed and signed, verbally agreed to, or agreed to by electronic mail by the mediator and the parties to the mediation (the complainant or complainant's representative and the recipient or recipient's representative). In circumstances where verbal agreement is obtained, the mediator shall send a letter or electronic mail to the parties confirming this Agreement.

In order to maintain confidentiality of the mediation process, any notes taken during mediation by the facilitator and/or any records or other documents offered by either party to the mediator during mediation will be kept in a separate file and will not be shared with the staff member(s) assigned to investigate the complaint.

## SECTION 205    SUCCESSFUL CONCLUSION OF MEDIATION

At the conclusion of mediation, OCR will obtain a copy of a statement that the allegation(s) has been resolved, signed by the complainant, or a copy of any agreement that has been signed by the parties. Once resolution of any allegation has been obtained, OCR will notify the parties in writing that the allegation(s) has been resolved; other outstanding allegations, if any, are to be resolved through the investigation and resolution process. See CPM Article III. A copy of the agreement between the parties or the signed statement from the complainant that the allegation(s) has been resolved will be attached to the closure letter.

## SECTION 206    BREACH OF MEDIATION AGREEMENTS

OCR will not monitor or enforce the agreement but will inform the parties that if a breach occurs, the complainant has the right to file another complaint; such new complaint is not subject to dismissal pursuant to subsection 108(m). If a new complaint is filed, OCR will not address the alleged breach of the agreement. Instead, OCR will determine whether to investigate the original allegation. When making this determination, OCR will consider whether the alleged breach is material, its relation to any alleged discrimination and any other factors as appropriate. To be considered timely, the new complaint must be filed either within 180 calendar days of the date of the alleged discrimination or within 60 calendar days of the date the complainant obtains information that a breach occurred, whichever date is later.

JA553

**SECTION 207    INVESTIGATIVE DETERMINATION WHEN MEDIATION IS NOT SUCCESSFUL**

OCR will monitor the mediation to ensure adequate time for completion of the investigation in the event that mediation is unsuccessful.

# ARTICLE III: CASE PLANNING, INVESTIGATION, AND RESOLUTION

OCR will ensure that the actions its takes in investigations are legally sufficient, supported by evidence, and dispositive of the allegations. OCR can resolve allegations at any point during the course of the investigation if appropriate. OCR resolution agreements will be drafted to ensure compliance with the civil rights laws and regulations enforced by OCR.

When during the course of the investigation of a complaint, OCR identifies compliance concerns and/or violations involving issues that were not raised in the complaint, OCR may address any compliance concerns and/or identified violations in the resolution letter or letter of findings and the resolution agreement or, depending on the nature of the compliance concerns, provide technical assistance or consider the compliance concerns for a possible compliance review or directed investigation. See CPM Sections 401 and 402.

**SECTION 301    CASE PLANNING**

Case planning will begin as early as possible, will be thorough, and will be conducted throughout the life of every case to ensure high quality decisions, prompt investigations and efficient use of OCR resources. Planning decisions will reflect sound legal standards and will be adjusted as necessary to take into account information obtained during case processing. See CPM Section 702. The scope of OCR's investigation and resolution activities is governed by the applicable statute(s) and regulations.

Regional Office management and investigative staff are accountable for effective planning and will participate in critical planning decisions commensurate with the nature and complexity of the case, to ensure consistent high quality casework.

The following essential elements of case planning will be addressed in every OCR file (unless inapplicable):

- Allegation(s).
- OCR's Jurisdiction over the subject matter and entity.
- Legal standards, regulatory authority and elements of proof.
- Ensuring OCR's actions comport with First Amendment principles.
- Scope of the investigation.
- Investigative methods (i.e., what data and/or information are necessary to resolve the case and the means and methods OCR will employ to obtain the relevant data and/or information).
- Resolution strategy.

The case file will contain documentation that supports the decisions made. Planning documentation should be organized so that it can be readily located in the case file. Case planning should be documented in the Case Planning Document.

These planning activities will ensure accountability for high quality and consistency and will address:

- required actions to investigate compliance;
- dates for completion of specific actions;
- description of evidence required; and
- all settlement activities.

## SECTION 302     RESOLUTION AGREEMENT REACHED DURING AN INVESTIGATION

Allegations under investigation may be resolved at any time when, prior to the point when the Regional Office issues a final determination under CPM Section 303, the recipient expresses an interest in resolving the allegations **and** OCR determines that it is appropriate to resolve them because OCR's investigation has identified issues that can be addressed through a resolution agreement. The provisions of the resolution agreement must be tied to the allegations and the evidence obtained during the investigation, and will be consistent with applicable regulations.

OCR will inform the recipient that this resolution process is voluntary before proceeding to resolution under this section. When OCR determines that it is appropriate to resolve the allegations(s) pursuant to CPM Section 302, OCR will notify the complainant of the recipient's interest in resolution.

(a) **Statement of the Case**

For cases with allegations proposed for resolution under CPM Section 302, OCR will prepare a Statement of the Case. The Statement of the Case sets forth:

- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation.
- An explanation of the pertinent legal standard(s).
- The allegations investigated.
- Relevant background information.
- A summary of the investigation, including an analysis of the evidence obtained to date and the identified concern(s) that support the need for the provisions of the agreement.

The Statement of the Case must address all of the allegations proposed for resolution under CPM Section 302.

(b) **Timeframes and Procedures for Negotiations**

From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 30 calendar days within which to reach final agreement.

During the negotiations period (which may be less than 30 days, at the discretion of OCR), OCR may suspend its investigation of the case. Where a final agreement is not reached by the 30th day, the investigation will resume no later than on the 31st day after negotiations were initiated; however, negotiations may continue while the investigation resumes. This 30-day period for suspension of the investigation in order to conduct negotiations cannot be restarted.

(c) **Resolution Letters**

After the recipient signs the resolution agreement, OCR will issue a Resolution Letter, which will address all allegations in the case resolved pursuant to CPM Section 302. The letter must include, at a minimum:

- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation.
- A statement of the allegations investigated and an analysis of the evidence obtained to date.
- A statement that the recipient has signed a resolution agreement.
- A statement that, when fully implemented, the resolution agreement will address all of the allegations investigated and that OCR will monitor the implementation of the agreement. See CPM Section 304 and CPM Article V.
- The following statement: "The complainant may have a right to file a private suit in federal court whether or not OCR finds a violation." For service complaints under the Age

  Discrimination Act, the complainants may file in federal court only after they have exhausted administrative remedies. See CPM subsection 701(a).

A copy of the signed resolution agreement will be included with the resolution letter. OCR will monitor the implementation of the agreement until the recipient has fulfilled the terms of the agreement. Upon completion of the obligations under the agreement, OCR will close the case. See CPM Article V.

## SECTION 303    INVESTIGATIVE DETERMINATIONS

At the conclusion of the investigation, OCR will determine, using a preponderance of the evidence standard, whether:

- There is insufficient evidence to support a conclusion of noncompliance, or
- The evidence supports a conclusion of noncompliance.

(a) **Insufficient Evidence Determination**

When OCR determines that the preponderance of the evidence does not support a conclusion that the recipient failed to comply with applicable statute(s) and regulation(s), OCR will issue a letter of finding(s) to the parties explaining the reasons for its decision.  See CPM Section 303(e).

(b) **Non-Compliance Determination**

When OCR determines that the preponderance of the evidence supports a conclusion that the recipient failed to comply with applicable statutes(s) and regulation(s), OCR will negotiate a resolution agreement and issue a letter of finding(s). See CPM Sections 303(e) and 304.  The agreement must include actions steps that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur.

(c) **Mixed Determination**

A "mixed determination" is appropriate for complaints with multiple allegations, where the allegations will be resolved in different ways (e.g., investigation has found a violation with regard to some allegations and insufficient evidence with regard to other allegations; the investigation has found a violation with regard to some allegations and there are other allegations that are appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302; or OCR has found insufficient evidence with regard to some allegations and determined that other allegations are appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302). In a "mixed determination" case where OCR is making a determination(s) pursuant to Section 303(b), OCR will negotiate a resolution agreement and issue a letter of finding(s). See CPM Sections 303(e) and 304. In a "mixed determination" case where OCR is not making a determination(s) pursuant to 303(b) but is resolving allegations pursuant to Section 302, OCR will issue a resolution letter pursuant to Section 302(c).

(d) **Statement of the Case**

OCR will prepare a Statement of the Case for investigative determinations under CPM Section 303. The Statement of the Case sets forth:

- Allegations raised in the complaint.
- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation.
- An explanation of the pertinent legal standard(s).
- Relevant background information.
- A statement of each allegation investigated and the findings of fact for each, including analysis of the evidence on which the findings are based.

- Conclusions for each allegation that reference the relevant facts, the applicable regulation(s), and the appropriate legal standards.

(e) **Letter of Finding(s)**

For insufficient evidence, non-compliance and mixed determinations that include non-compliance determinations, OCR will issue a letter of finding(s) explaining the reason(s) for its decision to both the recipient and the complainant.[10]

Letters of finding(s) address all allegations in the case. The letter includes, as appropriate:

- A statement of the allegations in the case.
- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation.
- A statement of the findings of fact for each allegation, supported by any necessary explanation and/or analysis of the evidence on which the findings are based.
- Conclusions for each allegation that reference the relevant facts, the applicable regulation(s), and the appropriate legal standards.
- A statement that: "The complainant may have a right to file a private suit in federal court whether or not OCR finds a violation." For service complaints under the Age Discrimination Act, the complainants may file in federal court only after they have exhausted administrative remedies.  See CPM subsection 701(a).

(f) **Timeframes and Procedures for Negotiations**

From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 90 calendar days within which to reach final agreement.

(g) **Negotiation Impasse**

OCR may end the 90-day negotiations period if no agreement has been reached by the 90th day and may end the negotiations period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached (e.g., the recipient has refused to discuss any resolution; the recipient has indicated a refusal to agree to a key resolution term; the recipient has not responded to a proposed resolution agreement and at least 30 calendar days have passed). At such time, OCR shall issue an Impasse Letter that informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period.  The letter will include a description of OCR's unsuccessful attempts to resolve the complaint. If the recipient does not enter into a resolution agreement within 10 calendar days of the date of the issuance of the Impasse Letter, OCR must follow the procedures in CPM Section 305 for the issuance of a Letter of Impending Enforcement Action regarding non-compliance determinations.

---

[10] For recipients operating under federal court order, see CPM Section 704.

In the case of a mixed determination, when the negotiations included allegations that were appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302 and allegations for which OCR made determinations of non-compliance, OCR shall issue a Letter of Impending Enforcement Action in 10 calendar days if a resolution agreement is not reached within that 10-day period. The letter will include a description of OCR's unsuccessful attempts to resolve the complaint. If the recipient does not enter into a resolution agreement within 10 calendar days of the date of the issuance of the Impasse Letter, OCR must follow the procedures in CPM Section 305 for the issuance of a Letter of Impending Enforcement Action regarding non-compliance determinations.

(h) **Negotiations On-Going at the End of the 90-day Period**

If OCR and the recipient negotiate for 90 calendar days and fail to reach final agreement by the 90th day, but negotiations are on-going, OCR shall inform the recipient that OCR will issue a Letter of Impending Enforcement Action in 30 calendar days if a resolution is not reached within that 30-day period. Negotiations will be considered on-going if the recipient has agreed in principle to the terms of the agreement, but needs a short period of time within which, for example, to obtain approval of the agreement (e.g., by a board of education or president of a college) and/or the appropriate signature on the agreement; or where the recipient has agreed to most of the terms of the agreement but requests a short period of additional time to negotiate other terms. If the recipient does not enter into a resolution agreement within 30 calendar days, OCR will issue a Letter of Impending Enforcement Action regarding non-compliance determinations pursuant to CPM Section 305.

In the case of a mixed determination, when the negotiations included allegations that were appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302, and allegations for which OCR made determinations of non-compliance, OCR shall inform the recipient that OCR will issue a Letter of Impending Enforcement Action in 30 calendar days if a resolution is not reached within that 30-day period. If the recipient does not enter into a resolution agreement within 30 calendar days, OCR will issue a Letter of Impending Enforcement Action regarding non-compliance determinations pursuant to CPM Section 305.

## SECTION 304    GUIDELINES FOR RESOLUTION AGREEMENTS

The complaint will be considered resolved and the recipient deemed compliant when the recipient, after negotiating with OCR and reaching agreement on its terms, enters into and fulfills the terms of a resolution agreement.

**Resolution Agreements:**

- Must be signed by a person with authority to bind the recipient.
- Includes in the agreement itself or through an exchange of letters or other written communications:
  - Specific acts or steps the recipient will take to resolve compliance concerns and/or violations.
  - Dates for implementing each act or step.
  - Dates for submission of reports and documentation.
  - Where appropriate, language requiring submission of documents and/or other information or actions for OCR's review and approval, and timeframes for their submission.

- ▪ Timeframes requiring the recipient to implement what OCR has approved, and language requiring documentation verifying implementation.
- ▪ The following statements of principle:
  - o The recipient understands that by signing the resolution agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the resolution agreement. Further, the recipient understands that during the monitoring of the resolution agreement, if necessary, OCR may visit the recipient, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the recipient has fulfilled the terms and obligations of the resolution agreement.
  - o Upon the recipient's satisfaction of the commitments made under the Agreement, OCR will close the case.
  - o The recipient understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of the resolution agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the recipient written notice of the alleged breach and sixty (60) calendar days to cure the alleged breach.

## SECTION 305    LETTER OF IMPENDING ENFORCEMENT ACTION

When following the expiration of the 10 calendar day period referenced in CPM subsection 303(g) or the 30 calendar day period referenced in CPM subsection 303(h), the recipient does not enter into a resolution agreement to resolve the identified areas of non-compliance, OCR will prepare a Letter of Impending Enforcement Action, which will include the following:

- A statement of allegation(s) in the case.
- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation.
- A statement of the findings of fact for each allegation supported by any necessary explanation or analysis of the evidence on which the findings are based.
- Conclusions for each allegation that reference the relevant facts, the applicable regulation(s), and the appropriate legal standards.
- Notice that the Letter of Impending Enforcement Action is not intended and should not be construed to cover any other issue regarding the recipient's compliance.
- Notice of the time limit on OCR's resolution process and the consequence of failure to reach agreement.
- A description of OCR's unsuccessful attempts to resolve the case.
- When a decision is made to defer final approval of any applications by the recipient for additional federal financial assistance or, with respect to the Boy Scouts Act, additional funds made available through the Department over what the recipient is presently receiving, the letter also will provide notice of such possible deferral. A separate deferral letter will be prepared if appropriate.
- Title II letters will include the following language: "The complainant may have a right to file a private suit pursuant to Section 203 of the Americans with Disabilities Act, whether or not OCR finds a violation of Title II."

To resolve the case after issuance of the Letter of Impending Enforcement Action, any resolution agreement that the recipient proposes must be approved by OCR.

**SECTION 306      REFERRALS FROM THE DEPARTMENT OF JUSTICE (DOJ) AND THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC)**

When a Title II complaint is referred to OCR by the Department of Justice, OCR will send a copy of the letter resolving the case to DOJ. When a Title II/504 employment discrimination complaint has been dual-filed with EEOC and OCR, and when a complaint has been referred to OCR, OCR will notify the EEOC once the complaint has been resolved.  See 28 C.F.R. Part 37 and 29 C.F.R. Part 1640.

# ARTICLE IV: COMPLIANCE REVIEWS AND DIRECTED INVESTIGATIONS

The investigation and resolution options and procedures identified in the CPM will be utilized for compliance reviews and directed investigations, as appropriate.  See CPM Articles III, V, and VI. The "initiation date" is the date of the letter notifying the recipient of the compliance review or directed investigation.

**SECTION 401      COMPLIANCE REVIEWS**

In addition to the regulations implementing Title VI that require OCR to investigate complaints that are filed with the agency, the regulations require OCR to initiate "periodic compliance reviews" to assess the practices of recipients to determine whether they comply with the Title VI regulations. See 34 C.F.R. § 100.7(a).  This regulatory provision is incorporated by reference in the regulations implementing other statutes enforced by OCR.  See Title IX (34.C.F.R. § 106.71), Section 504 (34. C.F.R. § 104.61), and the Boy Scouts Act (34. C.F.R. § 108.9). For the Age Discrimination Act, see 34 C.F.R. § 110.30.  For Title II, see 28 C.F.R. § 35.172(a).

The compliance review regulations afford OCR broad discretion to determine the substantive issues for investigation and the number and frequency of the investigations.

**SECTION 402      DIRECTED INVESTIGATIONS**

In appropriate circumstances, OCR may conduct a directed investigation when information indicates a possible failure to comply with the laws and regulations enforced by OCR, the matter warrants attention and the compliance concern is not otherwise being addressed through OCR's complaint, compliance review or technical assistance activities.  See 34 C.F.R. § 100.7(c). This regulatory provision is incorporated by reference in the regulations implementing the other statutes enforced by OCR. See Title IX (34 C.F.R. § 106.71), Section 504 (34 C.F.R. § 104.61), and the Boy Scouts Act (34 C.F.R. § 108.9). For the Age Discrimination Act, see 34 C.F.R. § 110.30.  For Title II, see 28 C.F.R. Part 35.

A directed investigation is an OCR-initiated process that allows OCR to address possible discrimination that is not currently being addressed through OCR's complaint, compliance review or technical assistance activities. Depending on the circumstances, a directed investigation may include offering technical assistance to the recipient, and/or conducting an expedited investigation that may result in a resolution agreement that will ensure that recipients come into compliance with the requirements of the civil rights laws and regulations enforced by OCR.

# ARTICLE V: MONITORING RESOLUTION AGREEMENTS

**SECTION 501    RESPOND TO MONITORING REPORTS AND VERIFY RECIPIENT'S IMPLEMENTATION**

OCR will promptly acknowledge receipt of interim and final monitoring reports. OCR will evaluate each report and issue an appropriate response (e.g., where OCR determines actions taken are sufficient or insufficient under the agreement). OCR must obtain sufficient information to determine whether the recipient had complied with the terms and obligations of the resolution agreement. Depending on the nature of the agreement, verification of remedial actions may be accomplished by, for example, review of reports, documentation and other information submitted by recipients and knowledgeable persons, interviews of the recipients and knowledgeable persons and/or site visit(s).

**SECTION 502    IMPLEMENTATION PROBLEMS**

OCR will promptly provide written notice to the recipient of any deficiencies with respect to implementation of the terms and obligations of the agreement, and will request appropriate action to address such deficiencies. When OCR has determined that a recipient has failed to comply with the agreement or any of the terms and obligations thereof for reasons that do not justify modification of the agreement pursuant to CPM subsection 503(a), OCR will take prompt action pursuant to CPM Section 305 and CPM Article VI to enforce the agreement.

**SECTION 503    MODIFICATIONS OF AGREEMENTS**

(a) **Changed Circumstances Affecting Agreements**

OCR may agree to modify or terminate a resolution agreement when it learns that circumstances have arisen that substantially change, fully resolve, or render moot, some or all of the compliance concerns that were addressed by the resolution agreement. OCR may also modify the agreement in response to changes in controlling case law, statutes, and regulations.

(b) **New Compliance Issues**

OCR may address a new compliance issue(s) identified for the first time during monitoring by providing technical assistance or considering the issue(s) for a possible compliance review or directed investigation.  See CPM Section 401 and 402.

(c) **Approval of Modifications**

OCR must approve modifications to the agreement (e.g., requests to change the substance of any provision in the agreement, requests for extension of time to submit a report or to complete a required action). Approved modifications must be set forth in writing and appended to the original agreement. Requests for modification must be documented in the case file. OCR will send the complainant written notification of approved modification(s) to the substance of the original agreement.

**SECTION 504    CONCLUSION OF MONITORING**

OCR will conclude the monitoring of a case when it determines that the recipient has fully and effectively implemented the terms and obligations of the resolution agreement, including any subsequent approved modifications to the agreement. OCR will promptly send written notification to the recipient and the complainant of its determination that the terms and obligations of the resolution agreement have been implemented and that OCR is closing the case.

# ARTICLE VI: INITIATION OF ENFORCEMENT ACTION

When OCR is unable to negotiate a resolution agreement with the recipient, OCR will initiate enforcement action. OCR will either: (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from or, with respect to the Boy Scouts Act, funds made available through the Department to the recipient; or (2) refer the case to DOJ for judicial proceedings to enforce any rights of the United States under any law of the United States.

## SECTION 601    INITIATE ADMINISTRATIVE PROCEEDINGS WHERE APPROPRIATE

When post-Letter of Impending Enforcement Action negotiations do not result in a resolution agreement, OCR will where appropriate, request that an administrative proceeding be initiated. OCR will establish a team to prosecute the case. When deferral of funds has been imposed, the Notice of Opportunity for Hearing will be issued within 30 days of the notice of the deferral action.

## SECTION 602    REFER TO DOJ WHERE APPROPRIATE

When post-Letter of Impending Enforcement Action negotiations do not result in a resolution agreement, OCR will where appropriate, issue a letter to the recipient stating that the case will be referred to DOJ in 10 days from the date of the letter.

## SECTION 603    ENFORCEMENT FOR DENIAL OF ACCESS

A recipient denies access to OCR when it:

- Refuses to permit OCR access during the recipient's normal business hours to information maintained by the recipient that is necessary to determine compliance status of the allegation(s) and issue(s) under investigation, or, during monitoring, recipient's compliance with a resolution agreement. Generally, this includes the access to books, records, accounts, including electronic storage media, microfilm, retrieval systems and photocopies, and other sources of information, including witnesses, and recipient's facilities.

- Refuses to permit OCR access to its employees during the recipient's regular business hours.

- Fails to provide information by virtue of the refusal of one of its employees to do so or to provide access to information maintained exclusively by an employee in his/her official capacity.

- Refuses to complete applicable OMB-approved compliance and survey forms relevant to an investigation.

Where the recipient has refused to provide OCR access orally, either in person, over the telephone or through use of other media, OCR must attempt to ascertain the exact basis for the recipient's refusal and explain OCR's authority to obtain the evidence. Where attempts to persuade the recipient to provide access have failed, OCR must send a letter to the recipient that sets forth in detail the evidence (e.g., documents, data, other information, witnesses) to which the recipient denied OCR access and specifies the efforts that OCR has made to obtain the evidence. If the recipient does not voluntarily provide OCR with access to the requested evidence within 30 calendar days of OCR's issuance of the letter to recipient, OCR will issue a Letter of Impending Enforcement Action. If the recipient continues to deny OCR access to the requested evidence, OCR will issue a letter to the recipient stating OCR's intention to take enforcement action.

## SECTION 604    ENFORCEMENT FOR FAILURE TO COMPLY WITH OCR AGREEMENT

Where the recipient has failed to comply with the terms of a resolution agreement OCR will issue a Letter of Impending Enforcement Action pursuant to CPM Section 305. If the recipient does not come into compliance after issuance of the Letter of Impending Enforcement Action, OCR will initiate enforcement action pursuant to either CPM Section 601 or CPM Section 602.

# ARTICLE VII: APPENDICES

## SECTION 701    SPECIAL INTAKE PROCEDURES

(a) **Age Discrimination Complaints**

An age discrimination complaint is timely when it is filed within 180 days of the date the complainant first had knowledge of the alleged discrimination. For good cause shown, OCR may extend this time limit.

For service complaints under the Age Discrimination Act, the complainant may file a civil action under the Age Discrimination Act in federal court but only after he or she has exhausted administrative remedies. Administrative remedies are exhausted when either of the following has occurred: (1) 180 days have elapsed since the filing of a complaint with OCR and OCR has made no finding, or (2) OCR issues a finding in favor of the recipient. If OCR fails to make a finding within 180 days or issues a finding in favor of the recipient, OCR will promptly notify the complainant of this fact and of his or her right to bring a civil action for injunctive relief. OCR's notice must also contain the following information: that a civil action can be brought only in a United States district court for the district in which the recipient is found or transacts business; that a complainant prevailing in a civil action has the right to be awarded the costs of the action, including reasonable attorney's fees, but that these costs must be demanded in the complaint filed with the court; that before commencing the action, the complainant shall give 30 days' notice by registered mail to the Secretary, the Secretary of Health and Human Services, the Attorney General of the United States, and the recipient; that the notice shall state the alleged violation of the Age Discrimination Act, the relief requested, the court in which the action will be brought, and whether or not attorney's fees are demanded in the event the complainant prevails; and that the complainant may not bring an action if the same alleged violation of the Age Discrimination Act by the same recipient is the subject of a pending action in any court of the United States.

1. **Employment Complaints**

OCR does not have jurisdiction over employment complaints under the Age Discrimination Act. Employment complaints filed by persons 40 and older are referred to the appropriate EEOC office, and the OCR complaint is dismissed. Employment complaints filed by persons under 40 are not within the jurisdiction of EEOC and may be closed with notice to the complainant that there is no jurisdiction under the Act. If the complaint alleges age discrimination in employment that is within EEOC's jurisdiction and also contains allegations of discrimination in services within the jurisdiction of OCR, the complaint is split into two separate cases. Each is given its own case number, the age employment complaint is referred to EEOC with the OCR age employment case being closed, and OCR proceeds with the age services complaint.

2. **Service Complaints**

OCR will offer to mediate all complete and timely complaints (see 34 C.F.R. §§ 110.31 and 110.32) containing an allegation of age discrimination in services.

Where OCR receives a complaint containing both allegations of age discrimination in services and allegations under Title VI, Title IX, Title II, Section 504, and/or the Boy Scouts Act, and OCR determines that the non-age allegation(s) is independent and separable from the age allegation, OCR will mediate only the age portion of the complaint. OCR will proceed to investigate the additional allegations over which OCR has jurisdiction.

Case: 25-1529  09/22/2025  DktEntry: 36.1  Page 104 of 127
Case 1:25-cv-02429-MKV   Document 51-5   Filed 04/04/25   Page 26 of 33

Case Processing Manual                                    |Page 25

If OCR's mediation does not resolve the complaint within 60 days from the date of filing with OCR, OCR will resume processing the age aspects of the complaint. The date that OCR initiated mediation of the complaint or any portion of a complaint shall be entered in CMS; the date that the mediation of the complaint is terminated shall also be entered in CMS. The time involved in OCR's mediation will, therefore, not be included in OCR's case processing time.

(b) **Title VI Complaints against Proprietary Schools**

Authority to process Title VI complaints against proprietary vocational schools (privately owned, profit-making enterprises that teach a trade or skill) has, with certain exceptions, been delegated to the U.S. Department of Veterans Affairs. Such complaints must be forwarded to:

> U.S. Department of Veterans Affairs
> Office of Resolution Management
> 810 Vermont Avenue, N.W.
> Washington, D.C. 20420

OCR must refer to the U.S. Department of Health and Human Services Title VI complaints filed against a proprietary school operated by a hospital. The complainant must be notified of the referral, and the complaint is dismissed.

The following exceptions apply:

- OCR remains responsible for enforcement of Title VI where a proprietary vocational school is operated by a college or university.  See 38 C.F.R. § 18a.1(a).
- OCR remains responsible for enforcement of Title VI where a proprietary vocational school offers non-degree courses for which credit is given and which, on transfer, would be accepted toward a baccalaureate or higher degree by a degree-granting institution. See 38 C.F.R. § 18a.1 (b).

(c) **Title VI and Title IX Employment Complaints (see 29 C.F.R. §§ 1691.1 – 1691.13 and 28 C.F.R. §§ 42.601 – 42.613)**

Race, color, national origin and sex discrimination in employment complaints will be processed in accordance with the government-wide regulations.  OCR will:

1. Within ten days of receipt, notify the complainant and the recipient that OCR has received the complaint, including the date, place and circumstances of the alleged unlawful employment practice.

2. Within 30 days of receipt:

   i.   Determine whether OCR has jurisdiction over the complaint under Title VI and/or Title IX.
   ii.  Determine whether EEOC may have jurisdiction over the complaint.
   iii. Transfer to the EEOC all complaints over which OCR does not have jurisdiction but over which EEOC may have jurisdiction. Notify the complainant and the recipient of the transfer, the reason for the transfer, the location of the EEOC office to which the complaint was transferred and that the date the agency received the complaint will be deemed the date it was received by EEOC.

iv.    Refer to the EEOC certain complaints over which both OCR and EEOC appear to have jurisdiction ("joint complaints"), consistent with the following guidance:

Absent special circumstances, OCR will refer a joint complaint that solely alleges employment discrimination against an individual.

Absent special circumstances, OCR will not refer a joint complaint alleging a pattern or practice of employment discrimination.

Absent special circumstances, OCR will not refer a joint complaint that alleges discrimination in employment and includes allegations regarding other practices of a recipient. If, because of special circumstances, the employment allegations of such a complaint are referred to EEOC, OCR will assign a new case number to the allegations that are retained.

OCR will notify the complainant and recipient of the action taken on the joint complaint. In the case of a referral to EEOC, the notice will include the location of the EEOC office to which the complaint was referred, the civil rights provision(s) involved, the authority of EEOC under this regulation and that the date the agency received the complaint will be deemed the date it was received by EEOC.

For those joint complaints retained for OCR investigation, OCR will contact the EEOC to ensure that, in the event EEOC has also received the complaint, EEOC defers its investigation.

**(d)  Title II ADA Complaints (Other than Employment) (see 28 C.F.R. § 35.171(a)(2)(i))**

OCR has jurisdiction to investigate Title II complaints against public elementary and secondary education systems and institutions, public institutions of higher education and vocational education (other than schools of medicine, dentistry, nursing, and other health-related schools), and public libraries. When OCR receives an ADA-only complaint over which it does not have jurisdiction, it will be referred to the DOJ and then dismissed.  The complainant will be notified of the referral.

**(e)  Section 504 and Title II Disability Employment Complaints (see 28 C.F.R. Part 37 and 29 C.F.R.  Part 1640)**

**1.  Referral or Deferral**

i.    Disability employment complaints shall be referred to the DOJ Civil Rights Division if OCR has no jurisdiction under either Title II of the ADA or Section 504 of the Rehabilitation Act of 1973, and EEOC does not have jurisdiction under Title I (*i.e.*, recipient has fewer than 15 employees). If EEOC has jurisdiction under Title I (recipient has 15 or more employees) the complaint shall be referred to the EEOC.

ii.    OCR shall defer individual complaints unless the complainant elects to have OCR process the charge. OCR must notify the complainant in writing that he or she may choose whether to have OCR or the EEOC process the complaint and that if the complainant would like OCR to process the complaint, OCR must receive such written request within 20 calendar days of the date of the letter. See 28 C.F.R. § 37.8 (a)(1). If special circumstances make deferral inappropriate, OCR and the appropriate agency may jointly determine to reallocate investigation responsibilities.  See 28 C.F.R. § 37.8 (e).

2. **Retention**

i.   When OCR has jurisdiction over a disability employment complaint under Section 504, OCR shall retain the complaint if:

- The EEOC does not have jurisdiction under Title I (i.e., if fewer than 15 employees).
- The EEOC has jurisdiction, but the complainant elects to have OCR process the complaint.
- The complaint alleges discrimination in both employment and in other practices or services covered by Section 504.
- The complaint alleges a pattern or practice of employment discrimination.  See 28 C.F.R. § 37.6(d)(1).

ii.  When OCR has jurisdiction under Title II of the ADA but not under Section 504, OCR shall retain jurisdiction over a complaint when it determines that EEOC does not have jurisdiction under Title I.  See 28 C.F.R. §§ 37.6 (d)(2) and (3).

## SECTION 702    DATA COLLECTION AND INFORMATION GATHERING

**(a)  Generally**

OCR's data collection and information gathering activities will depend upon the particular case, applicable legal standards, and investigative/resolution strategy.  The data/information collection and other investigative activities will vary from case to case depending on the extent to which relevant data are in the control of the recipient or others, and investigation strategies.  Some general investigative principles and practices include:

- Obtain independent written documentation to corroborate oral statements.
- Label all evidence, documents, electronic media, and written records of contact, with information identifying the case being investigated and the circumstances under which the evidence was obtained (e.g., where and when an interview was conducted, and who provided a given document).
- Document efforts to obtain access to recipient data and witnesses.
- Undertake a robust outreach to the recipient community to increase access to relevant information in the conduct of an investigation (*e.g.,* by publicizing OCR's presence and availability in onsite investigations for individual interviews and focus groups as well as OCR's availability for discussion with interested individuals before and subsequent to the onsite), as appropriate.
- Determine whether it is appropriate to obtain interim relief for the complainant.  As soon as OCR identifies the need for such relief, OCR will contact the recipient to secure it.
- Collect data resulting from any methods that OCR or recipients use to track and evaluate recipient's compliance with their legal responsibilities (*e.g.,* data from OCR's Civil Rights Data Collection, recipient public websites, climate surveys, and other self-assessment tools).

**(b)  OCR's Authority to Obtain Information**

OCR has the right of access during a recipient's regular business hours to the recipient's facilities and to information maintained by the recipient that is necessary to determine compliance status on those issues under investigation.  See e.g., 34 C.F.R. § 100.6 (c), 34 C.F.R. § 99.31(a)(3)(iii) and 34 C.F.R. § 110.22. Generally, this includes access to such of the recipient's books, records, accounts, including electronic storage media, microfilming, retrieval systems and photocopies maintained by the recipient, and other sources of information, including witnesses, and its facilities as may be relevant in OCR's judgment to ascertain compliance.

(c)  **Requests for Records**

1.  **Data Requests**

A data request seeks information from the recipient relevant to the investigation.  It can be used to initiate information collection or to request further information, as necessary.

2.  **Timeframes for Recipient's Response**

Depending upon the nature and extent of OCR's data request, the recipient will be given an appropriate amount of time to submit the information required.  The timeframe will be established at OCR's discretion, depending on the nature and extent of data requested and/or other special circumstances, including factors affecting feasibility of the timeframe brought to OCR's attention by the recipient.

3.  **Data Provided by Recipient**

A recipient must submit information as necessary for OCR's compliance activities.  However, other federal regulations and policies may restrict OCR's information requests:

i.    For example, in the context of an ongoing complaint, compliance review, or directed investigation, OCR may require recipients to record information in such form and containing such information as OCR may determine is necessary to assess compliance, without obtaining prior approval for its use by the Office of Management and Budget.[11]  See 34 C.F.R. § 100.6(b).

ii.   OCR must consider federal policies concerning paperwork burdens when requesting a recipient to do more than provide OCR access to normally maintained information.  Requests that a recipient manipulate or compile information to meet an OCR need must be reasonable and take into consideration the burden placed on the recipient. Recipients that maintain data in an electronic format must provide the data in that format to OCR in a file type that can be accessed by OCR.  Recipients that do not maintain data in an electronic format are encouraged to provide the requested information in an electronic format that can be accessed by OCR.

If a recipient invites OCR to come onsite and collect the requested information, including the interview of witnesses and provides OCR with sufficient access to files, records, logs, and appropriate indexes for OCR to obtain the needed information, then the recipient has provided OCR with the requisite access.

4.  **Confidentiality**

OCR has the right of access to a recipient's records, even if those records identify individuals by name.  To protect the confidential nature of the records, OCR, for example, may permit the recipient to replace names with a code and retain a key to the code. However, OCR should inform the recipient that if at any time such a procedure impedes the timely investigation of the case, OCR

---

[11] The Paperwork Reduction Act only applies to collections directed at 10 or more respondents, but with one important exception. Any information requirement in a "rule of general applicability" is presumed to affect or potentially affect at least 10 respondents.

shall have access to the unmodified records. See also 20 U.S.C. §§ 1232g (b)(1) and 1232g (b)(3) regarding the applicable provisions of the Family Educational Rights and Privacy Act.

## (d) Interviews

### 1. Introduction

Interviews are an integral part of investigations. The objective of interviews is to gain an understanding of the records and data relevant to the issues in the case; to obtain information from and assess the credibility of witnesses; and to evaluate recipient defenses. OCR may conduct individual interviews and focus groups, as appropriate, as part of its investigations. OCR will make efforts to work with recipients to conduct interviews in a manner that minimizes disruptions to the recipient's educational environment.

### 2. Notice

Prior to initiating an interview, OCR should inform the witness of the following:

i. The general purpose of the interview, including OCR's role, what law or laws may be pertinent to the investigation, and where appropriate, a brief explanation of what is under investigation.

ii. The potential uses of the information to be obtained from the witness and the Freedom of Information Act. A witness who wants a more thorough explanation should be given a copy of the "OCR Notice of Witness Rights." This Notice is available at: (http://www2.ed.gov/about/offices/list/ocr/docs/witness-notice-mw.pdf)

iii. The witness's right to personal representation during the interview by a person of his or her choice.

iv. When the witness is an employee of a recipient, his or her right to refuse to have anyone else present during the interview and his or her right to refuse to reveal the content of an interview.

v. The regulatory provision(s) concerning prohibition of intimidating or retaliatory acts by a recipient.

vi. In most cases, the recipient's counsel will be allowed to be present during upper level management interviews.

### 3. Privacy

OCR interviews witnesses under circumstances that assure privacy. An interpreter may be used when safeguards are taken to ensure the competence of the interpreter and to protect the witness's privacy.

### 4. Interviews with Minors (Persons under 18) or Legally Incompetent Individuals

OCR shall obtain written consent from a parent or guardian prior to conducting an interview of any person under 18 years of age or otherwise adjudicated legally incompetent, for example, mentally impaired. Parental or legal guardian consent may not be required for persons under 18 if they are emancipated under state law and are therefore considered to have obtained majority. For persons under 18 who state they are emancipated, OCR should obtain proof of emancipation.

Parental or legal guardian consent may not be necessary where the questions asked are of a general nature, not related to any specific events in which the minor was involved, and there are no records kept to identify the student. Where a recipient refuses to allow minor students to be interviewed without consent where the questions asked are of a general nature, not related to any

specific events in which the minor was involved, and there are no records kept to identify the student, written consent must be obtained.

Where parents or guardians refuse to provide consent for an interview, and OCR determines that the child's information is critical, OCR may attempt to secure parental or guardian consent by inviting the parent or guardian to be present during the interview. Where consent is denied, OCR will not interview the child.

5. **Records of Interviews**

A written record of interviews (i.e., in-person, telephonic, or through use of other electronic media) must be kept. Interviewers will notify interviewees when a tape recording is used and tape recording will be done only with the consent of the interviewee. When interviewers use tape recording, the tape becomes part of the case record along with the written record. Regardless of the technique used during the interview, a written record of the interview must be created.

The record of the interview to be placed in the case file must contain the following information:

  i. Case identification (name and case number).
  ii. Name and identification of the interviewee, interviewer, and any other person present (include an explanation for the presence of any other persons).
  iii. Date, time, and location of interview (including whether the interview was conducted in person or through use of media (e.g., telephone, videoconferencing.
  iv.  A record of whether the interviewee was informed of required notifications.
  v. Written record reflecting the questions and responses obtained during the interview (this need not be a verbatim transcript but must accurately reflect the responses of the witness).

## SECTION 703    FREEDOM OF INFORMATION ACT AND PRIVACY ACT

The information OCR collects is analyzed by authorized personnel within the agency and is used only for authorized civil rights compliance and enforcement activities. In order to resolve a complaint OCR may need to reveal certain information to persons outside the agency to verify facts or gather additional information. Such information could include the name, the age or physical condition of a complainant. The Privacy Act of 1974, 5 U.S.C. § 552a, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552, govern the use of personal information submitted to all federal agencies and their individual components, including OCR.

The Privacy Act of 1974, 5 U.S.C. § 552a, regulates the collection, maintenance, use, and dissemination of certain personal information in federal agency files. OCR's investigation files have been exempted from the provisions of the Privacy Act that provide individuals with access to records maintained on them. The Department has published a Privacy Act system of records notice entitled "Complaint Files and Log", (18-08-01). Third parties may not gain access to records about individuals within a system of records without the consent of the subject individual except as required by FOIA or pursuant to other statutory exceptions contained in the Privacy Act. See 5 U.S.C. § 552a(b).

FOIA gives the public a right of access to records of federal agencies. The FOIA is implemented by Department regulations. See 34 C.F.R. Part 5.

Any requests for copies of documents or other access to information contained in OCR's case files should be referred to the Regional Office staff responsible for handling FOIA and Privacy Act requests.

Although each request will be reviewed on a case-by-case basis, generally, OCR is not required to release documents during the case resolution and investigation process or enforcement proceedings if the release could reasonably be expected to interfere with OCR's law enforcement activities. See 5 U.S.C. § 552(b)(7)(A). Also, a federal agency is not required to release records if they are pre-decisional documents that would be subject to certain privileges in litigation. See 5 U.S.C. § 552(b)(5). Finally, a federal agency is not required to release documents if their release would or could result in an unwarranted invasion of privacy of an individual. See 5 U.S.C. §§ 552(b)(6) and (7)(C). Disclosure will only be made as consistent with the Privacy Act and FERPA. OCR will only reveal the name or identifying information about an individual if such disclosure is consistent with the Privacy Act and FERPA.

In addition, OCR can release certain information about the complaint to the press or general public, including the name of the school or institution; the date the complaint was filed; the type of discrimination included in the complaint; the date the complaint was resolved, dismissed, or closed; the basic reasons for OCR's decision; or other related information. Any information OCR releases to the press or general public will not include the complainant's name or the name of the person on whose behalf the complaint was filed, except as noted in the paragraph above.

## SECTION 704    RECIPIENTS OPERATING UNDER FEDERAL COURT ORDER

### (a) United States a Party

When OCR receives a complaint alleging discrimination by a recipient against which the DOJ represents the United States as a party in pending litigation, the following procedures will apply:

1. **OCR notification to DOJ**: The Regional Office Director will forward the complaint to DOJ by electronic mail immediately and ask whether DOJ wants OCR to refer the complaint to DOJ. This will occur before any OCR evaluation of the complaint begins and even if it is clear on the face of the complaint that OCR would not open it for investigation.

2. **DOJ response**: DOJ will have seven calendar days after the date of OCR's electronic mail notification to determine whether (1) DOJ wants OCR to refer the complaint to DOJ, or (2) DOJ does not want OCR to refer the complaint to DOJ. There are no additional options. For example, a complaint cannot be conditionally referred or conditionally declined, nor may DOJ request referral of only a portion of a complaint.

3. **No referral to DOJ**: When DOJ indicates that it does not want OCR to refer the complaint, or DOJ does not respond within seven calendar days of the date of OCR's electronic mail notification, OCR, in its sole authority, will immediately process the complaint.

4. **Referral to DOJ**: When DOJ indicates that it wants OCR to refer the complaint, then:

   i.   OCR will refer the entire complaint to DOJ.
   ii.  OCR will close the complaint and notify the complainant that the complaint has been referred to DOJ.
   iii. Once a complaint is referred to DOJ, DOJ will be responsible for investigating and resolving the entire complaint. OCR will forward all communications it receives from the complainant relating to the complaint to DOJ and DOJ will be responsible for addressing all such communications.  OCR will not accept any type of return or re-referral of the complaint from DOJ.

**(b) United States Not a Party**

As part of evaluation of the complaint OCR will consult with parties about the current status of the court order.

# EXHIBIT 46

# Columbia | OFFICE OF THE PRESIDENT

[Home](#)  »  [Announcements](#)  »  Upholding Our Values

ANNOUNCEMENTS

# Upholding Our Values

October 18, 2023

Dear fellow members of the Columbia community,

Many of our students, faculty, staff, and colleagues are suffering great distress over the terror attacks on Israel and the humanitarian crisis in Gaza. Let me first say that there are no words to describe the fear and anxiety people experience when lives are at risk. To those who are struggling, you are never far from my thoughts, and Columbia will do everything possible to support you.

As we grapple with these challenging circumstances, it is important to clarify and reaffirm several guiding principles for how Columbia can stay true to its mission while upholding important values in our interactions with one another.

During any crisis in the world, our priority is providing immediate support to Columbia community members whose lives have been directly affected. Our day-to-day duty of care for the security and well-being of our students, faculty, and staff is paramount. Some students may need special accommodations as they cope with fear and grief, and those arrangements can be made through advisors or deans of students.

We know that the atmosphere on campus is extremely charged, and some of you have expressed concern about your personal security. Let me reassure you that the University will take all available steps to help you. We have increased public safety presence across all of our campuses. We are also working with outside security firms for additional support and are in regular contact with the New York City Police Department. We have added resources to our [existing hotline and escort service](#) ⧉  and I encourage anyone who is concerned about their safety to use it.

Debate, advocacy, and protest are essential ways for students to address and process political and social turmoil, and we are duty-bound to ensure they can gather and express themselves. We will continue to observe all necessary safeguards around these activities and will work closely with students to ensure that they adhere to our event guidelines.

Unfortunately, some are using this moment to spread antisemitism, Islamophobia, bigotry against Palestinians and Israelis, and various other forms of hate. I have been disheartened that some of this abhorrent rhetoric is coming from members of our community, including members of our faculty and staff. Especially at a time of pain and anger, we must avoid language that vilifies, threatens, or stereotypes entire groups of people. It is antithetical to Columbia's values and can lead to acts of harassment or violence. When this type of speech is unlawful or violates University rules, it will not be tolerated.

Some students, including at Columbia, have been victims of doxing. This form of online harassment, involving the public posting of names and personal information, has been used by extremists to target communities and individuals. This kind of behavior also will not be tolerated and should be reported through appropriate school

JA573

channels. When applicable, we will refer these cases to external authorities.

Universities play a vital role in society by fostering critical thinking, scholarship, and, ideally, opening minds to different points of view. But for universities to be effective, we must use our voices differently than other institutions. Unlike a political organization or advocacy group, Columbia's role is to create space for our scholars and students to fill with their own moral and intellectual conversations, an essential function in a world in which that space is narrowing.

That doesn't mean we don't have values. A shared commitment to civility, respect, and empathy must guide how we interact with one another. It is not what we believe, but how we treat people who don't share our views, that shapes the character of our community and ultimately educates and empowers new generations of engaged citizens. Our focus must be de-escalating tensions, modeling respectful behavior, and finding common ground in our shared humanity.

On a personal note, I want to thank all those who have shown great compassion, leadership, and kindness in recent days. Whether this has been providing spiritual or emotional care for students, supporting friends and colleagues in distress, taking part in thoughtful classroom discussions or seminars—you are exemplars of the best of Columbia.

Sincerely,

Minouche Shafik
President, Columbia University in the City of New York

# News

March 25, 2025
## Statement Regarding Columbia's Commitments

March 21, 2025
## Sharing Progress on Our Priorities

March 19, 2025
## Our Next Steps

March 15, 2025
## Standing Together for Columbia

March 13, 2025
## Update to Our Community Regarding DHS Activity Tonight

# EXHIBIT 47

JA575

# COLUMBIA | OFFICE OF THE PRESIDENT

Home  »  Announcements  »  Standing in Solidarity

## ANNOUNCEMENTS

# Standing in Solidarity

October 27, 2023

Dear fellow members of the Columbia community:

I have been shocked to hear of several antisemitic incidents in just the last couple of days.

The perpetrators of these incidents are not only attacking members of our community, they are attacking the values it is built on—respect for our shared humanity. I want to reiterate that antisemitism, like any form of bigotry, is an assault on everything we stand for at Columbia. Palestinian, Muslim, or Arab students have also been subjected to harassment and targeted by doxing, a dangerous form of intimidation. We take these incidents seriously and they are being investigated.

When hate speech or incidents violate University rules, it will not be tolerated and will be referred for disciplinary action in accordance with our policies. These disciplinary actions are already underway and we will continue to use every available tool to keep our community safe.

Just as we defend the right to free speech, we are duty-bound to be vigilant when we see discourse devolve into hate speech which can be a prelude to harassment or violence. No political debate or division can justify antisemitism or any form of bigotry based on the religious, racial, national, or ethnic identity of anyone.

I am appealing to everyone to hold each other closer during these distressing times. I know that these hateful acts come from a small minority of the Columbia community. Each of us has a role to play in standing in solidarity against hate that targets any member of our community and to call it out whenever we see it.

In these difficult days each of us can renew our resolve to be a community that rejects all forms of bigotry and respects the fundamental dignity and human rights of all our members.

Sincerely,

Minouche Shafik
President, Columbia University in the City of New York

# News

March 19, 2025

[Our Next Steps](#)

---

March 15, 2025

[Standing Together for Columbia](#)

---

March 13, 2025

[Standing Together for Columbia, March 15, 2025](#)

---

March 13, 2025

[Update to Our Community Regarding DHS Activity Tonight](#)

---

March 13, 2025

[Columbia's Commitment to Our International Community](#)

---

JA577

# EXHIBIT 48

JA578

Home    »    Task Force on Antisemitism



# Task Force on Antisemitism

The Columbia Task Force on Antisemitism was created by Columbia University President Minouche Shafik, Barnard College President Laura Ann Rosenbury, and Teachers College President Thomas R. Bailey to address the harmful impact of rising antisemitism on Columbia's Jewish community and to ensure that protection, respect, and belonging extends to everyone.

The task force is being led by Ester R. Fuchs, Professor of International and Public Affairs and Political Science and Director of the Urban and Social Policy Program at SIPA; Nicholas Lemann, Joseph Pulitzer II and Edith Pulitzer Moore Professor of Journalism and Dean Emeritus of Columbia Journalism School; and David M. Schizer, Harvey R. Miller Professor of Law and Economics and Dean Emeritus of Columbia Law School.

In the coming months, the task force will identify practical ways for our safety and inclusion work to enhance support for all members of the Columbia, Barnard, and Teachers College communities, particularly our Jewish students. Longer term, it will recommend more ambitious changes related to academic and extracurricular offerings and student, faculty, and staff training programs.

The Task Force on Antisemitism can be reached at AntisemitismTaskForce@columbia.edu.

## About the Task Force on Antisemitism

Members of the Task Force on Antisemitism          Report #1          Report #2

JA579

3/21/25, 12:29 PM

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 120 of 127

Case 1:25-cv-02429-MKV    Task Force on Antisemitism | Columbia University in the City of New York    Filed 04/24/25    Page 3 of 9

# TASK FORCE CO-CHAIRS

JA580

3/21/25, 12:29 PM          Task Force on Antisemitism | Columbia University in the City of New York

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 121 of 127
Case 1:25-cv-02429-MKV          Document 58-1          Filed 04/04/25          Page 4 of 9



### Ester R. Fuchs

Professor of International and Public Affairs and
Political Science; Director, Urban and Social Policy
Program



### Nicholas Lemann

Joseph Pulitzer II and Edith Pulitzer Moore Professor of
Journalism; Dean Emeritus



### David M. Schizer

Harvey R. Miller Professor of Law and Economics and
Dean Emeritus

Members of the Task Force on
Antisemitism

## NEWS AND ANNOUNCEMENTS



[Task Force on Antisemitism Releases Its Second
Report](#)

August 30, 2024

The report focuses on student experiences, and offers
recommendations on training, reporting, and student
group governance.



[Opinion: We hear you](#)

*Columbia Daily Spectator*, May 16, 2024

Opinion column by the Task Force on Antisemitism.



[Statements From the April 17 Congressional
Committee Hearing](#)

April 18, 2024



[Opinion: To combat antisemitism, start by
following the law](#)

*CNN*, April 17, 2024

Opinion column by David Schizer.

JA582

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 123 of 127
Case 1:25-cv-02429-MKV   Document 51   Filed 04/04/25   Page 6 of 9

Statements from President Shafik, Task Force on Antisemitism Chair David Schizer, and Columbia University Board Co-Chairs Claire Shipman and David Greenwald.



[President Shafik Welcomes the First Set of Recommendations From the Task Force on Antisemitism](#)

March 4, 2024

President Shafik welcomes this first in a series of reports that will come from the task force.



[Columbia Launches a Reinvestment in Its Values and Mission](#)

December 20, 2023

The goal is to foster a community where debates are rooted in academic rigor and civil discourse through work that includes professional development, resources, and other activities.

## News



## Resources Dedicated to Supporting Your Emotional Health, Well-being, and Safety

JA583

Supporting Jewish Communities    University Services and Resources

Resources to Assist After Online
Targeting/Doxing

JA584

Case: 25-1529, 09/22/2025, DktEntry: 36.1, Page 125 of 127

Case 1:25-cv-02429-MKV    Document 51    Filed 04/04/25    Page 8 of 9



JA585

"This is an opportunity for every academic department, every faculty member and teaching assistant, every member of the administration, and every member of the Columbia, Barnard, and Teachers College student family to bring their ideas, life experiences, and spirit to help us emerge as a stronger and more cohesive community."

## Contact Us

AntisemitismTaskForce@columbia.edu

JA586

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2025, I electronically filed the foregoing Joint

Appendix with the Clerk of Court for the United States Court of Appeals for the

Second Circuit using the ACMS system, which will send notice of such filing to all

counsel of record in compliance with Local Rule 25.1(h)(2).

Dated: September 22, 2025

By: <u>s/ Rachel Goodman</u>
    Rachel Goodman
    Protect Democracy Project
    82 Nassau Street, #601
    New York, NY 10038
    Tel: (202) 579-4582
    Fax: (202) 769-3176
    rachel.goodman@protectdemocracy.org

*Counsel for Plaintiffs-Appellants*