# 25-1529

## United States Court of Appeals

### *for the*

## Second Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,
AMERICAN FEDERATION OF TEACHERS,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES DEPARTMENT OF JUSTICE, PAMELA BONDI, in her
official capacity as the U.S. Attorney General, LEO TERRELL, in his official
capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and
head of the DOJ Task Force to Combat Anti-Semitism, UNITED STATES
DEPARTMENT OF EDUCATION, LINDA MCMAHON, in her official

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* FIRST AMENDMENT SCHOLARS IN SUPPORT OF APPELLANTS

MATTHEW D. BRINCKERHOFF
SARA LUZ ESTELA
EMERY CELLI BRINCKERHOFF ABADY
 WARD & MAAZEL LLP
*Attorneys for Amicus Curiae*
 *First Amendment Scholars*
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

CP COUNSEL PRESS    (800) 4-APPEAL • (385663)

capacity as the U.S. Secretary of Education, THOMAS E. WHEELER, in his official capacity as Acting General Counsel of the U.S. Department of Education, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ROBERT F. KENNEDY, JR., in his official capacity as the U.S. Secretary of Health and Human Services, SEAN R. KEVENEY, in his official capacity as Acting General Counsel of the U.S. Department of Health and Human Services, NATIONAL INSTITUTES OF HEALTH, MATTHEW J. MEMOLI, in his official capacity as the Acting Director of the National Institutes of Health, UNITED STATES GENERAL SERVICES ADMINISTRATION, STEPHEN EHIKIAN, in his official capacity as Acting Administrator of the U.S. General Services Administration, JOSH GRUENBAUM, in his official capacity as Commissioner of the Federal Acquisition Service,

*Defendants-Appellees.*

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...................................................................ii-iv

INTEREST OF AMICI....................................................................1

SUMMARY OF THE ARGUMENT ......................................................1

ARGUMENT ..............................................................................6

    I.    PLAINTIFFS' STANDING UNDER WELL-SETTLED FIRST AMENDMENT PRINCIPLES DOES NOT DEPEND ON WHETHER THEY WERE THE RECIPIENTS OF THE GRANTS THE TRUMP ADMINISTRATION SUSPENDED ........................................................6

    II.    THE FACT THAT COLUMBIA REACTED IN PREDICTABLE WAYS TO THE GOVERNMENT'S ACTIONS DOES NOT UNDERMINE THE TRACEABILITY OF THE PLAINTIFFS' HARMS ............................................................................13

    III.    PLAINTIFFS HAVE ESTABLISHED OBJECTIVE EVIDENCE OF A CHILLING EFFECT RESULTING FROM THE GOVERNMENT'S ACTIONS ..............................................................................18

CONCLUSION ...........................................................................22

i

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Ass'n of Univ. Professors v. United States Dep't of Just.*, No. 25 Civ. 2429,
2025 WL 1684817 (S.D.N.Y. June 16, 2025) ................................. 3, 6, 13, 14

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ......................................................................... 19

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ......................................................................... 19

*Bantam Books v. Sullivan*,
372 U.S. 58 (1963) .................................................................... 10, 12

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ........................................................................... 8

*Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*,
717 F.3d 189 (D.C. Cir. 2013) ........................................................... 7

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
145 S. Ct. 2121 (2025) ................................................................ 4, 15

*Gooding v. Wilson*,
405 U.S. 518 (1972) ........................................................................... 9

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank*,
747 F.3d 44 (2d Cir. 2014) ............................................................... 7

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951) ........................................................................... 3

*Laird v. Tatum*,
408 U.S. 1 (1972) ..................................................... 5, 18, 20, 21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................... 2, 14

*Meese v. Keene*,
481 U.S. 465 (1987) .................................................................. 19, 20

*Murthy v. Missouri,*
603 U.S. 43 (2024) .................................................................. 16, 18

*Nat'l Rifle Ass'n of Am. v. Vullo,*
602 U.S. 175 (2024) ........................................................................12

*President and Fellows of Harvard Coll. v. United States Dep't of Health and Human Servs.,*
No. 25 Civ. 11048, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ..................8

*Sec'y of State of Maryland v. Munson Co.,*
467 U.S. 947 (1984) ................................................................... 2, 10

*Shelton v. Tucker,*
364 U.S. 479 (1960) ........................................................................21

*Smith v. People of the State of California,*
361 U.S. 147 (1959) ................................................................... 5, 21

*Virginia v. Hicks,*
539 U.S. 113 (2003) ................................................................... 9, 10

*Warth v. Seldin,*
422 U.S. 490 (1975) ..........................................................................7

**Other Authorities**

Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., General Services Administration, et al., to Dr. Katrina Armstrong, Interim President, Columbia University, et al. (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85 dec154-full.pdf  [https://perma.cc/7DXL-986Y] .........................................18

*Preserving Columbia's Critical Research Capabilities,*
COLUMBIA UNIVERSITY: OFFICE OF THE PRESIDENT (May 6, 2025), https://president.columbia.edu/news/preserving-columbias-critical-research-capabilities ....................................................................................16

Seth F. Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, and the Problem of the Weakest Link,*
155 U. Pa. L. Rev. 11 (2006) ..........................................................12

**Rules**

Fed. R. App. P. 29 ......................................................................................1

## INTEREST OF AMICI[1]

*Amici* are First Amendment scholars who have taught courses on freedom of speech, published articles and books on First Amendment doctrine and history, and dedicated significant attention to the study of First Amendment protections. *Amici* submit this brief in support of Plaintiffs-Appellants to assist the Court in deciding the significant First Amendment issues presented by this case which favor reversing the lower court's order dismissing the case for lack of standing.[2]

## SUMMARY OF THE ARGUMENT

Plaintiffs who seek to challenge the constitutionality of the government's actions must establish in all cases their standing to sue. Although courts impose other prudential limits on the scope of plaintiffs' standing, at its "irreducible" core, standing requires that the plaintiff demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical;' . . . a causal connection between the injury and the conduct complained of;" and a likelihood that the injury will be "redressed by a favorable [judicial] decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561

---

[1] A list of the *amici* is compiled in the appendix.

[2] Both Plaintiffs-Appellants and Defendants-Appellees have consented to the filing of this *amicus* brief. No party or its counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

(1992) (internal citations and quotation marks omitted). These requirements ensure that plaintiffs have a personal stake in the outcome of the cases they bring to court and are not merely raising a "generally available grievance." *Id.* at 573. They thus protect the separation of powers established by Articles I and III of the federal Constitution. *Id.* at 560.

The requirement that plaintiffs establish their standing to sue is not, however, meant to close the courthouse door for those who have in fact been injured by the government's allegedly wrongful acts. This is particularly so when it comes to injuries that implicate the First Amendment. This is because, as the Supreme Court has explained, when plaintiffs are unable to defend their free speech rights, they are not the only ones who lose out; instead, "society as a whole [is] the loser." *Sec'y of State of Maryland v. Munson Co.*, 467 U.S. 947, 956 (1984). Hence, courts tend to interpret standing in First Amendment cases as broadly as Article III permits. *Id.*

Notwithstanding these well-settled principles, the district court denied the faculty Plaintiffs standing to defend their First Amendment rights against the speech-repressive actions of the Trump administration, even though there is no question that Plaintiffs suffered concrete and particularized injuries as a result of the administration's actions, including the loss of federal funding for their research and the imminent threat that the conditions of their research and teaching would be profoundly altered by the government's coercive acts. The court held that because

Plaintiffs were not the formally named holders of the grants that they developed, applied for, and/or supervised, they had no right to challenge the administration's subsequent decision to terminate or suspend those grants. *Am. Ass'n of Univ. Professors v. United States Dep't of Just.* ("*AAUP*"), No. 25 Civ. 2429 (MKV), 2025 WL 1684817, at *11 (S.D.N.Y. June 16, 2025). The court also held that, because Columbia University chose to compensate Plaintiffs for some of their financial harms, and exercised other kinds of authority over them, Plaintiffs cannot establish that their harms were caused by the government. *Id.* at *13. And finally, the court held that the chilling of Plaintiffs' speech and association was purely subjective and therefore does not constitute the kind of injury-in-fact that standing requires. *Id*.

All three holdings make a hash of standing law as it applies in the First Amendment context. The first holding ignores the fact that prudential limits on standing apply only weakly, if at all, in First Amendment cases. Hence, Plaintiffs who are impacted by allegedly unconstitutional speech-suppressive acts on the part of the government cannot ordinarily be denied standing merely because they are the indirect rather than direct targets of those actions. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 141 (1951) ("We long have granted relief to parties whose legal rights have been violated by unlawful public action, although such action made no direct demands upon them."). This means that the fact that Plaintiffs' names were not on the grants that the Trump administration cancelled should make no difference

3

to their standing to sue. What matters only is whether they were injured, in ways that are traceable to the government and redressable by the court.

Second, in reaching the conclusion that Plaintiffs' injuries are not traceable to the government because Columbia decided to compensate them for some of their financial injuries but not others, and took other remedial steps in response to the government's actions, the district court interpreted the traceability requirement extraordinarily narrowly to prevent plaintiffs from bringing suit when a private third party responds to government action in a way that impacts how those plaintiffs are harmed. But in fact, as the Supreme Court reaffirmed just last term, even outside the First Amendment context, traceability only requires plaintiffs to establish that they have been injured by private decisions that are themselves the predictable consequence of allegedly wrongful governmental acts. *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2134 (2025). Plaintiffs have amply satisfied this requirement.

Finally, the district court's conclusion that the chilling of Plaintiffs' speech and association represents the kind of purely subjective injury that does not establish injury-in-fact ignores the obvious fact that Plaintiffs are not merely speculating about the possibility that the government could act adversely against them but have instead either themselves already suffered direct economic and professional harm at the government's hands or are members of an institution that has—an institution,

moreover, that the government has promised to continue to act against unless and until it complies with its speech-suppressive demands. Plaintiffs have consequently established the kind of chill that suffices to establish standing: namely, chill that arises from the "exercise of government power [that is] regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*, 408 U.S. 1, 9 (1972).

With respect to all three holdings, the district court misinterpreted the law of standing, making it extraordinarily difficult for speakers whose speech is suppressed as part of a coercive campaign of speech suppression directed against a third-party institution that hosts or enables their speech to defend their rights in court. As this brief explains, this approach to the question of standing is not only unjustified by existing precedents but deeply threatening to the interests that the First Amendment protects, because it permits the government to evade constitutional limits on its power so long as it can act forcefully enough to persuade institutions like Columbia University to settle, rather than risk its wrath by attempting to vindicate its own rights, and the rights of its faculty and students, in court. *See, e.g.*, *Smith v. People of the State of California*, 361 U.S. 147, 153–54 (1959) (recognizing the "timidity" of private businesses to challenge the government in court and the harms this can impose on the public "by restricting [its…] access" to a diversity of views). For this reason, this Court should reverse.

5

# ARGUMENT

## I. PLAINTIFFS' STANDING UNDER WELL-SETTLED FIRST AMENDMENT PRINCIPLES DOES NOT DEPEND ON WHETHER THEY WERE THE RECIPIENTS OF THE GRANTS THE TRUMP ADMINISTRATION SUSPENDED

The first justification that the district court provided for denying Plaintiffs standing to sue was that they are not the official recipients of the grants that the Trump administration suspended in March 2025. *AAUP*, 2025 WL 1684817, at *11 ("[N]either Plaintiffs nor their members were ever the recipients of th[e cancelled] grants and contracts."). Instead, Plaintiffs are *merely* the academic researchers who applied for those grants and/or supervise the work that they fund.[3] This fact means, the court concluded, that Plaintiffs are "inserting themselves into a quarrel" that has nothing to do with them, thereby interfering with Columbia's ability to "resolve [the dispute] cooperatively." *Id.*

---

[3] In many cases, Plaintiffs were also listed on the grants as principal investigator, a role that carries with it legal responsibilities of its own. *See* Martin Decl. ¶¶ 25, 37, *AAUP*, No. 25 Civ. 2429 (S.D.N.Y. Apr. 3, 2025), ECF No. 29; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES: OFFICE FOR HUMAN RESEARCH PROTECTIONS, *Investigator Responsibilities FAQ's*, https://www.hhs.gov/ohrp/regulations-and-policy/guidance/faq/investigator-responsibilities/index.html (last visited Sept. 26, 2025). This fact complicates the district court's conclusion that Plaintiffs were not the "recipients" of the grants. They were not the contract holders, to be sure; but they were in many cases recognized by the federal government to possess official responsibilities under them. Nevertheless, we leave this factual question aside because Plaintiffs can establish standing regardless, as we explain above.

The district court is correct that in cases involving contractual disputes, courts have sometimes denied standing on prudential grounds to plaintiffs who are not parties to the contract or its intended third-party beneficiaries. *See Hillside Metro Assocs., LLC v. JPMorgan Chase Bank*, 747 F.3d 44, 48 (2d Cir. 2014); *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 717 F.3d 189, 194 (D.C. Cir. 2013). This limitation on the scope of standing in contract dispute cases is one example of the more general prudential rule against granting plaintiffs standing to enforce the rights of others (in this case, the contract holders). *Warth v. Seldin*, 422 U.S. 490, 509 (1975) (noting that "prudential" considerations "normally bar[] litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves"); *Deutsche Bank*, 717 F.3d at 194 (explaining that the limitation on standing in contract dispute cases reflects a desire to prevent plaintiffs from "effectively seeking to enforce the rights of third parties . . . which the doctrine of prudential standing prohibits").

This principle has no application to this case, however. For one thing, this is not, at its core, a dispute over the terms of the contracts themselves but about the administration's efforts to use the economic leverage its funding contracts provide to pressure Columbia into sacrificing its own free speech rights, and those of its students and faculty. *Cf. President and Fellows of Harvard Coll. v. United States Dep't of Health and Human Servs.*, No. 25 Civ. 11048, 2025 WL 2528380 (D. Mass.

Sept. 3, 2025) (concluding that similar claims, brought by faculty at Harvard university, are not fundamentally about "whether the government is obligated to pay money under a contract" but about "speech and whether the federal government is improperly infringing on the free speech rights of an academic institution and its employees" and that while the "resolution of these claims might result in money changing hands, . . . what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms"). The contract dispute cases are therefore inapposite.

More fundamentally, even if this case did involve a dispute over contractual terms, the district court would still have been wrong to deny standing to Plaintiffs on prudential grounds. This is because prudential limits on third party standing do not apply in First Amendment cases—or at least not in cases where, as here, the application of those limits makes it less likely that anyone will be able and willing to defend the underlying free speech rights in court. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (noting that "the Court has altered its traditional rules of standing to permit . . . [l]itigants . . . to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression").

Prudential limits on standing apply only weakly in the First Amendment context because, as the Supreme Court has recognized, freedom of speech is both supremely valuable to a democratic society like our own, and also easily chilled by government action. *See, e.g.*, *id.* (noting that "the protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes"); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting that "[m]any persons, rather than undertak[ing] the considerable burden (and sometimes risk) of vindicating their [free speech] rights through case-by-case litigation, will choose simply to abstain from protected speech . . . harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas"). Because it will often be easier for those targeted by the government to simply shut up—or to shut others up—rather than sue to defend their rights, the Court has concluded that prudence requires a broader approach to standing in cases involving free speech rights than elsewhere.

Hence, plaintiffs who are regulated by an allegedly constitutionally overbroad law are permitted to challenge that law even when they do not themselves engage in protected expression. *Gooding v. Wilson*, 405 U.S. 518, 521 (1972) ("[T]he transcendent value to all society of constitutionally protected expression . . . justif[ies] allowing attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated

by a statute drawn with the requisite narrow specificity" (internal citations omitted));
*Hicks*, 539 U.S. at 119 ("Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces the[] social costs caused by the withholding of protected speech.").

For similar reasons, the Court has made clear that prudential considerations cannot be applied to limit the ability of indirect targets of government regulation to sue when doing so makes it less likely that First Amendment rights will be vindicated in court. For example, in *Munson*, the Court concluded that prudential considerations did not justify denying standing to a professional fundraiser who raised a First Amendment challenge to a law that regulated how charities raised funds but did not directly regulate fundraisers like himself. 467 U.S. at 954-59. The court acknowledged that the fact that the fundraiser was not directly targeted by the law was a prudential argument that would be relevant to the standing analysis "outside the First Amendment context," but rejected the idea that it had any relevance to the question of whether "standing exists to challenge a statute that allegedly chills free speech." *Id.* at 957. This was because, "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible [is] outweighed by society's interest in having the statute challenged." *Id.* at 956.

The Court reached the same conclusion in *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), when it recognized that publishers had standing to challenge the actions

10

of a state commission that engaged in an allegedly coercive campaign of informal censorship even though the campaign was not targeted at them but at book distributors—that is to say, even though they were only indirectly harmed by the government's actions. *Id.* at 64 n.6. The Court justified this conclusion by noting that "the distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights" whereas "[t]he publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it." *Id.* The fact that publishers had a much stronger economic incentive to challenge the campaign of allegedly unconstitutional coercion meant, the Court explained, that "pragmatic considerations argue[d] strongly for the standing of [the] publishers," so long as they too had suffered legal injury—as indeed they had. *Id.* The Court concluded, in other words, that given the context and the rights at stake, prudential concerns mitigated *in favor* of a broad standing rule because, were it otherwise, "infringements of freedom of the press may too often go unremedied." *Id.*

In concluding that Plaintiffs lacked standing because they were not (in the court's view) the direct targets of the government's actions, the district court violated the principle established by these cases: namely, that courts should not deny standing to indirectly injured plaintiffs, especially when they may be the only parties ready and able to defend free speech rights in court. Indeed, the facts of this case strongly

suggest that, if Plaintiffs are denied standing to sue on prudential grounds, there will be no one who will be in a position to challenge the government's actions on First Amendment grounds. This is because the only *direct* target of the government's actions is Columbia University and Columbia has been so coerced by the government's actions that it is unwilling to sue to defend either its First Amendment rights or those of its faculty. This is not surprising. As First Amendment scholars have long pointed out, and as the Supreme Court itself explicitly recognized just last Term, the powerful private institutions that play such an important role in the contemporary system of free expression by hosting and disseminating other people's speech can be quite easily mobilized as tools of government censorship—in part because their institutional incentives often make it eminently rational to strike a deal with the government that regulates their operations than to challenge it in court. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024) (noting that actions targeted at speech "intermediaries allows[] government officials to be more effective in their speech-suppression efforts because intermediaries will often be less invested in the speaker's message and thus less likely to risk the regulator's ire") (cleaned up); *Bantam Books,* 372 U.S. at 64 n.6; Seth F. Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, and the Problem of the Weakest Link*, 155 U. Pa. L. Rev. 11, 29-30 (2006) (noting that institutions that host third party speech tend to be the "weakest link" in the system of free expression because they are "peculiarly

susceptible to chill, for they often face cost and revenue structures quite different from those of first-party speakers"). It is therefore vitally important that the district court's erroneous standing analysis be reversed.

By adopting this expansive approach to standing in First Amendment cases, the Supreme Court has assured that non-intermediaries can access court to defend the rights that intermediaries may not believe it to be in their economic self-interest to defend. The district court, in contrast, suggested that a positive effect of denying standing to Plaintiffs on prudential grounds was that it prevented any interference with Columbia's attempts to resolve the dispute with the government "cooperatively." *AAUP,* 2025 WL 1684817, at *11. Cooperation between government and private parties is all well and good. But this cooperation is neither constructive nor constitutional when it is coerced, or when it entails the surrender of student and faculty's free speech rights. Plaintiffs should not be prohibited from accessing court merely because their names are not on the grants the administrations suspended.

## II.  THE FACT THAT COLUMBIA REACTED IN PREDICTABLE WAYS TO THE GOVERNMENT'S ACTIONS DOES NOT UNDERMINE THE TRACEABILITY OF THE PLAINTIFFS' HARMS

The second argument that the district court made to deny Plaintiffs standing—namely, that their injuries cannot be traced to the government because Columbia University's actions affected how the government's actions impacted Plaintiffs—is

13

similarly unavailing. The Court argued that, because Columbia used its own funds to temporarily compensate faculty for the research funding the administration suspended, those faculty suffered no injury at the hands of the government. *AAUP*, 2025 WL 1684817, at *13 (noting that Columbia agreed to "provid[e] salary coverage during this *immediate* period of uncertainty for personnel whose grants have been terminated" (emphasis added)). Alternatively, the Court argued that, for those faculty who did in fact suffer either economic or professional injuries as a result of the government's actions, because Columbia had the ability to alleviate those injuries but chose not to, it is the university, not the government, that is ultimately to blame. *Id.* ("Insofar as Columbia elects not to use its various private resources to fund specific research and personnel, Plaintiffs' members' quarrel is with Columbia.").

This argument has no basis in the law of standing. There is no question that litigants who are harmed by the *independent* actions of a third party lack standing to sue the government for those harms. *Lujan*, 504 U.S. at 560 (requiring plaintiffs to show that their injury-in-fact is "fairly . . . trace[able] to the challenged action of the [government] defendant, and not . . . the result of the independent action of some third party not before the court" (internal citations omitted)). Instead, they must show a causal connection between their injury and a governmental act. *Id.*

In this regard there is no question that the government's action caused Plaintiffs injuries. The district court did not suggest, nor could it plausibly, that Columbia independently desired to or would have terminated Plaintiffs' research funds or salaries absent the government's actions. The Court has recognized that standing will "often depend on how regulated third parties not before the court . . . act in response to the government regulation." *Diamond Alternative Energy*, 145 S.Ct. at 2134. When plaintiffs' injuries are a consequence of the *predictable* response of regulated third parties to the government's actions, the traceability requirement of Article III standing is established. *Id.* It is plainly predictable that when the government cut funding designated for Plaintiffs' research that the university would, by necessity, have to pass on many if not all of those losses to Plaintiffs.

Moreover, in making the decision to cover some of the research funding that the government Defendants suspended, Columbia did not *exacerbate* Plaintiffs' injuries. To the contrary, it *minimized* them, even if, given the nature and extent of these injuries, the university could not alleviate them entirely. *See* Wolfson Decl. ¶¶ 10-11, *AAUP*, No. 25 Civ. 2429 (S.D.N.Y. Apr. 3, 2025), ECF No. 27 (noting the reputational harms that plaintiffs suffered by losing and potentially in the future not being able to apply for prestigious federal grants and the chill it imposed on researchers and teachers); *Preserving Columbia's Critical Research Capabilities*,

COLUMBIA UNIVERSITY: OFFICE OF THE PRESIDENT (May 6, 2025), https://president.columbia.edu/news/preserving-columbias-critical-research-capabilities (announcing the "difficult choice[]" to terminate or not renew some 20% of those researchers who were funded by federal grants).

The fact that Columbia did what it could to lessen Plaintiffs' injuries—but could not alleviate them entirely—does not break the causal chain between the government's actions and Plaintiffs' harms. Any other conclusion would be to, in effect to blame the victim of governmental wrongdoing for its failure to fully protect other victims from the same bad acts. It would, moreover, produce the same result as the first argument relied upon by the district court by making it extremely unlikely that speakers who are injured by government censorship campaigns targeted at the institutions that host their speech would ever be able to establish their standing to sue. After all, these institutions will almost always react in some way to government threats and coercion, just as Columbia did in this case. This is not a result that Article III requires, or that the First Amendment permits.

Nor is the Supreme Court's decision last term in *Murthy v. Missouri,* 603 U.S. 43 (2024), to the contrary. In *Murthy,* the Court concluded that users of social media platforms lacked standing to seek an injunction against efforts by federal government officials to coerce those platforms into suppressing their posts because they could not show that government pressure had ever in the past caused the social

16

media companies to suppress their speech, or even that there were ongoing attempts by government officials to achieve that result. *Id.* at 59 ("The primary weakness in the record of past restrictions is the lack of specific causation findings with respect to any discrete instance of content moderation."); *id.* at 72 ("[I]n the months leading up to this suit, [government] officials issued no directives and threatened no consequences."). Instead, there was evidence that social media companies had regularly taken action to suppress speech of the kind in question, even in the absence of government pressure, for commercial and other reasons. *Id.* at 60 ("Facebook announced an expansion of its COVID-19 misinformation policies in early February 2021, before White House officials began communicating with the platform. And the platforms continued to exercise their independent judgment even after communications with the defendants began.").

Here in contrast, it was the government that acted directly to suppress Plaintiffs' speech, by cutting the funding necessary to support it. In addition, the government Defendants directly threatened to take further action against Columbia and its faculty and researchers unless the university complied with its demands by, among other things, intruding upon Plaintiffs' academic freedom. *See* Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., General Services Administration, et al., to Dr. Katrina Armstrong, Interim President, Columbia University, et al. (Mar. 13, 2025),

17

https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec15

4-full.pdf   [https://perma.cc/7DXL-986Y] (threatening the end of Columbia's

"financial relationship with the United States government" unless the university

places the MESAAS department under financial receivership). And Columbia

University had no longstanding practice of terminating or imposing similar

restrictions on its faculty's grants. Given these facts, Plaintiffs have clearly satisfied

the traceability requirement, as expounded by the Supreme Court in *Murthy*: they

have shown that their injuries are the result of government actions and the

predictable reaction of Columbia University to those actions; and they have shown

that they face a "real and immediate threat of repeated injury." *Murthy*, 603 U.S.at

58.

## III.   PLAINTIFFS HAVE ESTABLISHED OBJECTIVE EVIDENCE OF A CHILLING EFFECT RESULTING FROM THE GOVERNMENT'S ACTIONS

Finally, the district court's conclusion that Plaintiffs' complaint establishes

only their subjective rather than an objective feeling of chill fundamentally

misconstrues what it means to say that a plaintiff experiences a merely subjective

chilling effect. The Court has held that Plaintiffs cannot establish their right to a

judicial tribunal merely by alleging that their speech or association has been chilled

by their fear that government surveillance of them will be used in the future to target

them in some unlawful way. *Laird*, 408 U.S. at 13 (1972) (rejecting standing based

on "speculative apprehensiveness that the Army may at some future date misuse the information [it has gathered about plaintiffs'] in some way that would cause [them] direct harm"). But it has made clear that plaintiffs *do* have standing to challenge government actions that have the effect of chilling their speech or association when those actions amount to more than mere data-gathering that could be used, at some future time, for bad purposes. *Id.* at 12-13 (listing cases which "fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights"). For example, the Supreme Court has held that the chilling of speech that is a result of mandated government disclosure is the kind of injury-in-fact that establishes Article III standing. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021) (citing cases). It has reached the same conclusion about the chilling of speech that is produced by campaign finance "matching funds" regulations. *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 748 (2011). And it has reached the same conclusion about a law that required certain films to be designated "political propaganda." *Meese v. Keene*, 481 U.S. 465 (1987). The Court noted, in that case, although the law did "not prevent [the plaintiff filmmaker] from obtaining or exhibiting [his] films[,]" it would deter him from doing so by making it "personal[ly] political[ly] and professional[ly]" damaging to do so—and that this was sufficient to establish his standing to sue. *Id.* at 473-74.

The general rule that these cases establish is that the chilling of speech and association is sufficient to establish an injury-in-fact for standing purposes when it is the direct result of a "regulatory, prescriptive, or compulsory" action on the part of the government, and there is some evidence to substantiate plaintiffs' fear of bad consequences if they speak. *Laird*, 408 U.S. at 11 (recognizing that in the cases in which courts recognized chill as a basis for standing "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging"); *Meese*, 481 U.S. at 473-474 (noting that plaintiff "submitted . . . affidavits" establishing that he would suffer reputational costs from the government's regulatory actions).

In this context, Plaintiffs are not alleging that they have been injured by government data gathering that the government could use at some point in the future to harm them. Instead, they allege that the government's "compulsory" past actions against Columbia, and its threat of future actions if Columbia does not comply with its demands, make it eminently reasonable for them to censor their own research, teaching and extracurricular speech out of fear that the continued vitality of the institution at which they work will be impeded if they do not—and that they have in fact engaged in such self-censorship. They are alleging, in other words, the kind of

20

"objective" chill that it has been a core concern of modern First Amendment law to alleviate.

This is not the kind of claim of injury that threatens the separation of powers that the law of standing protects. Permitting standing in this case would not make courts "virtually continuing monitors of the wisdom and soundness of Executive action" absent any claims of "actual present or immediately threatened injury." *Laird,* 408 U.S. at 15.

Instead, it would vindicate important constitutional values by allowing speakers to challenge specific government actions that, by leading plaintiffs to censor themselves, limit the exercise of those rights of thought and discussion so vital to democracy itself. *Smith,* 361 U.S. at 154 (noting that "self-censorship [that is] compelled by the State" is "hardly less virulent for being privately administered"); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools . . . Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate" (internal quotations omitted)). With respect to this holding also, the district court should be reversed.

## CONCLUSION

It is a well-established principle of free speech law that standing rules should be interpreted broadly—as broadly as Article III permits—in order to ensure that courts are able to defend the precious, democratically-important rights that the First Amendment protects. This principle applies even, and perhaps especially, to cases like this one, that involve governmental efforts to pressure private institutions into suppressing the expressive and associational freedoms of those who work within them. The district court violated this principle, by interpreting the law of standing to keep Plaintiffs out of court even though they have credibly alleged that they have been specifically injured by intentional government acts. The Court should reverse, to protect not only the rights of the faculty Plaintiffs but freedom of speech for us all.

Dated:      September 29, 2025
            New York, New York

EMERY CELLI
BRINCKERHOFF ABADY
WARD & MAAZEL LLP

/s/ Matthew D. Brinckerhoff
Matthew D. Brinckerhoff
Sara Luz Estela

One Rockefeller Plaza, 8th Floor
New York, New York 10020

(212) 763-5000

*Attorneys for Amici First*
*Amendment Scholars*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 5,215 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
      September 29, 2025

# APPENDIX

**Erwin Chemerinsky**, Dean and Jesse H. Choper Distinguished Professor of Law, UC Berkeley School of Law

**David Cole**, the Honorable George J. Mitchell Professor in Law and Public Policy at Georgetown Law School

**Evelyn Douek**, Associate Professor of Law, Stanford Law School

**Heidi Kitrosser**, the William W. Gurley Professor of Law, Northwestern Pritzker School of Law

**Genevieve Lakier**, Professor of Law and Herbert and Marjorie Fried Teaching Scholar, the University of Chicago Law School

**Amanda Shanor**, Associate Professor and Wolpow Family Faculty Scholar, The Wharton School of the University of Pennsylvania

**Geoffrey Stone**, Edward H. Levi Distinguished Service Professor of Law, The University of Chicago Law School

**Nadine Strossen**, The John Marshall Harlan II Professor of Law Emerita, New York Law School

**Rebecca Tushnet**, Frank Stanton Professor of the First Amendment, Harvard Law School