# 25-1529

# United States Court of Appeals

*for the*

# Second Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,
AMERICAN FEDERATION OF TEACHERS,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES DEPARTMENT OF JUSTICE, PAMELA BONDI, in her
official capacity as the U.S. Attorney General, LEO TERRELL, in his official
capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and
head of the DOJ Task Force to Combat Anti-Semitism, UNITED STATES
DEPARTMENT OF EDUCATION, LINDA MCMAHON, in her official
capacity as the U.S. Secretary of Education, THOMAS E. WHEELER, in his
official capacity as Acting General Counsel of the U.S. Department of Education,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* JEWISH COUNCIL FOR PUBLIC AFFAIRS (JCPA) IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

ADAM HOLLANDER
LUC C. PIERRE-LOUIS
SLARSKEY LLC
*Attorneys for Amicus Curiae*
767 Third Avenue, 14th Floor
New York, New York 10017
(212) 658-0661

CP COUNSEL PRESS      (800) 4-APPEAL • (386097)

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ROBERT F. KENNEDY, JR., in his official capacity as the U.S. Secretary of Health and Human Services, SEAN R. KEVENEY, in his official capacity as Acting General Counsel of the U.S. Department of Health and Human Services, NATIONAL INSTITUTES OF HEALTH, MATTHEW J. MEMOLI, in his official capacity as the Acting Director of the National Institutes of Health, UNITED STATES GENERAL SERVICES ADMINISTRATION, STEPHEN EHIKIAN, in his official capacity as Acting Administrator of the U.S. General Services Administration, JOSH GRUENBAUM, in his official capacity as Commissioner of the Federal Acquisition Service,

*Defendants-Appellees.*

# **TABLE OF CONTENTS**

INTEREST OF AMICUS ................................................................................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................... 2

ARGUMENT .................................................................................................. 6

I.     The Constitutional Framework of Rights and Freedoms Has Enabled the Safety of Jewish Communities and Other Vulnerable Groups. ...................... 6

II.    False Tradeoffs Between Confronting Antisemitism and Preserving Rights Harm Both. ................................................................................................ 8

III.   Jewish Safety and Democratic Values Are Interdependent. ......................... 13

CONCLUSION ............................................................................................... 15

i

## TABLE OF AUTHORITIES

### Cases

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*
    385 U.S. 589 (1967) .................................................................................. 6

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*
    No. 25-CV-10910 (ADB), 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ... 8, 9

*W. Virginia State Bd. of Educ. v. Barnette*
    319 U.S. 624 (1943) .............................................................................. 6, 8

### Statutes

Fed. R. App. P. 29(a) ...................................................................................... 1

### Other Authorities

American Jewish Committee, *Report on the State of Antisemitism in America
    2024* (Feb. 12, 2025) .............................................................................. 7

Antony Polonsky, *The Jews in Poland and Russia: Volume II: 1881 to 1914*
    (Littman Library of Jewish Civilization, Liverpool Univ. Press 2010).......... 6

Campbell Robertson, *The Synagogue Attack Stands Alone, but Experts Say Violent
    Rhetoric Is Spreading*, N.Y. TIMES (Aug. 4, 2023)......................................... 7

Editorial Bd., *Antisemitism Is an Urgent Problem. Too Many People Are Making
    Excuses.*, N.Y. TIMES (Jun. 14, 2025) ......................................................... 7

Jason DeRose, *Most American Jews say Trump is using antisemitism as an
    'excuse' to silence free speech at universities,* NPR (Sep. 17, 2025) ........... 10

Michel Martin & Obed Manuel, *Trump exploiting antisemitism fears to undermine
    rule of law, warns Jewish coalition*, NPR (Apr. 16, 2025)....................... 8, 10

## INTEREST OF AMICUS[1]

The Jewish Council for Public Affairs ("JCPA") is the national convener of Jewish coalitions working to build a just and inclusive democracy. Founded more than eighty years ago, JCPA has consistently brought together national and local partners to address the issues that most deeply affect Jewish communities and to advance the core values of justice, equality, and civic participation.

Throughout its history, JCPA has been at the forefront of civil rights, racial justice, and equality movements in the United States. Today, JCPA mobilizes its community relations network and partners across the country to strengthen democratic institutions and promote solidarity across lines of difference. JCPA's mission rests on the conviction that Jewish safety is inseparable from the safety of other vulnerable groups and from the health of a pluralistic democracy.

Amid rising antisemitism, extremism, and disinformation, JCPA works to ensure that these threats are not exploited to pit Jewish communities against others or to justify rollbacks of rights. JCPA submits this brief to emphasize that the protection of Jewish communities depends upon, and is strengthened by, the preservation of academic freedom, due process, and the democratic framework that safeguards all vulnerable populations. Pursuant to Federal Rule of Appellate

---

[1] No party or its counsel had any role in authoring this brief. No person or entity—other than amicus curiae and its counsel—contributed money that was intended to fund preparing or submitting this brief.

1

Procedure 29(a)(2), amicus has authority to file this brief because all parties have consented to the filing.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This case arises from the federal government's unprecedented decision to terminate more than $400 million in research funding to Columbia University ("Columbia") and to condition the restoration of grants totaling billions of dollars in funding on Columbia's adoption of sweeping limits on campus discourse, in the form of programmatic and disciplinary changes impacting campus instruction, student activism, and numerous other core aspects of campus life. For example, Columbia was compelled to relocate its University Judicial Board—the body that adjudicates protest-related disciplinary cases—into the Office of the Provost;[2] to hire thirty-six "special officers" with the authority to remove individuals from campus or make arrests;[3] to appoint a new Senior Vice Provost tasked with reviewing regional studies programs, beginning with Columbia's Department of Middle Eastern, South Asian, and African Studies;[4] and to commit to expanding "intellectual diversity" in faculty hiring.[5] Within days of these measures, Columbia's president publicly acknowledged the coercive nature of the federal government's demands, and shortly

---

[2] *See* Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction at 10, *Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*, No. 25-cv-02429 (S.D.N.Y. Apr. 3, 2025), Dkt. No. 26; Joint Appendix ("JA") 359.
[3] *Id.*
[4] *Id.* at 9–10; JA 359.
[5] *Id.*

thereafter resigned under pressure—a resignation Defendants' task force celebrated as an "important step" in advancing negotiations.[6]

The government's actions have had immediate and severe consequences for faculty, students, and the public. Columbia professors have lost access to federal grants that funded groundbreaking research on Alzheimer's disease, cancer prevention, maternal and fetal health, and the health impacts of climate change.[7] These terminations have halted ongoing projects, forced research teams to downsize, disrupted longstanding collaborations, and prevented students from continuing their training.[8] Faculty members also report that their speech and scholarship are now chilled by the fear that expressing views disfavored by the federal administration could trigger additional funding freezes or punitive oversight of their departments.[9] The result is not enhanced safety but a climate of coercion and self-censorship, undermining both academic freedom and the university's ability to generate knowledge that benefits the nation.

The government justified its demands to implement those measures as necessary to combat antisemitism on campus and protect Columbia's Jewish

---

[6] *Id.* at 10; JA 364.
[7] *Id.* at 12; JA 420.
[8] *Id.*
[9] *Id.* at 12–13.

community.[10]  We are under no illusions about the fact that antisemitism is real and rising, and that Columbia has been at the center of these concerns. On campuses and in communities across the country, Jews have been targeted and held collectively accountable for the actions of a foreign government, pushed out of classrooms and movements for expressing connections to their heritage, subjected to public rhetoric that justifies or celebrates their murder, and, increasingly, faced direct violence such as in Washington D.C. and Boulder, CO this spring.  University administrators, including at Columbia, simply did not live up to their obligations to their Jewish students, faculty, and staff in key moments over the past year.

But fighting antisemitism through restrictions on speech, expression and assembly is grounded in a false and dangerous framing: that Jewish safety can be achieved only by weakening academic freedom, due process, and other constitutional guarantees. That framing is inconsistent with the Constitution and the Jewish historical experience in America, doing nothing to make Jews safer on campus – rather, it only makes Jews less safe while compromising key Jewish values.

For generations, Jewish communities in the United States have depended on strong democratic institutions, the rule of law, and access to higher education.

---

[10] Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction at 30–31, *Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*, No. 25-cv-02429 (S.D.N.Y. Apr. 3, 2025), Dkt. No. 91.

American Jews have built thriving communities and made numerous substantial contributions to science, medicine, law, the arts, and other disciplines. Those contributions and successes have been due in large part to democratic norms that have long secured open participation and academic inquiry at institutions of higher education and research. Weakening those norms in the name of safety undermines the very conditions that made Jewish flourishing possible.

Amicus submits this brief to advance three core points. First, the safety and success of Jewish communities in America have always been rooted in constitutional freedoms and vibrant academic institutions. Curtailing those freedoms in the name of protecting Jews erodes the foundations of Jewish security and the security of other vulnerable groups. Second, false tradeoffs between combating antisemitism and preserving rights harm both goals: they chill speech, destabilize universities, and leave the real problems of antisemitism unresolved. And third, Jewish safety and democratic values are not opposing imperatives but interdependent ones. When democracy is strong, Jews are safe; when democracy is weakened, Jews and other vulnerable groups are placed at greater risk.

By invoking Jewish safety to justify coercive funding cuts, compelled speech codes, and sweeping incursions into academic life, the government inverts these lessons. This Court should reject that false choice, reverse the judgment below, and

remand for further proceedings consistent with the Constitution's protections of safety and freedom.

## ARGUMENT

### I. The Constitutional Framework of Rights and Freedoms Has Enabled the Safety of Jewish Communities and Other Vulnerable Groups.

For more than two centuries, American Jews have enjoyed levels of opportunity and civic participation unparalleled in modern Jewish history. That flourishing has never depended on the erosion of democratic rights. It has been made possible by them. The freedoms enshrined in the U.S. Constitution—including freedom of speech, freedom of religion, equal protection of the laws, and due process—helped create and make meaningful the conditions for Jewish communities to learn, to worship, to teach, and to participate fully in public life.

Access to higher education, in particular, has played a decisive role in the story of Jews in America. Although Jewish students frequently faced exclusionary quotas in the early twentieth century that limited access to institutions of higher education, principles of equal access eventually prevailed. The post-World War II expansion of access to public and private universities and the increased protections of civil rights laws opened pathways for Jewish students and faculty, who went on to become leaders in virtually every academic discipline. As a result, Jews in America have been able to make substantial contributions to scientific research, medicine, law, and the arts. Although antisemitism has long threatened Jewish safety on campuses,

democratic norms have served to protect Jews by ensuring open and fair participation. Restricting First Amendment freedoms has never been the answer.

As the U.S Supreme Court has long recognized, freedoms of inquiry and association are core constitutional guarantees, not secondary values to be curtailed or weaponized for political ends. For example, in *West Virginia State Board of Education v. Barnette*, the Supreme Court declared that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[11] That principle has been vital for Jews, who have historically been most at risk when governments prescribed orthodoxy in religion or politics. Similarly, in *Keyishian v. Board of Regents*, the Court recognized academic freedom as a "special concern of the First Amendment," stressing that "the Nation's future depends upon leaders trained through wide exposure to robust debate and inquiry."[12] These protections have not only safeguarded Jewish faculty and students, but have enabled universities to serve as engines of Jewish inclusion and advancement.

By contrast, when democratic norms and academic independence have collapsed or been threatened in world history, Jewish communities have almost

---

[11] 319 U.S. 624, 642 (1943).
[12] 385 U.S. 589, 603 (1967).

always been among the first to suffer.[13]  From Tsarist Russia to Weimar Germany, the curtailment of civil liberties, narrowing of educational opportunity, and suppression of dissent created fertile ground for scapegoating and exclusion.  The United States's record has been precisely the opposite: strong institutions and constitutional protections have enabled, not threatened, Jewish safety and success.

This instant action arises against that historical backdrop and in the face of unprecedented attacks on campus freedoms and on Jewish life.  The government claims that Jewish safety justifies extraordinary incursions into the autonomy of universities and the rights of students and faculty.[14]  But that argument ignores and runs counter to the lessons of history and constitutional law alike.  The safety of Jews in America has always been secured by democratic rights and institutions, not by their restriction.

## II.  False Tradeoffs Between Confronting Antisemitism and Preserving Rights Harm Both.

Antisemitism is real, visible, and rising.[15]  It demands urgent action by government leaders, universities, and civic institutions.  But this case illustrates a

---

[13] *See, e.g.* Antony Polonsky, *The Jews in Poland and Russia: Volume II: 1881 to 1914* 15 (Littman Library of Jewish Civilization, Liverpool Univ. Press 2010) (describing how educational opportunities were curtailed by strict quotas on Jewish admissions to institutes and universities, closure of vocational schools, suspension of Jewish entry into the Bar, and other punitive restrictions).

[14] Defendants' Memorandum of Law, *Am. Ass'n of Univ. Professors*, No. 25-cv-02429, at 30–31.

[15] *See, e.g.,* Editorial Bd., *Antisemitism Is an Urgent Problem. Too Many People Are Making Excuses.*, N.Y. TIMES (Jun. 14, 2025); American Jewish Committee, *Report on the State of Antisemitism in America 2024* (Feb. 12, 2025), https://www.ajc.org/news/ajcs-state-of-antisemitism-in-america-2024-report-behind-the-numbers (last accessed Sep. 22, 2025).

dangerous mistake: treating Jewish safety and democratic rights as opposing imperatives. The government's approach—terminating $400 million in funding to Columbia, coercing the university to adopt sweeping programmatic changes, and threatening billions more in research grants—purports to protect Jewish students but in fact undermines the very rights that secure their safety.

This coercive strategy comes at a moment when Jews are already being targeted and held collectively accountable for the actions of a foreign government, pushed out of classrooms and movements for expressing connections to their heritage and the Jewish homeland, subjected to public rhetoric that justifies or celebrates their murder, and facing increasing hate crimes and violence. Dangerous antisemitic tropes and conspiracy theories that fueled the deadliest attack on the Jewish community in U.S. history at the Tree of Life Synagogue in Pittsburgh have now been mainstreamed by political leaders, social media platforms, and other influencers.[16] Yet rather than addressing these genuine threats, the government has invoked the language of combating antisemitism to justify stripping students of due process rights, chilling constitutionally protected speech, and crippling universities' ability to conduct critical research. These actions weaken the very academic and

---

[16] Campbell Robertson, *The Synagogue Attack Stands Alone, but Experts Say Violent Rhetoric Is Spreading*, N.Y. TIMES (Aug. 4, 2023).

civic institutions that have historically provided Jews—and other vulnerable groups—with security, opportunity, and equal citizenship.[17]

Efforts to combat antisemitism must not be permitted to erode fundamental freedoms of inquiry, due process, and academic independence. The Constitution itself reflects this wisdom.[18] Yet the government's March 13, 2025 letter to Columbia demanded precisely such erosions: within one week, the University was instructed to complete disciplinary proceedings resulting in expulsions or multi-year suspensions; abolish the University Judicial Board and centralize all disciplinary power in the President's office; impose permanent time, place, and manner restrictions on campus protest; ban masks; and formalize and promulgate a government-approved definition of antisemitism. The government further required Columbia to give campus security full law enforcement authority, place its Middle East, South Asian, and African Studies department under academic receivership for a minimum of five years, and undertake sweeping admissions reforms to reshape undergraduate and graduate enrollment.[19] These demands are not consistent with protecting Jewish students. They represent compelled orthodoxy and intrusive state control of universities—restrictions that threaten to chill open debate, exclude

---

[17] Michel Martin & Obed Manuel, *Trump exploiting antisemitism fears to undermine rule of law, warns Jewish coalition*, NPR (Apr. 16, 2025).
[18] *Barnette*, 319 U.S. at 642.
[19] Plaintiffs' Memorandum of Law, *Am. Ass'n of Univ. Professors*, No. 25-cv-02429, at 9–10; JA 356, 359.

10

vulnerable students and faculty from academic spaces, and deepen division rather than foster safety.

The government's actions here mirror those that the District of Massachusetts recently condemned. In *President & Fellows of Harvard College v. U.S. Department of Health & Human Services*,[20] as here, the government claimed that its extraordinary interventions were necessary to protect Jewish students from antisemitism. But the court found that rationale to be largely "pretextual"[21] and unsupported by any concrete evidence of Title VI violations.[22] Instead, the government's letters to Harvard revealed an effort to impose sweeping ideological and structural demands unrelated to the statute's purposes, including viewpoint diversity audits, mandated restructuring of academic governance, and the elimination of diversity programs.[23] As Judge Burroughs explained, "a review of the administrative record makes it difficult to conclude anything other than that [the government] used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI."[24]

---

[20] *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-CV-10910 (ADB), 2025 WL 2528380 (D. Mass. Sept. 3, 2025) (the "Harvard Case").
[21] *Id.* at *25.
[22] *Id.* at *30.
[23] *Id. at* *24–25, 36.
[24] *Id.* at *36.

The parallels to Columbia are striking. In both cases, the government invoked antisemitism as a justification for draconian funding cuts and coercive preconditions, yet the demands themselves targeted unrelated issues such as governance, admissions, and academic inquiry. This Court should likewise reject the notion that Jewish safety requires such erosions of constitutional freedoms and recognize the asserted rationale for what it is: a pretext for unlawful intrusion into academic independence.

Further, the costs of such restrictions extend well beyond the university. As with the Harvard case, where the Court found that "[the government's] actions have jeopardized decades of research and the welfare of all those who could stand to benefit from that research, as well as reflect a disregard for the rights protected by the Constitution and federal statutes[,]"[25] Columbia and its community face similar repercussions. The terminated grants at Columbia supported research on such important issues on Alzheimer's disease, fetal health, cancer, and climate impacts on maternal well-being.[26] By abruptly cutting that work short, the government has caused and threatened harm to the health and prosperity of millions of Americans, ostensibly in order to protect Jews. Meanwhile, the damage is not theoretical. The

---

[25] *Id.*

[26] *See* Compl., at ¶ 48, Exs. 13, 15, 32–35; Plaintiffs' Memorandum of Law, *Am. Ass'n of Univ. Professors*, No. 25-cv-02429, at 12–13.

result has not been greater security, but a climate of suspicion and instability that leaves all communities—Jews included—less safe.[27]

The lesson is clear: antisemitism cannot meaningfully be addressed by undermining the rights that protect Jews and other vulnerable minorities. Efforts that strip away due process, curtail academic freedom, or silence campus debate confuse repression with protection. They do not make Jews safer; they make everyone more insecure. Indeed, Jewish Americans broadly oppose cutting funding to colleges and universities and believe that antisemitism is being used as a pretextual "excuse" to "penalize and tax college campuses," rather than meaningfully address the real problem of antisemitism on campus.[28]

## III.  Jewish Safety and Democratic Values Are Interdependent.

The safety of Jewish communities and the strength of American democracy rise and fall together. Jewish life in the United States has thrived because constitutional freedoms have been enforced and democratic institutions have been resilient. The freedoms of speech, press, assembly, and religion, combined with equal protection under law, have given Jews the security to worship, to organize, to pursue education, and to participate fully in civic life. Weakening those freedoms in the name of safety undermines both safety and democracy.

---

[27] Michel Martin & Obed Manuel, *Trump exploiting antisemitism*, NPR (Apr. 16, 2025).
[28] Jason DeRose, *Most American Jews say Trump is using antisemitism as an' excuse' to silence free speech at universities,* NPR (Sep. 17, 2025).

13

History makes the point unmistakably. In societies where democratic norms collapsed—from Tsarist Russia's imposition of quotas and restrictions on Jewish education, to interwar Europe's crackdowns on dissent and academic freedom—Jews became among the first communities to be scapegoated and excluded. By contrast, in the United States, Jewish communities have found stability and prosperity precisely because democratic rights were broadly extended and enforced. These rights did not immunize Jews from prejudice, but they provided reliable recourse when discrimination occurred, and they allowed Jewish communities to flourish within an open society.

The government's actions in this case invert those lessons. By invoking Jewish safety as a justification for curtailing academic freedom, cutting off vital research, and coercing universities into adopting restrictive codes, the government weakens the very framework that has historically secured Jewish security. Efforts to "protect" Jews through the erosion of democratic norms do not merely miss the mark; they expose Jewish communities to greater danger by fostering division and undermining the institutions that stand as their first line of defense.

The Constitution recognizes that rights are indivisible—that liberty and equality must be preserved for all if they are to be secure for any. This is why the Court has resisted false hierarchies of rights, instead affirming that constitutional freedoms sustain one another. When speech, inquiry, and due process are strong,

14

Jews and other vulnerable groups are protected. When those freedoms are curtailed, Jews and others are placed at risk.

Jewish safety is not an exception to democratic values but one of their most telling proofs. Protecting Jewish communities requires reinforcing, not abandoning, the democratic norms that safeguard all. To accept the government's framing—that Jewish safety can only be purchased by sacrificing democracy—is to embrace a false and dangerous choice that leaves both values diminished.

## CONCLUSION

The district court erred in accepting the government's framing that Jewish safety justifies sweeping incursions on constitutional rights and academic freedom. Jewish security and democratic values are not in tension; they are inseparable. For that reason, this Court should reject the false tradeoff advanced below, reverse the order dismissing the case, and remand for further proceedings.

Dated: September 29, 2025                    Respectfully submitted,


By: *//s// Adam Hollander*
   Adam Hollander
   Luc C. Pierre-Louis
   SLARSKEY LLC
   767 Third Ave., 14th Floor
   New York, NY 10017
   ahollander@slarskey.com
   lpierrelouis@slarskey.com
   (212) 658-0661

15

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 29 and 32, undersigned counsel certifies that the foregoing brief:

1. Complies with the type-volume limitation of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,230 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.