# 25-1529

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,
AMERICAN FEDERATION OF TEACHERS,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF JUSTICE,

*(For Continuation of Caption, See Inside Cover)*

———————————

On Appeal from the United States District Court
for the Southern District of New York, No. 1:25-cv-02429-MKV
Hon. Mary Kay Vyskocil

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

Ronald G. London
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org
Counsel for *Amicus Curiae*

PAMELA BONDI, in her official capacity as the U.S. Attorney General, LEO TERRELL, in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism, UNITED STATES DEPARTMENT OF EDUCATION, LINDA MCMAHON, in her official capacity as the U.S. Secretary of Education, THOMAS E. WHEELER, in his official capacity as Acting General Counsel of the U.S. Department of Education, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ROBERT F. KENNEDY, JR., in his official capacity as the U.S. Secretary of Health and Human Services, SEAN R. KEVENEY, in his official capacity as Acting General Counsel of the U.S. Department of Health and Human Services, NATIONAL INSTITUTES OF HEALTH, MATTHEW J. MEMOLI, in his official capacity as the Acting Director of the National Institutes of Health, UNITED STATES GENERAL SERVICES ADMINISTRATION, STEPHEN EHIKIAN, in his official capacity as Acting Administrator of the U.S. General Services Administration, JOSH GRUENBAUM, in his official capacity as Commissioner of the Federal Acquisition Service,

*Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* certifies that *amicus* has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF *AMICUS CURIAE* ........................................................... 1

SUMMARY OF ARGUMENT ................................................................ 3

ARGUMENT ........................................................................................ 8

I. Government Coercion of Columbia Abuses Federal Power and
   Violates the First Amendment. ....................................................... 8

    A. The Government Ignored Federal Law to Coerce
       Columbia Into Censoring Students and to Commandeer
       Institutional Decision-Making. ............................................... 9

    B. The Government's Coercion Flatly Violates the First
       Amendment. ......................................................................... 19

II. Flagrant Government Coercion Will Destroy Our Universities
   If Left Unchecked. ....................................................................... 28

CONCLUSION ................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Backpage.com, LLC v. Dart,*
807 F.3d 229 (7th Cir. 2015) ........................................................ 27

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ........................................................................ 20

*Bd. of Regents of the Univ. of Wisc. Sys. v. Southworth,*
529 U.S. 217 (2000) ................................................................ 26, 29

*Cammarano v. United States,*
358 U.S. 498 (1959) ...................................................................... 25

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) .......................................................... 10, 17, 33

*DeJohn v. Temple Univ.,*
537 F.3d 301 (3d Cir. 2008) .......................................................... 33

*Flores v. Bennett,*
No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) .............. 31

*Gerlich v. Leath,*
861 F.3d 697 (8th Cir. 2017) ........................................................ 31

*Heim v. Daniel,*
81 F.4th 212 (2d Cir. 2023) .......................................................... 18

*Keyishian v. Bd. of Regents,*
385 U.S. 589 (1967) ................................................................ 18, 35

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2000) ...................................................................... 26

*Levin v. Harleston,*
966 F.2d 85 (2d Cir. 1992) ............................................................ 35

*Lieberman v. Gant,*
630 F.2d 60 (2d Cir. 1980) ............................................................ 17

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ................................................................ 24

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ................................................. 5, 22, 23

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
No. 1:25-cv-00091 (D.N.H. agreement Apr. 9, 2025) .................... 11

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........................................................... 6, 25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ................................................ 4, 20, 21, 22

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003).............................................. 21

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
2025 WL 2528380 (D. Mass. Sept. 3, 2025) ........... 13, 25, 27, 28, 29

*Regan v. Tax'n With Representation of Wash.*,
461 U.S. 540 (1983) ........................................................... 6, 25

*Regents of Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985) ............................................................ 35

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ............................................................. 7

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ............................................................ 23

*Speiser v. Randall*,
357 U.S. 513 (1958) ............................................................ 25

*Students for Just. in Palestine v. Abbott*,
No. 1:24-CV-523, 2024 U.S. Dist. LEXIS 196180 (W.D. Tex. Oct. 28, 2024)................................................................ 16

iv

*Sweezy v. New Hampshire*,
　354 U.S. 234 (1957) ................................................ 8, 17, 18, 27, 35

*Tex. A&M Queer Empowerment Council v. Mahomes*,
　No. 25-992, 2025 WL 895836 (S.D. Tex. Mar. 24, 2025) .............. 31

*Thakur v. Trump*,
　2025 WL 1734471 (N.D. Cal. June 23, 2025).......................... 13, 27

*Zeno v. Pine Plains Cent. Sch. Dist.*,
　702 F.3d 655 (2d Cir. 2012)........................................... 17

**Statutes**

42 U.S.C. § 2000d .......................................................... 9

**Regulations**

28 C.F.R. § 42.108 (DOJ)................................................. 12

34 C.F.R. § 100.7(d)(1) (1980) .......................................... 11

34 C.F.R. § 100.8(c) (1980) ............................................. 12

41 C.F.R. § 101-6.211-1 to -4 (GSA) .................................... 12

45 C.F.R. § 80.8–.10 (HHS) .............................................. 12

**Other Authorities**

*'Blueprint' No More? Feds Back Away from New Campus Speech
　Restrictions*, FIRE (Nov. 21, 2013) ................................. 33

Adam Steinbaugh, *FIRE, First Amendment Allies Ask OCR to
　Reject Calls to Ban Anonymous Social Media Applications*,
　FIRE (Apr. 5, 2016) ................................................ 13

Angel Eduardo, *Harvard's resistance to Trump is a model for US
　universities*, FIRE (Apr. 16, 2025) ................................. 30

*BREAKING: New Title IX regulations undermine campus free
　speech and due process rights*, FIRE (Apr. 19, 2024) .................. 13

Dep't of Educ., Off. of Civ. Rights, *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* (May 7, 2024) ................................................................................ 9

*DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Servs. Admin. (Mar. 7, 2025) ................................... 12

*Education Dept. issues new Title IX regs with crucial campus due process protections, adopts Supreme Court sexual harassment definition*, FIRE (May 6, 2020) ....................................................... 33

*Federal government mandates unconstitutional speech codes at colleges and universities nationwide*, FIRE (May 17, 2013) ......... 13

FIRE, *Columbia University* .................................................................... 24

First Amendment Protections on Public College and University Campuses: Hearing Before the H.R. Comm. on the Judiciary, Subcomm. on the Const. & Civ. Just., 115th Cong. (2017) ........... 32

Karen W. Arenson & Tamar Lewin, *A Columbia Expert on Free Speech Is Accused of Speaking Too Softly*, N.Y. Times (Oct. 22, 2006) ............................................................................................ 24

Kenneth S. Stern, *Will Campus Criticism of Israel Violate Federal Law?*, N.Y. Times (Dec. 12, 2016) .................................................... 16

Letter from Anurima Bhargava, Chief, C.R. Div., U.S. Dep't of Justice, and Gary Jackson, Reg'l Dir., Off. for C.R., U.S. Dep't of Educ., to Royce Engstrom, President, Univ. of Mont., and Lucy France, Univ. Counsel, Univ. of Mont. (May 9, 2013)............................................................................................... 32

Letter from FIRE et al. to Anurima Bhargava, Chief, C.R. Div., U.S. Dep't of Justice, and Seth Galanter, Acting Assistant Sec'y for C.R., Off. for C.R., U.S. Dep't of Educ. (July 16, 2013)............................................................................................... 32

Letter from Josh Gruenbaum, Thomas E. Wheeler, and Sean R. Keveney to Dr. Katrina Armstrong, David Greenwald, and Claire Shipman (Mar. 13, 2025) .................................. 14, 15, 17, 22

Lewis Carroll, Alice's Adventures in Wonderland (1865) ...................... 13

Michael C. Bender & Sheryl Gay Stolberg, *Trump Administration Freezes $1 Billion for Cornell and $790 Million for Northwestern, Officials Say*, N.Y. Times (Apr. 8, 2025) ............... 29

Resolution Agreement Between the United States of America and Columbia University (July 23, 2025) ............................. 19

Ross Douthat, *What if There's No Way to Stop Trump's Approach to Power?*, N.Y. Times (Apr. 17, 2025) ........................... 11

*Rules of University Conduct*, Columbia Univ. ........................ 30

Sharon Otterman, *Columbia Said It Had 'No Choice' but to Call the Police*, N.Y. Times (May 1, 2024) ............................. 10

Sofia Lopez, *Groups across ideological spectrum unite in opposing Antisemitism Awareness Act*, FIRE (July 12, 2024) ...................... 16

Troy Closson, *Columbia Agrees to Trump's Demands After Federal Funds Are Stripped*, N.Y. Times (Mar. 21, 2025) ......................... 18

Tyler Coward, *Biden administration commits to anti-Semitism definition that could stifle campus speech*, FIRE (Mar. 19, 2021).................................................. 15

Tyler Coward, *Feds to Columbia: 'You want $400 million in contracts back? Do this (or else)'*, FIRE (Mar. 14, 2025) ............... 10

Tyler Pager, Andrew Duehren, Maggie Haberman & Jonathan Swan, *Trump Threatens Harvard's Tax Status, Escalating Billion-Dollar Pressure Campaign*, N.Y. Times (Apr. 15, 2025).................................................. 30

Vimal Patel, *Trump Administration Will Freeze $2 Billion After Harvard Refuses Demands*, N.Y. Times (Apr. 14, 2025) ............... 30

Will Creeley, *A Year Later, Impact of Feds' 'Blueprint' Comes into Focus*, FIRE (Aug. 28, 2014) .......................................................... 33

*Working definition of antisemitism*, Int'l Holocaust Remembrance All. .................................................................................................. 15

### INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights on college campuses nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. *See, e.g.*, *Texas A&M Queer Empowerment Council v. Mahomes*, No. 25-992, 2025 WL 895836 (N.D. Tex. Mar. 24, 2025); *Novoa v. Diaz*, No. 4:22-cv-324, ECF No. 44 (N.D. Fla., Nov. 17, 2022), *pending appeal sub nom.*, *Novoa v. Comm'r of Fla. State Bd. of Educ.*, No. 22-13994 (11th Cir. arg. June 14, 2024); Br. of *Amicus Curiae*, *Univ. at Buffalo Young Ams. for Freedom v. Univ. at Buffalo Student Ass'n, Inc.*, No. 25-140 (2d Cir. filed Mar. 11, 2025); Br. of *Amici Curiae*, *Students for Justice in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, 2024 WL 4361863 (D. Md. Oct. 1, 2024).[2]

---

[1] All parties consent to the filing of this brief. No counsel for a party authored this brief in whole or in part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund this brief's preparation or submission.

[2] In June 2022, FIRE expanded its advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. In lawsuits across the United States, FIRE works to

FIRE has a direct interest in this case because colleges and universities play a vital role in preserving free thought within a free society. To this end, FIRE places special emphasis on defending the individual rights of students and faculty to freedom of expression, freedom of association, academic freedom, and due process of law on our nation's campuses. Having advocated against censorship at Columbia for more than twenty years, FIRE knows the institution's protection of free speech and academic freedom has been inconsistent and insufficient. But FIRE has fought against top-down federal efforts to silence protected speech on campus for just as long. Permitting the government to impose restrictive speech codes and dictate university decision-making via unlawful and unconstitutional coercion endangers these invaluable rights, teaches tomorrow's leaders the wrong lessons about life in our free country, and threatens the vigor and independence of our institutions of higher education.

---

vindicate First Amendment rights without regard to speakers' views. *See, e.g.*, Br. of *Amici Curiae*, *Khalil v. Trump*, No. 2:25-cv-01963 (D.N.J.); *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024); *Volokh v. James*, No. 23-356 (2d Cir. argued Feb. 16, 2024).

## SUMMARY OF ARGUMENT

The federal government characterized its abrupt revocation of $400 million in federal grants to Columbia University—and the government's threat to revoke billions more if its demands were not met—as necessary to address antisemitism on campus in the wake of pro-Palestinian protests that sometimes veered into unlawful activity. Addressing discrimination is a worthy end. But it cannot justify the government's flatly unconstitutional means here. While Columbia's response to campus misconduct may raise questions about the university's obligations under federal anti-discrimination law, there is no question about the government's failure to meet *its* obligations under the First Amendment. The administration's coercion blatantly end-ran statutory safeguards and flagrantly jawboned the university in an attempt to force it to surrender its institutional autonomy to federal officials. For the sake of Columbia's students, faculty, and our free society, that government intimidation cannot stand unanswered.

The same federal statute that governs institutional responses to allegations of antisemitism—Title VI—requires funding recipients like Columbia to receive notice, a hearing, and an opportunity to come into

compliance voluntarily before the government can terminate funding. These provisions protect students, faculty, and institutions from precisely the kind of repressive, capricious government overreach that now harms Plaintiffs. Yet despite its professed interest in addressing campus antisemitism, the administration chose to ignore entirely the lawful statutory means by which it may do so. Instead, it instituted rule by fiat: arbitrarily declaring Columbia subject to punishment, cancelling hundreds of millions of dollars in grants and threatening worse to come, and leaving Columbia faculty and students at the mercy of unchecked federal authority under threat of a hostile takeover.

This is unlawful. Just last year, the Supreme Court reaffirmed that the government cannot jawbone private actors into punishing speech that the First Amendment protects from state intrusion. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). But jawboning is exactly what we have here—except the government's bullying is so extreme it might more accurately be called extortion.

Wielding a threat of crippling financial consequences like a mobster gripping a baseball bat, the government forced Columbia to adopt a restrictive speech code that punishes disfavored or dissenting viewpoints.

4

Not only would it be unconstitutional at a public university, the speech code also violates Columbia's free speech promises and its right as a private entity to set its own rules regarding speech. The government further forced Columbia to surrender control of an entire academic department and relinquish its right to make independent decisions about discipline and admissions—all of which violate longstanding precepts of academic freedom, institutional independence, and university self-governance.

These demands are unconstitutional. Again, just last year, the Supreme Court reemphasized the limits the Constitution places on the government in its interactions with private institutions. "On the spectrum of dangers to free expression," the Court wrote, "there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741–42 (2024). As Defendants trample constitutional barriers in seeking to effectively outlaw certain political views on campus, this grave danger that the Court identified is fully realized.

None of this is permissible simply because federal funding is involved. The Supreme Court long ago established that "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas'"—and that the First Amendment demands judicial intervention if funding is "'manipulated' to have a 'coercive effect.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 550 (1983)). Few things could be more manipulative or coercive than revoking grants in an explicit attempt to override the expressive and associational rights of a private institution of higher education, its students, and its faculty.

This case illustrates the grave threat to core First Amendment freedoms posed by expansive—and here, extralegal and unbounded—conceptions of governmental power to address discrimination. For more than a quarter century, *amicus* FIRE has advocated against overly broad and impossibly vague campus speech codes promulgated under federal anti-discrimination law. To that end, FIRE successfully led the charge against the Obama administration's attempt to pressure institutions to adopt a federal definition of "sexual harassment"—advanced as a national "blueprint"—that subjected wide swaths of protected speech to

investigation and punishment. And yet as misguided as that initiative was, those pressure tactics pale in comparison to the scope and intensity of the unlawful shakedown Defendants mount here.

The government's aggression against Columbia is alarming not just because it is unlawful and unconstitutional, but because its plain aim is "suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 836 (1995). While Columbia was the first institution targeted by the administration, it has not been the last—the list of colleges facing coercive funding cuts and chilling demands is growing.

Addressing antisemitism does not and cannot require violating the First Amendment. Left unchecked, the administration will continue to deploy its distorted conception of federal anti-discrimination law as a battering ram against institutional autonomy and to seize for itself power to control permissible speech and instruction on our campuses. The stakes are high: "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy*

*v. New Hampshire*, 354 U.S. 234, 250 (1957). This Court must act now to protect freedom of expression, academic freedom, and our institutions of higher education from a hostile federal takeover.

## ARGUMENT

### I. Government Coercion of Columbia Abuses Federal Power and Violates the First Amendment.

The government has claimed the actions challenged in this case were designed to address antisemitism at Columbia University, but it willfully ignored statutory provisions governing how it must proceed. As a result, the administration is abusing its power to force Columbia into adopting a restrictive speech code and to commandeer its institutional authority. Those are means federal anti-discrimination law does not authorize—in pursuit of ends the First Amendment prohibits.

It is settled law that the government cannot coerce private actors into punishing protected expression. Nor may the government attempt to drive out disfavored ideas by dictating a private institution's decision-making about speech, discipline, instruction, and admissions. And while the federal government need not fund institutions like Columbia, once it opts to do so, it cannot hinge funding on censorship of certain views. While these legal and constitutional roadblocks appear not to trouble

8

Defendants—who have sought to replicate this unlawful playbook at other institutions—they should greatly concern this Court and all Americans who care about free speech, academic freedom, and our nation's future.

### A. The Government Ignored Federal Law to Coerce Columbia Into Censoring Students and to Commandeer Institutional Decision-Making.

The government's use of federal funding as a "hook" to pursue Columbia is illegitimate. Like the vast majority of our nation's colleges and universities, Columbia receives federal funding and is thus bound by federal anti-discrimination law—including Title VI, which functionally bars antisemitic discrimination.[3] And like institutions nationwide, Columbia saw protests on campus in the months following Hamas'

---

[3] 42 U.S.C. § 2000d. Title VI prohibits discrimination on the basis of race, color, or national origin, but not religion. For the past twenty years, however, the U.S. Department of Education's Office for Civil Rights has interpreted the law to prohibit discrimination based on a student's "actual or perceived (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity" to address antisemitism. Dep't of Educ., Off. of Civ. Rights, *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* (May 7, 2024), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf.

October 7 attack on Israel and Israel's subsequent military action in Gaza. And some on Columbia's campus crossed the line from peaceful protest to unlawful activity—occupying buildings, for example, and blocking access to public areas.[4]

Columbia's institutional response to that misconduct, *amicus* FIRE has noted, raises fair questions about its compliance with Title VI.[5] And pursuant to that law and its implementing regulations, if the government finds Columbia failed to effectively address antisemitic harassment on its campus, it may take action to hold it accountable. But that action must follow a series of carefully prescribed steps designed to protect students

---

[4] *See, e.g.*, Sharon Otterman, *Columbia Said It Had 'No Choice' but to Call the Police*, N.Y. Times (May 1, 2024), https://www.nytimes.com/2024/05/01/nyregion/columbia-university-protests-arrests.html.

[5] Tyler Coward, *Feds to Columbia: 'You want $400 million in contracts back? Do this (or else)'*, FIRE (Mar. 14, 2025), https://www.thefire.org/news/feds-columbia-you-want-400-million-contracts-back-do-or-else. An institution is liable when its response to harassment occurring in contexts under its control is "deliberately indifferent" and "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

from harassment and the institution from government overreach—steps Defendants chose to ignore entirely.[6]

Had the administration followed the law, the Department of Education would first have had to use "informal means whenever possible" to work with Columbia to address any problems identified in Title VI investigations. 34 C.F.R. § 100.7(d)(1) (1980). If those efforts proved unsuccessful, before issuing an order terminating federal funding, the Department would have to notify Columbia, conclude that it refused to voluntarily comply with its Title VI obligations, hold a hearing, issue

---

[6] The administration is well aware of its statutory obligations. In a recent filing in a lawsuit challenging the legality and constitutionality of various Department of Education actions, for example, DOJ attorneys argued "ED's only power is to withhold funding from institutions receiving federal funding, *after a robust process required by statute and aimed at ensuring compliance.*" Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 1:25-cv-00091 (D.N.H. agreement Apr. 9, 2025) (emphasis added). This admission is not surprising. Any reasonable attorney, let alone a top-ranking official at a federal agency, would recognize the failure to comply with binding federal regulations. For example, Jack Goldsmith, who led the White House Office of Legal Counsel during the George W. Bush administration, characterized the administration as "doing something pretty overtly illegal" in freezing funds to colleges, because "they didn't comply with the process." Ross Douthat, *What if There's No Way to Stop Trump's Approach to Power?*, N.Y. Times (Apr. 17, 2025), https://www.nytimes.com/2025/04/17/opinion/ross-douthat-interesting-times-jack-goldsmith.html.

findings, and provide relevant House and Senate committees a full written report—and only after all that, wait thirty days before terminating funding. 34 C.F.R. § 100.8(c) (1980).[7]

The administration did exactly none of that. Instead, it simply announced in a March 7 press release "the immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University," assertedly "due to the school's continued inaction in the face of persistent harassment of Jewish students."[8] Thus, despite citing allegations of discriminatory harassment, the government rejected Title VI's enforcement procedures and proceeded straight to axing hundreds of millions of dollars in federal funds—directly causing injuries to Plaintiffs'

---

[7] Other agencies have similar regulations, which are binding on them, that establish procedural requirements for any termination or refusal to grant or to continue federal financial assistance based on Title VI. *E.g.*, 45 C.F.R. § 80.8–.10 (HHS); 41 C.F.R. § 101-6.211-1 to -4 (GSA); 28 C.F.R. § 42.108 (DOJ).

[8] *DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Servs. Admin. (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025.

members that are clearly traceable to Defendants' conduct.[9] In other words: "Sentence first—verdict afterwards."[10]

The procedures Defendants ignored are in place for good reason. They reduce the risk of error and political bias and protect institutions against pressure from the federal government to censor students and faculty—pressure *amicus* FIRE has fought against for years.[11] Without

---

[9] *See President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 2528380, at *16 (D. Mass. Sept. 3, 2025) ("[T]he notion that the resultant harm to professors and graduate students is at best speculative or attenuated is divorced from the reality of how federal research grants function. The professors and graduate students—who are responsible for funding their own research—apply for federal grants, are awarded the grants on the strength of their credentials and proposed research, and then build their professional reputations on those grants."); *Thakur v. Trump*, 2025 WL 1734471, at *24 (N.D. Cal. June 23, 2025) ("It is hard to imagine who could have a more personal stake in this case than the researchers whose research was allegedly defunded….").

[10] Lewis Carroll, Alice's Adventures in Wonderland (1865).

[11] *See, e.g., Federal government mandates unconstitutional speech codes at colleges and universities nationwide*, FIRE (May 17, 2013), https://www.thefire.org/news/federal-government-mandates-unconstitutional-speech-codes-colleges-and-universities-nationwide; Adam Steinbaugh, *FIRE, First Amendment Allies Ask OCR to Reject Calls to Ban Anonymous Social Media Applications*, FIRE (Apr. 5, 2016), https://www.thefire.org/news/fire-first-amendment-allies-ask-ocr-reject-calls-ban-anonymous-social-media-applications; *BREAKING: New Title IX regulations undermine campus free speech and due process rights*, FIRE (Apr. 19, 2024), https://www.thefire.org/news/breaking-new-title-ix-regulations-undermine-campus-free-speech-and-due-process-rights.

them, nothing prevents the federal government from unilaterally declaring a university in violation of federal law, yanking federal funding, and demanding fealty.

And that's just what Defendants did. In a letter sent to Columbia's leadership days later, administration officials summarily claimed the university had "fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964."[12] It then issued a list of nine demands, styled as "immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government."[13] Ignoring federal regulations to unilaterally declare a school guilty of turning a blind eye to discrimination and cut its funding is a problem in itself; twisting the screws with demands only exacerbates

---

[12] Letter from Josh Gruenbaum, Thomas E. Wheeler, and Sean R. Keveney to Dr. Katrina Armstrong, David Greenwald, and Claire Shipman (Mar. 13, 2025) [hereinafter Letter from Gruenbaum et al.], *available                                                                              at* https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212 d/85dec154-full.pdf.

[13] *Id.*

the lawlessness. And while the government's top-down imposition of *any* demands in this manner would raise serious legal concerns, several items on Defendants' list of "immediate next steps" stand as especially grave threats to First Amendment freedoms.

First, the government demanded Columbia "[f]ormalize, adopt, and promulgate a definition of antisemitism," and strongly suggested the International Holocaust Remembrance Alliance's definition.[14] But that definition is so broad and vague ("a certain perception of Jews, which may be expressed as hatred toward Jews") that it renders vast swaths of speech subject to punishment—a fatal flaw further evidenced by the definition's accompanying examples, which explicitly identify criticism of Israel protected by the First Amendment as inherently antisemitic.[15]

---

[14] *Id.*; *see also Working definition of antisemitism*, Int'l Holocaust Remembrance All., https://holocaustremembrance.com/resources/working-definition-antisemitism.

[15] For example, the definition lists "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis" as an example of anti-Semitism. *Id.*; *see also* Tyler Coward, *Biden administration commits to anti-Semitism definition that could stifle campus speech*, FIRE (Mar. 19, 2021), https://www.thefire.org/news/biden-administration-commits-anti-semitism-definition-could-stifle-campus-speech.

For that reason, the definition's use is opposed by lawmakers and organizations, including Jewish advocacy groups, from across the political spectrum—from the Alliance Defending Freedom to the American Civil Liberties Union, from Democratic Representative Jerry Nadler to Republican Senator Tommy Tuberville.[16] That broad opposition is reflective of the fact that the definition was never intended to be used to police discrimination on campus,[17] and it has been declared likely unconstitutional by a federal court when used in that context.[18] That conclusion is apt, because Title VI already requires institutions to address discriminatory harassment—that is, conduct so "severe,

---

[16] Sofia Lopez, *Groups across ideological spectrum unite in opposing Antisemitism Awareness Act*, FIRE (July 12, 2024), https://www.thefire.org/news/groups-across-ideological-spectrum-unite-opposing-antisemitism-awareness-act.

[17] Kenneth S. Stern, *Will Campus Criticism of Israel Violate Federal Law?*, N.Y. Times (Dec. 12, 2016), https://www.nytimes.com/2016/12/12/opinion/will-campus-criticism-of-israel-violate-federal-law.html.

[18] *Students for Just. in Palestine v. Abbott*, No. 1:24-CV-523, 2024 U.S. Dist. LEXIS 196180, *31, *36 (W.D. Tex. Oct. 28, 2024) ("[T]he Court finds the incorporation of this specific definition of antisemitism is viewpoint discrimination. . . . [T]he Court finds that Plaintiffs are likely to succeed on their claim, even under *Tinker*, that the GA-44-compliant university policies impose impermissible viewpoint discrimination that chills speech in violation of the First Amendment.").

pervasive, and objectively offensive" that it effectively denies students access to an educational opportunity or benefit. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) (quoting *Davis*, 526 U.S. at 650). Defendants, in short, demanded that Columbia adopt a restrictive speech code on student and faculty expression.

Second, the government violated core precepts of academic freedom and university self-governance by demanding that Columbia change its academic staffing and decision-making. Most troublingly, the administration demanded that Columbia place "the Middle East, South Asian, and African Studies department under academic receivership for a minimum of five years" and provide the administration, within a week, "a full plan, with date certain deliverables" detailing how it would do so.[19] The administration also demanded specific changes to both Columbia's admissions process and its disciplinary procedures. This dramatic overreach is a sharp break with "our long tradition of academic freedom." *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980).

Nearly seventy years ago, Justice Felix Frankfurter identified "the dependence of a free society on free universities." *Sweezy*, 354 U.S. at 262

---

[19] Letter from Gruenbaum et al., *supra* note 11.

(Frankfurter, J., concurring). That relationship requires "the exclusion of governmental intervention in the intellectual life of a university," a deliberate separation necessary to protect "'the four essential freedoms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 263. Yet the government here seeks to dictate Columbia's institutional decision-making over these areas and more. Simply put, Defendants' demands cannot be reconciled with "the Supreme Court's long-professed, 'deep[] commit[ment] to safeguarding academic freedom' as 'a special concern of the First Amendment.'" *Heim v. Daniel*, 81 F.4th 212, 227 (2d Cir. 2023) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

To its shame, Columbia did not defend its independence, choosing instead to acquiesce to Defendants' demands.[20] Because behavior that is rewarded will be repeated, the university's submission did not satisfy the government. Columbia eventually agreed to a settlement with the

---

[20] Troy Closson, *Columbia Agrees to Trump's Demands After Federal Funds Are Stripped*, N.Y. Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/nyregion/columbia-response-trump-demands.html.

government which fails to restore all the terminated funding, enshrines the restrictive speech code Columbia was coerced into adopting, and leaves hanging the specter of future punishment under continuing federal oversight—further perpetuating the chilling effect of the government's unconstitutional coercion.[21]

## B. The Government's Coercion Flatly Violates the First Amendment.

The administration's railroading of Columbia is not only unlawful, but unconstitutional. Just as Defendants ignored federal anti-discrimination law, so too did they ignore the First Amendment in three specific ways.

First: The government cannot threaten consequences to pressure a private institution into censoring protected student and faculty speech and into refraining from its own protected expressive activity. This basic but vital rule has been well-established law for more than sixty years, beginning with the Supreme Court's recognition in *Bantam Books, Inc. v.*

---

[21] Resolution Agreement Between the United States of America and Columbia University ¶¶7, 8.c, 12 –13, 27 (July 23, 2025), https://president.columbia.edu/sites/president.columbia.edu/files/content/July%202025%20Announcement/Columbia%20University%20Resolution%20Agreement.pdf.

*Sullivan* that extralegal demands from the government—like those levied here against Columbia—present a serious danger to expressive rights. 372 U.S. 58 (1963). Identifying the chilling power of "informal censorship," the Court held that when government officials threaten private actors with "legal sanctions and other means of coercion, persuasion, and intimidation" in an effort to silence speech, they run afoul of the First Amendment just as surely as more straightforward restrictions on speech. *Id.* at 67.

Because government officials are fond of abusing their power to silence others, the lesson of *Bantam Books* bears constant repeating. To that end, in deciding *National Rifle Association of America v. Vullo* less than a year ago, the Court emphatically reaffirmed it: "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." 602 U.S. at 180. *Vullo* involved New York State officials punishing the NRA for its views by warning businesses that engaging with the group meant risking regulatory consequences. That warning, intended to chill, exceeded the constitutional boundary established by *Bantam Books*, which "stands for the principle that a government official cannot do indirectly what she is

20

barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 190.

New York's tactic was successful—and unlawful.[22] But it looks positively genteel in comparison with the wholesale and unabashed shakedown here. "To state a claim that the government violated the First Amendment through coercion of a third party," the *Vullo* Court explained, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. Following their demands that Columbia impose a speech code and abdicate its authority over institutional functions, Defendants concluded their March 13 letter by leaving no doubt about the government's intent: "We expect your immediate compliance with these critical next steps, after which we hope to open a conversation about

---

[22] The pressure is also unlawful even if, as here, the government actor threatens consequences beyond their legal authority. "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

immediate and long-term structural reforms that will return Columbia to its original mission of innovative research and academic excellence."[23] Not only could Defendants' demands "be reasonably understood as conveying a threat of adverse government action," *Vullo*, 602 U.S. at 191, no other understanding is reasonable. The settlement Columbia reached with the government only underscores that.

Second: The government cannot intrude upon private institutions' right to make their own choices about speech. As the Court also reaffirmed just last year, "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. This rule is a corollary to the core principle enshrined in *Bantam Books* and *Vullo*, and equally well-established. In a series of decisions stretching back decades and arising in a variety of contexts—addressing government efforts to dictate expressive choices of private actors like newspapers, parade organizers, and utility companies—the Court held repeatedly that the First Amendment "could not support the government's effort to alter the speaker's own expression." *Id.* at 742 (discussing cases). As with *Bantam Books* and *Vullo*, this rule prevents

---

[23] Letter from Gruenbaum et al., *supra* note 11.

the government from pursuing heavy-handed attempts to rewrite a private institution's rules or impose upon a private entity's choices about the speech it hosts or permits.

It does not matter how righteous or "critical" the government believes its cause to be—here, for example, an overweening desire to assertedly "return Columbia to its original mission of innovative research and academic excellence." The law is clear: "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011). Nor does the government's "failure to persuade" permit it "to hamstring the opposition," *id.* at 578, because the First Amendment prohibits "licensing the government to stop *private actors* from speaking as they wish and preferring some views over others." *Moody,* 603 U.S. at 741.

Just as it is barred from overseeing a private newspaper's editorial choices or a social media platform's content moderation rules, the government may not dictate to Columbia what its academic decisions and policies must permit or forbid. "[A]ny other accommodation—any other system that would supplant private control … with the heavy hand of government intrusion—would make the government the censor of what

the people may read and know." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 260 (1974) (White, J., concurring). So too here. And the corrosive injury inflicted by government control of expressive activity is particularly acute on our nation's campuses. *Amicus* FIRE is well aware of Columbia's checkered record on student and faculty speech and has advocated for an institutional recommitment to free expression for years.[24] But allowing the federal government to administer this "cure" would be worse than the disease.

Third: The government cannot manipulate state funding to silence disfavored or dissenting viewpoints. The government is under no obligation to fund higher education. But having chosen to do so, it must play by applicable constitutional rules.

The Supreme Court long ago concluded it is "plainly mistaken" to argue that because a benefit—here, federal funding—may be considered "a 'privilege' or 'bounty,' its denial may not infringe speech." *Speiser v.*

---

[24] *See, e.g.*, Karen W. Arenson & Tamar Lewin, *A Columbia Expert on Free Speech Is Accused of Speaking Too Softly*, N.Y. Times, https://www.nytimes.com/2006/10/22/nyregion/22columbia.html (Oct. 22, 2006) (noting FIRE's concerns about censorship at Columbia); *see also* FIRE, *Columbia University*, https://www.thefire.org/colleges/columbia-university/cases (collecting FIRE advocacy efforts at Columbia and noting Columbia's poor showing in FIRE's campus free speech rankings).

*Randall*, 357 U.S. 513, 518 (1958). The First Amendment thus forbids government actors like Defendants from imposing unconstitutional conditions, including on funding, to silence disfavored but protected speech. And the government may not "discriminate invidiously in its subsidies in such a way as to 'aim[] at the suppression of dangerous ideas.'" *Regan*, 461 U.S. at 548 (1983) (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)). When subsidies are "'manipulated' to have a 'coercive effect'" on expressive activity, judicial relief is warranted. *Finley*, 524 U.S. at 587.

Here, Defendants explicitly aimed to compel Columbia into action against what the government deems "harassment," under a definition so broad that it reaches core protected speech. Defendants' intent to coerce and manipulate Columbia into censorship by revoking funding could scarcely be clearer. The District of Massachusetts grasped this in *Harvard* in recognizing the "Plaintiffs … established that their members have been and likely will continue to be compelled to forgo certain research and discussion topics or at least parse their words carefully to maximize any chance of maintaining funding." 2025 WL 2528380, at *17.

The government simply cannot create a robust system of higher education funding—for financial aid, research grants, and innovation across medicine, science, agriculture, and industry—then allow the unbounded discretion of political decisionmakers to "distort its usual functioning." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). In other words, the First Amendment does not permit the government to commandeer a system that facilitates expressive activity, like the federal funding of higher education, in "an unconventional way to suppress speech inherent in the nature of the medium." *Id.* at 543.

But that describes Defendants' actions well. The blunt demands the administration forced on Columbia—requiring a speech code and hijacking institutional decision-making—constrict campus speech and infringe on the university's autonomy. Those demands thus fundamentally contradict "the important and substantial purposes of the University, which seeks to facilitate a wide range of speech." *Bd. of Regents of the Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 231 (2000). Allowing the government to "impose [a] strait jacket upon the intellectual leaders in our colleges and universities" by withholding funding to coerce and control institutions like Columbia would be more than

26

unconstitutional; it "would imperil the future of our Nation." *Sweezy*, 354 U.S. at 250.

The suggestion below, SA25, that Columbia could replace massive federal funding cuts with endowment or tuition funds—even if true—does not vitiate the First Amendment violation or the injuries Plaintiffs' members will sustain. First, the constitutional violation was complete once the jawboning occurred, regardless of how Columbia reacted. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) ("such a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent"). And the factual premise is flawed in any event. As the *Harvard* court explained, "even if the Court were to accept … that Harvard could theoretically bridge the gap for all $2.2 billion in terminated grants," the Plaintiffs' members "will still experience concrete harm by virtue of the grant terminations." 2025 WL 2528380, at *17; *see also Thakur*, 2025 WL 1734471, at *23 (rejecting the government's argument that universities could use their own funds to cover the cuts to their federal funding because the government's actions were "likely to cause a predictable

disruption to Plaintiffs' research" which is "sufficient for causation and redressability").

Federal grants have immense value in academia beyond financing recipients' research. For example, federal grants impact tenure decisions because receipt of a federal grant indicates the peer-reviewed caliber of the recipient's work. *See Harvard*, 2025 WL 2528380, at *17. And "the loss of the opportunity to be a principal investigator on a federal, peer-reviewed grant is *solely* traceable to the grant funding terminations." *Id.* (emphasis added). Plaintiffs therefore "successfully alleged that their members will suffer harm to their research as well as their careers by virtue of losing the opportunity to work with and receive funding from the federal government." *Id.* The government's punishment of Columbia prefigured and mirrored its attack on Harvard. There, as here, the brazen lawlessness of the government's conduct rendered it "entirely predictable" that its actions would "immediately and directly harm" faculty members like those belonging to Plaintiffs. *Id.*

## II. Flagrant Government Coercion Will Destroy Our Universities If Left Unchecked.

Like a bully raising a fist, the administration blows past boundaries, daring someone to stop it. So this case presents a test: Do

28

Title VI's implementing regulations still mean what they say? Does the First Amendment still protect teaching, scholarship, and speech at our colleges and universities from political interference? Does Columbia still possess the long-recognized "autonomy that bars legislatures (and courts) from imposing conditions on the spectrum of subjects taught and viewpoints expressed" on its campus? *Southworth*, 529 U.S. at 239 (Souter, J., concurring). This Court's answer will resonate beyond the instant dispute.

That's because after coercing Columbia into compliance, the government, like most bullies, moved on to its next targets to apply the same aggressive pressure.[25] In recent months, the President has gone even further, freezing billions of dollars in federal funding and threatening Harvard University with loss of its tax-exempt status.[26]

---

[25] *See, e.g.*, Michael C. Bender & Sheryl Gay Stolberg, *Trump Administration Freezes $1 Billion for Cornell and $790 Million for Northwestern, Officials Say*, N.Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/cornell-northwestern-university-funds-trump.html.

[26] In a model decision, the District of Massachusetts held the *Harvard* organizational plaintiffs—including AAUP—had standing and vacated the termination of federal grants as violative of the First Amendment and Title VI. 2025 WL 2528380, at *15, 18, 38.

Why? Simply because it had the gall to refuse to accede to a disturbingly detailed and sweeping set of demands for institutional control that would essentially leave Harvard a vassal of the federal government.[27] Taken in sum, there is no doubt that if left unchecked Defendants' unlawfully coercive actions will destroy American colleges and universities, starting with Columbia.

*Amicus* FIRE issues this warning as an honest broker. Having defended student and faculty expressive rights on campuses nationwide since 1999, FIRE knows well that institutions like Columbia all too often fail to honor their promises, such as that to be "a place for received wisdom and firmly held views to be tested, and tested again."[28] As a

---

[27] Tyler Pager, Andrew Duehren, Maggie Haberman & Jonathan Swan, *Trump Threatens Harvard's Tax Status, Escalating Billion-Dollar Pressure Campaign*, N.Y. Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/politics/trump-harvard-tax-status.html; Vimal Patel, *Trump Administration Will Freeze $2 Billion After Harvard Refuses Demands*, N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/us/harvard-trump-reject-demands.html; *see also* Angel Eduardo, *Harvard's resistance to Trump is a model for US universities*, FIRE (Apr. 16, 2025), https://www.thefire.org/news/harvards-resistance-trump-model-us-universities.

[28] *See Rules of University Conduct*, Columbia Univ., *available at* https://www.thefire.org/sites/default/files/2022/01/14105506/Rules-of-University-Conduct-Columbia-University-Policies.pdf.

proudly nonpartisan watchdog, FIRE has successfully fought for students and faculty across the ideological spectrum, including through litigation, against campus administrators wielding broad, censorial speech codes.[29] But because colleges and universities play a vital role in preserving free thought within a free society, FIRE has also taken on threats to student and faculty expression originating beyond campus, in statehouses and our nation's capital.

To that end, FIRE challenged the federal government when it sought to expand the definition of discriminatory harassment in ways that force colleges to violate student and faculty speech rights. For example, under President Obama, the Departments of Justice and Education entered a May 2013 resolution agreement with the University of Montana following federal investigation into its policies and practices governing sexual harassment and assault. The findings letter, which

---

[29] *See, e.g.*, *Tex. A&M Queer Empowerment Council v. Mahomes*, No. 25-992, 2025 WL 895836 (S.D. Tex. Mar. 24, 2025) (securing preliminary injunction against campus ban on student drag shows); *Flores v. Bennett*, No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) (affirming preliminary injunction against college policy on behalf of conservative student group banned from hanging pro-life flyers on college bulletin boards); *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017) (affirming permanent injunction against university policy used to censor marijuana legalization advocacy group).

referred to the agreement as "a blueprint for colleges and universities throughout the country to protect students from sexual harassment and assault," explained the Departments' interpretation of applicable legal standards, and the terms of the agreement defined sexual harassment as "any unwelcome conduct of a sexual nature," including "verbal" conduct.[30]

As FIRE explained in congressional testimony,[31] and in correspondence with the Departments,[32] the federal "blueprint" definition sharply broke with that the Supreme Court articulated in *Davis v. Monroe County Board of Education*, defining harassment as conduct so "severe, pervasive, and objectively offensive" it effectively

---

[30] Letter from Anurima Bhargava, Chief, C.R. Div., U.S. Dep't of Justice, and Gary Jackson, Reg'l Dir., Off. for C.R., U.S. Dep't of Educ., to Royce Engstrom, President, Univ. of Mont., and Lucy France, Univ. Counsel, Univ. of Mont. (May 9, 2013), *available at* http://www.justice.gov/opa/documents/um-ltr-findings.pdf.

[31] First Amendment Protections on Public College and University Campuses: Hearing Before the H.R. Comm. on the Judiciary, Subcomm. on the Const. & Civ. Just., 115th Cong. (2017), https://docs.house.gov/meetings/JU/JU10/20170404/105828/HHRG-115-JU10-Wstate-LukianoffG-20170404.pdf.

[32] Letter from FIRE et al. to Anurima Bhargava, Chief, C.R. Div., U.S. Dep't of Justice, and Seth Galanter, Acting Assistant Sec'y for C.R., Off. for C.R., U.S. Dep't of Educ. (July 16, 2013), https://www.thefire.org/research-learn/fire-coalition-letter-departments-education-and-justice-july-16-2013.

denies students access to an educational opportunity or benefit. 526 U.S. at 650. Unlike that *Davis* definition, defining sexual harassment as "unwelcome conduct of a sexual nature" conditioned the permissibility of speech entirely on the subjective reaction of the listener—a flaw courts have repeatedly held violates the First Amendment.[33] Following FIRE's advocacy, the Departments backed away from the definition.[34] But the damage was done; colleges and universities nationwide had already rushed to alter their policies to comply.[35]

---

[33] *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008) (university harassment policy without requirement speech be objectively offensive provided "no shelter for core protected speech").

[34] *'Blueprint' No More? Feds Back Away from New Campus Speech Restrictions*, FIRE (Nov. 21, 2013), https://www.thefire.org/news/blueprint-no-more-feds-back-away-new-campus-speech-restrictions.

[35] Will Creeley, *A Year Later, Impact of Feds' 'Blueprint' Comes into Focus*, FIRE (Aug. 28, 2014), https://www.thefire.org/news/year-later-impact-feds-blueprint-comes-focus. This is why FIRE participated in notice-and-comment rulemaking at the Department of Education during President Trump's first term, urging restoration of the *Davis* definition, and why it praised the administration when its final rule did so. *Education Dept. issues new Title IX regs with crucial campus due process protections, adopts Supreme Court sexual harassment definition*, FIRE (May 6, 2020), https://www.thefire.org/news/education-dept-issues-new-title-ix-regs-crucial-campus-due-process-protections-adopts-supreme.

That episode and others inform FIRE's advocacy because they illustrate how the government's sweeping power under federal anti-discrimination law may be abused to force colleges to censor protected speech on campus. When the feds say jump, colleges typically ask "how high?" But as serious of a threat as the "blueprint" presented, it pales in comparison to that posed by Defendants' lawless and unconstitutional coercion here.

In reaching an agreement with the University of Montana, however constitutionally flawed, the Obama administration's Departments of Education and Justice at least followed statutorily prescribed procedures. They did not, as Defendants have here, unilaterally freeze funding in an attempt to break the institution's will or seek federal oversight and control of institutional decision-making regarding admissions or academic departments. If not stopped, the government's aggressive attempt to coerce and capture Columbia will serve as a new "blueprint" that Defendants can export to other campuses and that future administrations can likewise use to exert expansive control over institutions in a manner the law and the First Amendment deny.

"The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603. For more than sixty years, courts have recognized that the "essentiality of freedom in the community of American universities is almost self-evident." *Sweezy*, 354 U.S. at 250. To protect that essential freedom, courts generally defer to the academy and are loath to interfere with the independence of colleges and universities. *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (noting judicial "reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom"); *Levin v. Harleston*, 966 F.2d 85, 88 (2d Cir. 1992) (acknowledging "great reluctance with which this court intrudes upon the decisions of a university administration"). But the current administration does not share that reluctance. So this Court must answer in turn and act now to protect our institutions of higher education from the vandalism of federal overreach and coercion.

## CONCLUSION

The administration's actions are indefensible violations of the First Amendment's protection of freedom of expression, freedom of association, and academic freedom. For that and all the foregoing reasons, this Court should reverse the district court's dismissal of Plaintiffs' complaint and remand the case for further proceedings.

Dated: September 29, 2025

Respectfully Submitted,

/s/ *Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

Counsel for *Amicus Curiae*

36

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,880 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: September 29, 2025          /s/ *Ronald G. London*
                                                    Ronald G. London

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 29, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the ACMS system, and that all parties will be served through that system pursuant to Local Rule 25.1(h)(2).

/s/ *Ronald G. London*
Ronald G. London